SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. Thomas Zingis (A-66-21) (087132)**

**Argued March 26, 2024 -- Decided August 8, 2024**

**NORIEGA, J., writing for a unanimous Court.**

In State v. Cassidy, 235 N.J. 482, 486 (2018), the Court addressed the consequences of then-Sergeant Marc Dennis's certification of improperly conducted calibration checks of certain Alcotest machines "used to determine whether a driver's blood alcohol content is above the legal limit," which called into question over 20,000 Alcotest results. In this appeal, the Court addresses issues arising from the notification procedure required after Cassidy.

In August 2018, defendant Thomas Zingis was charged with careless driving and driving while under the influence (DWI). He had a prior DWI conviction in April 2012. In December 2018, a trial was held in the municipal court and Zingis was found guilty of DWI. The State requested that Zingis be sentenced as a second offender due to his April 2012 DWI conviction. Relying on Cassidy, Zingis argued that his first conviction should be disregarded for sentencing purposes because the State failed to prove beyond a reasonable doubt that his 2012 DWI conviction was not predicated on a Dennis-calibrated Alcotest. The State responded by asserting that (1) Camden was not one of the Dennis-affected counties, and (2) Zingis's failure to receive notice, consistent with this Court's order in Cassidy, was proof that he was not a Dennis-affected defendant.

The municipal court accepted the prosecutor's representation and sentenced Zingis as a second DWI offender. On appeal, the Law Division also found Zingis guilty of DWI and rejected his request to be sentenced as a first-time offender.

The Appellate Division affirmed Zingis's conviction but vacated the enhanced sentence. 471 N.J. Super. 590, 608 (App. Div. 2022). The Appellate Division held that the State failed to prove beyond a reasonable doubt that Zingis's 2012 DWI conviction was not based on an inadmissible Alcohol Influence Report (AIR). Id. at 607. The Court granted certification and remanded the matter to a Special Adjudicator for a plenary hearing on two questions: (1) which counties were affected by Dennis's conduct, and (2) what notification was provided to defendants affected by Dennis's conduct. 251 N.J. 502 (2022).

1

The Special Adjudicator filed a comprehensive 370-page report detailing his findings of fact and conclusions of law, which the Court summarizes. The parties largely agree with the Special Adjudicator's findings and conclusions. Relevant to this appeal, there are two areas of disagreement: (1) the availability of Exhibit S-152 -- a 180-page Excel Spreadsheet that sets forth solution changes and calibrations on all Alcotest Instruments in New Jersey from November 5, 2008 through June 30, 2016 -- and (2) the proper procedure for challenging a prior Dennis-affected DWI conviction when facing enhanced sentencing on a subsequent DWI.

The State asks the Court to accept the Special Adjudicator's factual findings and recommendations with two exceptions: (1) Exhibit S-152's availability should be limited; and (2) the validity of a prior DWI should be pursued through PCR in the municipal court where the prior conviction occurred and not be litigated at sentencing for a successive DWI. The State agrees with the Special Adjudicator that prior to seeking an enhanced DWI sentence, it must inform defendants "that a prior DWI conviction it intends to" rely on "was potentially affected by Dennis's malfeasance." The State contends, however, that this notification obligation extends only to cases confirmed to be Dennis-affected cases, not those in which there is no known evidence that would justify overturning convictions on PCR.

**HELD:** The Court now resolves those limited areas in which the parties could not agree regarding the implementation of the Special Adjudicator's findings and legal conclusions: (1) the proper procedure for challenging a prior Dennis-affected DWI conviction when facing enhanced sentencing on a subsequent DWI; and (2) the appropriate availability of Exhibit S-152.

1. During the initial conference for a DWI matter, the court shall inquire whether the pending matter represents the first or subsequent DWI for a defendant. If the record reflects that the defendant has a prior conviction for DWI, the prosecutor must inform the court, defendant, and defense counsel whether it occurred between the critical dates of November 5, 2008 and April 2016. If so, the court must then schedule a discovery conference for the State to fulfill its obligation and provide to the defendant and counsel, as well as the court, discovery indicating whether the defendant is a Dennis-affected defendant. The prosecutor will accomplish this by using the summons number from the earlier offense to search Exhibit S-152, which will be redacted to include only non-personal identifying information. Once the corresponding entry is located within Exhibit S-152, the prosecutor is to "copy and paste" that row of data into a new document. The AIR number from that entry must then be compared against the Dennis Calibration Repository, which shall be made publicly available by placing it on a State website and shall also be summarized in a Dennis AIR Summary sheet. If the State determines that the defendant's prior offense involved a Dennis-affected Alcotest Instrument that produced an evidential BAC reading, corroborated by Exhibit S-152 and the Dennis AIR Summary sheet,

2

judges should afford the defendant a reasonable amount of time to decide whether to challenge the prior conviction. If the defendant wishes to challenge that earlier conviction, the defendant shall do so by filing for PCR in the jurisdiction of the previous conviction. If the defendant, after being made aware of the existence of a Dennis-affected matter, chooses to proceed without challenging the earlier conviction, the court will inquire on the record that the defendant's decision is knowing and voluntary, and the matter may proceed in the usual course. The Court calls on judges to resolve PCRs and related new matters as expeditiously as possible. The Court provides detailed guidance on all of these points. (pp. 18-23)

2. With regard to Exhibit S-152, the Court adopts a process that balances the State's concerns for privacy with defendants' due process need for notification. Once a summons number is cross-referenced in Exhibit S-152, it shall be provided to the defendant and defense counsel in discovery. Through that process, the defendant and counsel can see the date and location of offense, summons number, and the defendant's name. The prosecutor must then use the summons number to search Exhibit S-152. Therefore, Exhibit S-152 in its newly redacted form, excluding all personal identifiers, must be publicly released on the State's website. The prior disposition, along with the complete row of data from Exhibit S-152 and the Dennis AIR Summary sheet, together will be deemed proof beyond a reasonable doubt of whether a defendant's prior DWI conviction is a Dennis-affected matter. (pp. 23-25)

3. The Court adopts the remainder of the Special Adjudicator's findings, which are supported by substantial credible evidence in the record. (p. 25)

      **AFFIRMED and REMANDED.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, PIERRE-LOUIS, WAINER APTER, and FASCIALE join in JUSTICE NORIEGA's opinion.**

3

SUPREME COURT OF NEW JERSEY
A-66 September Term 2021
087132

State of New Jersey,

Plaintiff-Appellant,

v.

Thomas Zingis,

Defendant-Respondent.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
471 N.J. Super. 590 (App. Div. 2022).

| Remanded | Special Adjudicator Report |
|---|---|
| July 28, 2022 | September 15, 2023 |
| Argued | Decided |
| March 26, 2024 | August 8, 2024 |

Regina M. Oberholzer, Deputy Attorney General, argued the cause for appellant (Matthew J. Platkin, Attorney General, attorney; Regina M. Oberholzer and Robyn B. Mitchell, Deputy Attorney General, of counsel and on the briefs).

Michael B. Cooke argued the cause for respondent (Michael B. Cooke and The Hernandez Law Firm, attorneys; Michael B. Cooke and Steven Hernandez, on the briefs).

Michael R. Noveck, Assistant Deputy Public Defender, argued the cause for amicus curiae Public Defender of

1

New Jersey (Jennifer Sellitti, Public Defender, attorney; Michael R. Noveck, of counsel and on the brief).

Jeffrey Evan Gold argued the cause for amicus curiae New Jersey State Bar Association (Timothy F. McGoughran, President, New Jersey State Bar Association, attorneys; Timothy F. McGoughran, of counsel, and Jeffrey Evan Gold, on the brief).

JUSTICE NORIEGA delivered the opinion of the Court.

This case calls upon this Court to revisit the consequences that remain from then-Sergeant Marc Dennis's certification of improperly conducted calibration checks of certain Alcotest machines "used to determine whether a driver's blood alcohol content is above the legal limit," which called into question over 20,000 Alcotest results. State v. Cassidy, 235 N.J. 482, 486 (2018). Specifically, defendant Thomas Zingis's matter illuminates a flaw in the notification procedure required after our Cassidy decision.

All parties to this matter have made significant efforts to reach consensus in order to arrive at a fair resolution. With the comprehensive and extraordinary work the Special Adjudicator performed in this case, there remain only two issues on which the parties still have lasting concerns. We now resolve those issues.

I.

We briefly highlight the following facts from the record. We rely heavily on Special Adjudicator's comprehensive report for the full details of the present case and those events predating it.

A.

On August 27, 2018, a Berkeley Township patrolman stopped defendant Thomas Zingis for driving his motorcycle erratically. During the traffic stop, the patrolman became suspicious that Zingis was under the influence and asked him to perform a field sobriety test. Based on his observations, the patrolman concluded Zingis was under the influence of alcohol and arrested him. Zingis was charged with careless driving and driving while under the influence (DWI), contrary to N.J.S.A. 39:4-50. Notably, he had a prior DWI conviction in April 2012 from Collingswood in Camden County.

In December 2018, a trial was held in the municipal court and Zingis was found guilty of DWI. The State requested that Zingis be sentenced as a second offender, pursuant to N.J.S.A. 39:4-50(a)(2), due to his April 2012 DWI conviction. Zingis opposed the State's sentencing recommendation. Relying on our decision in Cassidy, Zingis argued that his first conviction should be disregarded for sentencing purposes because the State failed to prove beyond a reasonable doubt that his 2012 DWI conviction was not

3

predicated on a Dennis-calibrated Alcotest.  The State responded by asserting that (1) Camden was not one of the Dennis-affected counties, and (2) Zingis's failure to receive notice, consistent with this Court's order in Cassidy, was proof that he was not a Dennis-affected defendant.

The municipal court accepted the prosecutor's representation and sentenced Zingis as a second DWI offender pursuant to N.J.S.A. 39:4-50. Zingis successfully moved to stay his sentence pending his appeal to the Law Division.

### B.

In October 2020, Zingis appealed to the Law Division.  Following a trial de novo, the Law Division also found Zingis guilty of DWI and rejected his request to be sentenced as a first-time offender.  Relying on the Special Adjudicator's report in Cassidy, the trial judge found that Dennis's misfeasance was limited to Middlesex, Monmouth, Ocean, Somerset, and Union Counties.  The trial judge also viewed the State's failure to notify Zingis of his status as a Dennis-affected defendant to be outcome determinative.

### C.

Zingis appealed his conviction and sentence to the Appellate Division. In a published opinion, the court rejected the State's two arguments that (1)

Zingis's prior conviction was not tainted because his name did not appear on the Attorney General's list of Dennis-affected defendants, and (2) Dennis's misconduct did not affect any DWI convictions in Camden County. State v. Zingis, 471 N.J. Super. 590, 606 (App. Div. 2022). The court determined that both the municipal court and the Law Division erred in accepting the prosecutor's assertion and ultimately affirmed the conviction but vacated the enhanced sentence. Id. at 608.

The Appellate Division held that the State failed to prove beyond a reasonable doubt that Zingis's 2012 DWI conviction was not based on an inadmissible Alcohol Influence Report (AIR). Id. at 607. In doing so, the court found that the record did not contain "evidence with respect to how the Attorney General's list . . . was compiled and whether it definitively includes all DWI convictions tainted by Dennis's malfeasance." Id. at 606. Moreover, the court noted that the record lacked support for the prosecutor's assertions and in some instances undermined the State's proffer that all Dennis-affected defendants had been notified. Id. at 606-07. The Appellate Division reasoned that in future cases the State may meet its burden to prove beyond a reasonable doubt that a DWI defendant was not convicted in the first instance based on a faulty AIR with a "more robust record." Id. at 607. Accordingly, the appellate

court remanded to the municipal court to resentence Zingis as a first-time offender. Id. at 608.

The State moved for reconsideration, arguing for the first time that Cassidy imposes an obligation on defendants to seek post-conviction relief (PCR) for any DWI conviction defendants believed to be tainted by an inadmissible AIR, while relieving the State from any burden to prove that a prior DWI conviction was not tainted when seeking a sentencing enhancement.

The Appellate Division considered and rejected both arguments. In its order and statement of reasons, the appellate court found that a defendant's failure to seek PCR should not insulate a prior conviction from scrutiny if the State later aims to rely on it. The court found that the State's position had no support under Cassidy, particularly its argument that it had no obligation to prove whether a prior DWI conviction was premised upon tainted evidence. The court also held that the State's argument that defendants could easily search the publicly available Alcotest Inquiry System (AIS) contradicted its representation to the Law Division court that proving a prior conviction was not tainted by Dennis would be "almost impossible."

### D.

We granted the State's petition for certification and motion to stay. 251 N.J. 502 (2022). We remanded the matter to retired Appellate Division Judge

Robert A. Fall as a Special Adjudicator for a plenary hearing to consider and decide two questions: (1) which counties were affected by Dennis's conduct, and (2) what notification was provided to defendants affected by Dennis's conduct. Ibid. We instructed that the Special Adjudicator had the discretion to address any other relevant issues. We invited the Office of the Public Defender (OPD) to participate as amicus curiae. Ibid. The Special Adjudicator granted the New Jersey State Bar Association's (NJSBA) motion to appear as amicus curiae.

After briefing and plenary hearings, the Special Adjudicator filed a comprehensive 370-page report detailing his findings of fact and conclusions of law. Expanding on the two questions in the order from this Court, the Special Adjudicator divided the issues further and concluded, in summary, the following:

> (1) the State did not identify all individuals who were requested to provide breath samples on Alcotest instruments calibrated by Dennis during the relevant time period;
>
> (2) the classification of those defendants entitled to notification of the Court's decision in Cassidy is limited to those who were requested to provide breath samples on an Alcotest instrument calibrated by Dennis that resulted in the reporting of an evidential blood alcohol content (BAC) reading;

7

(3) the State did not fully provide the ordered notification to all defendants affected by the Court's decision in Cassidy;

(4) there are solutions available that should be implemented to better assure the proper identification of those individuals who have provided breath samples on Alcotest instruments calibrated by Dennis and to provide those individuals with additional notification:

> (a) the use of the proposed "Dennis Calibration Repository," in conjunction with Exhibit S-152, is the best available method of determining whether an individual was requested to provide breath samples on an Alcotest instrument calibrated by Dennis and an evidential BAC was obtained;

> (b) where an enhanced sentence is sought for a DWI conviction on the basis of a prior DWI conviction, the State should be required to provide discovery to defendant and counsel regarding the applicability of a Dennis-affected matter;

> (c) where a defendant files an application seeking PCR based on the Court's ruling in Cassidy contending he is a Dennis-affected defendant, discovery should be provided from Exhibit-152 and Exhibit-28, under a protective order, regarding that original conviction;

> (d) the State's recommendations regarding additional notification to those individuals identified as Dennis-affected defendants, who have been omitted from several of the spreadsheets produced, are persuasive and should be accomplished.

8

With the case before us once more, the parties largely agree with the Special Adjudicator's findings and conclusions.  Relevant to this appeal, there are two areas of disagreement:  (1) the availability of Exhibit S-152[1] and (2) the proper procedure for challenging a prior Dennis-affected DWI conviction when facing enhanced sentencing on a subsequent DWI.

A.

The State asks this Court to accept the Special Adjudicator's factual findings and recommendations with the following exceptions:  (1) Exhibit S-152's availability should be limited; and (2) any suggestion that the validity of a prior DWI may be litigated at sentencing for a successive DWI should be rejected.  Instead, the State contends that such a challenge must be pursued through PCR in the municipal court where the prior conviction occurred.

First, with respect to the availability of Exhibit S-152, the State objects to the Special Adjudicator's recommendation that the document be released publicly subject to a protective order as determined by the Court.  The State asserts that privacy concerns would remain in the face of such an order.

---

[1] Exhibit S-152 is an Excel Spreadsheet that sets forth solution changes and calibrations on all Alcotest Instruments in New Jersey from November 5, 2008 through June 30, 2016.  It contains 236,664 subject test records and comprises 25,180 pages.

Namely, the State contends that Exhibit S-152 contains sensitive identifying information of those who are confirmed not to be a Dennis-affected defendant, contrary to this Court's requirement in State v. Chun, 194 N.J. 54 (2008), that sensitive information be redacted in the public AIS. The State argues further that merely subjecting Exhibit S-152 to a protective order would still expose the document to significantly more individuals than currently have access, which the State asserts stands at around twenty-five people across the state. The State argues access to Exhibit S-152 should be limited to "County Prosecutors' Municipal Prosecutor Liaisons -- or another designated Assistant Prosecutor in the County Prosecutors' Offices" -- and not extended to municipal prosecutors, defendants, defense counsel, or the general public.

Second, the State agrees with the Special Adjudicator that prior to seeking an enhanced DWI sentence, it must inform defendants "that a prior DWI conviction it intends to" rely on "was potentially affected by Dennis's malfeasance." The State contends, however, that this notification obligation extends only to cases confirmed to be Dennis-affected cases, not those in which there is no known evidence that would justify overturning convictions on PCR. The State avers that its notification obligation may be satisfied using the Dennis Calibration Repository and a certification from the Municipal

10

Prosecutor Liaison or the assigned Assistant Prosecutor who maintains Exhibit S-152 for each county, as an officer of the court.

The State disagrees with the Special Adjudicator's report to the extent that the report recommends that the validity of a prior DWI conviction should be litigated at sentencing on a subsequent DWI conviction. The State asserts that any such challenge can proceed only by filing a petition for PCR in the court in which the prior conviction occurred. It further contends that if a defendant first becomes aware of grounds to challenge the validity of a prior DWI in a subsequent DWI case, the second DWI case should be stayed pending the PCR process. According to the State, this Court acknowledged this procedure in Cassidy and thus, it should be adopted here.

B.

Zingis asks us to affirm the Appellate Division's judgment that he should be sentenced as a first-time offender. He asserts that the State must prove beyond a reasonable doubt that prior DWI convictions being used to impose enhanced penalties or otherwise relied upon in subsequent cases are not Dennis-affected cases. He argues that the State failed to prove beyond a reasonable doubt that his prior DWI conviction was not a Dennis-affected conviction. Zingis further contends that nothing in Cassidy, or any other source cited by the State, limits defendants' relief to PCR applications.

11

C.

Amicus curiae the New Jersey State Bar Association (NJSBA) agrees with the Special Adjudicator's proposed solution of using the Dennis Calibration Repository and Exhibit S-152 to identify Dennis-affected defendants and argues that in discovery, the State must disclose "whether or not Dennis was involved in any predicate DWI related offense that occurred during Dennis's tenure." NJSBA asserts that, to the extent the Special Adjudicator recommends that an individual must file for PCR prior to obtaining <u>any</u> access to the documents, <u>Cassidy</u> does not require the filing of a PCR application "to get notice that Dennis was involved." It contends that such a requirement would result in unnecessary PCR applications.

NJSBA requests that this Court reject the State's proposed modifications to the Special Adjudicator's recommendation of subjecting Exhibit S-152 to a protective order. It contends that (1) Exhibit S-152 should be accessible to defense counsel to allow independent review and that, to account for the State's privacy concerns, an online version could be subject to a protective order through implementing a "click through certification"; and (2) AIS is not a solution to quickly confirm whether Dennis was involved. It also asks that the Court make a partially redacted version of Exhibit S-152 publicly available

-- removing Name, Driver License Number, Issuing State-- to end the <u>Cassidy</u>

notice issue.[2]

D.

Amicus curiae OPD disagrees with the State that the State may satisfy its

notification obligation with a certification by the prosecutor.  It argues instead

that the State should be required to provide the actual data contained in Exhibit

S-152 pertinent to a defendant facing an enhanced sentence or other collateral

penalties based on a prior DWI conviction with an arrest date between

November 5, 2008 and April 9, 2016.  OPD proposes that the State use this

data to make a prima facie showing that the prior matter was not adjudicated

based on an Alcotest reading from a Dennis-calibrated machine, and failure to

make this showing should result in waiver of any sentencing enhancement.  As

to the issue of PCR, OPD agrees with the State that any challenge to a Dennis-

affected conviction must be made through PCR in the court where the prior

---

[2]  After oral argument, NJSBA drew the Court's attention to the United States
Supreme Court's decision in <u>Erlinger v. United States</u>, 602 U.S. ___, 144 S.
Ct. 1840 (2024), in which the Court held that whether a defendant's prior
convictions were "committed on occasions different from one another" for
purposes of 18 U.S.C. § 924(e)(1) must be decided by a unanimous jury, not
by a judge at sentencing.  <u>See</u> 144 S. Ct. at 1851-52.  <u>Erlinger</u> did not hold that
the existence of a prior conviction must be found by a unanimous jury, and it
is thus not relevant to our disposition here.

13

conviction occurred. OPD also submits that Zingis should be sentenced as a first-time offender because the prosecutor's assertions about notice and affected counties in this case were incorrect.

III.

A.

The Law Division reviews municipal court judgments de novo. R. 3:23-8(a)(2). Appellate courts "focus[] on whether there is 'sufficient credible evidence . . . in the record' to support the [Law Division's] findings." State v. Robertson, 228 N.J. 138, 148 (2017) (omission in original) (quoting State v. Johnson, 42 N.J. 146, 162 (1964)). However, legal rulings are reviewed de novo and not afforded any deference. Ibid. Likewise, when faced with an appeal dealing with a special adjudicator's report, the Court owes no deference to a special adjudicator's legal conclusions but will generally defer to a special adjudicator's credibility findings regarding the testimony of expert witnesses. Cassidy, 235 N.J. at 491. "The Court also accepts the fact findings of a special [adjudicator] to the extent they are supported by 'substantial credible evidence in the record.'" Ibid. (quoting Chun, 194 N.J. at 93).

B.

Rule 7:10-2 governs PCR in municipal court and dictates that any petition for PCR that is not based upon correcting an illegal sentence "shall not

14

be accepted for filing more than five years after entry of the judgment of conviction or imposition of the sentence sought to be attacked." R. 7:10-2(b)(2). But we note that, in Cassidy, we lifted the stay on pending cases and relaxed Rule 7:10-2(b)(2)'s five-year time bar given that "the State waited approximately a year to notify the [defendants affected by a Dennis-calibrated Alcotest]." 235 N.J. at 498.

## IV.

We resolve the limited areas in which the parties could not agree regarding the implementation of the Special Adjudicator's findings and legal conclusions. We begin with a brief review of the Special Adjudicator's two conclusions over which the parties have remaining concerns: (1) the proper procedure for challenging a prior Dennis-affected DWI conviction when facing enhanced sentencing on a subsequent DWI; and (2) the appropriate availability of Exhibit S-152.

First, the Special Adjudicator concluded that when the State seeks an enhanced DWI sentence premised upon a prior DWI conviction that is potentially open to challenge as a Dennis-affected case, "the State has the obligation to provide a defendant . . . information and documentation, prior to imposing any sentence, whether the DWI conviction did, or did not, involve an evidential BAC reading obtained from breath samples provided on an Alcotest

15

Instrument calibrated by Sergeant Dennis." The Special Adjudicator also found that "an Alcotest Instrument reporting an 'Error Message' and, consequently, no BAC reading, has nothing to do with the fact that Sergeant Dennis calibrated a particular Alcotest Instrument, which is only relevant when an evidential BAC reading was produced." Thus, the Special Adjudicator concluded that "an AIR producing a 'Test Result' that the 'Subject Refused' can be admissible in evidence during a Refusal prosecution."

The Special Adjudicator held that in order to determine whether a defendant is a Dennis-affected defendant, the State should use the Dennis Calibration Repository in conjunction with Exhibit S-152, and that sentencing should not proceed until the State provides the Dennis Calibration Repository and Exhibit S-152 to the defendant, counsel, and the court. The Special Adjudicator also found that this burden applies equally to circumstances in which a defendant files an application for PCR based on the Court's ruling in Cassidy.

To facilitate the exchange of discovery where there is the possibility of a Dennis-affected prior DWI, the Special Adjudicator outlined a procedure relying on Zingis's case as an example:

> First, conducting a search of [Exhibit S-152] discloses, on Row 75536, that Thomas Zingis was arrested on January 13, 2012 (Column A), in the Borough of Collingswood (Column S), in Camden County, and

16

charged with DWI. . . . Mr. Zingis provided breath samples on Alcotest Instrument ARUM-0042 (Column B), located at the Collingswood Police Station (Column D), calibrated on October 13, 2011 (Column C), which resulted in an evidential BAC reading of 0.178 (Column U). Turning to [the Dennis Calibration Repository], a review of same discloses that Alcotest Instrument ARUM-0042 is not an Instrument that was calibrated by Sergeant Dennis.

Second, due to sensitive personal information contained within Exhibit S-152, the Special Adjudicator concluded it should be subject to a protective order, available "for access by municipal courts, Superior Courts, Prosecutors, Public Defenders, Defense Counsel and unrepresented Cassidy-affected defendants when either postconviction relief or enhanced sentencing is sought." Regarding the notification issues that have arisen repeatedly in this matter since Dennis's misfeasance was discovered in 2015, the parties have all acknowledged the ineffectiveness of identifying new addresses and seeking out individuals who have heretofore been unidentifiable.[3] Therefore, the Special Adjudicator held that it will be incumbent upon the State to identify these

---

[3] The Special Adjudicator noted in his findings that "the State has expressed a willingness to mail the second post-Cassidy notification letter to the addresses secured by the AOC for some of those potentially affected defendants who had been omitted from Exhibit S-90 (also Exhibit S-148), and consequently omitted from both Exhibits S-91 and S-83." We agree with the Special Adjudicator's conclusion that this should be accomplished and that the State should proceed with notifying this omitted group of individuals.

individuals when they face collateral consequences from a potentially Dennis-affected conviction. Be it in municipal court or in the Law Division, a collateral consequence that stems from a prior DWI conviction during the period of Dennis's misfeasance raises responsibilities and burdens that the Special Adjudicator concluded the State must now address.

To give effect to those conclusions, we adopt the following measures.

A.

We order that in any case in which the State seeks an enhanced sentence based on a prior DWI conviction with an arrest date between November 5, 2008 and April 9, 2016, the State must inform the court, defendant, and defense counsel whether defendant's prior DWI conviction involved a Dennis-calibrated Alcotest. The State shall rely upon a combination of the publicly accessible Exhibit S-152 and the Dennis Calibration Repository. As discussed more thoroughly below, the State must provide all defendants with a prior DWI during the effective dates the row of Exhibit S-152 that corresponds to that defendant's prior arrest. Given the fallibility of the notification procedures post-Cassidy, the parties will now be entitled to discovery, which is already readily available and capable of unearthing the procedural irregularities caused by Dennis's misfeasance. Such transparency and safeguards will both (1) allow the State to prove beyond a reasonable doubt

18

whether a defendant is an affected defendant, permitting them to confidently discharge their duty in seeking sentencing enhancements when permitted by law, and (2) enable defendants to defend against such claims.

By statute, municipal prosecutors must review a defendant's prior driving history in order to determine whether a DWI represents their first or subsequent offense before recommending whether enhancements may apply. N.J.S.A. 2B:25-5.1. Thus, the municipal prosecutor will be able to identify whether a defendant's prior record reflects a DWI conviction during the relevant timeframe for a Dennis review.

We now order that during the initial conference for a DWI matter, the court shall inquire whether the pending matter represents the first or subsequent DWI for a defendant. If the record reflects that the defendant has a prior conviction for DWI, the prosecutor must inform the court, defendant, and defense counsel whether it occurred between the critical dates of November 5, 2008 and April 2016, information readily available to the State in the defendant's abstract. If so, we now order that the court must then schedule a discovery conference for the State to fulfill its obligation and provide to the defendant and counsel, as well as the court, discovery indicating whether the defendant is a Dennis-affected defendant.

19

The prosecutor will accomplish this by using the summons number from the earlier offense to search Exhibit S-152.[4] As described below, that document will be redacted to include only non-personal identifying information. Once the corresponding entry is located within Exhibit S-152, the prosecutor is to "copy and paste" that row of data into a new document.[5] The AIR number from that entry must then be compared against the Dennis Calibration Repository. The Dennis Calibration Repository is currently a virtual folder containing a portable document format (PDF) file of every AIR in which Dennis was the calibrating officer. There are 1,046 files contained in this virtual folder, each representing one AIR and labeled accordingly. The repository shall be made publicly available by placing it on a State website.

Additionally, for ease of reference and use in exchanging discovery, the Dennis Calibration Repository shall be summarized in a Dennis AIR Summary

---

[4] Every municipal court is equipped with access to a defendant's prior court history, including the ability to obtain the summons number for a prior disposition. Upon appointment, municipal prosecutors receive access to the Person Case Search and Manage (PCSAM) system, permitting them to search a defendant's prior court history, which would allow them to access the summons number for use in conjunction with Exhibit S-152.

[5] The Excel spreadsheet program, like most other spreadsheet applications, permits one row of data to be highlighted entirely and, by using the "copy" feature, the entire row of data can be saved and "pasted" into a new document (either a new Excel spreadsheet or a Word document) that allows for the information to be isolated and printed individually, without any remaining reference to the other entries on the spreadsheet.

sheet, which shall be created as follows: the State shall compile a document -- in as few pages as possible, preferably in multiple columns, and in a readable font -- that contains a sequential, alphanumeric list of the 1,046 file names, including only the instrument number (for example, "ARWA-0188"). This Dennis AIR Summary document is to be certified as accurate, and certified copies will be distributed to each municipality for use by the municipal prosecutor.

Once the cross-reference has been completed, the State can identify whether an AIR from Exhibit S-152 is a match with an AIR from the Dennis AIR Summary sheet or not. The State must also provide a copy of the Dennis AIR Summary sheet for the defendant and defense counsel to verify whether the number is or is not listed. If it is determined that the defendant's prior DWI conviction did not involve a Dennis-calibrated Alcotest, the defendant and defense counsel are still provided their copy of the one row of complete data from Exhibit S-152, along with the Dennis AIR Summary sheets, and the confirming prior disposition revealing the summons number for the defendant's prior DWI conviction. The matter then proceeds in the normal course, and the defendant may face enhanced sentencing based on the prior DWI.

If the State determines that the defendant's prior offense involved a Dennis-affected Alcotest Instrument that produced an evidential BAC reading, corroborated by Exhibit S-152 and the Dennis AIR Summary sheet, judges should afford the defendant a reasonable amount of time to decide whether to challenge the prior conviction. If the defendant wishes to challenge that earlier conviction, the defendant shall do so by filing for PCR in the jurisdiction of the previous conviction. A copy of the motion must be provided to the court for the subsequent DWI. Upon receiving the copy of the motion for PCR, the court for the subsequent DWI matter shall stay the disposition of the matter, unless the defendant elects to enter a guilty or both parties consent to a trial, irrespective of the filing of the PCR. All pretrial procedures in the subsequent DWI matter, including timely production of discovery and participation in case management conferences as directed by the court, shall continue during the pendency of the PCR. The goal is to have the subsequent case trial ready when the PCR is resolved.

If the defendant, after being made aware of the existence of a Dennis-affected matter, chooses to proceed without challenging the earlier conviction, the court will inquire on the record that the defendant's decision is knowing and voluntary, and the matter may proceed in the usual course.

Because of the serious public safety concerns that DWI charges present, we call on judges to resolve PCRs and related new matters as expeditiously as possible.

B.

Exhibit S-152 contains the following columns of information: arrest date, time, and location, Alcotest serial number and calibration date, as well as the Alcotest test result, case number, and summons. The document as presently constituted also contains the following unredacted personal identifying information: the subject's first name, middle initial, age, gender, weight, height, and driver's license issuing state. The State seeks a protective order and access granted only to certain stakeholders, including all municipal courts and superior courts, municipal liaisons, and an assistant prosecutor in each county who will coordinate with municipalities in order to provide defendants and counsel with the relevant discovery. The following process balances the State's concerns for privacy with defendants' due process need for notification.

As discussed previously, municipal prosecutors must review a defendant's driving abstract in every case. Armed with the date of the offense and the defendant's name, the prosecutor -- with the assistance of the municipal court -- can then locate the summons number for any prior DWI.

23

Once a summons number is identified, the disposition for that offense must be preserved; once it is cross-referenced in Exhibit S-152, it shall be provided to the defendant and defense counsel in discovery. Through that process, the defendant and counsel can see the date and location of offense, summons number, and the defendant's name. The prosecutor must then use the summons number to search Exhibit S-152.[6] Therefore, Exhibit S-152 in its newly redacted form, excluding all personal identifiers, must be publicly released on the State's website.[7] By itself, without personal identifying information, the data in Exhibit S-152 is ineffective; in combination with other pieces of information possessed by the municipal prosecutor and defense counsel, however, the document becomes serviceable. Using Exhibit S-152 in this way retains the subjects' privacy while serving as a valuable tool.[8] The

---

[6] Most word processing applications, as well as spreadsheet applications, contain a "find" feature that would permit the person searching for information to search, in moments, an entire document for a given term. Inputting the summons number into the "find" or "search" dialog box would produce the data set sought.

[7] Defense counsel will also have an independent means of obtaining the same information through the Municipal Court Case Search (MCCS), should they find an independent evaluation of the evidence necessary.

[8] Despite the lengths to which the State, the Special Adjudicator, and this Court go to secure the personal identifying information of the defendants in these matters, it is worth noting that this information is a matter of public record and attainable by anyone who chooses to seek it out. Nonetheless,

24

prosecutor must now provide the prior disposition, along with the complete row of data from Exhibit S-152, and the Dennis AIR Summary sheet in discovery, which together will be deemed proof beyond a reasonable doubt of whether a defendant's prior DWI conviction is a Dennis-affected matter.

## V.

We take a moment to commend the parties for their valuable participation and willingness to reach consensus where possible. Additionally, such consensus could not have been possible without the extraordinary efforts of the Special Adjudicator, whose exceptional report was critical to the resolution of this matter. Because the remainder of his findings are supported by substantial credible evidence in the record, we adopt them.

In the present matter, we affirm the judgment of the Appellate Division as to vacating the sentence. We remand the matter to the municipal court to afford Zingis the benefit of the discovery process outlined herein, and the matter may then proceed consistent with this opinion.

CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, PIERRE-LOUIS, WAINER APTER, and FASCIALE join in JUSTICE NORIEGA's opinion.

---

risking possible embarrassment or encroaching on a defendant's privacy is not the goal, and we therefore adopt these measures to assure that those privacy concerns are honored.

# APPENDIX

SUPREME COURT OF NEW JERSEY

C-653 September Term 2021

087132

State of New Jersey,

Plaintiff-Movant,

v.

Thomas Zingis,

Defendant-Respondent.

## REPORT OF FINDINGS OF FACT & CONCLUSIONS OF REMAND COURT

| On Remand from the Supreme Court of New Jersey: July 28, 2022 | Findings and Conclusions Submitted to Supreme Court: September 15, 2023 |
| --- | --- |

Thomas R. Clark, Deputy Attorney General, and Rosina A. Rachuba, Deputy Attorney General, appeared on behalf of Plaintiff-Appellant State of New Jersey (Matthew J. Platkin, Attorney General, attorney).

Michael B. Cooke and Steven W. Hernandez appeared on behalf of Defendant-Respondent Thomas Zingis.

Sharon A. Balsamo (New Jersey State Bar Association), Jeffrey Evan Gold and Michael V. Troso (Helmer, Conley & Kasselman, P.A.) and John Menzel appeared on behalf of *amicus curiae* New Jersey State Bar Association.

Michael R. Noveck, Assistant Deputy Public Defender, appeared on behalf of *amicus curiae* The Office of the Public Defender (Joseph E. Krakora, Public Defender).

1

TABLE OF CONTENTS

Page

I.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

II.    BACKGOUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

III.    PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . .    29

IV.    WITNESSES; TESTIMONY AND ASSESSMENT OF CREDIBILITY  43

A. State's Witnesses:

    1. William Donahue, Jr. . . . . . . . . . . .    43

    2. William Gronikowski. . . . . . . . . . .    55

    3. Robyn Mitchell . . . . . . . . . . . . . . .    57

    4. Steven Symogyi . . . . . . . . . . . . . .    114

    5. Charles Prather. . . . . . . . . . . . . . .    123

    6. Thomas J. Snyder . . . . . . . . . . . . .    128

    7. Kevin W. Alcott. . . . . . . . . . . . . .    157

    8. Barbara Nolasco. . . . . . . . . . . . . .    222

    9. Monica do Outeiro. . . . . . . . . . . .    229

    10. Suzanne Musto. . . . . . . . . . . . . .    238

    11. Tracey Mannix. . . . . . . . . . . . . .    241

12. Brian Gillet . . . . . . . . . . . . . . .   245

13. Donna Prestia  . . . . . . . . . . . . . .   252

B.  Witness on Behalf of Amicus New Jersey State Bar Association   257

1. John J. Dell'Aquilo . . . . . . . . . .

V.     ISSUES AND ARGUMENTS PRESENTED . . . . . . . . . . . . . .   276

VI.    FINDINGS OF FACT AND CONCLUSIONS OF LAW . . . . . .   286

APPENDIX I  -  EXHIBITS. . . . . . . . . . .  370

APPENDIX II -  TRANSCRIPTS . . . . . . .   400

## I. <u>INTRODUCTION</u>

This report primarily deals with consideration of the following questions remanded to me by the Order of the Supreme Court entered on July 28, 2022:

> (1) Which counties had convictions affected by the conduct of Marc W. Dennis, a coordinator in the New Jersey State Police's Alcohol Drug Testing Unit, as described in <u>State v. Cassidy</u>, 235 N.J. 482 (2018), and
>
> (2) What notification was provided to defendants affected by Dennis's conduct?
>
> [<u>State v. Zingis</u>, 251 N.J. 502, 503 (2022).]

The Court also permitted me discretion to consider other questions deemed relevant to the issues posited.  In order to provide the Court with answers to those questions, that Order appointed me as Special Master to

conduct a plenary hearing, to consider applications for leave to participate as *amicus*, and to make findings of fact on the submitted questions. The Court specifically invited the Office of the Public Defender to participate as an *amicus* party.

## II. BACKGROUND

In 2008, the Court found that blood-alcohol content (BAC) breath test results obtained from drivers suspected of driving under the influence of alcohol, analyzed by law enforcement's proper use of the Alcotest 7110 MKIII-C instrument, were admissible in drunk-driving cases to establish a defendant's guilt or innocence. State v. Chun, 194 N.J. 54, 65 (2008). In Chun, the Court also required that Alcotest instruments be recalibrated semi-annually to help ensure accurate measurements of breath samples. Id. at 153.

On November 5, 2008, New Jersey State Police Trooper II Marc W. Dennis was duly certified as a Breath Test Coordinator/Instructor, authorized to perform calibrations on Alcotest 7110 MKIII-C instruments in the State of New Jersey. See Exhibits S-7, S-163 and S-164. Thereafter, he began calibrating Alcotest Instruments at various locations, primarily in Monmouth, Middlesex, Union, Somerset and Ocean Counties. At some point, Dennis was promoted to the rank of Sergeant."

4

On October 8, 2015, Sergeant First Class (SFC) Thomas J. Snyder, discovered that Dennis had recalibrated Alcotest Instruments located in the City of Asbury Park, the City of Long Branch, and in Marlboro Township without following the "Calibration Check Procedure for Alcotest 7110." At that time, SFC Snyder was the Alcotest Program Manager and supervised the Alcohol Drug Testing Unit. Specifically, SFC Snyder concluded Dennis knowingly had not been checking the simulator solution temperatures with a NIST-traceable thermometer prior to beginning the recalibration procedure, which was a required step in recalibrating an Alcotest Instrument. As a result of an internal investigation, Sergeant Dennis was precluded from performing further recalibrations of Alcotest Instruments after October 8, 2015, and the matter was referred for investigation to the Division of Criminal Justice within the Office of the Attorney General. See Exhibits S-1, S-37 and S-38.

As a result of that investigation, on September 19, 2016, criminal charges were filed by the Division of Criminal Justice against Sergeant Dennis, charging him with third-degree Tampering with Public Records, contrary to N.J.S.A. 2C:28-7, and fourth-degree Falsifying or Tampering with Records, contrary to N.J.S.A 2C:21-4. See Exhibit S-32.

5

Prior to the filing of those criminal charges, in November or December 2015, the Prosecutor's Supervision and Training Bureau (the "Bureau") within the Division of Criminal Justice was assigned to identify those individuals who had been requested to provide breath samples on Alcotest Instruments that had been calibrated by Sergeant Marc Dennis. See T3, pp. 128-29 (testimony of Deputy Attorney General (DAG) Robyn Mitchell).

At that time, DAG Mitchell was Deputy Chief of the Bureau. When assigned that task, she contacted the Alcohol Drug Testing Unit (ADTU) of the New Jersey State Police, and was advised the ADTU did not maintain copies of the calibration documents from its coordinators, but information concerning the identity of those individuals performing calibrations of Alcotest Instruments could be obtained by the Information Technology Bureau of the State Police accessing the Alcotest Inquiry System database. See T3, pp. 130-31.

In State v. Chun, 194 N.J. 54, 153, cert. denied, 555 U.S. 825, 129 S.Ct. 158, 172 L.Ed 2d 41 (2008), the Supreme Court required the State to create and maintain a centralized Alcotest statewide database. In State v. Chun, 215 N.J. 489, 491 (2013), the Court determined that the Alcotest Inquiry System database was in full compliance with its order of March 17, 2008.

6

William Donahue, Jr., retired since November 2021, worked for the New Jersey State Police for approximately thirty (30) years. His last position was Supervising Management Improvement Specialist, serving his last four years as Unit Head of the Programming Unit of the State Police's Information Technology Bureau. In 2011, Mr. Donahue wrote the design requirements for the Alcotest Inquiry System database, which contains information extracted from each of the approximately six hundred Alcotest Instruments used throughout New Jersey, which information, presently, is periodically downloaded, through phone-line servers, into that database, which is maintained by the Office of Forensic Sciences of the New Jersey State Police, located in West Trenton, New Jersey.

There are two types of accounts that can access information from the Alcotest Inquiry System database. The first is a "public account," where members of the public can access information through utilization of three different search types. The first is a "Subject Table Search," which would only return "Subject" data, used to find information concerning the administration of a breath-sample test to a particular individual. The second is a "Certification Table Search," which returns certification data specific as to a particular Alcotest Instrument, as to when it was last calibrated, when the last solution change took place, and the name of the coordinator who performed

7

the work.  The third type of public search that can be conducted is an "Activity Query," which is a combination search that would reveal any activity on a particular Alcotest Instrument, whether it was a blood-alcohol test or calibration performed on that Instrument.  A fee is charged to the member of the public for each search requested.

The second account type is an "Administrator Account," which is private, based on access granted to law enforcement personnel by the Office of Forensic Sciences of the New Jersey State Police, and there is no fee charged for such access.

At the request of the Prosecutor's Supervision and Training Bureau, Division of Criminal Justice, Mr. Donahue conducted a query, or search, of the Alcotest Inquiry System database for the names of subjects who had been asked to provide breath samples in Driving While Intoxicated cases on Alcotest Instruments that had been calibrated by Sergeant Marc Dennis.[1]

N.J.S.A. 39:4-50.2(a), commonly known as the Implied Consent Statute, provides that any person operating a motor vehicle on any public road, street or highway or quasi-public area in New Jersey is deemed to have given

---

[1]  Although Mr. Donahue could not specifically recall conducting that query, it is clear he did so because, at that time, he was the only person in the Programming Unit of the IT Bureau of the NJSP authorized to conduct such a query.

consent to the taking of breath samples for the purpose of making chemical tests to determine the content of alcohol in that person's blood, as long as a police officer has reasonable grounds to believe that such person has been operating a motor vehicle in violation of the Driving While Intoxicated statute, N.J.S.A. 39:4-50, or N.J.S.A. 39:4-50.14, that latter statute prohibiting a person, who is under the legal age (21) to purchase alcoholic beverages, from operating a motor vehicle with a blood-alcohol concentration (BAC) of 0.01% or more, but less than 0.08%.

Exhibit S-90 is the resulting Excel Spreadsheet created by Mr. Donahue, after conducting a query of the Alcotest Inquiry System database, and is entitled "Spreadsheet Received from NJSP__27,833 Subject Records," purportedly containing the names of all 27,833 potentially-affected individuals who had been requested to provide breath samples for chemical analysis on Alcotest Instruments that had been calibrated by Sergeant Marc Dennis. Exhibit S-90 was, thereafter, delivered to the Division of Criminal Justice within the Attorney General's Office. The tool utilized to create that Excel Spreadsheet is called "PL/SQL Developer," a product developed by Oracle, a technology provider company. However, that Excel Spreadsheet does not reflect the name of the Operator who calibrated the Alcotest Instrument, reflected on each Subject Row of an attempted breath-sample test in Column B

9

of Exhibit S-90. Moreover, an address for the Subjects listed on each Row are not obtainable from a query of the Alcotest Inquiry System database.

Upon receiving Exhibit S-90 from Mr. Donahue's office on a compact disc, DAG Mitchell downloaded its contents onto her work computer. Her task was to review Exhibit S-90, and determine those individuals who were potentially affected by the failure of Sergeant Dennis to properly recalibrate Alcotest Instruments. The Division of Criminal Justice determined that only those individuals listed on Exhibit S-90 who had been requested to provide breath samples that resulted in the Alcotest Instrument calculating and reporting a Blood-Alcohol Content (BAC) reading had been potentially affected by the malfeasance of Sergeant Dennis.[2] The basis for that conclusion was that, because no BAC reading had been obtained, any conviction for Driving While Intoxicated could not have been based thereon. Upon being entered into evidence, a BAC reading of 0.08%, or higher, constitutes what is known as a per se violation of N.J.S.A. 39:4-50. See State v. Lentini, 240 N.J. Super. 330, 331-32 (App. Div. 1990), certif. denied, 127 N.J. 553 (1991); State v. Foley, 370 N.J. Super. 341, 358 (Law Div. 2003).

---

[2] It should be noted that conclusion was reached in 2016, prior to the Court's decision in Cassidy.

Accordingly, based on that determination, DAG Mitchell deleted those Subject Rows from S-90, where no BAC reading had been reported in Column U of the Spreadsheet, and she created Exhibit S-91, a new Excel Spreadsheet entitled "Spreadsheet all counties_wo refusals and error msgs_20,667," purportedly representing the 20,667 individuals who were potentially affected by the misconduct of Sergeant Marc Dennis, namely, they had provided breath samples on an Alcotest Instrument that had been calibrated by Dennis and a BAC reading had been reported by that Alcotest Instrument in Column U of Exhibit S-90.  Thus, this procedure resulted in the State contending that the number of attempted breath tests affected by the misfeasance of Sergeant Dennis was reduced from 27,833, by 7,166, to 20,667.

DAG Mitchell then reorganized the information contained on Exhibit S-91 by creating five (5) separate Excel Spreadsheets, one for each of the main Counties (Middlesex, Monmouth, Ocean, Somerset and Union), containing those subject individuals who had provided breath samples that resulted in the reporting of BAC readings on Alcotest Instruments located in each of those Counties.  DAG Mitchell then electronically placed each of those Excels Spreadsheets on a separate Thumb Drive and provided those Thumb Drives to Elie Honig, Director of the Division of Criminal Justice.

11

Director Honig then sent a letter, dated September 19, 2016, to Hon. Glenn A. Grant, Administrative Director of the Courts, <u>see</u> Exhibit S-81A, informing Judge Grant that earlier that day, the Division of Criminal Justice had filed criminal charges against Sergeant Marc Dennis, outlining those charges, and stating, in pertinent part:

> The State recognizes that – regardless of scientific necessity – use of the NIST-traceable thermometer is a required procedure that was adopted by the Supreme Court in <u>State v. Chun</u>. The State therefore anticipates that additional legal challenges may be filed regarding the results of any Alcotest instrument that had been calibrated in the past by Dennis. As a coordinator for over seven years, Dennis calibrated Alcotest instruments in Middlesex, Monmouth, Ocean, Somerset, and Union Counties. The State has identified 20,667 individuals who provided evidential breath samples on those instruments. The attached thumb drive contains a county-by-county listing of these cases. This listing includes personal identifying information and accordingly should be handled confidentially.
>
> Given potential legal challenges and the underlying scientific nature of any potential challenges, the State respectfully requests that the Supreme Court issue a Notice to the Bar and appoint a Special Master to handle any litigation arising from the circumstances set forth in this letter. The State believes that appointment of a Special Master will best serve the ends of efficiency and uniformity in addressing these potential cases.

Each Excel Spreadsheet contained on the Thumb Drives provided by

Director Honig to Judge Grant has been separately marked into evidence, as

follows:

> Exhibit S-81B, Excel Spreadsheet entitled, "Middlesex_Indiv Defts wo refusals and error messages," containing 4,963 Subject Rows of individuals and 21 Columns, or Fields, of information on 318 pages.

> Exhibit S-81C, Excel Spreadsheet entitled, "Monmouth_IndivDefts wo refusals and error messages," containing 9,402 Subject Rows of individuals and 21 Columns, or Fields, of information on 603 pages.

> Exhibit S-81D, Excel Spreadsheet entitled, "Ocean_IndivDefs wo refusals and error messages," containing 289 Subject Rows of individuals and 21 Columns, or Fields, of information, on 28 pages.

> Exhibit S-81E, Excel Spreadsheet entitled, "Somerset_Individual Defts wo refusals and error messages," containing 1,207 Subject Rows of individuals and 21 Columns, or Fields, of information on 78 pages.

> Exhibit S-81F, Excel Spreadsheet entitled, "Union_Indviduals Defts wo refusals and error messages," containing 4,806 Subject Rows of individuals and 21 Columns, or Fields of information on 309 pages.

As noted, none of these Excel Spreadsheets delivered to Judge Grant contained

addresses of the individuals identified on each Row.

On September 22, 2016, DAG Mitchell sent an email to Assistant

Prosecutors in Middlesex, Monmouth, Ocean, Somerset, and Union Counties,

confirming a conference call with them earlier that day concerning defendants

potentially-affected by the conduct of Sergeant Dennis, notifying them that Director Honig had requested, in the September 19, 2016 correspondence to Judge Grant, that a Special Master be appointed to handle any litigation arising from the conduct of Sergeant Dennis. Prior to the appointment of a Special Master, DAG Mitchell suggested the following actions be taken:

1. Any case that is pre-trial or pending sentencing: seek stays whenever appropriate based upon your discretion.

2. Any case that is currently mid-trial should be reviewed on a case-by-case basis. The action to be taken will be fact-sensitive; you should use your discretion to take the appropriate action.

3. Any case that is on a municipal appeal or is before the Appellate Division: seek stays when appropriate based upon your discretion.

4. If you receive a motion regarding a person who falls under the universe of cases and is currently serving a prison sentence, please forward those to SDAG Rob Czepiel or myself for further review.

[See Exhibit S-2.]

On September 26, 2016, Eileen Cassidy, who had pled guilty to Driving While Intoxicated in Spring Lake Municipal Court on September 8, 2016, based on an evidential breath sample blood-alcohol content results on an Alcotest Instrument calibrated by Sergeant Marc Dennis, filed an application in that Court seeking to withdrawn her guilty plea. State v. Cassidy, 235 N.J.

14

482, 514-15 (2018) (Appendix, Report of Special Master, Hon. Joseph F. Lisa, P.J.A.D., Retired, on Recall).

On October 4, 2016, Judge Grant advised Director Honig that he had reviewed the September 19, 2016 letter, but a request for appointment of a Special Master should be made directly to the Supreme Court. Id. at 515. On October 17, 2016, the State applied to the Supreme Court for direct certification in the Cassidy matter, and for appointment of a special master. Ibid.

On April 7, 2017, the Court entered an order, granting the State's motion in Cassidy for direct certification, and appointed Judge Lisa as Special Master, remanding the matter for Judge Lisa to consider and decide the question of whether the failure to test the simulator solutions with an NIST-traceable digital thermometer before calibrating an Alcotest instrument undermines or call into question the scientific reliability of breath tests subsequently performed on the Alcotest instrument, and to consider and decide any other questions that the Special Master, in his discretion, deemed relevant to that undertaking. State v. Cassidy, 230 N.J. 232, 233 (2017).

On July 13, 2017, Special Master Judge Lisa issued an order requiring the Attorney General's Office to apprise the court of its efforts to obtain addresses for the individuals referenced in its motion to appoint a Special

Master. See Exhibit S-3. DAG Mitchell had previously spoken with Steven Somogyi, Assistant Administrative Director of the Courts for Municipal Court Services as to whether the Administrative Office of the Courts (AOC) would be able to obtain addresses for the individuals listed on the Excel Spreadsheets sent to Judge Grant in Director Honig's September 19, 2016 letter. Mr. Somogyi advised it might be possible to obtain addresses through queries of the Court's Automated Traffic System (ATS), a computer system that stores all information automatically when a law enforcement officer issues a summons.

Mr. Somogyi then provided Charles Prather, an independent computer expert who performed data analysis work for the AOC, with the Excel Spreadsheets that had been sent to Judge Grant, requesting him to query the Court's ATS database in an attempt to match the summons numbers and other identifying information of the individuals listed on the Spreadsheets to addresses for them. On July 14, 2017, following the entry of Judge Lisa's order, DAG Mitchell sent an email to Mr. Somogyi, asking whether the AOC had obtained the requested addresses so she could report back to Judge Lisa. See Exhibit S-18A.

In undertaking that assigned task, Mr. Prather uploaded the information on the provided Spreadsheets onto the court's recording servers and then "cleaned up" the information to prepare the requested query of the ATS

16

database. Mr. Prather discovered there were multiple Rows on the Spreadsheets where no driver's license number, or an invalid driver's license number, for the individual was listed on certain Rows of the Spreadsheets, and also contained some duplicate Subject records. He determined the most accurate method to match a subject to an address was matching the driver's license number listed on the Spreadsheets to the driver's license number listed for that individual in the ATS database. Once Mr. Prather eliminated those Rows containing no driver's license number, or an invalid driver's license number, as well as eliminating the duplicate entries, he extracted from the ATS database all DWI summonses that were in the ATS database from 2008 through 2017 into a separate file. He then linked the two files to determine whether there was a matching driver's license number from the uploaded information on the Spreadsheets to a driver's license number in the ATS database. He then also compared the arrest date and date of issuance of the summons, contained on the Spreadsheets provided, to the arrest date and date of issuance of the summons in the file he had created from the ATS database.

That procedure resulted in the creation of an Excel Spreadsheet with two tabs, one with the names and addresses of individuals where the driver's license numbers, arrest dates, and dates of issuance of the summons matched exactly, and a second tab with the names and addresses of individuals that

17

matched driver's license number and the arrest date and ticket issue dates within two days of each other.  See Exhibit S-83.  Once that Excel Spreadsheet was prepared, Mr. Prather delivered it directly to Mr. Somogyi.

On August 10, 2017, Mr. Somogyi sent an email to Supervising Deputy Attorney General (SDAG) Robert Czepiel, then Bureau Chief of The Prosecutor's Supervision and Training Bureau in the Division of Criminal Justice, transmitting Exhibit S-83, and stating, in pertinent part:

> Your office previously provided to Municipal Court Services electronic information on approximately 21,000 tickets you had flagged in this matter linking the Alcotest and Trooper Dennis.  The information that your office provided included defendants' first name, last name, driver's license number and arrest date.  Based on that data, staff from Municipal Court Services created a special report to match the information provided by your office with information in our ATS computer system.  My office was able to match approximately 18,000 of those records (out of approximately 21,000) to a ticket in ATS (spreadsheet attached) in which all data points matched – name, license number and ticket issue date (issue date matching the arrest date).  These exact matches are included on tab 1 of the attached Excel spreadsheet. The remaining records did not have an exact match.
>
> However, we were able to do some matching on a segment of those remaining cases.  Specifically, on tab 2 of the attached Excel file, additional ATS records are reflected which matched first and last name and the license number.  These same cases also closely match (within 2 days of the information you provided) the ticket issue date and the arrest date.  As these were not exact matches, but still "likely" cases, we elected to

18

place them on a second tab of the spreadsheet for further review and research by your team. In total, there were 948 of these "near matches."

[See Exhibit 18B.]

The Excel Spreadsheet in Exhibit S-83 contains 18,249 exact address-to-subject matches on Sheet 1, and 947 partial address-to-subject matches on Sheet 1, for a total of 19,196 addresses of the 20,667 individuals listed on Subject Rows contained in the Exhibit S-91 that had been sent to Administrative Director Grant on September 19, 2016, a difference of 1,471 subject rows where the AOC was unable to locate a matching address in the ATS database for those subjects listed on Exhibit S-91. The address information for each listed Subject Row is contained in columns J through O on each Sheet of Exhibit S-83.

On November 2, 2017, Judge Lisa, Special Master in Cassidy, issued an Order, inter alia, granting "the State's motion for a stay of proceedings in other courts that raise issues potentially affected by the Supreme Court's ultimate determination in this matter, i.e. a DWI prosecution in which a BAC reading derived from an Alcotest device calibrated by coordinator Marc Dennis[.]" See Exhibit S-98.

On December 6, 2017, Judge Grant issued a Notice to the Bar, stating the Supreme Court had granted certification in State v. Cassidy, and stated, in relevant part:

> The Alcotest machines calibrated by Sergeant Dennis during his tenure with the State police were used in over 20,000 DWI prosecutions. Although most of these cases were filed in five counties (Middlesex, Monmouth, Ocean, Somerset and Union Counties), there have been cases in twelve counties total.
>
> * * * *
>
> Additionally, on November 28,[2017][3] Judge Lisa issued a Supplemental Order (attached) providing that the burden for determining whether or not the defendant provided a breath sample on an Alcotest device calibrated by Sergeant Dennis rests with the prosecutor handling the case. The prosecutor is also required to produce and provide documentary evidence of that determination to the defendant and the court. Further, in any proceeding in any court involving a prosecution for an offense in which a prior "Dennis" DWI conviction constitutes a predicate offense that can enhance the gradation or applicable punishment in that new case, or involving a sentence emanating from such a case that has been adjudicated, the burden rests with the prosecutor to determine whether or not the defendant provided a breath sample on an Alcotest device calibrated by Sergeant Dennis in that prior DWI case, and to produce documentary evidence of that determination to the defendant and the court.

---

[3] A full copy of Judge Lisa's Supplemental Order dated November 28, 2017 is contained in Exhibit S-100.

In State v. Cassidy, 235 N.J. 482, 487 (2018), the Court adopted the 198-page report of its appointed Special Master, retired Appellate Division Presiding Judge Joseph F. Lisa, and ruled that the failure to test the simulator solution of an Alcotest 7110 MKII-C instrument in the recalibration process with an NIST-traceable digital thermometer undermines the reliability of the Alcotest blood-alcohol content readings produced. Ibid. The Court elaborated, as follows:

> During the calibration process, simulator solutions containing varying concentrations of ethanol are used to calibrate the Alcotest and confirm the accuracy of its blood alcohol content readings. The simulator solutions are poured into calibration units, which are glass containers that house a heating component. The calibration units heat the solutions to about 34 degrees Celsius, the generally accepted temperature for human breath, creating a vapor. The vapor is a proxy for human breath. It is essential that the temperature of the solution be accurate in order for the Alcotest's blood alcohol content readings to be correct. The Alcotest's calibration procedure requires the test coordinator to insert a thermometer that produces NIST-traceable temperature measurements into the simulator solution used to calibrate the Alcotest and confirm that the calibration unit heated the solution to temperature within 0.2 degrees of 34 degrees Celsius. The NIST is the federal agency responsible for maintaining and promoting consistent units of measurement. When a thermometer's temperature measurements are "traceable" to the standard measurements of the NIST, those measurements are generally accepted as accurate by the scientific community.

21

There are two other temperature probes used during the calibration procedure. Unlike the NIST-traceable thermometer, both of those probes are manufactured and calibrated by Draeger. The first is the "black key probe," which plugs into the Alcotest device and allows the coordinator to access the calibration function. That probe is used to measure each simulator solution's temperature during a series of control tests. The second is the "agency's probe," which also plugs into the Alcotest and is used to measure the temperature of the simulator solution used in the final test to confirm that the Alcotest was calibrated correctly.

[Cassidy, 235 N.J. at 488-49.]

After reviewing and adopting the factual findings of the Special Master, the Court concluded the "the accuracy of the temperature of the simulator solutions used to calibrate the Alcotest is critically important to the fidelity of its readings," id. at 94, and ordered "the State to notify all affected defendants of our decision that breath test results produced by Alcotest machines not calibrated using a NIST-traceable thermometer are inadmissible, so that they may take appropriate action[,]" relaxing the five-year time bar for making an application for post-conviction relief set forth in R. 7:10-2(b)(2). Id. at 498.

On August 27, 2018, Defendant-Respondent Thomas Zingis was issued a summons in the Township of Berkeley, Ocean County, New Jersey, charging him with Driving While Intoxicated, contrary to N.J.S.A. 39:4-50(a). He was also issued a summons charging him with Careless Driving, contrary to N.J.S.A. 39:4-97. Although a blood-alcohol content reading on an Alcotest

22

Instrument was obtained from breath samples provided by Mr. Zingis, that reading was excluded by the Municipal Court Judge based on a pretrial motion. The matter was tried in Berkeley Township Municipal Court on December 18, 2019 based on observational evidence only, and the Municipal Court Judge convicted Mr. Zingis of Driving While Intoxicated, merging and dismissing the Careless Driving summons. Mr. Zingis had a prior conviction for Driving While Intoxicated in the Borough of Collingswood, Camden County, New Jersey in April 2012, and he moved for sentencing as a first-time offender, arguing "the court should disregard the 2012 conviction because the State failed to produce documentary evidence that [the 2012 conviction] was not based on an Alcotest breath sample test result rendered inadmissible by the holding in Cassidy." Sentencing was adjourned to January 8, 2020.

The Municipal Court Judge rejected defendant's argument, based on representations by the municipal prosecutor that defendant's 2012 conviction did not fall within the Court's ruling in State v. Cassidy because he was not on a list on the Attorney General's website of defendants notified by the State that their conviction for DWI were potentially affected by the conduct of Sergeant March Dennis and, thereby, the misconduct of Dennis did not affect any convictions arising from Camden County. Accordingly, the Municipal Court Judge sentenced Mr. Zingis as a second offender, imposing a two-year

23

suspension of his driver's license, 48 hours IDRC, a $506.00 fine, $33.00 in costs, a $225.00 DWI surcharge, 3 years of an ignition interlock device, $50.00 VCCB, $75.00 SNSF, 30 days community service, and two days incarceration in the county jail, to be served in the IDRC. The sentence was stayed pending appeal to the Law Division of his conviction and sentence.

On October 20, 2020, the Law Division conducted a trial <u>de novo</u>. The conviction of Mr. Zingis for Driving While Intoxicated was affirmed. The Law Division Judge also affirmed the sentencing of Mr. Zingis as a second offender, noting that the Municipal Court Judge had appropriately taken notice of information on the State's Judiciary website that the conviction of Mr. Zingis in 2012 for Driving While Intoxicated did not involve breath samples provided on an Alcotest Instrument calibrated by Sergeant Marc Dennis. Mr. Zingis filed a timely appeal to the Appellate Division.

In <u>State v. Zingis</u>, 471 N.J. Super. 590, 594 (App. Div. 2022), an opinion issued on Aril 25, 2022, the court affirmed the order of the Law Division, convicting defendant of DWI. However, because the State did not prove beyond a reasonable doubt that the 2012 conviction of Mr. Zingis for DWI was not based on Alcotest breath sample test results rendered inadmissible by the Court's holding in <u>State v. Cassidy</u>, the court vacated his sentence as a second offender, and remanded the matter to the Law Division for resentencing Mr.

24

Zingis as a first offender. The court found there was reasonable doubt with respect to whether defendant's 2012 DWI conviction was based on false calibration records executed by Sergeant March Dennis, stating in pertinent part:

> The record contains no evidence with respect to how the Attorney General's list was compiled and whether it definitively includes all DWI convictions tainted by Dennis's malfeasance. A notice issued by the judiciary raises doubt about the comprehensive nature of the list. The judiciary's Cassidy website, of which we take judicial notice, N.J.R.E. 201, states that although "notices have been sent to all [defendants] eligible" who have a prior DWI conviction reviewed under Cassidy, "[y]ou may be eligible even if you did not get a notice . . . ." New Jersey Courts: Cassidy DWI Cases, https://www.njcourts.gov/courts/ mcs/Cassidy.html (last visited Apr. 8, 2022). This is an acknowledgement by the judiciary that the list of defendants who received a Cassidy notice from the State is not definitive.
>
> Moreover, two Notices to the Bar issued by the Acting Administrative Director of the Courts, of which we take judicial notice, cast doubt on the proposition that Dennis's misconduct did not affect any DWI conviction arising from Camden County. In a December 6, 2017 Notice to the Bar, the Acting Director stated with respect to cases affected by Dennis's falsification of records, that "[a]lthough most of these cases were filed in five counties (Middlesex, Monmouth, Ocean, Somerset and Union Counties), there have been cases in twelve counties total." Notice to the Bar, "Orders by Judge Lisa as Special Master in State v. Eileen Cassidy Staying Certain Alcotest-Related DWI Cases" (Dec. 6, 2017) (emphasis added). In addition, in a July 22, 2021 Notice to the Bar, the

25

Acting Director stated that more than 13,000 DWI convictions were eligible for review under Cassidy, "with most of those cases in four counties (Middlesex, Monmouth, Somerset, Union)." Notice to the Bar and Public, "Review of DWI Convictions Involving Not Properly Calibrated Equipment (State v. Cassidy) - Website to Facilitate Submission of Requests to Review a DWI Conviction" (July 22, 2021) (emphasis added). These notices acknowledge that Dennis's misconduct affected DWI convictions in counties beyond Middlesex, Monmouth, Ocean, Somerset, and Union Counties, which are those most commonly associated with his malfeasance.

[Zingis, 471 N.J. Super. at 606-07. (Emphases in original.]

In its opinion, the Appellate Division panel noted it did "not foreclose the possibility that a more robust record in a future case may establish beyond a reasonably doubt that the State had identified every DWI conviction possibly tainted by Dennis's misconduct, provided notice to the defendant in each of those cases, and compiled a record of such notification." Id. at 607. The court then concluded:

We note that when followed, the approach in place under Judge Lisa's supplemental order [entered as Special master in Cassidy on November 28, 2017] provided definitive proof that a prior DWI conviction was not affected by Dennis's misconduct. While this approach may be less convenient and efficient for the State than reliance on a list of defendants provided Cassidy notice, the definite nature of which has not been proven, the burden of Dennis's malfeasance as a law enforcement officer falls on the State. Where the State seeks to impose an enhanced sentence, it cannot

26

> escape on the grounds of convenience and expediency its obligation to prove that the prior conviction on which that enhanced sentence is predicated was not tainted by the previously established misconduct of a police officer.

> [Ibid.]

Judge Lisa's November 28, 2017 Order noted that the only definitive way to determine whether or not Sergeant Dennis calibrated an Alcotest Instrument used to take breath samples from a defendant is to obtain the relevant calibration documents for that particular Alcotest Instrument, which should be turned over to the defendant by the State in discovery. Zingis, 471 N.J. Super. at 597.

Following the court's decision in Zingis, the State filed an application for a stay and a motion for reconsideration in the Appellate Division. The Appellate Division considered the State's motion for reconsideration and entered an order on May 26, 2022, found no reason to alter its April 25, 2022 opinion, and denied the State's motion in an order entered on May 26, 2022. In a separate order, entered on that same date, the Appellate Division denied the State's motion for a stay.

The State then filed an application for emergent relief in the Supreme Court, seeking a stay. On June 1, 2022, the Supreme Court entered an order temporarily staying the Appellate Division's opinion pending further order of

27

the Court, and set forth requirements for the filing of the State's motion for a stay and its petition for certification and briefs, and the defendant's responses thereto.

On July 28, 2022, the Court issued an opinion and order in State v. Zingis, 251 N.J. 502 (2022), granting the State's petition for certification and its motion for a stay and provided, as follows:

> It is further ORDERED that the matter is remanded to a Special Master for a plenary hearing to consider and decide the following questions, along with any other questions that the Special Master, in his discretion, deems relevant to the undertaking: (1) Which counties had convictions affected by the conduct of Marc W. Dennis, a coordinator in the New Jersey State Police's Alcohol Drug Testing Unit, as described in State v. Cassidy, 235 N.J. 482 (2018), and (2) What notification was provided to defendants affected by Dennis's conduct?

> It is further ORDERED that the Honorable Robert A. Fall, retired Judge of the Appellate Division, is appointed to serve as the Special Master, with his consent. The Special Master shall have discretion over the remand proceedings and, in addition to submissions from the parties, shall consider applications for leave to participate as amicus. The Court invites the Office of the Public Defender to participate as an amicus party.

> It is further ORDERED that, subject to any rulings by the Special Master regarding the proofs to be submitted on remand, defendant and the State shall each present evidence in support of their respective positions. In developing evidence relevant to the questions presented, the parties should seek responsive

information from the Office of the Attorney General and the Administrative Office of the Courts.

It is further ORDERED that, after the record is developed, the Special Master shall make findings of fact and expeditiously complete and submit a written report of his findings to the Court.

It is further ORDERED that, upon the filing of the Special Master's report on remand, the Clerk of the Court shall establish a supplemental briefing schedule on appeal and shall schedule the matter for oral argument on the record as developed by the Special Master and supplemental briefing.

[Zingis, 251 N.J at 503-04.]

## III. PROCEDURAL HISTORY

Following the Court's July 28, 2022 Order, on August 1, 2022, notice was sent to all counsel of record, along with a copy of my June 21, 2019 Initial Report to the Court, as Special Master in State v. Cassidy, see Exhibit S-31, scheduling a case management conference before this court on August 29, 2022. Robyn S. Mitchell, Deputy Attorney General, counsel for plaintiff-appellant, State of New Jersey, Michael B. Cooke, Esq., counsel for defendant-respondent, Joseph J. Russo, First Assistant Public Defender, and Steven Somogyi, Assistant Director of the Administrative Office of the Courts, for Municipal Court Services, participated in the case management conference, resulting in issuance of a case management order dated August 31, 2022, which provided, as follows:

29

1. The New Jersey Public Defender shall advise the Special Master on or before September 30, 2022, whether his Office will accept the invitation of the New Jersey Supreme Court to participate as an amicus party in this matter;

2. All applications for participation as an amicus party in this matter, on notice to counsel of record at the addresses listed herein, shall be filed by September 30, 2022, with the Special Master, at: Superior Court of New Jersey, Appellate Division, Monmouth Park Corporate Center, 185 State Highway 36, Suite 1, West Long Branch, New Jersey 07764, with an electronic copy to ███████████████. Within five (5) business days thereafter, counsel of record shall advise the Special Master of any objection or assent to such an application, and the Special master will decide any such application thereafter;

3. The Office of Attorney General shall provide to the Special Master and counsel a copy of the notice and list of 20,667 potentially affected defendants, sent to the Administrative Office Courts following Marc Dennis being criminally charged, referenced in State v. Cassidy, 235 N.J. at 486-87, by not later than September 16, 2022, which notice and list shall be deemed confidential and shall not be disseminated to or shared with anyone or any entity, except counsel of record and the parties, pending further Order. Counsel for the State shall also prepare and file with the Special Master, with copies to counsel of record, by September 16, 2022, a certification outlining the manner in which the referenced 20,667 potentially-affected defendants were identified and compiled;

4. The copy of the referenced Special Master's Initial Report to the New Jersey Supreme Court provided to counsel shall not be disseminated or shared with anyone or any entity, except counsel of record and the parties, pending further Order;

5. Following receipt and review of the aforesaid list of 20,667 potentially affected defendants, the referenced certification, and the aforesaid Initial Report, counsel shall file with the Special Master, with copies to all counsel of record, any further discovery requests by not later than September 30, 2022, with any objections thereto filed with the Special Master and served upon counsel of record by October 7, 2022, after which the Special Master shall issue, if necessary, a Discovery Order;

6. Counsel are encouraged to exchange documentation relevant to the task of the Special Master as delineated in the Order of the Supreme Court entered in this matter on July 27, 2022 and to stipulate to any documents exchanged;

7. The goal of the Special Master is to conduct the plenary hearing set forth in the Court's July 27, 2022 Order sometime in November 2022, and to issue a Report to the Court promptly thereafter; and

8. The following contact information shall be utilized in performance of the requirements set forth in this Order:

Robert A. Fall, J.A.D., Special Master
Superior Court of New Jersey, Appellate Division
Monmouth Park Corporate Center Suite 1, 185 State Route 36, West Long Branch, New Jersey
Telephone: 848-448-0899
email: ███████████████████
███████████████

Michael B. Cooke, Esq.
25-F Main Street
Toms River, New Jersey 08753
Telephone: 732-244-1936
email: mike@attorneycooke.com

31

Robyn Mitchell, Esq.
Deputy Attorney General
25 Market Street
PO Box 085
Trenton, New Jersey 08625
Telephone: 609-376-2398 (office)
609-422-6320 (cell)
email: mitchellr@njdcj.org

Joseph J. Russo, Esq.
First Assistant Public Defender
25 Market Street
PO Box 850
Trenton, New Jersey 08625-0850
Telephone: 609-984-0094
email: Joseph.Russo@opd.nj.gov

[See Exhibit A.]

On September 16, 2022, DAG Mitchell sent the court and all counsel, the following: a copy of the letter, dated September 19, 2016, from Elie Hong, Director of the Division of Criminal Justice, to the Honorable Glenn A. Grant, Administrative Director of the Courts, see Exhibits S-32 and S-81A; DAG Mitchell's certification, dated September 22, 2022, setting forth the procedures utilized by the State to identify defendants potentially affected by the Court's decision in Cassidy, see Exhibit S-27; and the Excel Spreadsheets attached to the September 19, 2016 letter, containing the State's listing of the defendants potentially-affected by the Court's decision in Cassidy, see Exhibits S-91 and S-81B through 81F.

32

On September 30, 2022, the Public Defender's Office filed and served a Motion to Participate as *Amicus Curiae*.  <u>See</u> Exhibit B.  Also on September 30, 2022, defendant-respondent filed and served his First Combined Discovery Demands.  <u>See</u> Exhibit C.  On October 6, 2022, the State filed and served a request for an extension, to October 21, 2002, to file its reply to the discovery demands, which was granted.  <u>See</u> Exhibit D.  On October 12, 2022, the New Jersey State Bar Association (NJSBA) filed and served a Motion for Leave to Appear as Amicus Curiae.  <u>See</u> Exhibit E.

On October 21, 2022, the State filed and served, (1) a letter, opposing in part, the discovery demands; (2) a letter concerning the Public Defender's motion to appear as amicus curiae; and (3) a letter concerning the motion by NJSBA to appear as amicus curiae.  <u>See</u> Exhibit F.  Also on October 21, 2022, the NJSBA filed and served, a brief in reply to the State's opposition to the discovery demands and concerning its application to appear as *amicus curiae*. <u>See</u> Exhibit G.  On October 27, 2022, the Public Defender filed and served a response to the State's October 21, 2022 letters.  <u>See</u> Exbibit H.

On December 5, 2022, I issued an Order, granting the application of the Public Defender and NJSBA to appear as *amicus curiae*, scheduling oral argument on the discovery requests and scheduling a second case management conference, for December 22, 2022.  <u>See</u> Exhibit I.  On December 20, 2022,

33

Mr. Gold, on behalf of the NJSBA, sent an email to the court and all counsel, outlining the Bar's position on the discovery issues.  See Exhibit J.

Oral argument on the discovery issues, and a second case management conference, were conducted on December 22, 2022.  On December 27, 2022, the court issued an Order for Discovery and Second Case Management, and Scheduling Plenary Hearing.  See Exhibit K.  That Order adjudicated all outstanding discovery requests, requiring them to be satisfied and provided to the court and all counsel by January 17, 2023, and scheduled the plenary hearing to commence on January 31, 2023, to continue on consecutive days until completed.  Paragraph 3 of that Order permitted the Public Defender and the NJSBA to file and serve, via email, any additional requests for discovery, by January 4, 2023, with any responses thereto to be filed and served by January 9, 2023.

On January 3, 2023, Mr. Noveck, on behalf of the Office of Public Defender, submitted five (5) requests for discovery, see Exhibit L, as did the NJSBA, see Exhibit M.  On that same date, the State filed and served a request for the court to reconsider that portion of the December 27, 2022 Order for Discovery, requiring the State to identify individuals within the NJSP, presently employed or retired, who might provide testimony concerning creation of the Alcotest Inquiry System database.  See Exhibit N.

By letter dated January 9, 2023, the State submitted opposition to the applications of the Public Defender and NJSBA for additional discovery. <u>See</u> Exhibit O. In an email dated January 9, 2023, Mr. Noveck filed and served a reply to the State's letter brief. <u>See</u> Exhibit P. On January 10, 2023, the NJSBA filed and served a letter brief in opposition to the State's motion for reconsideration, and a response to the State's opposition for additional discovery. <u>See</u> Exhibit Q.

In letter briefs, and a certification, dated January 12, 2023, the State requested the court review the work records of Sergeant Dennis, ordered to be produced by the December 27, 2023 Order, <u>in</u> <u>camera</u>, and requested an extension of time to produce same. <u>See</u> Exhibit R. On January 16, 2023, the NJSBA filed and served a letter brief addressing the State's opposition to additional discovery and concerning the ordered work records of Sergeant Dennis. <u>See</u> Exhibit S.

On January 17, 2023, the court issued a letter opinion and Order determining the discovery issues raised by counsel, setting discovery deadlines, and adjourning commencement of the plenary hearing to February 15, 2023. <u>See</u> Exhibit T. The Order granted, in part, the application of the State for reconsideration of the December 27, 2022 Order, directing the State

to identify individuals within the Office of Forensic Sciences (OFS), the Information Technology Bureau (ITB), and the Alcohol Drug Testing Unit (ADTU) of the NJSP, and within the Attorney General's Office, presently employed or retired, who will be able to provide testimony concerning the method employed to create the list of defendants potentially affected by the Court's decision in Cassidy, as well as producing representatives of the AOC to provide testimony concerning the method it utilized to determine addresses of those potentially-affected defendants identified in Exhibit S-91. The Order further required the State to identify and provide testimony from witnesses concerning how the list of 18,827 cases impacted by the Court's decision in Cassidy, as contained in the June 21, 2019 Initial Report by the Special Master in Cassidy, see Exhibit S-31, was created, and to provide testimony concerning the notification letters sent to all Cassidy-affected defendants. The Order also required summaries of testimony of witnesses to be presented be supplied to the court and all counsel at least seven (7) days prior to commencement of the plenary hearing. Additionally, the Order required the State to provide, in discovery, all available digital information and spreadsheets pertaining to the 27,833 records noted in DAG Mitchell's September 16, 2022 certification. All other discovery requests were denied. The Order further directed that the work records of Sergeant Dennis, ordered to be produced, be first reviewed by the

36

court, in camera, with the court, thereafter, to provide counsel with a letter opinion concerning same. All additional discovery was to be produced by February 3, 2023.

Following the State's submission of the work records of Sergeant Dennis, and the court's in camera review of same, on January 19, 2023, the court issued a letter opinion and order, noting that the records supplied are not "work records" that would indicate day-to-day assignments, or work history of Sergeant Dennis, but were, rather, in the nature of "personnel performance" records, which the court deemed irrelevant to the issues presented. See Exhibit U.

On February 6, 2023, Michael B. Cooke, Esq., counsel for defendant-respondent, filed and served a motion for additional discovery, which the court denied, on that date, as being out-of-time. See Exhibit V. On February 6, 2023, the State provided its list of witnesses and summaries of proposed testimony. See Exhibit W.

During the course of this matter, the State provided the court and counsel with voluminous discovery, both in the form of eleven (11) password-protected Thumb Drives, and attachments to various emails. The discovery produced, as well as the exhibits produced during the hearings constitute more than 250,000 pages, and have been placed on a SharePoint site that is available

37

to the Court, the parties, and all counsel of record.  Many of the exhibits contain personal and confidential information and should be protected from public scrutiny.

On February 8, 2023, Michael Noveck, Assistant Deputy Public Defender, requested an adjournment of the plenary hearing, scheduled to commence on February 15, 2023, for a period of two to four weeks to allow review of the voluminous discovery provided.  As a result, the court scheduled and conducted a conference call with all counsel, arranged by Sharon Balsamo, Esq., General Counsel for the NJSBA, on February 10, 2023.  Prior thereto, Jeffrey Evan Gold, Esq., counsel for the NJSBA, filed and served a response to the adjournment request, joining in same.  See Exhibit X.  DAG Clark, on behalf of the State, also submitted a letter, dated February 9, 2023, outlining the State's position.  See Exhibit Y.  After conducting the conference call, the court rescheduled the plenary hearing to commence on March 15, 2023.

On February 13, 2023, the NJSBA sought access to the non-public portion of the Alcotest Inquiry System database, and provided the court with a proposed protective order.  See Exhibit Z.  On that date, the State filed and served written objections to that request, followed by a detailed letter-brief on February 21, 2023.  See Exhibit AA.  On February 22, 2023, the NJSBA filed a response to the State's objections.  See Exhibit AB.

On February 21, 2023, counsel for the AOC requested the court enter a protective order to safeguard the personal information and documentation provided by the AOC during this proceeding. See Exhibit AE. On February 22, 2023, the court entered a Protective Order, directing that all documentation provided in discovery concerning the personal information of litigants, counsel and potentially-affected defendants shall be deemed confidential, and shall not be disseminated beyond counsel of record without permission of the court. See Exhibit AF.

On February 22, 2023, Mr. Noveck, on behalf of the Public Defender, the NJSBA, and Defendant-Respondent, filed and served a letter-brief in support of its position that the State should be required to provide written, sworn statements from proposed witnesses, William Donahue, William Gronikowski, and Charles Prather, prior to their testimony and commencement of the plenary hearing. See Exhibit AC. On that same date, the NJSBA filed and served its support of the Public Defender's request. See Exhibit AD.

On February 27, 2023, the State filed and served a request, pursuant to N.J.R.E. 807, concerning admission into evidence documents provided in discovery that constitute Public Records, Reports and Findings in accordance with N.J.R.E. 803(c)(8). See Exhibit AG. That request was granted.

39

On February 28, 2023, the State filed and served a letter-brief concerning the positions of the NJSBA, the Public Defender, and Defendant-Respondent that the State's witnesses, Donahue, Gronikowski, and Prather be deemed experts.  See Exhibit AH.

On February 28, 2023, the Public Defender and NJSBA filed and served their arguments in support of access to the non-public portion of the Alcotest Inquiry System database.  See Exhibits AI and AJ.

On March 1, 2023, the State filed and served a letter-brief in further opposition to the proposed protective order submitted by the NJSBA, seeking access to the non-public portion of the Alcotest Inquiry System database.  See Exhibit AK.  On that same date, the NJSBA filed and served additional argument in support of that proposed protective order.  See Exhibit AL.

On March 2, 2023, the court issued a written opinion and Order, requiring the State to provide written, sworn statements from witnesses, William Donahue, William Gronikowski, and Charles Prather, and reserving on the request for access to the non-pubic portion of the Alcotest Inquiry System database until conclusion of the testimony of witnesses Donahue and Gronikowski.  See Exhibit AM.

On March 3, 2023, the State submitted a summary of the testimony to be provided by Deputy Attorney Robyn Mitchell, and Sergeant First Class Kevin Alcott of the NJSP.  See Exhibit AO.

On March 29, 2023, this court issued a letter opinion and order, denying the applications of the NJSBA, Office of Public Defender, and Defendant-Respondent for access to the private portion of the Alcotest Inquiry System database, but requiring the State to arrange for the Alcotest Inquiry System database to be queried, and provide the court and all counsel and Excel Spreadsheet that sets forth solution changes and calibrations on all Alcotest Instruments in New Jersey from November 5, 2008 through June 30, 2016. See Exhibit AS.[4]

As noted, throughout the course of the procedural history of this matter, the State, counsel for Defendant-Respondent, and counsel for *Amici Curiae*, the NJSBA and Office of Public Defender, submitted voluminous exhibits, and I prepared and periodically provided all counsel with copies of Exhibit Lists, assigning designated exhibit numbers to each exhibit for ease of reference during the plenary hearing.  Those assigned "Exhibit Numbers" are referenced throughout this court's Report to the Supreme Court, with the prefix

---

[4]  The ordered Excel Spreadsheet was provided and has been marked into evidence as Exhibit S-152, and consists of 236,664 subject test records, containing 25,180 pages.

41

designation of "S" for the State's exhibits, "DB" for the NJSBA's exhibits, "DPD" for the Office of Public Defender's exhibits, "DZ" for those submitted of behalf of Defendant-Respondent, Thomas Zingis, and "DB/DPD" or joint exhibits submitted by the NJSBA and Public Defender. Exhibits not marked during the plenary hearing, but constituting references in the Procedural History of this Report have been alphabetically marked. All Exhibits are listed in Appendix I of this Report.

Commencement of the plenary hearing was adjourned to March 20, 2023, and a "technology test" concerning the various electronic exhibits to be displayed to the witnesses, the court, and all counsel was conducted at the Middlesex County Courthouse on March 14, 2023.

The plenary hearing was conducted at the Middlesex County Courthouse on the following ten (10) dates: March 20, 21, 22, and 28, 2023; April 25, 26, and 27, 2023; and June 12, 13, and 14, 2023. The transcripts of those hearings are contained in Appendix II of this Report. The court received testimony from fourteen (14) witnesses which is summarized and discussed herein. On July 17, 2023, all counsel filed and served Proposed Findings of Fact and Conclusions of Law. See Exhibits AO, AP, AQ, and AR.

## IV. WITNESSES; TESTIMONY AND ASSESSMENT

### A. State's Witnesses

#### 1. William Donahue, Jr.

William Donahue, Jr., was called as a witness by the State. Mr. Donahue, who retired in November 2021, worked for the New Jersey State Police for approximately thirty (30) years. His position prior to retirement, which he held for four (4) years, was Supervising Management Improvement Specialist, as Head of the Programming Unit of the State Police's Information Technology Bureau. He spent his entire career with the State Police working in the information technology area. His testimony in contained in T1, the March 20, 2023, Transcript, on pages 11-139.

The Court's decision in State v. Chun, 194 N.J. 54, 153, cert. denied, 555 U.S. 825, 129 S.Ct. 158, 172 L.Ed. 2d 41 (2008), required the State to provide a central repository of data from all Alcotest Instruments in New Jersey. Mr. Donahue verified that the Alcotest Inquiry System database was created through collaboration with Drager, the manufacturer of the Alcotest 7110 MKIII-C used in New Jersey; Ayoka Systems, a third-party software developer contracted by Drager; the Office of Forensic Sciences, the Alcohol Drug Testing Unit (ADTU) and the Information Technology Bureau of the New Jersey State Police; and NICUSA, Inc., a company that provides software

43

and technology services to governmental agencies. As noted, the State has been determined to be in full compliance "with this Court's Order of March 17, 2008, in all respects." State v. Chun, 215 N.J. 489, 491 (2013). Mr. Donahue noted Ayoka created the software that communicates between the servers in West Trenton and the individual Alcotest Instruments and transfers the data retrieved into the database.

In 2011, Mr. Donahue wrote the design requirements for the Alcotest Inquiry System database used by the public, which he described as a web application whereby members of the public can register, receive an account number, and make various inquiries of the Alcotest database. As noted infra., Mr. Donahue explained there are two types of accounts relating to access to that database. The first is a "Public Account," and a fee is charged for the data extracted. The second is an "Administrative Account," which is private, access to which must be granted by the Office of Forensic Sciences of the New Jersey State Police, and there is no fee charged.

Mr. Donahue stated the Alcotest Inquiry System database contains information extracted from each of the approximately 600 Alcotest Instruments used through the State, and is downloaded weekly through dedicated phone-line servers into the database, which is centrally maintained by the Office of Forensic Sciences located at the New Jersey State Police

44

Headquarters in West Trenton. Upon successfully downloading the data from an Alcotest Instrument, the data in that Alcotest Instrument is deleted so that it will not be replicated during the next weekly download.

Mr. Donahue further explained the Alcotest Inquiry System database contains two groupings of information: (1) Alcotest Subject Records; and (2) Alcotest Instrument Certification records. There are three different search types that can be conducted to extract information from the database. The first is a "Subject Table" search, which would only return subject data. This search would be used to find information concerning the administration of breath-sample testing on an Alcotest Instrument to a particular individual. The second is a "Certification Table" search, which returns certification data, specific to the Alcotest Instrument searched, as to when it was last calibrated, when the solution changes took place, and the name of the State Police Coordinator who performed the work. The third type of search is an "Activity Query," which is a combination inquiry that would look at both Tables and reveal any activity on a specific Alcotest Instrument, whether it was a Blood-Alcohol Content (BAC) test conducted, or calibration work performed, and it would combine that query into the results for that specific request.

During his testimony, Mr. Donahue was shown a copy of Exhibit S-90, the Excel Spreadsheet entitled "Spreadsheet Received from NJSP_27,833

45

subject records.xlsx." This Spreadsheet, which was identified by Mr. Donahue as a product of the State Police's Information Technology Bureau, is the result of a search of the Alcotest Inquiry System database. It purportedly contains the names of all subject breath tests, 27,833 in number, that were potentially affected by the Supreme Court's decision in State v. Cassidy, 235 N.J. 482 (2018), because the individuals listed therein had been requested to provide breath samples on Alcotest Instruments, in DWI prosecutions, on Alcotest Instruments calibrated by Sergeant Marc Dennis.

Mr. Donahue testified the Excel Spreadsheet contained in Exhibit S-90 "looks like the spreadsheet that I had created," noting that in 2015 or 2016 when it was created, he would have been the only employee of the New Jersey State Police authorized to query the database and create same. However, he could not recall why the Spreadsheet contained in Exhibit S-90 was created, and noted that it does not contain a Column providing the identity of the State Police Operator who calibrated the Alcotest Instruments designated in Column B.

Sheet 2 of Exhibit S-90 contains the "SQL Statement," which is the computer code for the requested search, or "query," of the database. Mr. Donahue testified the tool used to create the search is called "PL/QQL Developer," a product developed by Oracle, a technology-provider company.

"SQL" stands for "Structured Query Language" and is a domain-specific language in programming, designed for managing data stored in a database. See Beaulieu, Alan (April 2009), Mary E. Treseler (ed.) Learning SQL (2nd ed). Sebastopel, CA, USA: O'Reilly. ISBN978-0-596-52083-0.  Mr. Donahue explained a "query" is a basic program that requests the database to return anything that matches the criteria placed in the query.  A "table" is where the data is located and, within the table, there are "Columns" or "Fields," which are the individual data information for that specific table.  In other words, a "table" is where the information is located, and a "query" contains the terms utilized to extract that information, putting that information in another form, such as on an Excel Spreadsheet, which is essentially a "report" of the requested information.  He stated Sheet 1 of Exhibit S-90 is the "Report," the results of that search, containing the subject data, for each row, in twenty-one (21) Columns, also knowns as "Fields" of information, alphabetically-designated as A through U, as follows:

| Column (Field) | Information Displayed |
| --- | --- |
| A | Arrest Date |
| B | Serial Number, Alcotest Instrument |
| C | Calibration Date |
| D | Location of Alcotest Instrument |
| E | Subject's Last Name |
| F | Subject's First Name |
| G | Subject's Middle Initial |
| H | Subject's Date of Birth |

47

| | |
|---|---|
| I | Subject's Age |
| J | Subject's Gender |
| K | Subject's Weight |
| L | Subject's Height |
| M | Driver's License Number |
| N | Issuing State of License |
| O | Case Number |
| P | Summons Number |
| Q | Arrest Date |
| R | Arrest Time |
| S | Arrest Location Code |
| T | Final Error (if any) |
| U | End Result (BAC reading, if any) |

Although there are 21 Columns in this Spreadsheet, Columns "A" and "Q" contain the same information, the "Arrest Date."

Mr. Donahue acknowledged that a query of the database can provide up to 310 Columns, or Fields, of information concerning each attempt to provide breath samples on a specific Alcotest Instrument, and the individual conducting the search designates, in the SQL query, which Columns, or Fields, of information are requested.

Mr. Donahue testified that in a Public Search, the information contained in Columns E through N, the personal identification information as to each subject, could not be retrieved or accessed.

As noted, all Exhibits have been provided during the discovery, almost all electronically on Thumb Drives or as attachments to emails. During the

plenary hearing, all electronic exhibits were displayed to each witness, all counsel, and to the court, on computer screens.

Mr. Donahue testified that during his career, he worked with Lieutenant Thomas Snyder, an officer in the Alcohol Drug Testing Unit (ADTU) of the State Police on various requests for information from the database. Mr. Donahue identified Exhibit S-78 in evidence, an email dated January 18, 2019, from Lieutenant Snyder to DAG Robyn Mitchell, referencing the request by Lieutenant Snyder for Mr. Donahue to query the Alcotest Inquiry System database and provide an Excel Spreadsheet of all solution changes on all Alcotest Instruments in New Jersey that occurred between November 1, 2008 and January 9, 2016. That requested Excel Spreadsheet, identified by Mr. Donahue, is Exhibit S-92, an Excel Spreadsheet entitled "20190124 Cert Tests Recs 11-1-08 thru 1-9-16-CD Order," and contains all solution changes performed on all Alcotest Instruments in New Jersey, between those two dates, and consists of 22,819 pages containing 68,450 solution change records, by date of solution change and calibration dates on each Alcotest Instrument, with 310 Columns, or Fields, of information as to each row. Notably, Columns AS through AV contain the full name and badge number of the Operator performing the solution change and calibration on each of the 68,450 Rows. A

line-by-line search of Exhibit S-92 reveals that Sergeant Marc Dennis completed calibrations on 1,111 Alcotest Instruments during that time period.

Mr. Donahue explained that the Excel Spreadsheet in Exhibit S-92 displays, on each of the 68,450 Rows, on Columns A, B and C, the start time, the date of the solution change for that specific test record, and the calibration date. A solution change is performed prior to every calibration. He noted that Columns C and L contain the same information, as do Columns B and U. He further explained that the method of determining whether Sergeant Dennis performed a calibration listed on Exhibit S-92 is to highlight Column AS, "Operator Last Name," and then perform a "Sort and Filter" function on that Column by typing in the name "Dennis," which will reveal information that he completed the calibrations on 1,111 Alcotest Instruments. By way of example, Row 66024 shows that Sergeant Dennis performed the calibration on Alcotest Instrument ARWC-0187, located at the Cranford Township Police Station, on October 9, 2015 and, Row 66025 shows, on that same date, he performed the calibration on Alcotest Instrument ARWC-0010, located at the Kenilworth Police Station.

On Cross-examination, Mr. Gold showed Mr. Donahue Exhibit DB-1A, which is a printout of the results of an Activity Query search Mr. Gold conducted of the Alcotest Inquiry System database concerning Alcotest

50

Instrument ARXA-0037, located in Wall Township Police Station, which shows 24 Rows relating to subjects tested on that Instrument, with all 310 Columns, or Fields, of available information, consisting of 45 pages. The purpose was to show the breadth of information that is available, beyond that contained on Exhibit S-90, when conducting a search pertaining to the breath samples provided by a subject on a particular Alcotest Instrument. Exhibit DB-1B contains the results of that same search and was taped page-to-page, with those Columns highlighted in "Yellow" to show the additional information available from such a search. Mr. Gold also showed Mr. Donahue Exhibit DB-1C, which is the printed-out results of a Subject Table search Mr. Gold conducted of the Alcotest Inquiry System database concerning the testing of 24 subjects on Alcotest Instrument ARAJ-0074, located at the Fair Haven Police Station. That Exhibit contains 21 Columns, or Fields, of information. Mr. Donahue acknowledged the results of the searches in Exhibits DB-1A, DB-1B and DB-1C do not display the identity of the Operator who performed the calibration of the Instrument, only the Operator who performed the breath test because they were searches of the Subject Table. Mr. Donahue explained a search of the Certification Table would be necessary to obtain the identity of the Operator who performed the calibration of the Alcotest Instrument.

51

When I asked Mr. Donahue whether the identity of the Operator could be extracted from a search of the database if I knew that a particular subject was arrested and requested to provide a breath sample on an Alcotest Instrument on a particular date, he stated:

> Judge, I know you get the record by the date. You can't query the subject's information. But if you specify a date range, it will let you know that the test was given. I know you can return one or the other using the queries that are provided to the public.
>
> [T1, page 88, lines 8-12.]

Thereafter the following colloquy ensued between myself and Mr. Donahue:

> THE COURT: What I'm contemplating is this and the question I have is this, if you know, Mr. Zingis was arrested and blew into a machine within the time frame, between 2008 and 2016 someplace in Camden County. And if he filed an application for post-conviction relief, and if the Court wanted to get the record of who calibrated the machine that he blew into, would they be able to extract that information?
>
> THE WITNESS: I'm Sure.
>
> THE COURT: Okay. All right. So if any person -- any defendant wanted to – counsel wanted to know and the Court authorized it, they could ask the State to produce an Alcotest calibration record for a machine within that time period in any municipality in the State.
>
> THE WITNESS: Yes, there's a query there for the public, there's a third query called the activity query, that would provide you information from both the

52

subject table and the certification table in the range that you've requested. Then there probably would have to be some manual comparison by the requester to try to match things up.

THE COURT:     All right. But the information could be extracted from the database?

THE WITNESS:  And it's provided. Sure it's provided.

[T1, page 88, line 8 to page 89, line 15.]

During cross-examination by Mr. Noveck, Mr. Donahue testified further that he believes he created the SQL Statement contained on the second-listed tab of S-90, which resulted in the Excel Spreadsheet contained on the first-listed tab of Exhibit S-90. He noted this was a search of the Subject Table of the database and did not contain the identity of the Operator who performed the calibration of the Alcotest Instrument on which the test was given. He explained that the query reflected in the SQL Statement on Tab 2 of Exhibit S-90 requested the records for each Alcotest Instrument within the specified date range of November 14, 2008 through May 1, 2016. He noted there were 19 Alcotest Instrument serial numbers listed in the SQL Statement in Tab 2, but there were more than 19 Alcotest Instrument serial numbers listed in the SQL Results in Tab 1. Mr. Donahue testified it appears that the query shown on the "SQL Statement" in Tab 2 does not match the information contained in the "SQL Results" tab of the Exhibit S-90 Spreadsheet. During cross-examination

53

of Mr. Donahue, Mr. Noveck created Exhibit DPD-1 as a Word formatted document, having extracted it from Tab 2, the "SQL Statement" of Exhibit S-90. The Query requested in that Exhibit contains all 310 available Columns of information, the specified date range of retrieval, and 19 Alcotest Serial Numbers to search. Mr. Noveck confirmed with Mr. Donahue that he believed the Excel Spreadsheet contained in Exhibit S-90 was created from a query he ran of the Alcotest Inquiry System Subject Table. <u>See</u> T1, p. 124, lines 20-24.

However, Mr. Donahue was unable to explain why the SQL Statement on Tab 2 of Exhibit S-90 requested 310 Columns and 21 were returned on the Excel Spreadsheet on Tab 1 thereof, or why a query of 19 Alcotest Instruments was requested in the SQL Statement, yet more than 19 were listed on the Excel Spreadsheet.

The court finds the testimony of Mr. Donahue to be credible, although it was clear he did not recall the reason for the requested query, or specifically conducting the query resulting in creation of the Excel Spreadsheet contained in Exhibit S-90. However, he testified he was the only employee in the IT Unit who would have been authorized to conduct that requested query of the Alcotest Inquiry System database. Accordingly, the court concludes Mr. Donahue conducted the query and produced the Excel Spreadsheet contained in Exhibit S-90.

54

However, based on the testimony and evidence submitted during the plenary hearing, it is clear that the SQL Statement concerning that query, contained on Tab 2 of Exhibit S-90, was flawed, which will be discussed in some detail infra.

## 2. William Gronikowski

William Gronikowski was presented by the State as a witness. His testimony is contained in T1, the March 20, 2023, Transcript, on pages 140-173. He has been employed by the New Jersey State Police for approximately twenty-five (25) years, and is currently the Supervisor of Information Technology in the Information and Technology Bureau. He replaced Mr. Donahue upon his retirement.

Toward the end of 2022, SFC Alcott requested Mr. Gronikowski to produce a report that had been previously created by Mr. Donahue. Exhibit S-43 is an email chain between SFC Alcott and Mr. Gronikowski on December 28, 2022. Specifically, SFC Alcott forwarded Mr. Gronikowski the Excel Spreadsheet contained in Exhibit S-92, requesting it be updated to include all Alcotest Instrument Records in the State from December 1, 2005 to December 31, 2017, which was requested by the Attorney General's Office.[5]   Mr.

---

[5]  Exhibit S-92 is the Excel Spreadsheet created by Mr. Donahue, containing all Solution Changes and Calibrations performed on all Alcotest Instruments from November 1, 2008, through January 9, 2016.

55

Gronikowski testified he located the report, and altered the range of dates requested, increasing the date range by one month on each side of the range, produced a query of the Alcotest Inquiry System database, see Exhibit S-45, exported the results onto an Excel Spreadsheet, and emailed it to SFC Alcott on that same date. To generate the query, Mr. Gronikowski used a software program called "Quest" from a product called "Toad," which was similar to "PLL SQL," the software used to produce Exhibit S-92.

That Excel Spreadsheet created by Mr. Gronikowski is Exhibit S-116, entitled "Records11012005_01312018[Compatibility Mode]." It contains all Solution Changes and Calibrations performed on all Alcotest Instruments in New Jersey from November 1, 2005 through January 31, 2018. It consists of two (2) Sheets. Sheet 1 contains 64,999 Solution Changes and Calibrations, and Sheet 2 contains 41,413 Solution Changes and Calibrations for a total of 106,412 during that time range. Each Sheet contains 126 Columns of information for each Row. Column A contains the Serial Number of the Alcotest Instrument, Column H the Calibration date and Column Q the Solution Change Date. Columns AO through AR contain the identity of the Coordinator performing each Solution Change and Calibration. In creating this Spreadsheet, Mr. Gronikowski emphasized he did not alter or change

anything in Exhibit S-92, but simply expanded the date range.  Thereafter, Mr. Gronikowski sent an email to DAG Clark, dated January 19, 2023, stating:

> Attached is an email chain from SFC Alcott, this email contained a spreadsheet that was previously supplied to him.  I used that information to find the query that produced it.  That query was stored on our network drive that Bill Donahue kept other AlcoTest documentation.  I then updated the query with the new date range that was requested.
>
> [Exhibit S-74.]

Mr. Gronikowski explained that both Sheets in Exhibit S-116 represent a continuous record of the data requested, and two Sheets were required because that version of Excel has a limit of 65,000 Rows per Sheet, and when that limit is reached, Excel automatically creates a second Sheet.  S-116 contains Certification Records extracted from the Alcotest Inquiry System database.

The testimony of Mr. Gronkowski was credible, but limited to the creation of the spreadsheet utilized to determine the identity of the operators who performed Solution Changes in conjunction with the Recalibration of Alcotest Instruments during the indicated time period.

### 3.  Robyn Mitchell

Robyn Mitchell is a Deputy Attorney General.  Since January 2023, she has been the Acting Chief of the Supervision and Training Bureau, within the Division of Criminal Justice (DCJ), in the Office of the Attorney General.

Prior to that, she was the Deputy Bureau Chief for ten (10) years.  In total, she has been employed by the DCJ for approximately twenty-three (23) years.  She was called by the State as a witness during this plenary hearing.  The testimony of DAG Mitchell in contained in T3, the March 22, 2023 Transcript, at pages 127-162, in T4, the March 28, 2023 Transcript, at pages 13-199 and 201-230, and in T5, the April 25, 2023 Transcript, at pages 13-164.

In November or December of 2015, after learning of the allegations against Sergeant March Dennis, DAG Mitchell was assigned to assist then-Bureau Chief Robert Czepiel, a Supervising Deputy Attorney General (SDAG), in identifying defendants who provided breath samples on Alcotest Instruments that had been calibrated by Sergeant Dennis.  It had been determined that November 5, 2008 was the first date Sergeant Dennis was authorized, as a Breath test Coordinator, to calibrated Alcotest Instruments, and the last date he was authorized to do so was October 9, 2015.  See Exhibits S-1 and S-7.

In order to accomplish that task, DAG Mitchell reached out to the Alcohol and Drug Testing Unit (ADTU) of the New Jersey State Police (NJSP), inquiring whether that Unit would be able to determine what Alcotest Instruments were calibrated by Sergeant Dennis during that time period.  She was advised that although the ADTU did not maintain copies of all calibration

58

documents, representatives of the ADTU believed that the Information Technology Bureau of the NJSP could perform a search of the Alcotest Inquiry System database (database) and obtain that information. Accordingly, DAG Mitchell requested the ADTU to perform that search and provided DCJ with a list of those subjects who had been requested to provide breath samples, on Alcotest Instruments calibrated by Sergeant Dennis from November 5, 2008 until six (6) months after October 9, 2015, since she was aware that Alcotest Instruments are required to be recalibrated every six (6) months.

Thereafter, either later in 2015 or early 2016, DAG Mitchell received a compact disc (CD) from the ADTU containing the results of the requested search, an Excel Spreadsheet, listing 27,833 subjects who had been requested to provide breath samples on Alcotest Instruments that had been calibrated by Sergeant Dennis, during the requested time period. DAG Mitchell testified she then downloaded the information on that CD onto her computer at work. Exhibit S-147, marked into evidence during DAG Mitchell's testimony, are her handwritten notes on the CD provided to her by the ADTU.[6] Exhibit S-90 and

---

[6] Exhibit S-147 contains the date of February 8, 2023, which, as testified by DAG Mitchell, was the date that she provided the CD to DAG Clark to verify that the only information on that CD was the Excel Spreadsheet containing the 27,833 Subject Rows and twenty-one (21) Columns, identical to that contained in Exhibits S-90 and S-148.

Exhibit S-148, entitled "5925_Spreadsheet_Final.xslx," are identi=cal in content, contain the same information.

DAG Mitchell testified she was aware there are over three hundred (300) columns of data that can be retrieved from the database as to each breath test, but was not aware as to why the Excel Spreadsheet provided by the NJSP, contained in Exhibits S-90 and S-148, only contain 20 Columns of information. During her direct examination, DAG Mitchell was shown Exhibit DB-1B, which is a sample Excel Spreadsheet produced by counsel for the New Jersey State Bar Association, extracted from a query of the Alcotest Inquiry System database for information pertaining to a specific Alcotest Instrument. It consists of forty-five (45) pages with three hundred and ten (310) Columns, or Fields, of information as to each Subject Row. That Exhibit has the two hundred and ninety (290) Columns not shown on Exhibits S-90 and S-148, which are highlighted in "Yellow." DAG Mitchell testified that none of the Columns highlighted in "Yellow" were necessary for her to complete the assigned task of identifying those subjects who had been arrested and charged with DWI, were requested to provide breath samples on an Alcotest Instrument that had been calibrated by Sergeant Dennis that resulted in an evidential BAC

reading and, thereby, were potentially affected by the misconduct of Sergeant Dennis.[7]

DAG Mitchell testified upon receipt of Exhibit S-90, she reviewed Column U (End Result), and deleted all Subject Rows where a Blood-Alcohol Content (BAC) reading had not been reported. By way of example, she was referred to Row 27,803, in which Column U contained "dashes," indicating no BAC reading had been obtained during the attempted breath test of that individual, and she testified she deleted that Row. She explained the deletion of that and other like Rows, as follows:

> Because no breath sample, no breath test reading was given. So there was no breath alcohol BAC reading, then any DWI conviction could not have been based on a reading given by an instrument. It had to be either an observation – if there was a conviction.

[T3, p. 140, lines 11-15.]

As a result, DAG Mitchell deleted 7,166 Rows on Exhibit S-90, where no BAC reading had been obtained, either because the Arresting Officer or Operator, after following the procedures set forth in the Implied Consent Statute and preparing the Alcotest Instrument, the subject refused to submit

---

[7] Again, as noted, the determination by the Attorney General's Office, that only attempted breath tests on Instrument resulting in a BAC reading were potentially affected by the misconduct of Sergeant Dennis, was made prior to the Cassidy litigation in the Supreme Court.

breath samples, or, during the testing procedure, the Operator concluded the conduct of the subject warranted a conclusion the subject had refused to provide breath samples sufficient for analysis, either circumstance resulting in Instrument reporting the absence of a BAC reading in Column U of the Exhibits.  In each of those deleted Rows, Column T (Final Error) on Exhibit S-90 contained various error messages, such as "Subject Refused," "Control Test Failed," "Ambient Air Check Error," "Test Terminated," "Mouth Alcohol," "Control Gas Supply," "Interference," "Purging Error," "Blowing Not Allowed," "Simulator Temperature Error," or "Ready to Blow Expired," as the reason for the inability of the Alcotest Instrument, on those Subject Rows, to produce an evidential BAC reading.

Upon completing those deletions, the resulting Excel Spreadsheet prepared by DAG Mitchell, became Exhibit S-91, entitled "Spreadsheet all Counties_wo refusals and error messages_20,667," which then consisted of 20,667 Rows of subjects who provided breath samples on Alcotest Instruments calibrated by Sergeant Dennis where an evidential BAC reading was produced by the Instrument.  DAG Mitchell testified she created the title of Exhibit S-91.  Upon further questioning, DAG Mitchell testified there is an error on one Row contained in Exhibit S-91, where that Row should have been deleted by her.  Specifically, on Row 11523, Column T (Final Error) contains the error

62

message "Subject Refused," and Column U on that Row does not reflect a BAD reading being obtained. Accordingly, DAG Mitchell testified that Row should have been deleted by her, which would result in Exhibit S-91 actually containing 20,666 subjects, not 20,667.

Upon editing Exhibits S-90 and S-148, and thus creating Exhibit S-91, DAG Mitchell testified she then went through the list of subjects and separated them into those who were tested in each County. She explained, as follows:

> So back then, what I did was, I would bold each row. So, for example, the very first up on here [Exhibit S-91], Row Number 2, it says Fair Haven Police. I would have bolded and gone all the way down to the end of the Fair Haven Police, down, and then I would have gone all the way over to Column U and I opened up another Excel Spreadsheet and I would copy and paste it onto a spreadsheet.

[T3, page 144, line 23 to page 145, line5.]

Using that methodology, DAG Mitchell stated she created five (5) separate Excel Spreadsheets, one for each of the five main Counties, Middlesex, Monmouth, Ocean, Somerset and Union. She then placed each Spreadsheet onto a Thumb Drive, and gave each Thumb Drive to the Prosecutor's Office in the corresponding County. Additionally, DAG Mitchell testified that Elie Honig, then Director of the Division of Criminal Justice, sent a letter to Judge Glenn A. Grant, Administrative Director of the Courts, dated September 19, 2016, see Exhibit S-81A, notifying him that criminal charges

63

had been filed against Sergeant March Dennis, and 20,667 individuals had provided evidential breath samples on Alcotest Instruments that had been calibrated by Sergeant Dennis. That letter to Judge Grant enclosed Exhibit S-91 and the five (5) referenced Excel Spreadsheets for those five Counties. See Exhibits S-81B (Middlesex County); S-81C (Monmouth County); S-81D (Ocean County); S-81E (Somerset County); and S-81F (union County).

Exhibit S-81B, entitled "Middlesex_IndivDefts wo refusals and error messages," extracted from Exhibit S-91, is an Excel Spreadsheet containing 30 Sheets, or Tabs. Sheet 30 contains 4,963 Rows, consisting of all individuals, listed on Exhibit S-91, who provided breath samples on Alcotest Instruments located in Middlesex County that resulted in the reporting of an evidential BAC reading. It contains 21 Columns of information for each Row. The other 29 Sheets in Exhibit S-81B consist of a breakdown, or sort, of Sheet 30 into one Sheet for each municipality or agency in Middlesex County, containing the names, and the same 21 Columns of information, for those individuals who provided evidential breath samples, at those locations, on Alcotest Instruments calibrated by Sergeant Dennis.

Exhibit S-81C, entitled "Monmouth_Indiv Defts wo refusals and error messages," is an Excel Spreadsheet, extracted from Exhibit S-91, containing 53 Sheets, or Tabs. Sheet 53 contains 9,401 Rows, consisting of all

64

individuals, listed on Exhibit S-91, who provided breath samples on Alcotest Instruments located in Monmouth County that resulted in the reporting of an evidential BAC reading. It contains 21 Columns of information for each Row. The other 52 Sheets in Exhibit S-81C consist of a breakdown, or sort, of Sheet 53 into one Sheet for each municipality or agency in Monmouth County, containing the names, and the same 21 Columns of information, for those individuals who provided evidential breath samples at those locations, on Alcotest Instruments calibrated by Sergeant Dennis.

Exhibit S-81D, entitled "Ocean_Indiv Defts wo refusals and error messages," is an Excel Spreadsheet, extracted from Exhibit S-91, containing 13 Sheets, or Tabs. Sheet 33 contains 289 Rows, consisting of all individuals, listed on Exhibit S-91, who provided breath samples on Alcotest Instruments located in Ocean County that resulted in the reporting of an evidential BAC reading. It contains 21 Columns of information for each Row. The other 12 Sheets in Exhibit S-81D consist of a breakdown, or sort, of Sheet 13 into one Sheet for each municipality or agency in Ocean County, containing the names, and the same 21 Columns of information, for those individuals who provided evidential breath samples at those locations, on Alcotest Instruments calibrated by Sergeant Dennis.

Exhibit S-81E, the entitled "Somerset_Indiv Defts wo refusals and error messages," is an Excel Spreadsheet, extracted from Exhibit S-91, containing 22 Sheets, or Tabs. Sheet 22 contains 1,207 Rows, consisting of all individuals, listed on Exhibit S-91, who provided breath samples on Alcotest Instruments located in Somerset County that resulted in the reporting of an evidential BAC reading. It contains 21 Columns of information for each Row. The other 21 Sheets in Exhibit S-81E consist of a breakdown, or sort, of Sheet 22 into one Sheet for each municipality or agency in Somerset County, containing the names, and the same 21 Columns of information, for those individuals who provided evidential breath samples at those locations, on Alcotest Instruments calibrated by Sergeant Dennis. It was noted by DAG Mitchell that Row 11523 in Exhibit S-91 was for the individual, █████████████, who was asked to provide breath samples on an Alcotest Instrument located in Hillsborough Township and, because no evidential BAC reading was obtained, is not contained in Exhibit S-81E.

Exhibit S-81F, entitled "Union_Individual Defts wo refusals and error messages," is an Excel Spreadsheet, extracted from Exhibit S-91, containing 25 Sheets, or Tabs. Sheet 25 contains 4,806 Rows, consisting of all individuals, listed on Exhibit S-91, who provided breath samples on Alcotest Instruments located in Union County that resulted in the reporting of an

66

evidential BAC reading. It contains 21 Columns of information for each Row. The other 24 Sheets in Exhibit S-81F consist of a breakdown, or sort, of Sheet 25 into one Sheet for each municipality or agency in Union County, containing the names, and the same 21 Columns of information, for those individuals who provided evidential breath samples at those locations, on Alcotest Instruments calibrated by Sergeant Dennis.

DAG Mitchell noted there are no addresses for the 20,666 subjects contained on the Exhibit S-91 Excel Spreadsheet, or in the Excel Spreadsheets contained in Exhibits S-81B through 81F. Based on discussions between DAG Mitchell and Steven Somogyi, Assistant AOC Director for Municipal Court Services, and pursuant to Case Management Order I, issued by Special Master Judge Joseph F. Lisa, P.J.A.D. on July 13, 2017, in the then-pending case of State v. Cassidy,[8] the Administrative Office of the Courts (AOC) was in the process of working on obtaining addresses for the subjects contained in Exhibit S-91, and as contained in Exhibits S-81B through -81F, so those subjects could be notified of the pending litigation, which could potentially

---

[8]  ¶4 of that July 13, 2017 Order required the State, by July 27, 2017, to "apprise the court of its efforts to obtain addresses for the 20,667 individuals referenced in its motion to appoint a Special Master and will file any motion the State deems appropriate concerning a directive as to notice to those individuals, including a proposed form of notice."

affect them. <u>See</u> Exhibit 18A (DAG Mitchell's email to Steven Somogyi dated July 14, 2017).

DAG Mitchell testified that, on August 10, 2017, Steven Somogyi sent an email to SDAG Robert Czepiel, Chief of the Supervision and Training Bureau, within the Division of Criminal Justice, copying her, sending him Exhibit S-83, the Excel Spreadsheet entitled "Spreadsheet from AOC_All Addresses_Alcotest ATS Defendant Matches – full matches and partial – to AG," which contained two (2) sheets, as follows:  Sheet 1: Full Subject-to-Address Matches, 18,249; and Sheet 2: Partial Subject-to-Address Matches, 947, for address matches for 19,196 of the 20,666 subjects contained in Exhibit S-91.  Thus, there were 1,470 Subject Rows in Exhibit S-91 that the AOC was unable to seek, of find, either an exact or partial matching subject-to-address match.

After receiving Exhibit S-83, the Excel Spreadsheet with addresses for the 19,196 subjects, DAG Mitchell testified she utilized that Spreadsheet to create separate Excel Spreadsheets for each of the five (5) main Counties. Exhibit S-84 contains a Spreadsheet she created, entitled "Spreadsheet from AOC_Middlesex County Only," which contains two (2) Sheets.  Sheet 1 contains 5,012 Rows of full subject-to-address matches, and fifteen (15) Columns of information for each Row, and Sheet 2 contains 215 Rows of

68

partial subject-to-address matches for each Row and the same 15 Columns of information, for total subject-to-address matches of 5,227 individuals who provided breath samples on Alcotest Instruments located in Middlesex County, calibrated by Sergeant Dennis, resulting in evidential BAC readings.

Exhibit S-85 contains another Spreadsheet created by DAG Mitchell, entitled "Spreadsheet from AOC_Monmouth County Only," which also contains two (2) Sheets. Sheet 1 contains 7,479 Rows of full subject-to-address matches, and fifteen (15) Columns of information for each Row, and Sheet 2 contains 432 Rows of partial subject-to-address matches for each Row and the same 15 Columns of information, for total subject-to-address matches of 7,911 individuals who provided breath samples on Alcotest Instruments located in Monmouth County, calibrated by Sergeant Dennis, resulting in evidential BAC readings.

Exhibit S-86 contains a Spreadsheet DAG Mitchell created from the information contained in Exhibit S-83, entitled "Spreadsheet from AOC_Ocean County Only," which contains two (2) Sheets. Sheet 1 contains 299 Rows of full subject-to-address matches, and fifteen (15) Columns of information for each Row, and Sheet 2 contains 27 Rows of partial subject-to-address matches for each Row and the same 15 Columns of information, for total subject-to-address matches of 326 individuals who provided breath

69

samples on Alcotest Instruments located in Ocean County, calibrated by Sergeant Dennis, resulting in evidential BAC readings.

Exhibit S-87 contains another Spreadsheet DAG Mitchell created, also from the information contained in Exhibit S-83, entitled "Spreadsheet from AOC_Somerset County Only," which contains two (2) Sheets. Sheet 1 contains 877 Rows of full subject-to-address matches, and fifteen (15) Columns of information for each Row, and Sheet 2 contains 52 Rows of partial subject-to-address matches for each Row and the same 15 Columns of information, for total subject-to-address matches of 929 individuals who provided breath samples on Alcotest Instruments located in Somerset County, calibrated by Sergeant Dennis, resulting in evidential BAC readings.

Exhibit S-88 contains a Spreadsheet DAG Mitchell created from the information contained in Exhibit S-83, entitled "Spreadsheet from AOC_Union County Only," which contains two (2) Sheets. Sheet 1 contains 4,464 Rows of full subject-to-address matches, and fifteen (15) Columns of information for each Row, and Sheet 2 contains 216 Rows of partial subject-to-address matches for each Row and the same 15 Columns of information, for total subject-to-address matches of 4,680 individuals who provided breath samples on Alcotest Instruments located in Union County, calibrated by Sergeant Dennis, resulting in evidential BAC readings.

70

After creating these five separate Excel Spreadsheets, DAG Mitchell sent them to each respective County Prosecutors. Specifically, Exhibit S-24A is a copy of an email, dated September 26, 2017, from DAG Mitchell to Assistant Ocean County Prosecutor Kim Pascarella, attaching the Excel Spreadsheet in Exhibit S-86, and stating:

> Please use the names and addresses contained in this spreadsheet to mail to these individuals the "Sgt. Dennis notice letter" that I sent to you yesterday via email. These notice letters should be mailed to these individuals no later than December 15, 2017. Please keep any of the letters that might be returned to you so that we can show that we did attempt to notify said individuals, should the issue arise.

Exhibit S-24B is a copy of an email, also dated September 26, 2017, from DAG Mitchell to Somerset County Assistant Prosecutor Anthony Parenti, attaching the Excel Spreadsheet in Exhibit S-87, containing the same language quoted above in Exhibit S-24A.

Exhibit S-24C is a copy of a series of emails, also dated September 26, 2017, between DAG Mitchell, Assistant Monmouth County Prosecutor Monica do Outeiro, and Jill Lake, an Information Technology employee with DCJ, attaching the Excel Spreadsheet in Exhibit S-85, containing the same language set forth in Exhibit S-24A.

71

DAG Mitchell testified that although she was unable to locate copies of the similar emails she sent to the Middlesex County and the Union County Prosecutors' Office, she had no doubt they were also sent.

Exhibit S-80 contains a copy of the referenced form letter sent by DAG Mitchell, signed by SDAG Robert Czepiel, Jr., Deputy Chief of the Prosecutors Supervision and Training Bureau, to the Office of the County Prosecutors in each of the five principal Counties. It is dated "December 4, 2018," but DAG Mitchell testified that date was a typographical error and should have been "December 4, 2017." The letter, addressed "To Whom It May Concern," referencing "Notice regarding your DWI case," states as follows:

> Court records indicate that you were arrested for and/or convicted of drunk driving sometime between 2008 and 2016. This letter is to inform you that it is possible there may have been an issue in the proceedings in your DWI case.
>
> Specifically, it has been alleged that on or about October 6, 2015, and on or about October 6, 2015, New Jersey State Police Sergeant Marc Dennis, a former coordinator in the Alcohol Drug Testing Unit, calibrated the Alcotest 7110 MKIII-C ("Alcotest") evidential breath testing instruments in the City of Asbury Park, the City of Long Branch, and the Township of Marlboro, without following the established protocol and then certified that the calibration was done in accordance with the required procedures. Sergeant Dennis's alleged false swearing and improper calibrations of these three instruments

72

may call into question all of the calibrations performed by Sergeant Dennis over the course of his career as a coordinator (i.e. 2008-2016), and might possibly entitle you to future relief.

The New Jersey Supreme Court has assigned the Honorable Joseph Lisa, P.J.A.D. (retired and t/a on recall) to preside over a hearing to determine whether Sergeant Dennis's failure to perform a specific step in the established protocol adversely affected the scientific reliability of the calibrations he performed, as well as any evidential breath tests conducted on those Alcotest instruments. The outcome of these legal proceedings, which are now underway, will determine whether you are entitled to future relief.

If you believe that you are presently suffering any adverse consequences from your DWI conviction or pending DWI case, you should consult an attorney to determine if you are entitled to emergent, immediate relief. You will be notified when the above-noted hearing is completed, Judge Lisa's determination as to whether Sergeant Dennis's failure to perform the specific step in the established protocol adversely affected the scientific reliability of the calibrations he performed, and if so, whether you are entitled to relief therefrom.

As noted, this form letter was sent to each of those County Prosecutors' Offices, with the request it be mailed to the subjects at the addresses set forth in Excel Spreadsheets, as set forth in Exhibits S-84 through S-88.

Column A of Exhibit S-83, entitled "Ticket Number," contains the summons number and municipal code for each Row. Upon reviewing Column A in each Row, DAG Mitchell discovered that some of the subjects had not

73

been arrested in one of the five (5) principal Counties, but had been requested to provide breath samples on Alcotest Instruments within one of those five Counties. She explained it was decided that those subjects should be provided notice letters, mailed directly by the Division of Criminal Justice. Accordingly, DAG Mitchell created a separate Excel Spreadsheet containing the names of those subjects and the addresses used to mail them the notification letter.[9] That Spreadsheet has been marked into evidence as Exhibit S-76A, entitled "Defendants who received notice letter from DCJ," consisting of six (6) Sheets. Sheet 1 contains all subjects arrested in those other Counties, with 113 exact subject-to address matches, and 5 partial subject-to-address matches. The remaining 5 Sheets in Exhibit S-76A contain breakdowns on those full and partial address matches in the other Counties, as follows: Sheet 2 contains 1 full subject-to-address match from an arrest in Burlington County; Sheet 3 contains 70 full subject-to-address matches and 3 partial subject-to-address matches from arrests in Essex County; Sheet 4 contains 1 full subject-to-address match from an arrest in Hudson County; Sheet 5 contains 1 full subject-to-address match in Hunterdon County; and Sheet 6 contains 39 full

---

[9] These subject-to-address matches were derived from Exhibit S-83, the Excel Spreadsheet sent by the AOC to the DCJ.

74

subject-to-address matches and 2 partial subject-to-address matches from arrests in Mercer County.

DAG Mitchell testified that Holly Lees, an Executive Administrative Assistant with DCJ, inserted the notice letters into envelopes addressed to the subjects listed in Exhibit S-76A, and attended to their mailing. There then ensued the following colloquy of questioning by DAG Clark of DAG Mitchell:

> Q. What if anything did DCJ do to track any mailings that were returned as undeliverable?
>
> A. To track, nothing.
>
> Q. What effort if any did DCJ make to edit the spreadsheets based on mailings that were undeliverable?
>
> A. We did not do that.
>
> Q. What effort did DCJ make to learn from the five prosecutors' offices the mailings that were returned as undeliverable to those offices, if any?
>
> A. I had heard from some of them that they were receiving envelopes back but I did not ask them to give me a listing of which envelopes were returned to them.
>
> [T4, page 27, line 22 to page 28, line 9.]

DAG Mitchell also testified that Exhibit S-97, a memorandum, dated December 1, 2017, was sent by SDAG Robert Czepiel, Jr. to all County Prosecutors and all County Prosecutors Liaisons. That memorandum attached a letter, dated November 3, 2017, sent by SDAG Czepiel to all County

Prosecutors, concerning the allegations and indictment against Sergeant

Dennis, attached the Order issued by Special Master Lisa, in State v. Cassidy,

dated November 2, 2017, see Exhibit S-98, granting the State's motion for "a

stay of proceedings in other courts that raise issues potentially affected by the

Supreme Court's ultimate determination in this matter, i.e. a DWI prosecution

in which a BAC reading serviced from an Alcotest device calibrated by

coordinator Marc Dennis[,]" and the Order issued by Judge Lisa on November

28, 2017, supplementing the November 2, 2017 Order, see Exhibit S-100,

which provided as follows:

> 1. In any proceeding in any court involving a prosecution, conviction or sentence for a DWI offense for which the offense date was between January 1, 2008 and September 30, 2016, it shall be the affirmative obligation of the prosecutor in that proceeding to determine whether or not the defendant provided a breath sample on an Alcotest device that had been calibrated by coordinator Marc Dennis, and to produce documentary evidence of that determination to the defendants and the court;
>
> 2. In any proceeding in any court involving a prosecution for an offense in which a prior DWI conviction constitutes a predicate offense to enhance the gradation or applicable punishment in that subsequent prosecution for another charge, or involving a sentence emanating from such a case that has been adjudicated, it shall be the affirmative obligation of the prosecutor in that proceeding to determine whether or not the defendant provided a breath sample on an Alcotest device that had been calibrated by coordinator Marc Dennis in that prior DWI case, and to produce

documentary evidence of that determination to the defendant and the court;

IT IS FURTHER ORDERED that the Attorney General shall forthwith provide a copy of this order to all county and municipal prosecutors.

In his Exhibit S-96, December 1, 2017 memorandum, SDAG Czepiel outlined the requirement in paragraph 1 of Judge Lisa's November 28, 2017 Order in Exhibit S-100, and then stated:

This requirement can be satisfied by obtaining and producing the four calibration documents generated by the Alcotest during the calibration process. Because a "proceeding" is any matter that is pending, if a defendant files a motion after sentencing (e.g., a motion to stay the sentence, a motion to withdraw their guilty plea, a municipal appeal, etc.), the case would then be considered a "proceeding" that triggers the prosecutor's affirmative obligation to make that determination and produce the required documentation. However, the prosecutor is not required to look through every closed case within this timeframe.

In that letter, SDAG Czepiel then addressed the State's obligation set forth in paragraph 2 of the November 28, 2017 Order, stating:

Please note that such matters may include Driving While Suspended offenses under both N.J.S.A. 39:3-40 and 2C:40-26 if the predicate offense is a Dennis-related DWI. In short, the affirmative obligation imposed by paragraph two of the Supplemental Order to determine whether the underlying DWI is a Dennis-related case impacts all pending DWI and DWS cases throughout the state, regardless of where the pending proceeding is located.

77

The December 1, 2017, Exhibit S-96, memorandum also notes that because a second or subsequent DWI offense could occur anywhere in the State, the DCJ was providing every County Prosecutor's Office a master list of the names or every individual who was identified as having provided a breath sample on an Alcotest Instrument that had been calibrated by Sergeant Dennis. It noted a meeting of those Assistant Prosecutors who are the Municipal Prosecutors Liaisons was scheduled for December 5, 2017, where a thumb drive of that master list would be distributed.

DAG Mitchell testified that meeting took place on December 5, 2017, and thumb drives of the master list were distributed to the attendees. She stated that because not all Municipal Prosecutor Liaisons attended that meeting, SDAG Czepiel sent letters, dated December 6, 2017, to the Prosecutors' Offices in Essex, Atlantic, Cape May, Cumberland, Ocean, Sussex, Union, and Warren Counties, enclosing a thumb drive containing the Excel Spreadsheets in Exhibits S-91 and S-83, as well as list of Municipal Codes (also contained in Exhibit S-101) to aid in the locations of arrests listed in S-91 and S-83.

DAG Mitchell acknowledged that the Court's November 2018 decision in State v. Cassidy, ordered the State "to notify all affected defendants of our decision that breath test results produced by Alcotest machines not calibrated

using a NIST-traceable thermometer are inadmissible, so that they may take appropriate action." 235 N.J. 482, 498 (2018). Accordingly, she testified the DCJ drafted a form letter that was sent to County Prosecutors in the five principal Counties, in an email dated December 14, 2018, <u>see</u> Exhibit S-80, asking them to mail that form letter to the addresses of the individuals set forth in Exhibits S-84 through S-88. That email also requested them "to keep any of the letters that might be returned to you so that we can show we did attempt to notify these individuals, should the issue arise." That form letter, also signed by SDAG Czepiel, is dated January 24, 2019, addressed "To Whom It May Concern," referencing "Notice regarding your DWI case," and states, as follows:

> You are being provided this notice according to <u>State v. Eileen Cassidy</u>, No. 078390, A-58-16 (N.J. Nov. 13, 2018), so please read this letter carefully as you may be entitled to file a motion for post-conviction relief pursuant to *N.J. Court Rule* 7:10-2. Court records indicate you may have been arrested and/or convicted of Driving While Intoxicated ("DWI") between 2008 and 2016. If you were convicted of DWI and gave a breath test sample on an affected Alcotest instrument, you may be entitled to post-conviction relief.

> A letter was previously mailed to you advising that legal proceedings were underway in <u>State v. Eileen Cassidy</u>, regarding a New Jersey State Police sergeant who calibrated several Alcotest instruments and who failed to follow the proper protocol. The legal proceedings are completed. The Court found that the sergeant's failure to follow the established protocol

79

aversely affected the scientific reliability of breath tests taken on Alcotest instruments calibrated by him, and ruled that the results from those instruments are inadmissible in court. **Therefore, if you gave a breath sample on an Alcotest instrument calibrated by this sergeant, the results of those breath tests cannot be used as evidence in your DWI case, and you might be entitled to post-conviction relief**. The Administrative Office of the Courts will be setting up procedures for those potentially affected individuals to seek post-conviction relief. Until such time that these procedures are established, you may contact the municipal court where your case was handled if you believe that you might be entitled to relief. You may consult with a private attorney or municipal public defender, if available, to determine whether you are entitled to relief and/or what action if any you should take.

[See Exhibit S-80.]

DAG Mitchell testified the DJC used the same subject-to-address matches set forth in Exhibit 76A for those individuals who had been arrested in Burlington, Essex, Hudson, Hunterdon and Mercer Counties to mail the January 14, 2019 notice letter. Those notification letters were also prepared and mailed by Holly Lees, an Executive Administrative Assistant in the DCJ. DAG Mitchell testified she was not aware as to how many of those mailed notice letters were returned as undeliverable.

DAG Mitchell also testified that she contacted Paul Kramel, who works in the Communications Section of the Office of the Attorney General, and at her request, in beginning of 2019, Mr. Kramel placed the January 14, 2019

80

notice letter, as well as a listing of the locations of Alcotest Instruments calibrated by Sergeant Dennis, onto the Attorney General's website.

When asked whether there was ever a distinction made, in the Excel Spreadsheets created and distributed, between a Driving While Intoxicated offense heard in Municipal Court or in the Superior Court as part of an Indictment, DAG Mitchell stated:

> We never did. The people that were on the spreadsheets were only those who gave breath samples on instruments that were calibrated by Sergeant Dennis. We never looked at whether or not they were charged in Municipal Court or Superior Court. It was just if they gave a breath sample on an instrument calibrated by Dennis.
>
> [T4, page 45, lines 8-14.]

On cross-examination by Mr. Gold, DAG Mitchell was shown Exhibit S-148, the Excel Spreadsheet received by the DCJ from the Alcohol Drug Testing Unit (ADTU) of the New Jersey State Police, entitled "5925_Spreadsheet_Final," which contains 27,833 Subject Rows and 21 Columns on information as to each Row. DAG Mitchell again verified that none of those Columns contain the identity of the Coordinator who performed the calibration of the Alcotest Instruments, listed in Column B, on the date set forth in Column C. It was noted, however, that "5925" listed in the title of the Exhibit S-148 Spreadsheet, is the badge number of Sergeant Marc Dennis.

81

DAG Mitchell acknowledged there may be individuals on those 27,833 Rows that are duplicates, appearing more than once because of multiple breath test attempts.

DAG Mitchell was again shown Exhibit S-90, which she stated contained the same information as contained in the Excel Spreadsheet designated as Exhibit S-148. Referring to the second Sheet in Exhibit S-148, the "SQL Statement," which was printed and separately marked as Exhibit DB-13,[10] DAG Mitchell verified that the number of Columns of information available for each breath test attempted from a private search of the Alcotest Inquiry System database, is 310.

In reviewing the nineteen (19) Alcotest Instrument Serial Numbers listed in the SQL Statement in Exhibit DB-13, DAG Mitchell agreed that the listing of those Serial Numbers in Column B on Exhibit S-148, ended with Row 3616, and the remaining Alcotest Serial Numbers appearing in Column B, Rows 3617 through 27834, were not contained on the printout of the SQL Statement Sheet (Exhibit DB-13) of Exhibit S-148. DAG Mitchell testified she was not aware how the query to obtain the Exhibit S-148 Excel Spreadsheet was prepared.

---

[10] During the hearing, this Exhibit was referred to as DB-12, but it is actually DB-13.

In State v. Chun, 194 N.J. 54, 72-73 (2008), the Court recognized that the Alcotest Instrument is programmed to require that a test subject produce a breath sample that meets four following minimum criteria before the sample is considered to be sufficient for purposes of deriving an accurate test result: (1) minimum volume of 1.5 liters; (2) minimum blowing time of 4.5 seconds; (3) minimum flow rate of 2.5 liters per minute; and (4) that the IR measurement reading achieves a plateau (i.e., the breath alcohol does not differ by more than one percent in 0.25 seconds). However, the Court agreed with the report issued by Special Master, Judge Michael Patrick King, finding there was credible evidence to support lowering the minimum breath volume from 1.5 to 1.2 liters for women over the age of sixty. The Court also noted:

> Although an Alcotest operator has several options if the device reports that the test sample is inadequate, the fact remains that one of them, refusal, carries with it the possibility of severe sanctions. See N.J.S.A. 39:4-50.4a. In the face of abundant evidence in the record that there is an identifiable group in the test population who may be physiologically incapable of complying, the risk of permitting the device to reject samples from members of that group and, by extension, authorizing the issuance of a summons for refusal, is unjust.
>
> [194 N.J. at 77-78.]

The Chun Court then entered an Order, which provided, in part, that the:

> Alcotest 7110 MKIII-C with New Jersey Firmware version 3.11 is sufficiently scientifically reliable, and

83

the Alcohol Influence Report (AIR) which sets forth the results of breath tests is admissible as evidence of blood alcohol content (BAC), except that:

* * * *

(3) in each prosecution involving any woman who, at the time of the alleged offense, was over the age of sixty and for whom an AIR was generated with an error message evidencing a breath sample of inadequate volume, the AIR shall not be admissible as evidence in a prosecution for refusal, see N.J.S.A. 39:4-50.4a, unless the woman also provided another breath sample of at least 1.5 liters;

* * * *

B. The firmware shall utilize minimum breath sample criteria as follows: (1) minimum volume of 1.5 liters for all test subjects except for women over sixty years of age, for whom the minimum volume shall be fixed at 1.2 liters; (2) for all subjects, regardless of age or gender, the minimum criteria shall also include (a) a minimum 4.5 second blowing time; (b) a minimum flow rate of 2.5 liters per minute; and (c) a plateau as established by the infrared (IR) measure which does not differ by more than one percent in 0.25 seconds[.]

[194 N.J. at 150-52.]

And, in State v. Chun, 215 N.J. 489 (2013), on the defendants' application for an order in aid of litigant's rights under R. 1:10-3, the Court entered an Order that provided, in part:

4.   IT IS ORDERED that, in addition to the directive in paragraph in Paragraph 1(A)(3) of this Court's March 17, 2008, Order, concerning the admissibility of Alcotest results for women over the age

84

of 60 in prosecutions for refusal, see N.J.S.A. 39:4-50.4a, if the only evidence of refusal is the inadmissible AIR [Alcohol Influence Report], such women may not be charged with, prosecuted for, or convicted of that offense.

[215 N.J. at 492.]

On cross-examination, DAG Mitchell, upon reviewing the Court's decision in Chun, confirmed that when obtaining a breath sample from a subject, the Alcotest Instrument requires the subject to blow into the receptacle at least 1.5 liters of air for at least 4.5 seconds. However, she acknowledged that the Court has ruled that for women over the age of 60, the acceptable minimum volume of air is 1.2 liters, and because the firmware of Alcotest Instruments has not been modified to account for that difference, women over the age of 60 who have not reached the minimum volume of 1.5 liters cannot be charged with a refusal, and operators of Alcotest Instruments have been trained not to charge such a subject with refusal.

Mr. Gold then displayed Exhibit DB-19, an Excel Spreadsheet he created by sorting the data contained in Exhibit S-148, the Spreadsheet entitled "5925_Spreadsheet_Final" by rearranging the columns. The Spreadsheet he created, as DB-19, is entitled "DB-19 courtesy import of DB-17 into MS Excel format (27,833 sorted DL_Last_First_ArrestDate_ArrestTime)." Among the sorted Columns are: Column A, the corresponding Row Number in Exhibit S-

85

148; Column F, the subject's last name; Column G, the subject's first name; Column H, the arrest date of the subject; Column J, the Summons Number; Column K, the subject's driver's license; Column L, the location of the Alcotest Instrument on which the breath test was attempted; Column M, the "Final Error," if any; Column N, the "End Result," as to whether a BAC Reading was obtained; and Column O, the serial number of the Alcotest Instrument on which the breath test was attempted.

DAG Mitchell was then shown the subject entries ███████████████ ████ on Rows 12 and 13 of Exhibit DB-19, which correspond to Rows 26,279 and 25,045 on Exhibit S-148 (also S-90).[11]  Those entries, on both Spreadsheets, show the same arrest date and summons number, and that ███ ████████████████ was first brought to Freehold Township for a breath test on Alcotest Instrument ARXC-084, but the control test failed, and then was brought to Freehold Borough for a breath test on Alcotest Instrument ARXC-0067, which produced a Blood-Alcohol Content reading of 0.144.  However, both Rows also show, in Column K, blank spaces as to whether he had a Driver's License.  DAG Mitchell acknowledged that this would be a subject she would have wanted to notify because a BAC reading had been obtained.

---

[11]  Exhibit DB-19 lists the corresponding Rows on Exhibit S-148 (also on Exhibit S-90), as 26,278 and 25,044, but they are actually one Row off, and are Rows 26,279 and 25,045.

86

However, this is an example where Mr. Prather, according to his testimony, in attempting to match subjects-to-addresses contained on Exhibit S-148 (or S-90), would have resulted in him deleting those entries because he would not have been able to find an address for ████████████████ in the ATS database without a driver's license number to cross-check. In fact, the court has reviewed Exhibit S-91, the Excel Spreadsheet prepared by DAG Mitchell, sent to the AOC to find subject-to-address matches, and Row 18,653 does contain the name of ████████████████ as being included on the list sent to the AOC for that purpose. Moreover, his name is not included in either Sheet of Exhibit S-85, the Alcotest Spreadsheet entitled "Spreadsheet from AOC_Monmouth County Only," which was received from the AOC as subject-to-address matches. Accordingly, this is an example of a subject who was requested to provide a breath sample on an Alcotest Instrument calibrated by Sergeant Dennis, a BAC reading was obtained, but he was not provided mailed notice in accordance with the Court's decision in State v. Cassidy, 235 N.J. 482, 498 (2018), directing the State "to notify all affected defendants of our decision that breath test results produced by Alcotest machines not calibrated using a NIST-traceable thermometer are inadmissible, so that they may take appropriate action."

87

Another example on Rows 25 and 26 on Exhibit DB-19 is ███████

███████████████. The corresponding Rows on Exhibit S-148 (and S-90) are

6569 and 6570.[12] Both tests were conducted on Alcotest Instrument ARTL-

0015, an Instrument calibrated by Sergeant Dennis. He was tested twice, on

July 13, 2015, on that Instrument, at the Sayreville Borough Police Station.

The first test produced an end result of "Mouth Alcohol," and the second test

produced a BAC reading of 0.147. Again, Row 5004 on Exhibit S-91, the

Excel Spreadsheet sent by the DCJ to the AOC, contains the name of ███████

███████████, but because there was no driver's license entry on Column

M of Exhibit S-91, his name did not appear as a subject-to-address match on

either Sheet of Exhibit S-83 or on Exhibit S-84 and, thus was not mailed notice

in accordance with Cassidy, 235 N.J. at 498.

Upon a further review of Column K, "Driver's License Number" on

Exhibit DB-19, DAG Mitchell acknowledged there were numerous examples

of Rows where no driver's license was contained in that Column, but there

were BAC readings listed on many in Column N, "End Result," on those

Rows, and because there was no driver's license, on an improper entry listed

---

[12] Again, Exhibit DB-19 lists the corresponding Rows on Exhibit S-148 (also on Exhibit S-0) as 6,568 and 6,559, whereas they are actually Rows 6,569 and 6,560.

thereon, the AOC was unable to obtain subject-to-address matches, resulting in no mailed notices being sent to them.

As to all these examples, DAG Mitchell acknowledged they would not have been sent mailed notices, but noted that notice of the Court's decision in Cassidy was posted on the website of the Attorney General and the websites of the Prosecutors of both Counties.

DAG Mitchell was also asked to review Rows 328, 329, and 330 on Exhibit DB-19. All three Rows relate to attempted breath tests of the subject ▮▮▮▮▮▮▮▮▮ on July 21, 2014. Row 328 concerns an attempted breath test on Alcotest Instrument ARWC-0062, located at the Scotch Plains Police Station, with the end result in Column M being "Subject Refused." Row 329 documents an attempted breath test on Instrument Alcotest Instrument ARWC-0069, located at the Plainfield Police Department, with an end result in Column M of "Subject Refused," and Row 330 shows an attempted breath test on that same Alcotest Instrument in Plainfield Police Station with an end result in Column M of "Control Test Failed." In all three Rows, no driver's license number is listed on Column K. These same entries are contained in Exhibit S-148 as Rows 16,519, 16,775 and 16,776.[13] DAG Mitchell acknowledged she

---

[13] As noted, Exhibits S-148 and S-90 are Excel Spreadsheets containing the same information concerning subjects who had been arrested, charged with DWI, and were requested to provide breath samples on Alcotest Instruments,

did not include this subject in Exhibit S-91 because there was no BAC reading obtained on any of those three attempted breath tests. She iterated her task in reviewing Exhibit S-90 (also Exhibit S-148), was to identify those subjects who had provided breath samples on Alcotest Instruments calibrated by Sergeant Dennis where an evidential BAC reading had been obtained based on the breath samples provided. Here, all three attempts to obtain breath samples from ████████████ did not produce a BAC reading and, accordingly, were not included in Exhibit S-91, the Excel Spreadsheet prepared by DAG Mitchell, and sent by the DCJ to the AOC, seeking mailing addresses so that notices of the Indictment of Sergeant Dennis and the then-pending Cassidy case could be sent.

DAG Mitchell testified further that, when reviewing Exhibit S-148, where attempts to obtain breath samples from subjects on Alcotest Instruments that had been calibrated by Sergeant Dennis did not result in a BAC reading, the basis for any DWI conviction could not have been an inadmissible BAC reading and, thus, was not affected by the miscalibration of the Alcotest Instrument by Sergeant Dennis. She did acknowledge that in a refusal prosecution for a violation of N.J.S.A. 39:4-50.4a, The Implied Consent

---

pursuant to the Implied Consent Statute, N.J.S.A. 39:4-50.2, that had been calibrated by Sergeant Marc Dennis.

Statute, the Alcohol Influence Report (AIR) produced by an Alcotest Instrument stating "Subject Refused" is admissible.

Mr. Gold also displayed Rows 13,879 and 16,846 on Exhibit S-148 (also on Exhibit S-90), pertaining to two attempts to provide breath samples from the subject ███████████ on October 3, 2015. Rows 13,879 and 16,846 on both Exhibits contain the same Arrest Date and Summons Number in Columns A and P, respectively.[14] Column M on both Rows show no entry for his Driver License Number. Row 13,879 documents an attempt to obtain breath samples from ████████ on Alcotest Instrument ARWA-0176, located at the Fanwood Police Station, with an Error Message in Column T, stating "Subject Refused." Row 16,846 shows an attempt to obtain breath samples from ███████████ on that same date, using Alcotest Instrument ARWC-0069, located at the Plainfield Police Station, with an Error Message in Column T, Stating "Control Test Failed. Both Instruments were identified as having been calibrated by Sergeant Dennis.

Upon reviewing these two Rows relating to the testing of ████████, DAG Mitchell testified she assumes that when the Control Test failed on the attempt to obtain breath samples on Alcotest Instrument ARWC-0069 at the

---

[14] The Transcript, T4, page 185, lines 13-14, refers to Rows 13,878 and 16,845, which is incorrect.

Plainfield Police Station, ███████ was transported to the Fanwood Police Station for breath sample testing on Alcotest Instrument ARWA-0176, where the operator reported that he had refused to submit to the taking of breath samples for analysis by that Instrument. DAG Mitchell acknowledged that these two Rows on Exhibit S-148 (also on Exhibit S-90) were eliminated by her, and are not contained on Exhibit S-91 because no evidential BAC reading had been obtained. Moreover, even if they had been contained on Exhibit S-91, Mr. Prather from the AOC would have eliminated them from his subject-to-address search because there was no driver's license number listed for ███ ██████. DAG Mitchell also noted that when the ██████ matter went before the Municipal Court on the refusal charge, defendant or his counsel would have been entitled to receive the Alcohol Influence Reports concerning both attempted breath tests, which would document the number of attempts to obtain breath samples and the reason for the failure of the control test.

During cross-examination, Mr. Gold then displayed Rows 12,864 and 23,756 on Exhibit S-148 (also on S-90), pertaining to the arrest of the subject ████████████.[15] Here, Columns A, M, and P, on both Rows, contain the same arrest date, Driver's License Number, and Summons Number. Row

_____

[15] Again, T4, page 191, line 18 states the Rows for ██████████ are 12,863 and 23,755, which are incorrect.

92

12,864 shows there was an attempt to obtain a breath sample from ████████ on Alcotest Instrument ARWA-0171, located at the New Jersey State Police Station in Holmdel, and Column T reported there was a "Control Test Failure." Row 23,756 documents there was also an attempt to obtain breath samples from ████████ on Alcotest Instrument ARXB-0066, located at the Holmdel Police Station, and Column T reported that "Subject Refused." DAG Mitchell acknowledged both Instruments had been calibrated by Sergeant Dennis and, for the same reasons, these Rows were eliminated by her from inclusion in Exhibit S-91 because no evidential BAC reading was obtained on either test. Accordingly, there was no attempt to find an address for ████████ or notify him concerning the miscalibration of those Instruments by Sergeant Dennis, or the issues pending before, or decided by, the Court in Cassidy.

Mr. Gold also displayed for DAG Mitchell Rows 2407 and 2408[16] on Exhibit S-148 (also on S-90), pertaining to two attempts to obtain breath samples from subject ████████, both for analysis on Alcotest Instrument ARRL-0019, located at the Woodbridge Township Police Station, on June 15, 2011, with Row 2407 reporting a "Mouth Alcohol" error in Column T, and Row 2408 reporting "Test Terminated" in Column T, with no

---

[16] T4, page 194, line 13, states the Rows for ████████ are 2,407 and 2,406, which are also incorrect.

evidential BAC readings reported in Column U on either Row. DAG Mitchell acknowledged these Rows were eliminated by her when creating Exhibit S-91 because there were no BAC readings obtained. She also agreed that more information from a query of the Alcotest Inquiry System database of all 310 Columns of available information, could have reflected how many attempts at providing breath samples were made, the breath volume or blowing length of any such attempts, and whether a single acceptable reading (two are required for an Instrument to report a final BAC reading) was obtained.

DAG Mitchell was then referred to Rows 25,150 and 25,151 on Exhibit S-148 (also on Exhibit S-90), pertaining to subject ███████████.[17] The Arrest Date, Location of the Alcotest Instrument, Driver License Number and Summons Number in Columns A, D, M, and P, respectively, are all the same. Both attempted tests were on Alcotest Instrument ARXC-0069. Row 25,150 reported the Final Error message "Ambient Air Check Error" in Column T, and Row 25,151 reported the Final Error message of "Subject Refused." That Instrument had been calibrated by Sergeant Dennis, and Column U did not report a BAC reading. DAG Mitchell explained that, prior to a breath test, the Alcohol Instrument analyzes the surrounding air to verify it contains no

---

[17] T4, page 196, refers to those as Rows 25,149 and 25,150, which Mr. Gold stated "is probably one off the Excel Spreadsheet[,]" and he is correct. The actual Rows reviewed from ██████ are 25,150 and 25,151.

94

alcohol and if, for example, hand sanitizer containing alcohol is used before the attempted test, the error message "Ambient Air Check Error" will appear, preventing the receipt of breath samples. Again, DAG Mitchell verified that these Rows were eliminated by her in creating Exhibit S-91 because no evidential BAC reading had been obtained.

DAG Mitchell was then shown Rows 3,686 and 6,409 in Exhibit S-148 (also contained on Exhibit S-90) pertaining to subject ███████.[18] Again, the same Arrest Date, Driver's License Number and Summons Number appear on both Rows in Columns A, M, and P, respectively. In Row 3686, an attempt was made to have ████████ provide breath samples on Alcotest Instrument ARSC-0059, located at the South Amboy Police Station, with the Final Error message "Subject Refused" appearing in Column T. In Row 6,409, an attempt was made to obtain breath samples from ███████ on Alcotest Instrument ARTL-0015, located at the Sayreville Borough Police Station, with the Final Error Message, "Control Test Failed" appearing. Again, both breath sample attempts were on Instruments that had been calibrated by Sergeant Dennis, and no evidential BAC readings were reported in Column U. DAG Mitchell again

---

[18] T4, page 197, lines 17-18, state the Rows as 6,408 and 4,685 on Exhibit S-148. Those are incorrect, the correct Rows being 3,686 and 6,409.

stated these Rows were eliminated by her in creating Exhibit S-91 because no BAC readings had been obtained.

Mr. Gold also displayed and questioned DAG Mitchell concerning a few other Row entries in Exhibits S-148 also appearing on the same Rows in Exhibit S-90, with the same responses from DAG Mitchell that, where no evidential BAC reading was obtained, those Rows were not included by her in creating Exhibit S-91.

DAG Mitchell explained that when conducting a breath test on an Alcotest Instrument, depending on the circumstances that occur, when breath samples are not sufficient to produce an evidential BAC reading, the Operator of the Instrument has the option of choosing "Test Terminated," or "Subject Refused" as the End Result that is then reported on Column U.

This line of questioning of DAG Mitchell is based on the position asserted by the Defendant-Respondent and *Amici*, the New Jersey State Bar and Office of the Public Defender that in instances where an Alcotest Instrument has been calibrated by Sergeant Dennis and an error message produced by that Instrument resulted in no BAC reading being obtained, that case should be deemed to have been included as one affected by the Court's decision in State v. Cassidy. They contend an Alcotest Instrument that had not been properly calibrated cannot function properly and, thereby, the conclusion

96

by the operator of the test that a subject had refused to submit to a breath test, was suspect, entitling that subject, if convicted of a refusal, to make an application for post-conviction relief. The State has contended that the Court's decision in Cassidy only permits post-conviction relief applications where a subject was convicted, by plea or trial, of Driving While Intoxicated, or some other offense, based on the existence of an evidential BAC reading obtained from breath samples provided on an Alcotest Instrument that had been calibrated by Sergeant Dennis.

DAG Mitchell was then questioned by Mr. Gold concerning Exhibit S-82B, the Excel Spreadsheet entitled "Defendants who received notice letter from DCJ," which contains 6 Sheets. This Spreadsheet concerns notice letters that were sent to subjects who had been asked to provide breath samples on Alcotest Instruments that were not located in any of the 5 principal Counties (Middlesex, Monmouth, Ocean, Somerset and Union). She acknowledged that the subjects listed in those Sheets of Exhibit S-82B were mailed notice letters directly by the Division of Criminal Justice to the addresses contained in Exhibit S-83.

Mr. Cooke, counsel for Defendant-Respondent Zingis, questioned DAG Mitchell concerning Exhibit S-96, the form notification letter signed by Supervising DAG Robert Czepiel in 2017, which was sent to all County

Prosecutors and all Municipal Prosecutor Liaisons.  DAG Mitchell explained that letter attached the November 3, 2017 letter, see Exhibit S-97, sent regarding the allegations against Sergeant Dennis and the then-pending case of State v. Cassidy, and also attached the November 2, 2017 Order issued by Special Master, Judge Lisa, see Exhibit S-98, granting a stay of proceedings in other courts that raised issues potentially affected by the ultimate decision of the Court in the Cassidy matter, and that  Exhibit S-96 also attached Judge Lisa's Supplemental Order issued on November 28, 2017, see Exhibit S-100, discussed  infra.

DAG Mitchell identified, Exhibit DZ-2, which is a letter signed by SDAG Robert Czepiel, dated June 29, 2018, addressed to all County Prosecutors and all County Municipal Prosecutor Liaisons, notifying them that until the Court issues its decision in Cassidy, Judge Lisa's Orders entered on November 2, 2017 and November 28, 2017, remained in effect.  DAG Mitchell testified those Orders expired after the Court issued its decision in State v. Cassidy, 235 N.J. 482 on November 23, 2018.  She explained that, thereafter, any conviction for Driving While Intoxicated that was based on an evidential BAC reading from an Alcotest Instrument that had been calibrated by Sergeant Dennis, could be challenged because that reading was determined by the Court to be inadmissible.

98

On questioning by Mr. Noveck, DAG Mitchell stated when she received the Excel Spreadsheet in Exhibit S-148 (also Exhibit S-90) from the Alcohol Drug Testing Unit (ADTU) of the New Jersey State Police, she assumed it contained a listing of all subjects identified, from a query of the Alcotest Inquiry System database, as having been asked to provide breath samples on an Alcotest Instrument that had been calibrated by Sergeant Dennis.

Mr. Noveck then displayed Exhibit S-27, the September 16, 2022 certification executed by DAG Mitchell. In that certification, DAG Mitchell states Sergeant Dennis became a Coordinator, authorized to perform calibrations on Alcotest Instruments, effective November 8, 2008, and that the last calibrations performed by Sergeant Dennis were on or about October 9, 2015. Since calibrations must be performed on each Alcotest Instrument every six months, she concluded the last date a defendant could have provided breath samples on an Instrument calibrated by Sergeant Dennis would have been approximately April 9, 2016. In that certification, she noted the ADTU did not maintain a list of the locations and dates of Alcotest Instruments calibrated by the Coordinators during the time period Sergeant Dennis was performing calibrations and, although calibration documents were left with the agency in which the Alcotest Instrument was located, Coordinators were not required to maintain a copy of the calibrations documents. Therefore, the ADTU did not

99

have copies of documents concerning calibrations performed by Sergeant Dennis.

In Exhibit S-27, DAG Mitchell certified that based on discussions with representative of the ADTU and the Office of Forensic Science (OFS) within the New Jersey State Police, it was determined the Information Technology Bureau (ITB) would be able to create a list of all subjects who had been requested to provide breath samples on an Alcotest Instrument calibrated by Sergeant Dennis by conducting a search and query of the Alcotest Inquiry System database. DAG Mitchell again noted the result was the creation of Exhibit S-148, the Excel Spreadsheet entitled "5925_Spreadsheet_Final.xslz," which was provided to the DCJ by the ADTU in 2016, containing the names of 27,833 subjects. As testified during direct examination, DAG Mitchell certified, in Exhibit S-27, she deleted all subject rows where no evidential BAC reading was obtained, during the attempted breath testing, in Column U of Exhibit S-148, resulting in 20,667 individuals remaining who had provided breath samples on an Alcotest Instrument calibrated by Sergeant Dennis and were thus potentially affected by his conduct. As noted, that adjustment of the Excel Spreadsheet contained in Exhibits S-90 and S-148 became Exhibit S-91, which was ultimately sent to Judge Grant in September 2016, along with a

county-by-county breakdown of those 20,667 subjects in five separate Excel Spreadsheets, seeking addresses for those 20,667 subjects.

Referring to paragraphs 34 and 35 of Exhibit S-27, DAG Mitchell explained she also worked with the ADTU and ITB in 2019 to obtain a query of the database to create an Excel Spreadsheet of all Solution Changes performed on all Alcotest Instruments in the State from November 1, 2008 through January 9, 2016, in order to isolate solution changes associated with calibrations performed by Sergeant Dennis. The ADTU provided the DCJ with Exhibit S-92, the Excel Spreadsheet entitled "Spreadsheet_All Solution Changes_11-1-08 thru 01-09-16," which consists of 68,450 Rows of solution changes performed during that period, with 130 Columns of information, including the solution change date (Column B), the calibration date (Column C), and the Alcotest Instrument Serial Number (Column E). In that certification, DAG Mitchell states she used Exhibit S-92 to isolate solution changes associated with calibrations performed by Sergeant Dennis to create Excel Spreadsheets, separated by county, of the location of Alcotest Instruments calibrated by Sergeant Dennis, as well as the dates of those calibrations, all of which is contained in Exhibit A to her Exhibit S-27 certification dated September 16, 2022. In her subsequent certification, Exhibit S-125, dated March 1, 2023, DAG Mitchell corrected various errors in

Exhibit A to her Exhibit S-27 certification, which had included some dates and locations that Sergeant Dennis performed a solution change that was not performed in concert with a calibrations, and she attached a "Corrected Exhibit A" to Exhibit S-125 to only include instances where Sergeant Dennis performed solution changes in conjunction with a calibration.[19]

Mr. Noveck displayed Exhibit S-152 during his questioning of DAG Mitchell, which is an Excel Spreadsheet ordered to be created by this court by the court on March 29, 2023, entitled "Subjectsfrom11052008_06302016," containing all subjects who were requested to provide breath samples on Alcotest Instruments in New Jersey from November 5, 2008 through June 30, 2016, consisting of 236,664 Subject Rows and the same 21 Columns of information as contained in Exhibits S-148 and S-90.

Mr. Noveck established, through DAG Mitchell's testimony, that Row 154,920 on Exhibit S-152 relates to an arrest of ▮▮▮▮▮▮ on February 8, 2009 (Column A), and ▮▮▮▮▮ provided breath samples on Alcotest Instrument ARWF-0356 (Column B), located in Warren Township Police Station (Column D), which Instrument was calibrated on January 22, 2009 (Column C), and a BAC reading of 0.209 was obtained (Column U). Mr. Noveck then displayed Exhibit S-90 (also Exhibit S-148), and highlighted

---

[19] A solution change must be performed in conjunction with a calibration.

Rows 18,225 through 18,235 for Alcotest Instrument ARWF-0356 (Column B), located at the Warren Township Police Station (Column D), and calibrated on July 22, 2009 (Column C). Mr. Noveck then highlighted Rows 18,236 through 18,242, which showed calibration dates of January 11, 2010 (Column C) of Alcotest Instrument ARWF-0356 (Column B) in the Warren Township Police Station (Column D), which are all the calibration dates listed for that Alcotest Instrument in Exhibit S-90 (also S-148). Referring to Row 1,836 on Exhibit S-92, Alcotest Instrument ARWF-0356 (Column E), located at the Warren Township Police Station (Column X), was calibrated on January 22, 2009 (Column C) by Sergeant Dennis (Columns AS through AV). However, there is no ▮▮▮▮▮▮▮ listed on Exhibit S-90 (also Exhibit S-148), despite the fact he provided breath samples on an Alcotest Instrument calibrated by Sergeant Dennis where an evidential BAC reading result was obtained. Accordingly, DAG Mitchell acknowledged ▮▮▮▮▮▮ would not have been contained on the Exhibits S-91 or S-83 Excel Spreadsheets and, hence, not mailed any of the notification letters.

Returning to Exhibit S-152, Mr. Noveck highlighted Rows 154,920 through 154,929, which contain all calibrations of Alcotest Instrument ARWF-0356 (Column B) in Warren Township Police Station (Column D) on January 22, 2009 (Column C), and noted it had been established that Sergeant Dennis

103

performed that calibration. It was confirmed by DAG Mitchell that Row 154,921 shows that ███████████ (Columns E & F) was arrested on March 1, 2009 (Column A), and tested on that Alcotest Instrument at the Warren Township Police Station, which resulted in a BAC reading of 0.209 (Column U), and this subject also does not appear on Exhibit S-90 (also Exhibit S-148), and also would not have received any of the notification letters.

Mr. Noveck then referred DAG Mitchell to Row 154,922 on Exhibit S-152, pertaining to ████████ (Columns F & G), who was arrested on March 28, 2009 (Column A), and also provided breath samples on that same Alcotest Instrument at the Warren Township Police Station, calibrated by Sergeant Dennis, which resulted in an evidential BAC reading of 0.139 (Column U). Returning to Exhibit S-90 (also Exhibit S-148), and searching Column E (Last Name) for ████ reveals, on Row 19519 a ██████████ was arrested on March 29, 2009 and asked to provide breath samples on Alcotest Instrument ARWJ-0013 (Column B), located at the Watchung Borough Police Station (Column D), with no driver's license number listed in Column M, and an Ambient Air Check Error result appearing in Column T and, hence, no BAC reading obtained in Column U. Other identifying information on both S-90 and S-152 indicate this is the same individual, even though the arrest dates have a one-day difference. DAG Mitchell ultimately agreed, because the summons

104

numbers on both entries matched, that ███████ was arrested and brought first to Watchung Police Station for testing and, when that resulted in the Ambient Air Check Error, was then transported for testing at the Warren Township Police Station, where an evidential BAC reading was obtained.  The one-day difference is explained by Column Q on Exhibit S-152, which shows an arrest time of 23:54 and Column Q on Exhibit S-90, which shows an arrest time of 00:54.  In any event, since Row 19519 on Exhibit S-90 (also on Exhibit S-148) shows no BAC reading on Column U, DAG Mitchell confirmed that Row would have been deleted by her and not be contained on Exhibit S-91. Accordingly, no notification letter would have been sent to him either, because the entry on Row 154,922 for Warren Township does not appear on Exhibit S-90 (also S-148).

Mr. Noveck then displayed Row 154,925 on Exhibit S-152, which shows ███████████ (Columns E & F) was arrested on April 25, 2009 (Column A) and was requested to provide breath samples on that same Alcotest Instrument ARWF-0356 (Column B) at the Warren Township Police Station (Column D), calibrated by Sergeant Dennis on January 22, 2009 (Column C), and an evidential BAC reading of 0.194 was obtained (Column U). Returning to Exhibit S-90 (also Exhibit S-148), and searching Column E (Last Name) for "███████," discloses that the same ███████████ was arrested more than

five years later on September 26, 2014 (Column A) and requested to provide breath samples on Alcotest Instrument ARTL-0012 (Column B), located at the Union Township Police Station with a BAC reading of 0.258 reported on Column U. However, reviewing Exhibit S-81(F), it appears ███████ was mailed notification letters at the indicated address, albeit not for the Warren Township matter, which is not listed in Exhibit S-90 (also S-148).

Mr. Noveck then referenced DAG Mitchell's Corrected Exhibit A appended to her March 1, 2023 certification, Exhibit S-125, which states Sergeant Dennis performed the calibration on the Alcotest Instrument ARWF-0400 located at the Highlands Borough Police Station on March 8, 2012. Turning back to Exhibit S-92 (mis-identified in the transcript as S-78), the Excel Spreadsheet containing all solution changes from November 1, 2008 through January 9, 2016, Row 32277 lists the calibration date of March 8, 2012 (Column C) for Alcotest Instrument ARWF-0400 (Column E) at the Highlands Borough Police Station (Column K), performed by Sergeant Dennis (Columns AS through AV). Returning to Exhibit S-152, DAG Mitchell confirmed that Row 167764 shows an arrest date of March 11, 2012 (Column A) for ███████ (Columns E & F), who was asked to provide breath samples on Alcotest Instrument ARWF-0400 (Column B), calibrated on March 8, 2012 (Column C) by Sergeant Dennis, with a BAC reading reported in

106

Column U of 0.058, which is below the legal per se limit. Turning back to Exhibit S-90 (also S-148) and filtering for Instrument ARWF-0400 reveals calibrations of that Instrument in Rows 18833 through 19022 (Column B) at the Highlands Borough Police Station (Column D), but yet there are no listed calibration dates of March 8, 2012, contained in Exhibit S-125.

Mr. Noveck also displayed Exhibit S-152, referring DAG Mitchell to Row 167771 (mis-stated on the transcript as "column 16771"), pertaining to the arrest on April 29, 2012 (Column A) of ███████████ (Columns E & F), with a request he provide breath samples on Alcotest Instrument ARWF-0400 (Column B), located at the Highlands Borough Police Station (Column D), calibrated by Sergeant Dennis on March 8, 2012 (Column C), with a resulting evidential BAC reading of 0.204 reported in Column U. Returning to a review of Exhibit S-90 (also S-148), there is no Subject Row listed for ███████ ███████. Accordingly, not being identified as a subject who provided breath samples on an Alcotest Instrument calibrated by Sergeant Dennis on Exhibit S-90 (also Exhibit S-148), he also would not have been mailed any of the notification letters.

On re-direct, referring to Exhibit DZ-1, The Draeger Alcotest 7110 MKIII-C New Jersey State Police User Manual, DAG Mitchell noted that, on page 36, the Manual instructs:

> If a control check fails, the instrument will abort the test and report the failure. Locate the error and compare it to the "Remedies" section of this guide. The instrument will not proceed until the issue has been resolved and a 'Solution Change' performed. If the issue continues, contact Draeger Safety Diagnostics, Inc.

Referring to pages 40-41 of Exhibit DZ-1, DAG Mitchell also testified there about twenty steps that must be taken when performing a solution change, noting that when a control test fails, it is reasonable for the arresting officer to transport the arrested defendant to a nearby location to have breath samples taken on a different Alcotest Instrument, rather than waiting for another solution change to be performed.

On questioning by Mr. Hernandez concerning mailed notice letters that were returned as being undeliverable, DAG Mitchell agreed that a search of the ATS and ACS databases by the AOC would have reflected whether defendants were represented by counsel during their court appearances. However, she stated there were no discussions by representatives of the Attorney General's Office with representative of the AOC concerning identifying and contacting any attorneys who had represented those defendants if the mailed notices were returned as being undeliverable.

During additional cross-examination by Mr. Gold, DAG Mitchell was again shown Exhibit DB-21, which is an "Alcotest 7110 Calibration Record" for Instrument ARWF-0400, located at the Highland Borough Police Station,

108

dated March 8, 2012, and signed by Sergeant Dennis.  DAG Mitchell confirmed this calibration record is also not contained on Exhibit S-90 (also S-148) or on Exhibit S-91.  Upon being shown, again, Exhibit DB-22, an "Alcotest 7110 Calibration Record" for Instrument ARWF-0356, located at the Warren Township Police Station, dated January 22, 2009, and signed by Sergeant Dennis, DAG Michell acknowledged this calibration also does not appear on Exhibits S-90 (also S-148) or on Exhibit S-91.

Mr. Gold then examined DAG Mitchell concerning Exhibit DB-23, which is a PDF spreadsheet file he prepared containing twenty-six (26) subject entries concerning requests by those subjects to provide breath samples on Alcotest Instrument ARWF-0356, located at The Warren Township Police Station, and on Instrument ARWF-0400, located at the Highlands Borough Police Station.  Mr. Gold represented he created this spreadsheet by extracting the information contained in Exhibit S-152, the Excel Spreadsheet entitled "Subjectsfrom11052008_06302016," which contains 236,664 Rows of Subjects requested to provide breath samples on all Alcotest Instruments in New Jersey from November 5, 2008 through June 30, 2016.

DB-23 contains the same Columns as in Exhibit S-152, and has added a Column entitled "not in 27k."  Upon reviewing Exhibit S-152 and Exhibit DB-23, DAG Mitchell confirmed that none of these Subject Rows are included in

109

the Exhibit S-90 (also S-148) or S-91 Excel Spreadsheets.  The court's review of Exhibit DB-23 discloses that subject ███████████ appears twice.  His first attempt to provide breath samples on Alcotest Instrument ARWF-0356 resulted in an Ambient Air Check Error, and his second attempt on that same Instrument produced an evidential BAC reading of 0.117.  The subject ████ ██████ also appears twice. The first breath sample test provided on Alcotest Instrument ARWF-0400 produced a BAC reading of 0.125 and the second breath test sample provided on that same Instrument produced an evidential BAC reading of 0.124.  The subject ██████████ also appears twice.  The first breath sample test listed   provided on Alcotest Instrument ARWF-0400 produced an evidential BAC reading of 0.193 and the second breath sample test listed on that same Instrument produced a BAC reading of 0.203.  The subject ████████ provided breaths samples on Alcotest Instrument ARWF-0400 which produced a "0" BAC reading.  The attempted breath sample test on subject ██████████ on Alcotest Instrument ARWF-0400 and on Subject ██████ ██████████ on Alcotest Instrument ARWF-0400 both resulted in the Error Messages of "Test Terminated," with no BAC reading recorded.  The attempted breath test of subject ██████████ on Alcotest Instrument ARWF-0356 resulted in the Error Message "Subject Refused," as did the attempted breath sample tests of █████████████ and █████████████ on Alcotets

110

Instrument ARWF-0400, and no BAC readings were obtained on those three attempted tests. The attempted breath tests of the remaining subjects on Exhibit DB-23 resulted in evidential BAC readings, the court noting the BAC readings on the testing of subjects ████████ ██████████, and ██████████ were below the statutory, per se, legal limit. During her testimony concerning this Exhibit, DAG Mitchell affixed her initials verifying these Subject Rows are not contained in Exhibits S-90 (also S-148) or S-91 and, accordingly, were not identified as individuals who were requested to provide breath samples on Alcotest Instruments calibrated by Sergeant Dennis, nor were they sent notification letters.

Referring DAG Mitchell to Exhibit S-90 (also S-148), Mr. Gold highlighted Rows 18,225 through 18,242, which pertain to, in Column B, Alcotest Instrument ARWF-0356, located at the Warren Township Police Station. In reviewing Column C, "Calibration Date," DAG Mitchell confirmed that none of those columns contained the calibration date of January 22, 2009, which is the calibration date of that Alcotest Instrument contained on Exhibit DB-23, containing ten (10) subjects who were requested to provide breath samples on that Instrument, which was calibrated by Sergeant Dennis. Exhibit DB-23 is a partial extraction from Exhibit S-152. Stated differently, although Exhibit S-152 confirms that Sergeant Dennis calibrated Alcotest Instrument

111

ARWF-0356 on January 22, 2009, that calibration date is not contained in the Exhibit S-90 (also S-148) Excel Spreadsheet sent by the NJSP to the Attorney General's Office, which was represented as consisting of all subjects who had been requested to provide breath samples on Alcotest Instrument calibrated by Sergeant Dennis.

Similarly, in reviewing Rows 18,833 through 19,022 on Exhibit S-90 (also S-148), which pertain to, in Column B, Alcotest Instrument ARWF-0400, located at the Highland Borough Police Station, DAG Mitchell confirmed that none of those Rows, in Column C, contain the calibration date of March 8, 2012, which appears on those entries for Instrument ARWF-0400 contained in Exhibit DB-23, containing sixteen (16) subjects who were requested to provide breath samples on that Instrument. As noted, Exhibit DB-23 is a partial extraction from Exhibit S-152. Again, although Exhibit S-152 confirms that Sergeant Dennis calibrated Alcotest Instrument ARWF-0400 on March 8, 2012, that calibration date is not contained in the Exhibit S-90 (also S-148) Excel Spreadsheet sent by the NJSP to the Attorney General's Office.

The court finds the testimony of DAG Mitchell to be credible and candid. During the pendency of the Cassidy litigation, on behalf of the DCJ, she properly requested the NJSP to query the Alcotest Information System database to provide the DCJ with a list of all subjects who had been requested

to provide breath samples on Alcotest Instruments calibrated by Sergeant Dennis. The NJSP represented to the DCJ that the Excel Spreadsheet it provided, in Exhibit S-90, fulfilled that request. As the testimony and evidence received in this matter, clearly, it did not. Nonetheless, it was appropriate for DAG Mitchell and the DCJ to, in good faith, rely on that list received from the NJSP as properly identifying all individuals who were potentially affected by the misfeasance of Sergeant Dennis, in performing their subsequent tasks of notifying the Municipal Courts and, thereafter, those identified individuals with an address secured from the AOC, of that misfeasance, concerning the pending Cassidy litigation, and the Court's ultimate decision in that case.

Additionally, as discussed more fully, infra., this court finds it was fully appropriate for DAG Mitchell and the DCJ to eliminate from Exhibit S-90, the list of 27,833 subjects identified as being requested to provide breath samples on Alcotest Instruments calibrated by Sergeant Dennis, those Subject Rows where the "End Result" in Column U did not report an evidential BAC reading, which resulted in the creation of the Excel Spreadsheet contained in Exhibit S-91, which reduced the 27,833 potentially-affected breath tests by 7,166, to 20,667 (actually, as testified, to 20,666) breath tests that resulted in an evidential BAC reading.

Also in good faith, since the Alcotest Information System database does not contain addresses for individuals tested, DAG Mitchell, on behalf of the DCJ, properly requested the AOC to perform a search of its databases in an attempt to secure addresses for the individuals listed in Exhibit S-91, identified as having provided breath samples on Alcotest Instruments calibrated by Sergeant Dennis, where an analysis of those samples resulted in the reporting of an evidential BAC reading.  No other public database has been identified as being more comprehensive in order to complete that task.  Unfortunately, the AOC was unable to find either exact or partial subject-to-address matches for 1,470 of those 20,666 subjects.  Moreover, as will be discussed more fully infra., the addresses that were provided by the AOC were those individual's addresses that existed between 2008 and 2016.  As noted in my June 21, 2019 Initial Report to the Court as Special Master in the Cassidy post-conviction relief cases, see Exhibit S-31, some people do, periodically, move to a different address, and that issue will be discussed more fully in the "notification" portion of this Report.

### 4. Steven Symogyi

Steven Somogyi is the Assistant Director of Municipal Court Services in the Administrative Office of the Courts (AOC), and testified he has worked in the AOC for twenty-nine (29) years.  He oversees the Municipal Court

114

Services Division, and provides support and oversight to more than five hundred (500) Municipal Courts throughout the State of New Jersey.[20] The testimony of Mr. Somogyi is contained in T2, the March 21, 2023 Transcript, on pages 111-219.

At the direction of Special Master, Judge Lisa, in State v. Cassidy, DAG Mitchell contacted Mr. Somogyi and later sent him an email, dated July 14, 2017, requesting a search of the AOC's database for addresses of the 20,667 subjects who had been identified by the New Jersey State Police as being potentially affected by the misfeasance of Sergeant Dennis.  See Exhibit S-18A.  As noted, paragraph 4 of Judge Lisa's Case Management Order I, dated July 13, 2017, required the State to apprise the court of its efforts to obtain addresses for the 20,667 individuals referenced in its motion to appoint a Special Master. See Exhibit S-113.

Mr. Somogyi testified that upon receipt of Exhibit S-91, he requested Charles Prather, an independent computer expert who worked with the AOC, to perform searches of ATS, the Municipal Court database maintained by the AOC, in an attempt to identify and match those individuals contained in Exhibit S-91 with addresses contained in that database.  Mr. Somogyi stated he

---

[20]  It should be noted that after a distinguished career with the Administrative Office of the Courts, Mr. Somogyi has retired, effective August 31, 2023.

worked with Mr. Prather to develop a spreadsheet of the address information they were able to obtain from those databases for those individuals.

Once he and Mr. Prather were able to match as many of those subjects to actual addresses as possible, Mr. Somogyi sent an email to SDAG Czepiel, dated August 10, 2017, attaching the Exhibit S-83 Excel Spreadsheet, containing addresses of those individuals contained on Exhibit S-91 for which his office was able to match addresses. See Exhibits S-18B. Mr. Somogyi explained that Mr. Prather and his staff had attempted to match the information contained in Exhibit S-91 to a case filed in the ATS and ACS databases by utilizing the subjects' names, drivers license numbers, the date of the Alcotest testing, location of same, and summons or complaint numbers. He noted that in some instances an arresting officer does not issue the summons until days after the arrest and breath testing, making matching more difficult. Accordingly, when performing a query of the ATS and ACS databases for matches, Mr. Prather provided for the search to include any listings for summons issued two days after the date of the arrest.

Mr. Somogyi also explained that where a defendant is charged with DWI as a well as a related, indictable, criminal offense, based on the same incident, the case is entered in the criminal Promis Gavel database, and is entered in ATS database as a transfer with the notation "TRAN." He did note there were

some DWI charges that get transferred to the Superior Court, are resolved there, and that disposition does not get entered back into the ATS database. Specifically, with a charge of Driving While Suspended, the suspension due to a DWI conviction, contrary to N.J.S.A. 2C:40-26, a fourth-degree indictable offense, that charge only gets entered into the ATS database if the arresting officer has also charged the defendant with the motor vehicle offense of Driving While Suspended, contrary to N.J.S.A. 39:3-40 and the 2C:4-26 charge, simultaneously. In absence of that circumstance, he explained that when a defendant is charged solely with a violation of N.J.S.A. 2C:4-26, and that underlying conviction for DWI, upon which the license suspension was based, is one potentially affected by the Court's decision in Cassidy, but the ATS database would not contain any records concerning the disposition of the 2C:4-26 case because it never originated in Municipal Court. However, Mr. Somogyi testified that the AOC is able to search for records of defendants who were convicted of a violation of N.J.S.A. 2C:4-26, which could potentially be matched up to a list of cases potentially affected by State v. Cassidy.

Mr. Somogyi testified his office was able to provide Mr. Czepiel an Excel Spreadsheet on August 10, 2017, entitled "Spreadsheet from AOC_All Addresses_Alcotest ATS Defendants Matches – full matches and partial – to AOC," which contains two Sheets. See Exhibit S-83. As has been noted,

117

Sheet 1 thereof contains 18,249 exact addresses-to-subject matches, and Sheet 2 contains 947 partial addresses-to-subject matches, which he stated were probable matches based on matching most variables utilized in the searches. The address information, for each Row, is contained in Column J of each Sheet of the Spreadsheet. As a result, the AOC was able to provide the Attorney General's Office with addresses for 19,196 of the 20,667 individuals listed in Exhibit S-91, leaving 1,471 subject Rows contained in Exhibit S-91 without a matching address. During cross-examination, Mr. Somogyi acknowledged that by setting the two-day criteria for matching summonses from the date of arrest, there was a possibility some partial-address matches were not identified.

However, on further questioning on cross-examination, in circumstances where a defendant was arrested and charged with DWI in one municipality, but was asked to provide breath samples in another municipality or agency, Mr. Somogyi testified the address search his office conducted would still locate a match for that defendant under the query criteria utilized because the search parameters were the defendant's name, driver's license number, date of arrest, and the Alcotest testing information.

Mr. Somogyi testified his office staff also created Exhibit S-54, which is a 621-page listing of Alcotest records with matching tickets in the ATS database, listed by subjects in each Municipal Court, and County, containing

118

the name of the defendant, the summons number, the date it was issued, the status of the case, and its then-current disposition. Mr. Somogyi described Exhibit S-54 as a document generated in 2017, following Case Management Order II, issued by Special Master Judge Lisa dated August 17, 2017, see Exhibits S-115 and DB-11, staying the prosecution of Driving While Intoxicated cases that were linked to the then Cassidy case, pending issuance of an opinion by the Supreme Court. He stated Exhibit S-54 was created to assist Municipal Courts in complying with Judge Lisa's Order by identifying potential Cassidy-affected matters pending in their courts.

Mr. Somogyi also identified Exhibit S-118, a 493-page document, which he explained was a "sort" of Exhibit S-54 that provided an alphabetical listing of those defendants listed in S-54, by name. He testified S-118 was developed by his staff to further assist Municipal Courts in identifying defendants who might have a claim, in a pending DWI prosecution, that they had a previous Cassidy-affected conviction potentially subject to being vacated.

Mr. Somogyi testified these lists in Exhibits S-54 and S-118 were developed by Mr. Prather, and were based on the original Excel Spreadsheet, Exhibit S-91, delivered to the AOC by the Attorney General's Office. He noted that the bulk of the defendants listed in Exhibit S-54 had cases in Municipalities within Middlesex, Monmouth, Somerset, Ocean and Union

119

Counties, with some defendants having cases in Municipal Courts in Atlantic County (2), Bergen County (5), Burlington County (5), Camden County (1), Essex County (80), Hudson County (3), Hunterdon County (6), Mercer County (39), Morris County (6), and Passaic County (1). Again, these are those cases listed where full or partial subjects-to-addresses matches were found by the AOC in their databases, and do not include those in Exhibit S-91 where no match was found.

Mr. Somogyi further noted, based on his staff's analysis of those defendants who had full and partial address matches, and were thereby potentially affected by the Court's decision in State v. Cassidy, there were 13,608 convictions for DWI for those subjects listed on Exhibit S-83. Based on that determination, following the Court's November 2018 decision in Cassidy, notices were prepared and mailed to those defendants, advising them of their right to seek post-conviction relief, and providing them with a form to complete and file with the court. Mr. Somogyi identified a portion of Exhibit S-55, which is an example of the form of notice mailed to those defendants, dated July 14, 2021. That letter also referred the mailed defendants to the New Jersey Judiciary's Cassidy website for more specific information and contained forms to utilize in filing an application for post-conviction relief, which was handled centrally through Middlesex County Court staff. Mr. Somogyi

120

explained that the list of 13,608 defendants did not include those defendants who pled guilty or were found guilty of a lesser-included offense, such as reckless driving or careless driving, where the DWI charge had been dismissed. Mr. Somogyi also noted that the Supreme Court thereafter issued an Order directing that all Cassidy-based applications for post-conviction relief filed on or after June 1, 2022, be filed, processed and adjudicated in the Municipal Court where the DWI conviction was entered.

On cross-examination, Mr. Somogyi testified that, in addition to the July 14, 2021 mailing, a Notice to the Bar was published in the New Jersey Law Journal and New Jersey Lawyer, essentially containing the same information set forth in the July 14, 2021 notification letter. He further stated that the July 14, 2021 mailing was the only notice mailed by the AOC. He explained that when any mailed notices were received back and being undeliverable, if an updated address was provided by the Post Office, the notice was mailed back out to that corrected address. He acknowledged that if an updated address was not provided, no further steps were taken. Referring to page 14 of my Initial Report, as Special Master in Cassidy-based applications for post-conviction relief, dated June 21, 2019, see Exhibit S-31, noting that the addresses obtained by the AOC were based on summonses issued between 2008 and 2016, and obtaining updated addresses from the Motor Vehicle Commission

121

might be a possibility where notices are returned as undeliverable, Mr. Somogyi testified he contacted the Motor Vehicle Commission but was unable to arrange that with the Commission. Mr. Somogyi also explained his office did ask the DCJ if it could provide any additional information that would enable the AOC to conduct additional on those defendants where addresses-to-subjects matches could not be obtained, but was informed no such information was available.

Mr. Somogyi made it clear in his testimony that the AOC did not make any determination as to which defendants were potentially affected by the Supreme Court's decision in <u>Cassidy</u>, Rather, he stated, that determination was made by the New Jersey State Police, as memorialized in the Exhibit S-90 Spreadsheet it provided to the Attorney General's Office, and which had further been modified by the Attorney General's Office, as contained in Exhibit S-91, to 20,667, by eliminating individuals where an evidential BAC reading had not been obtained.

The testimony of Mr. Somogyi was credible, candid and forthcoming. His Office simply utilized the Excel Spreadsheets contained in Exhibits S-91 and S-81B through 81F, that were provided by the DCJ to query the court's database system in a good faith attempt to provide addresses for the individuals listed therein. Obviously, that effort was unable to secure

addresses for 1,471 of those individuals and, as will discussed more fully herein, many of the addresses were stale, resulting in numerous notification letters sent by the Offices of County Prosecutors, by the DCJ, by County Prosecutors, and by the AOC being returned as being undeliverable, with no attempts made to secure updated mailing addresses for them, other than Mr. Somogyi's attempt to obtain interface cooperation from the Motor Vehicle Commission.

### 5. Charles Prather

Charles Prather is an independent data analyst who has been performing work for the AOC since 2011. The testimony of Mr. Prather is contained in T3, the March 22, 2023 Transcript, on pages 17-100. Mr. Prather has worked in the Information Technology field since 1985. Following his graduation from college in 1979, he worked for an insurance company in Philadelphia, where he was trained in data processing and became a Cobalt Programmer, performing work on the company's mainframe, inputting data, building its infrastructure and maintaining it. In his work for the AOC, he performed various tasks requested by the Municipal Court Services Division of the AOC between 2011 and 2018, reporting to Assistant Director, Steven Somogyi. In that capacity, he was primarily responsible for maintaining the Court's Automated Tracking System (ATS) and Automated Criminal Tracking (ACT)

databases. He noted that ATS is a computer system database that stores all information from summonses issued by police officers in New Jersey, consisting of about 100 million records. He explained that a "table" in the database is a repository of information, and a "query" is something that requests and retrieves certain fields of information from that table, which is printed in the form of a "report" that displays the information retrieved based on that query.

With respect to the <u>Cassidy</u> litigation, sometime in 2017 Mr. Somogyi provided Mr. Prather with Exhibit S-91, with a request to match each subject to an address in the court's databases. That file was on a secured thumb drive and Mr. Prather was able to download the Excel Spreadsheet contained in Exhibit S-91 onto his work computer. Each Row on the downloaded Spreadsheet represented a specific blood-alcohol breath test conducted on a subject who had been arrested and charged with DWI, and an evidential BAC reading had been obtained.

Mr. Prather explained that in order to complete that task he had to "clean-up" the data, because here were instances in the downloaded file where the listed driver's license number of many subjects was either absent or invalid, containing "zeroes" or "dashes," which prevented a search of the databases for those subjects. He accomplished that by loading the Spreadsheet

onto the ATS mainframe and then began running queries against it in the form of extraction codes, which were designed to eliminate those Rows where there was no driver's license listed, or an incorrect entry for same, and then using a separate extraction code to remove several duplicate entries identified.

During cross-examination, Mr. Prather was shown a sorting of Column M, "Driver License No." in Exhibit S-91, to illustrate entries where either no driver's license was shown, or an invalid driver's license was contained in Column M. The court also reviewed Column M during Mr. Prather's testimony. By way of example, Rows 82 through 84, Row 92, Rows 99 and 100 on Exhibit S-91 all contain blank spaces where a driver's license number would otherwise be entered. Row 133 contains the entry "00" and Row 606 the entry "0" in Column M, Rows 774, 775 and 775 contain the entry "None" in Column M. These are examples, and there are many other entry examples in Column M, of Rows that Mr. Prather eliminated because he would be unable to match those Subject Rows with a driver's license number in the court's databases. Mr. Prather again testified he discovered duplicate records, where the same information in the file, such as the same summons number or same arrest date of a subject, appeared multiple times. Accordingly, he eliminated approximately 1,300 Rows in Exhibit S-91, where a search of the databases for addresses of those individuals could not be accomplished.

Once the data was "cleaned-up," Mr. Prather began the process of linking the driver's license numbers of each subject in the file to those in the databases, and then compared the arrest date listed in the file to the arrest date contained in the database. He stated that using driver's license number of each subject was the best way to match information in the ATS database. This was done by writing a code, using software called "Web Focus" to query the ATS database. That Software then generated an SQL Statement, a separate Tab or Sheet, on Exhibit S-91. He explained that he then created an Excel Spreadsheet with two Sheets, see Exhibit S-83, which was then sent back to the Division of Criminal Justice on August 10, 2017, see Exhibits S-3 and S-18B. The first Sheet on Exhibit S-83 contained addresses for all subjects where an exact subject-to-address match was achieved, both entries containing the same driver's license number and the same arrest date for 18,249 Subject Rows in Exhibit S-91. The second Sheet contained 947 Subjects Rows from Exhibit S-91, where there was a match for the driver's license number, and the arrest date and summons issuance date were within two days of each other.

Mr. Prather testified that upon completing the Excel Spreadsheet contained in Exhibit S-83, he delivered it to Mr. Somogyi. He also prepared two additional lists at the request of Mr. Somogyi. Mr. Prather identified Exhibit S-54, which is a 621-page PDF file of "Alcotest Records With

126

Matching Tickets in ATS" for each Municipal Court in each County found from Exhibit S-91. Additionally, he identified Exhibit S-118, a PDF file, entitled "Alco Test Record With Matching Ticket in ATS," which is an alphabetized listing of all the same subjects, consisting of 493 pages, containing the name of the subject, the ticket number, the issuance date of the ticket, the disposition date, the case status, county in which the ticket was issued, and the name of the Municipal Court where the matter was determined.

In summary, Mr. Prather, acknowledged that the AOC was provided with Exhibit S-91, the Excel Spreadsheet containing 20,667 Subjects, that approximately 1,300 were eliminated by his described clean-up of the files, leaving 19,367 Subjects who were queried in the ATS database, which resulted in a total of 19,196 full and partial subject-to-address matches of the 20,667 Subject Rows originally provided to him in Exhibit S-91, a difference of 171 plus the 1,300 where no match could be attempted, or 1,471. See Exhibit S-83. He testified that he did not attempt to match the resulting 171 subjects without matches to addresses through the ACS database because those cases are transferred to the Superior Court, but did note it would be possible to query the ACS database to obtain the names of defendants who are convicted of a certain crime within a designated period of time.

The testimony of Mr. Prather was credible. However, the fact remains that, of the 20,666 individuals contained in Exhibit S-91 for whom addresses were sought, the AOC was unable to locate addresses for 1,471, either because some Subject Rows in Exhibit S-91 were duplicate entries, some listed no driver's license number, or an invalid driver's license making a search for those not possible, and addresses for 171 of the individuals that were searched were not obtainable from the court's databases. Mr. Prather did acknowledge that a search of the ACS database could have been accomplished, that might secure an individual's address or the name of the attorney representing that individual, by conducting a query by the name of a defendant who was convicted of a designated crime, within a designated period of time, but that information had not been requested.

## 6. Thomas John Snyder

Thomas John Snyder was called as a witness by the State. He is a Lieutenant with the New Jersey State Police, and has been employed by the State Police for more than twenty-four (24) years. The testimony of Lieutenant Snyder is contained in T1, the March 20, 2023 Transcript, on pages 175-255, and in T2, the March 21, 2023 Transcript, on pages 19-108.He is currently Assistant Chief for the Forensic Service Bureau of the State Police, a position he has held for about a year. Prior to that assignment he was the Unit

Head in the State Police's Alcohol Drug Testing Unit (ADTU). He began working in that Unit in February 2006, as a Trooper and, after training, was appointed as a Breath Test Coordinator, performing Solution Changes and Calibrations of Alcotest Instruments in a specific geographic region. He became an instructor on the Training team of the State Police and was promoted to Sergeant. He then became a Project Manager, his main duty being oversight of grants and providing field operation stations and Breath Test Coordinators with supplies, getting their equipment recertified and conducting spot inspections of Alcotest-related documents produced by the Coordinators. At some point, he was promoted to the rank of Lieutenant.

Lieutenant Snyder testified that Trooper Marc Dennis was assigned to the ADTU approximately two years after he had been assigned to the Unit, and was a Breath Test Coordinator in training, under supervision of a Coordinator. After completing his training, Trooper Denis was approved as a Breath Test Coordinator, effective November 5, 2008. See Exhibit S-7. Thereafter, he was permitted to perform solution changes and calibrations of Alcotest Instruments on his own, and was initially assigned to perform those duties in portions of Somerset County, and all of Middlesex and Union Counties. Lieutenant Snyder testified that the last date Dennis was authorized to perform solution changes and calibrations of Alcotest Instruments was October 9, 2015.

129

Lieutenant Snyder stated that in early October 2015, he learned that Sergeant Dennis may have not been using his NIST-traceable digital thermometer when conducting calibrations of Alcotest Instruments. Referring to Exhibit S-1, Lieutenant Snyder explained he confronted Sergeant Dennis as to Alcotest Instruments located in the Cities of Asbury Park and Long Branch, and in the Township of Marlboro, placing those Instruments out of service until they could be properly recalibrated. He stated Sergeant Dennis would not cooperate with an investigation into that issue, and was precluded from conducting solution changes and calibrations after October 9, 2015. Exhibit S-1 contains an email sent by Lieutenant Snyder to Sergeant Dennis, dated October 9, 2015, outlining the problem, and a State Police Interoffice Communication, dated December 1, 2015, from Lieutenant Tormo, then Unit Head of the ADTU to Major Acevedo, Commanding Officer of the Special Investigations Section, containing the result of the investigation, concluding Sergeant Dennis had knowingly performed recalibrations of the Alcotest Instruments in Asbury Park, Long Branch, and Marlboro Township that were not consistent with the "Calibration Check Procedure for Alcotest 7110," specifically stating "he did not check the simulator solution temperatures with a NIST traceable thermometer prior to beginning the re-calibration procedure."

Lieutenant Snyder then detailed his attempts to obtain calibration documents related to Alcotest Instruments that had been calibrated by Sergeant Dennis. He explained that a copy of calibration documents are required to be kept by each Coordinator, with a copy kept at the Offices of the ADTU. He stated that in early 2023, he discovered that not all of Sergeant Dennis's calibration documents were at the ADTU Offices, so he directed the field Coordinators to go to the location of each Alcotest Instrument and obtain copies of those calibration documents.

Lieutenant Snyder was then shown Exhibits S-102 through S-107, which are calibration records of Sergeant Dennis for Alcotest Instruments locations, respectively, in Middlesex County (S-102), Monmouth County (S-103), New Jersey State Police Stations (S-104), Ocean County (S-105), Somerset County (S-106), and Union County (S-107). Those Exhibits contain actual calibration documents, signed by Sergeant Dennis. For example, Exhibit S-102, contains the calibration documents for twenty-eight (28) Alcotest Instruments located in Middlesex County and, as to each Alcotest Instrument there are a number of calibration documents signed by Sergeant Dennis. By way of further example, as to Alcotest Instrument ARLD-0012, located at the Edison Township Police Station, there are twelve (12) calibration documents, signed by Sergeant Dennis, each one reflecting a calibration date. As to Exhibit S-103, Monmouth

131

County, there are calibration documents for forty-eight (48) Alcotest Instruments calibrated by Sergeant Dennis on various dates. On Exhibit S-104, New Jersey State Police Stations, there are calibration documents, signed by Sergeant Dennis, for fifteen (15) Alcotest Instruments, calibrated on various dates. On Exhibit S-105, Ocean County, there are calibration documents, signed by Sergeant Dennis, for six (6) Alcotest Instruments, calibrated on various dates. On Exhibit S-106, Somerset County, there are calibration documents, signed by Sergeant Dennis, for twenty (20) Alcotest Instruments, calibrated on various dates. Finally, on Exhibit S-107, Union County, there are calibration documents, signed by Sergeant Dennis, for twenty-three (23) Alcotest Instruments, calibrated on various dates.

Citing to State v. Chun, 194 N.J. 54 (2008), Lieutenant Snyder testified that a "Calibration" of every Alcotest Instrument must be performed, minimally, every six (6) months by a certified Breath Test Coordinator, utilizing the State Police-issued equipment, which consists of a NIST-traceable digital thermometer, a black key temperature probe, and three CU-34 Simulators. A "Solution Change" is a function performed at least very thirty (30) days, or twenty-five (25) breath tests, whichever comes first. He stated a solution change can be performed by any certified Alcotest 7110 Operator, and every agency is responsible for performing their own solution changes.

132

However, Lieutenant Snyder explained that there are also occasions when a Breath Test Coordinator responds to an agency to perform a solution change. He noted an NIST-traceable digital thermometer is not used during a Solution Change. Additionally, a solution change must be performed prior to each calibration by a Breath Test Coordinator.

Using, as an example, the calibration documents for Alcotest Instrument ARLD-0012, located in Edison Township, contained in Exhibit S-102, performed by Sergeant Dennis on December 12, 2008, consisting of a four-page document, Lieutenant Snyder explained that the first page, entitled "Alcotest 7110 Calibration Record," shows Sergeant Dennis performed the calibration procedure. These are the foundational documents to assure the Instrument is working properly. The second page, entitled "Alcotest 7110 Calibration Certificate Part I – Control Tests," documents that there were three Control Tests successfully conducted with the "Test Passed" entries. Lieutenant Snyder explained that the third page, entitled "Alcotest 7110 Calibration Certificate – Part II – Linearity Tests," is the third component of the recalibration procedure. This test shoots the control solution through the Alcotest Instrument to make sure it is working properly by measuring the temperature of the Simulator Solution. He explained that the fourth page of this document, entitled "Calibration Unit – New Standard Solution Report,"

133

shows the results of the final step of the recalibration process, where the Coordinator certifies that all tests are within acceptable tolerance, or not, and the Instrument has been recalibrated and is, or is not, ready to accept breath samples for analysis. In this example, the recalibration procedure was successfully completed, and all pages were signed by Sergeant Marc Dennis.

Lieutenant Snyder testified all of the calibration documents contained in Exhibits S-102 through S-107 are maintained in the office of the ADTU on a network drive which contains all calibration records in their files concerning Alcotest Instruments in the five listed Counties and State Police Stations, and all listed Instruments were calibrated by Sergeant Marc Dennis.

During cross-examination by Mr. Hernandez, Lieutenant Snyder stated that the ADTU attempts to have each Breath Test Coordinator assigned to perform calibrations in a specific geographic area, but there are occasions where a Coordinator will recalibrate Alcotest Instruments, based on the needs of the ADTU and as approved by a Supervisor.

He also explained that the CU-34 Simulator is a device, used during a solution change, consisting of a glass jar into which a Simulator Solution, which has an alcohol content of 0.10%, is poured, and it is plugged into the back of the Alcotest Instrument and heated to 34 degrees Celsius, plus or minus .2 degrees. A temperature probe, which is plugged into the Instrument,

134

is used to monitor the temperature of the solution. At that temperature a vapor is produced which "simulates" human breath, which is measured for alcohol content, which should be 0.10%. If the solution is not within 34 degrees Celsius, plus or minus .2, the Instrument generates an error message.

Lieutenant Snyder stated that during the taking of breath samples from a subject, at least two samples of sufficient volume and duration are required in order to produce an evidential BAC result, and a subject is given up to eleven (11) chances to provide two acceptable breath samples. If proper breath samples are not delivered by the subject, the final error message produced by the Instrument could be "Test Terminated," or "Subject Refused," in the discretion of the Operator who is administering the breath test. Lieutenant Snyder acknowledged there are various circumstances where a conclusion can be reached that a subject has refused to submit to a breath test. The first is where the subject is arrested for DWI, and refuses to submit to breath-sample testing. In that situation, the Instrument is prepared for receipt of breath samples and the Operator records on the Instrument that the "Subject Refused," which becomes part of the record of that attempted breath test. There is also what is referred to as a "blowing refusal," where the subject is blowing too hard or not hard or long enough into the mouthpiece to produce a sample with the required volume, or was blowing into it too soon, i.e., not

135

following the instructions provided by the Operator or prompts given by the Instrument. However, Lieutenant Snyder stated the error messages generated by the Alcotest Instrument in these circumstances are not caused by the Instrument not properly working, but, rather, are caused by the conduct of the subject. Even when the error message returned is "Interference," Lieutenant Snyder testified it is caused by a chemical in the body of the subject. Lieutenant also stated that the Operator might conclude, and record, that the subject has refused to submit to a breath test where the subject, having provided one breath sample, refuses, at the request of the Operator, to provide anther sample. Accordingly, Lieutenant Snyder acknowledged there could be circumstances where one proper breath sample for analysis was obtained, but the Operator concludes the subject had refused based on the subject's conduct.

On cross-examination by Mr. Gold, Lieutenant Snyder was shown Exhibit S-78, which is an email from him to DAG Robyn Mitchell, dated January 18, 2019. After informing DAG Mitchell that Mr. Donahue had advised him that he would be able to provide an Excel Spreadsheet consisting of all solution changes performed on all Alcotest Instruments in New Jersey during the requested time frame, Lieutenant Snyder provided DAG Mitchell

136

with answers to questions that she had posed to Captain Salvatore DeGirolamo of the ADTU,[21] stating as follows:

· Could there be any missing solution forms in the centralized database

° Yes there could be.

· What is the workaround if there are?

° The Alcotests are recalibrated every 6 months plus the coordinators also goes back to perform simulator/temperature probe changes (which require a solution change).   Therefore, there are numerous solution change reports per Alcotest that will have coordinators names on them.  Chances of every solution change being missing would be incredibly remote.

· Can the list include all NJ solution change forms, not just Dennis or SP?

° Yes, we can get them for all Alcotests throughout the State.  It appears we may be able to also break it down by County too.  This would allow us to show that Dennis was never in the vast majority of counties to conduct recalibrations.

Lieutenant Snyder testified his focus in early 2019 was on obtaining all Solution Changes performed in the State during the indicated time period because he viewed that as being the best method of determining the identity of Alcotest Instruments calibrated by Sergeant Dennis.  He did acknowledge that all of the Solution Change reports might not be contained in the Alcotest

---

[21]  Captain DiGirolamo was the Executive Officer of the ADTU at that time.

Inquiry System database, but that would have no effect on being able to determine the Calibration dates of all Alcotest Instruments.

Lieutenant Snyder was shown pages 16 and 17 of Exhibit DB-4, the 26-page New Jersey Police User Manual for Operators of the Alcotest 7110 MKIII-C Instrument. Those pages are a sample of an Alcohol Influence Report (AIR) that contain a number of error messages as the end results of eleven (11) breath sample tests, which Lieutenant Snyder was asked to explain.

He testified that the error message, "Minimum Volume Not Achieved," appears where the breath sample provided has not achieved a volume of 1.5 liters, noting that the minimum volume required for a female age 60 or older is 1.2 liters, or the duration of the blowing is less than the required 4.5 seconds. He noted the firmware of Alcotest Instruments has not been modified to allow for this differential for females 60 or older, but Operators have been trained to disregard an error message of "Minimum Volume Not Achieved" where the subject is a female age 60 or older and she has met the 1.2 liter-volume requirement.

Regarding the error message, "Ready to Blow Expired," Lieutenant Snyder explained this message is automatically generated by the Instrument where the subject failed to provide a breath sample within the minimum period of time, three minutes, after being prompted to provide the sample. He stated

the error message, "Blowing Time Too Short," will be generated by the Instrument where, even if the minimum volume of the breath sample is achieved, the required "blowing time" was too short. He further explained that the error message, "Blowing Not Allowed," appears where the Instrument detects that the subject was providing a breath sample, but there was an interruption in the blowing by the subject. He testified that the error message, "Blowing Time Too Long," is generated by the Instrument when the subject blows into the mouthpiece too long. In the sample AIR, on page 17 of Exhibit DB-4, it is reported that the subject blew into the Instrument for 34.3 seconds, way beyond the minimum duration of 4.5 seconds.

The seventh breath sample provided in that sample AIR, on page 17 of DB-4, reported that the minimum volume and duration of the blowing was within the required ranges and a Blood-Alcohol Content (BAC) reading of 0.00% was reported. However, two successful tests are required. On the sample AIR reviewed, four additional tests resulted in the error messages discussed, with the AIR reporting, after the eleventh attempt, the "Test Result" being reported as "Test Terminated."

On re-direct, Lieutenant Snyder testified that calibrating an Alcotest Instrument has nothing to do with, and has no effect on, any of those error messages, as those are the result of conduct by the subject at the time the test

was administered.  Additionally, Lieutenant Snyder was shown page 11 of Exhibit DB-4, the Drager New Jersey State Police User Manual for the Alcotest 7110 MKIII-C, which is 26 pages in length.  Page 11 is titled "Test Data," and the large bracketed box thereon contains 22 items of information the officer administering the test must manually enter into the listed data fields.  Thereafter, he explained, the actual operation of the Instrument is done automatically by the firmware prompting the sequence of the testing, and two acceptable breath samples must be received in order to produce a valid, BAC Breath-Alcohol reading that can then be used for evidentiary purposes in a DWI prosecution.

Lieutenant Snyder was also referred to page 21 of the Exhibit DB-4 User Manual, which is titled "Solution Change Test."  He explained that the large bracketed box toward the top of that page contains the information that the Alcotest Operator performing the solution change must manually enter into the listed data fields to identify himself or herself, as well as the particular information for the bottle of solution used for the change.  He was then shown page 34 of Exhibit DZ-1, which is the Drager New Jersey State Police User Manual-Technical, which is 52 pages in length.  That page, titled "System Management," subtitled "Calibrate," lists the steps required by the Beath Test Coordinator to adjust the EC and IR sensors using a certified, new solution,

prior to the calibration. Lieutenant Snyder testified that the first bracketed box on that page contains the data fields that the Breath Test Coordinator must manually enter to identify himself or herself as the Coordinator performing the calibration and the particular solution botte percentage being utilized for that calibration.

Lieutenant Snyder was also shown a two-page redacted Alcohol Influence Report (AIR), contained in Exhibit DB-5, from testing of a subject on Alcotest Instrument ARXD-0007, located at the Keyport Police Station, the date of the test being November 27, 2021, and the calibration of that Instrument reported as June 15, 2021. Although beyond the time period within which Sergeant Dennis was calibrating Alcotest Instruments, Mr. Gold questioned Lieutenant Snyder on this document for illustrative purposes because that AIR ultimately reported the test result as "Subject Refused." On this example, Lieutenant Snyder acknowledged that here were six (6) tests attempted, with Breath Test 4 producing a BAC reading EC Result of 0.138 and an IR Result of 0.137, with the other five (5) tests producing various error messages, with the end result reported, as stated, "Subject Refused." Mr. Gold asked Lieutenant Snyder whether that AIR could be admitted into evidence, to which Lieutenant Snyder replied, "It could be a case-by-case basis but it could be used against the subject." T1, page 240, lines 5-6.

141

On re-direct, Lieutenant Snyder explained that where there are multiple attempts to obtain two acceptable breath samples without success, the testing officer has discretion as to whether to report the conduct of the subject as a "Refusal" by determining whether the subject has been properly attempting to provide valid breath samples. Lieutenant Snyder testified, however, that has nothing to do with the method of calibration of an Alcotest Instrument.

Lieutenant Snyder was also referred to page 18 of DB-4, which he acknowledged lists eleven (11) errors that can be generated by an Alcotest Instrument that will cause a breath test to be automatically aborted.

On questioning by Mr. Noveck, Lieutenant Snyder acknowledged that although the Alcohol Influence Report (AIR) states the date of the last calibration of the Alcotest Instrument being utilized on the breath test, it does not reflect the identity of the Coordinator who performed that calibration. Lieutenant Snyder explained that to determine the identity of the Coordinator, the actual calibration documents pertaining to the calibration dated listed on the AIR would need to be supplied and reviewed.

On re-cross by Mr. Gold, Lieutenant Snyder was shown a four-page Alcotest 7110 Calibration Record for Instrument ARLD-0012, located in Edison Township Police Station, performed by Sergeant Dennis on June 10, 2009. That Calibration Record is a portion of Exhibit S-102, the Calibration

142

Records of Sergeant Marc Dennis for Middlesex County, and that four-age record was also marked as Exhibit DB-6.  Mr. Gold then displayed Exhibit S-92, the Excel Spreadsheet containing all solution changes on all Alcotest Instruments in New Jersey from November 1, 2008 through January 9, 2006, which contains 68,450 Rows of Solution Changes, listed in chronological order.[22]   Scrolling down to June 10, 2009 on Exhibit S-92, the date contained on Exhibit DB-6 (also a portion of Exhibit S-102), there are 35 Rows with June 10, 2009 listed as the Solution Change date (Rows 5528 through 5562), but Instrument ARLD-0012 is not among those listings, and Column AS, the "Operator's Last Name," demonstrates, on Row 5535, that Sergeant Dennis performed a Solution Change and Calibration on Alcotest Instrument ARUL-0064, located at the Edison Township Police Station, on June 10, 2009.  In fact, a review of Exhibit S-102 shows, on Row 5748, that Alcotest Instrument ARLD-0012, located at the Edison Township Police Station, had a solution Change and a Calibration performed by Sergeant Dennis on June 18, 2009.

---

[22]  During the plenary hearing, there were occasions when Exhibit S-92 was referred to as "S-78."  Exhibit S-78 consists of the email exchanges between Lieutenant Snyder and DAG Mitchell concerning the creation of an Excel Spreadsheet containing all Solution Changes from November 1, 2008, through January 9, 2016, which was referenced in the S-78 email, but not attached thereto, since it was created subsequently.  The actual Excel Spreadsheet was marked separately by the court as Exhibit S-92, and was provided by the State, during discovery, on Thumb Drive Number 3.

Mr. Gold then displayed for Lieutenant Snyder Exhibit DB-7, which is a four-page Alcotest 7110 Calibration Record for Instrument ARUL-0055, located at the New Jersey State Police Station in Cranbury, dated May 16, 2011, and signed by Sergeant Dennis. That four-page document is also contained in Exhibit S-104, the "Calibration Records of Sergeant Marc Dennis for each New Jersey State Police Station," under "ARUL-0055 NJSP Cranbury." Turning again to Exhibit S-92, and scrolling down the Rows of dates to May 16, 2011 (Rows 24527 through 24555), Column E does not contain Instrument ARUL-0055 on any of those 29 Rows, and Column AS demonstrates that Sergeant Dennis did not perform a solution change on any of the Instruments contained in those Rows. Although Lieutenant Snyder acknowledged that this was an example of a Calibration Record that does not appear on the record of all solution changes, a further review of Exhibit S-92 reveals, on Row 25347, that Sergeant Dennis performed a solution change and a calibration of Instrument ARUL-0055 on June 16, 2011 (not May 16, 2011).

Exhibit DB-8 was then shown to Lieutenant Snyder. It is a one-page Alcotest 7110 Calibration Record for Alcotest Instrument ARWC-0020, located at the Kean University Police Station, dated March 26, 2013, and signed by Sergeant Dennis. Turning again to Exhibit S-92, and scrolling down to the date March 26, 2013, there are 28 Rows (42072 through 42099)

144

containing that date, and Lieutenant Snyder acknowledged Instrument ARWC-0020 does not appear as having a solution change on that date. However, a further search of Instrument ARWC-0020 on Exhibit S-92 discloses that Sergeant Dennis conducted a solution change and calibration on that Instrument, at the Kean University Police Station, on October 2, 2012 (Row 37520) and on May 20, 2013 (Row 43520).

The last Alcotest 7110 Calibration Record shown to Lieutenant Snyder was marked as Exhibit DB-9 and is also contained in Exhibit S-104, the PDF file "Calibration Records of Sergeant Marc Dennis for each New Jersey State Police Station," under "Monmouth Station." That one-page document reflects the calibration of Alcotest Instrument ARWC-0064 on July 15, 2013 by Sergeant Dennis. Turning back to Exhibit S-92, and scrolling down to July 15, 2013 (42 Rows, numbers 44949 through 44990), Lieutenant Snyder verified there is no record in that Exhibit of a Solution Change on July 15, 2013 on Instrument ARWC-0064. Thus, this is another incident of a solution change, in connection with the calibration of an Instrument by Sergeant Dennis, not appearing on Exhibit S-92. However, a search of Exhibit S-92 for Instrument ARWC-0064 shows a listing on Row 45002 that a solution change and calibration of that Instrument, in Monmouth Station, was performed by Sergeant Dennis on July 16, 2013, one day after the July 15, 2013 date listed

145

on Exhibit DB-9. Clearly, the wrong date appears either on Exhibit DB-9 or Exhibit S-92. As has been noted, during a solution change and a calibration, the Operator or the Coordinator is responsible for manually entering certain information into the various data fields prior to performing both a solution change and a calibration. Here, human error is the only plausible explanation for the one-day difference in dates.

Accordingly, on all of these examples of an "Alcotest 7110 Calibration Record," which necessitates a solution change of an Alcotest Instrument immediately before a calibration of that Instrument, performed by Sergeant Marc Dennis, where the date it was performed as listed on that "Record" does not appear in Exhibit S-92, containing all solution changes, as extracted from the Alcotest Inquiry System database, from November 1, 2008 through January 9, 2016, a search by the Court of Exhibit S-92, by the Alcotest Instrument Serial Number (Column E of S-92), disclosed a solution change and a calibration performed by Sergeant Dennis on a date close in close proximity to that appearing on the actual signed "Alcotest 7110 Calibration Record" produced during the cross-examination of Lieutenant Snyder. The import of that is an extraction from Exhibit S-92 does reveal all calibrations performed by Sergeant Dennis, regardless of various date discrepancies, no doubt due to human error when entering information into the various required data fields.

146

On questioning during recross by Mr. Noveck, Lieutenant Snyder acknowledged that, in a prosecution for a violation of the Implied Consent Statute, N.J.S.A. 39:4-50.2, i.e., a refusal to comply therewith, under circumstances where the refusal violation was based on the testing officer's conclusion that the defendant had failed to properly perform the test, as instructed, the Alcohol Influence Report (AIR) can be admitted into evidence to substantiate that conclusion.  Namely, an AIR can be received in evidence for reasons other than documenting a final evidential BAC reading.

During that questioning, Lieutenant Snyder testified concerning the procedure for the downloading solution changes and calibrations performed on Alcotest Instruments onto the Alcotest Inquiry System database.  He explained that although this function is currently accomplished through the weekly extraction of that information from each Alcotest Instrument through a telephone modem directly connected into the database, at one point in time, Field Coordinators were manually downloading the memory from each Alcotest Instrument onto two Compact Discs, leaving one Disc at the agency where the Instrument was located, and then transporting the other Disc back to the Office of Forensic Sciences at the State Police Headquarters in West Trenton, and the information on the Compact Disc was the  downloaded onto the database.  Lieutenant Snyder also acknowledged that certain information

147

gets entered on each Alcotest Instrument by the Operator or Coordinator when solution changes, calibrations, and breath testing on an Instrument occurs.

In reviewing Exhibit S-92 with Lieutenant Snyder, Mr. Noveck pointed out that on multiple Rows in Column AS, entitled "Operator Last Name," there are numbers, such as 4, 24, 44, 224, and 11A085, appearing, rather than the actual last name of the Operator who conducted the Solution Change. Lieutenant Snyder stated these were the result of manual entry errors by the Operator when entering the information for that data field.[23]

On additional redirect questioning, DAG Clark displayed the "Alcotest 7110 Calibration Record" for Instrument ARLD-0012, located at the Edison Township Police Station, dated June 10, 2009, the four-page document on which Lieutenant Snyder had been questioned earlier, which appears on the Edison Township Police Station portion of Exhibit S-102, "Calibration Records of Sergeant Marc Dennis for each Municipality in Middlesex County." Lieutenant Snyder verified that the Control Test had failed, with the final result notation on the fourth page stating, "Test results are not within acceptable range." Lieutenant Snyder testified this signifies that the recalibration procedure was not completed successfully. He was then shown,

---

[23] The court, in searching Column AS in Exhibit S-92, counted 21 of those instances, where the identity of the Operator cannot be determined based on the entry errors.

148

from that same Exhibit, a seven-page "Alcotest 7110 Calibration Record," for that same Alcotest Instrument ARLD-0012, dated June 18, 2009, eight (8) days later, also signed by Sergeant Dennis, which reflects that the calibration procedure was successfully performed on that date. Referring back to Exhibit S-92, Row 5784 reflects that June 18, 2009 Solution Change and Calibration (Columns B and C), was performed by Sergeant Dennis (Column AS).

DAG Clark also displayed "Alcotest 7110 Calibration Record" for Alcotest Instrument ARWC-0020, located at the Kean University Police Station, dated March 26, 2013, the three-page document on which Lieutenant Snyder had also been questioned, contained in Exhibit S-107 under "Kean University." Lieutenant Snyder verified that the Control Test failed and it states "Test results are not within acceptable range." He was then shown the "Alcotest 7110 Calibration Record" for that same Instrument, also contained in Exhibit S-107 under the same heading, which is dated May 20, 2013, signed by Sergeant Dennis, and reflecting that the Calibration procedure was successfully performed. Referring back to Exhibit S-92, Row 43520 shows that May 20, 2013 solution change and calibration (Columns B and C), was performed by Sergeant Dennis (Column AS).

The same review was conducted as to Alcotest Instrument ARWC-0064, located at the Monmouth Station of the New Jersey State Police. As contained

149

on Exhibit S-104 and in Exhibit DB-9, the full, three-page "Alcotest 7110 Calibration Record," signed by Sergeant Dennis and dated July 15, 2013, shows that the Control Test Failed and states, "Test results are not within acceptable range." Again, turning back to Exhibit S-92, Row 45002 shows that Instrument ARWC-0064 had a solution change and calibration performed on July 16, 2013, by Sergeant Dennis, which is reflected on Exhibit S-104 under the heading "Monmouth Station," as a solution change and calibration being successfully performed by Sergeant Dennis.

DAG Clark then conducted a search for the number "4" on Column AS, "Operator Last Name," and Lieutenant Snyder verified that none of the "4" results contained the "Operator First Name" of "Marc" in Column AT. This court conducted a more thorough review of those entries in Column AS, "Operator's Last Name," Column AT, "Operator's First Name," Column AV, "Operator's Badge Number," Column A, "Solution Change Date," and Column B, "Calibration Date," on Exhibit S-92. The court reviewed each of the 68,451 Rows in Exhibit S-92, and discovered sixty-three (63) entries in Column AS where the name of the Operator appeared either as a number, a single letter, some nomenclature other than a name, or there was a blank in that Column. The court then cross-referenced those entries to not only the Operator's First name in Column AT, but also the Operator Badge Number which appears in

150

Column AV (the badge number of Sergeant Dennis was 5925), and then to

Columns A and B to determine whether any of those sixty-three (63) Rows

contained a solution change in conjunction with a calibration of the noted

Alcotest Instrument.  The table below contains the results of that search and

cross-checking:

| Row Number | Column AS Operator's Last Name | Column AT Operator's First Name | Column AV Operator's Badge # | Column A/B Solution Change and Calibration? |
|---|---|---|---|---|
| 580 | 4 | James | 6907 | NO |
| 834 | 24 | 24 | 799 | NO |
| 1248 | Y | Michael | 1157 | NO |
| 1790 | Y | Benjamin | 265 | NO |
| 3559 | Y | Michael | 7195 | NO |
| 4536 | 41 | Michael | 51 | NO |
| 4670 | 6 | Roger | 8 | NO |
| 4710 | 1 | Glenn | 0178 | NO |
| 5777 | P | Terence | 233 | NO |
| 6722 | Y | Michael | 2613 | NO |
| 8444 | 4 | Darryl | 31 | NO |
| 8532 | 224 | Keith | 06 | NO |
| 8623 | 44 | Donald | 42 | NO |
| 8655 | Y | Jason | 11 | NO |
| 8882 | 24 | 24 | 10 | NO |
| 9413 | 24 | 24 | 10 | NO |
| 9927 | 24 | 24 | 10 | NO |
| 10206 | 4 | Nicholas | 6878 | NO |
| 11186 | 4 | Nicholas | 281 | NO |
| 11355 | Y | Michael | 110 | NO |
| 11583 | Y | Armenti | 37 | NO |
| 11702 | Y | David | 197 | NO |
| 11900 | 4 | David | 4 | NO |
| 12944 | Y | Carmine | 2 | NO |
| 16706 | 4 | Jason | 11 | NO |

151

| 17260 | --- | Chris | 127 | NO |
|---|---|---|---|---|
| 18247 | 1 | Rafael | 107 | NO |
| 19805 | Y | Kenneth | 306 | NO |
| 22391 | 44 | Bryan | 189 | NO |
| 22855 | 41 | David | 7040 | NO |
| 25063 | Y | Jeff | 20 | NO |
| 26718 | 4 | Todd | 5492 | NO |
| 27499 | 1 | William | 2326 | NO |
| 28878 | --- | Michael | 20 | NO |
| 30584 | 11A085 | Peter | 058 | NO |
| 31088 | 4 | Terrence | 5870 | NO |
| 32162 | 4 | John | 1358 | NO |
| 33204 | 4 | Steven | 187 | NO |
| 34372 | 44 | Todd | 5492 | NO |
| 36752 | Y | Adam | 7192 | NO |
| 38208 | 148 | McErlean | 148 | NO |
| 41232 | 24 | 24 | 10 | NO |
| 45477 | Y | Junior | 1009 | NO |
| 45576 | 1 | Thomas | 125 | NO |
| 45791 | 4 | Kevin | 31 | NO |
| 47234 | P | Juan | 2106 | NO |
| 48866 | --- | Benjamin | 265 | NO |
| 48969 | E | Joseph | 714 | NO |
| 51464 | 4 | Lt. Joseph | 359 | NO |
| 53289 | P | Glenn | 0178 | NO |
| 54213 | Y | Jeffrey | 127 | NO |
| 54763 | 44 | Lt. Joseph | 359 | No |
| 54871 | P | Louis | 274 | NO |
| 55347 | P | Thomas | 98 | NO |
| 56067 | 4 | Joseph | 156 | NO |
| 57084 | 24 | 24 | 10 | NO |
| 58825 | 4 | Victor | 213 | NO |
| 59016 | 6 | Brian | 7383 | NO |
| 60343 | P | PTL | 9080 | NO |
| 61289 | 1 | Michael | 6411 | NO |
| 62022 | Y | Erik | 288 | NO |
| 63835 | 24 | 24 | 10 | NO |
| 63864 | 4 | Terrence | 233 | NO |

The inference in this exercise was that because of the improper entries by the Operators, perhaps Sergeant Dennis performed a calibration of the Alcotest Instrument listed in one or more of those Rows. However, from a review of the Columns containing the first name and badge number of the Operator, it is highly improbable that Sergeant Dennis performed any of these sixty-three (63) solution changes contained on Exhibit S-92. Moreover, even if he had, every one of these solution changes was not performed in conjunction with a calibration of the listed Alcotest Instrument. There has been credible testimony illustrating that Operators and Coordinators are required to manually input required identification information into certain data fields when performing a solution change, calibration, or both. Moreover, there has been adequate, credible testimony establishing that, for the most part, Breath Test Coordinators only perform solution changes when they are in the process of calibrating an Alcotest Instrument and that local officers of the municipality or agency where the Instrument is located perform the solution changes, unless the periodic calibration of the Instrument is necessary. Accordingly, it is reasonable to conclude that the sixty-one (61) solution changes listed in this table were not performed by certified Breath Test Coordinators.

During additional cross-examination of Lieutenant Snyder, Mr. Gold again displayed Exhibit DB-6, one page of the "Alcotest 7110 Calibration Record" for Instrument ARLD-0012, located in Edison Township Police Station, dated June 10, 2009; Exhibit DB-7, one page of the "Alcotest 7110 Calibration Record" for Instrument ARUL-0055, located at the New Jersey State Police Cranbury Station, dated May 16, 2011; Exhibit DB-8, one page of the "Alcotest 7110 Calibration Record" of Instrument ARWC-0020, located at the Kean University Police Station, dated March 26, 2013; and Exhibit DB-9, one page of the "Alcotest 7110 Calibration Record" for Instrument ARWC-0064, located at the New Jersey Police Monmouth Station, dated July 15, 2013. Lieutenant Snyder again verified these are not contained in the June 10, 2009 Row listings for those dates on Exhibit S-92. Lieutenant Snyder testified that Exhibit S-92 contains all solution changes from November 1, 2008 through January 9, 2016, and those DB Exhibits only contain the first page of the Calibration Records for those Instruments, and he would have to cross-reference the PDF files contained in Exhibits S-102 (Calibration Records of Sergeant Dennis for Middlesex County), S-104 (Calibration Records of Sergeant Dennis for New Jersey State Police Stations), and S-107 (Calibration Records of Sergeant Dennis for Union County) to determine whether the solution change failed and the calibration was unsuccessful.

154

Then, on additional direct examination, DAG Clark displayed the full, three-page "Alcotest 7110 Calibration Record" for Instrument ARWC-0020, dated March 26, 2013,which is contained within Exhibit S-107 as a part of the PDF files for "Kean University."  Lieutenant Snyder reviewed same and testified, as to page 3 thereof, "[t]hat indicates that there was a control test failure on the linearity test on the first .080 percent solution."  T2, p. 107, lines 7-9.  The full four-page "Alcotest 7110 Calibration Record," which is contained within Exhibit S-102 as part of the PDF files for "Edison Township," was then displayed for Lieutenant Snyder.  He reviewed same and testified, "[t]here were control test failures on the control test two both the EC and the IR and control test three both the EC and the IR." T2, p. 107, lines 16-18.  Thereafter, DAG Clark displayed the full four-page "Alcotest 7110 Calibration Record" for Instrument ARWC-0064, located at the New Jersey State Police Monmouth Station, dated July 15, 2013, which is contained within Exhibit S-104 as part of the PDF files for "Monmouth Station."  Upon reviewing same, Lieutenant Snyder testified that pages 3 and 4 thereof show there was a control test failure on control test 6 of both the EC and IR of the .160 percent solution (Page 3) and control test failures on the linearity test on test five and six, both the E and IR on the .160 percent solution (page 4).

155

The testimony of Lieutenant Snyder was credible and candid. Based on the requirement that Alcotest Instruments are required to be recalibrated at least every six (6) months, Lieutenant Snyder's testimony clearly established that the period within which an individual could have been requested to provide breath samples on an Alcotest Instrument calibrated by Sergeant Dennis and, thereby, be potentially affected by the Court's decision in State v. Cassidy, was from November 5, 2008, through April 9, 2016.

Also significant is Lieutenant Snyder's credible testimony that the error messages generated by an Alcotest Instrument during an attempted breath test procedure are not caused by the Instrument failing to operate properly but, rather, are caused by the conduct of the subject being tested or by the circumstances surrounding that testing procedure. Although a reported "Control Test Failed" error message could be the result of an improper calibration, without use of a NIST-traceable thermometer to verify the temperature of the solution, it is clear that once that error message appears, the Alcotest Instrument will not function, i.e., it will not permit breath testing to begin and, at a minimum a new solution change must be successfully completed. This further supports the Court's conclusion that the failure of a Coordinator to utilize an NIST-traceable thermometer in the recalibration of an Alcotest Instrument does not affect the ability of the Instrument's sensors to

156

react and produce an Error Message relating to the actual breath test attempt, which directly relates to the conduct of the subject or environmental conditions.

### 7. Kevin W. Alcott

The State called Kevin William Alcott as a witness. He is a Sergeant First Class (SFC) with the New Jersey State Police (NJSP), and has worked for the NJSP for eighteen years. He has been assigned to the Alcohol Drug Testing Unit (ADTU) of the Forensic and Technical Services Bureau of the NJSP for the last eight and one-half years. For the last five years, he has been assigned as the Alcotest Project Manager, which includes responsibility for supervising the Coordinators, and assisting them in performance of their jobs, including the calibration of Alcotest instruments. His testimony is contained in T8, the June 12, 2023 Transcript, on pages 113-166, in T9, the June 13, 2023 Transcript, on pages 4-113, and in T10, the June 14, 2023 Transcript, on pages 11-133.

SFC Alcott has been a Breath Test Operator since 2006 and is qualified to train Breath Test Operators. SFC Alcott identified Exhibit S-156, a Certificate issued by Drager, dated March 14, 2012, certifying that he successfully completed the two-day Draeger Safety Diagnostics, Inc. Alcohol Coordinator Training Course on the New Jersey specific Alcotest 7110 MKIII-

157

C instrument (Alcotest). The Certificate further provides that SFC Alcott is a qualified "Operator Trainer and Maintenance Technician," qualifying him to train and certify Operators in the proper use and operation of, as well as to perform Preventive Maintenance on, the Alcotest.

SFC Alcott explained that in order to perform calibrations on the Alcotest, he was required to take a 40-hour State Police Instructor Training Course concerning operation and maintenance of the Alcotest and pass a written test, as well as completing a Standard Field Sobriety Test 40-hour course  He also attended and successfully completed the Borkenstein Drug Course at Indiana University.[24]  In addition, he underwent on-the-job training, completing calibrations on the Alcotest under the supervision of a qualified Coordinator.  As result, in a letter dated May 21, 2015, from John J. Hoffman, Acting Attorney General, to Colonel Joseph R. Fuentes, Superintendent of the NJSP, then-Trooper II Kevin W. Alcott was approved as a duly certified Breath Test Coordinator/Instructor, effective immediately.  See Exhibit S-157A.

SFC Alcott testified he has performed hundreds of calibrations on Alcotest instruments, if not over a thousand, during his career, and is familiar

---

[24]  The Borkenstein Drug Course covers topics related to the pharmacology of drugs and their effects on psychomotor performance and driving.  See https://bcahs.indiana.edu/drugcourse/index.html.

with the usage and operation of the Alcotest. Exhibit DZ-1 is a copy of "The Drager User Manual – Technical" of the NJSP for the Alcotest 7110 MKIII-C (Manual). SFC Alcott was shown page 20 of the Manual, which contains an internal schematic drawing of the Alcotest instrument and, utilizing that schematic, he explained in detail the manner in which a breath sample is obtained and analyzed by the Alcotest instrument. See T8 (June 12, 2023 Transcript, page 120, line 6 through page 124, line 10).

SFC Alcott stated that if the breath test is successfully completed, the Alcotest generates and prints out an Alcohol Influence Report (AIR) setting forth the results of the analysis of the subject's breath sample. Additionally, a digital record is created for each breath test conducted, which is maintained on the Alcotest instrument and then digitally downloaded into the Alcotest Inquiry System database. He explained that the Alcotest generates approximately 311 Columns of digital information for each breath sample of which approximately 21 Columns of information are manually entered by the law enforcement officer conducting the breath test, which he described as "identifying information," such as the full name of the subject, driver's license number, date of birth, height, weight, the arrest location, time of arrest, and case number. He stated the remaining information is automatically created and analyzed by the Alcotest instrument itself. He explained there are

159

approximately 18 Coordinators in the ADTU at any one time, and there are approximately 550 Alcotest instruments currently in use throughout the State. He noted that Coordinators are geographically assigned to perform required periodic recalibrations of Alcotest instruments.

For purposes of the Zingis hearings, SFC Alcott reviewed Exhibit S-90, the Excel Spreadsheet created by William Donahue in 2016, entitled "Spreadsheet Received from NJSP__27833 subject records," for the purpose of determining the calibrations of Alcotest instruments performed by Sergeant Marc Dennis. He reviewed each calibration record for each Alcotest instrument contained in Exhibit S-90. If the Calibration Record was not available, he utilized the digital records in the Alcotest Inquiry System database to identify the Coordinator who conducted the calibration by going to the publicly available system and ran a search for each Alcotest Instrument to determine which Coordinator conducted the solution changes. He explained a solution change always occurs at the end of a Calibration. Based on his review of the entries contained on Exhibit S-90 and those calibration and digital records, SFC Alcott then created, and identified Exhibit S-128, an Excel Spreadsheet entitled "Alcotest Spreadsheet Received from NJSP__27833 subject records." That Spreadsheet contains 27,833 Rows of subject breath tests conducted and 21 Columns, or Fields, of information as to each breath

160

test, including the calibration date (Column C) of each Alcotest instrument listed in each Row, on Column B. SFC Alcott explained that he color-coded Column C, "Calibration Date" on each Row. Beginning with Row 2 (Row 1 contains the information headings), Column C on Row 2 through Row 7796 are colored in "Green," signifying those 7795 calibrations were conducted on the corresponding Alcotest instruments contained in Column B, entitled "Serial Number," by Sergeant Marc Dennis. The 28 Calibration Dates in Column C on Row 7797 through Row 7824, concerning Alcotest instrument, serial number ARUL-0058, located in the Westfield Police Department, colored-coded in "Red," were not calibrated by Sergeant Marc Dennis. Further reviewing the Calibration dates in Column C of Exhibit S-128, on Row 7825 through Row 27,834, there are an additional 408 Rows color-coded in Red, signifying the corresponding Alcotest instruments contained in Column B, on those Rows, were not calibrated by Sergeant Marc Dennis. SFC Alcott determined that the remaining Alcotest instruments in Column B, totaling 19,568, were calibrated by Sergeant Marc Dennis. Accordingly, 436 subjects listed in Exhibit S-90 (also Exhibit S-148) were asked to provide breath samples for analysis on Alcotest Instruments that were not calibrated by Sergeant Marc Dennis, and 23,397 subjects listed in Exhibit S-90 were asked

161

to provide breath samples on Alcotest Instruments that were calibrated by Sergeant Marc Dennis.

SFC Alcott testified he then created Exhibit S-129, an Excel Spreadsheet entitled "Alcott Sorted Spreadsheet Received from NJSP__27833 subject records," which constitutes a sorting of Exhibit S-128. He created the S-129 Excel Spreadsheet in order to group together, sequentially, all Alcotest Instruments not calibrated by Sergeant Dennis and all those Alcotest Instruments that were calibrated by Sergeant Dennis. Thereby, Exhibit S-129 contains all 27,833 subject records, sorted as indicated. Row 2 through Row 437, color-coded in "Red," contain the 436 subjects who were asked to provide breath samples taken on Alcotest Instruments that were not calibrated by Sergeant Marc Dennis, and Row 438 through Row 27,834 contain the 27,397 subjects who were asked to provide breath samples on Alcotest Instruments that were calibrated by Sergeant Marc Dennis.

By way of example, SFC Alcott was then shown Exhibit S-130, which is an Excel Spreadsheet he created when analyzing the identity of Coordinators who calibrated Alcotest Instrument ARWJ-0019 located at the North Plainfield Police Department, in order to determine whether the inclusion of entries on Exhibit S-90 (also Exhibit S-148) concerning that particular Alcotest Instrument, as purportedly being calibrated by Sergeant Dennis, was correct

162

and appropriate. The information contained on S-130 was derived from a search, or query, of the Alcotest Information System database. S-130 contains 31 Rows relating to the history of Alcotest Instrument ARWJ-0019 from July 6, 2012 to February 24, 2014, and 126 Columns of information for each Row. Line 6 thereof, highlighted in "Yellow," relates to a solution change and a calibration of that Instrument on December 11, 2013. Scrolling over to Columns AO through AR, it is evident that Christopher C. Mulch, Badge Number 6806, was the Operator who performed that particular Solution Change and Calibration, not Sergeant Marc Dennis. Accordingly, any subject entry included in Exhibit S-90 (also Exhibit S-148) that relates to that particular solution change and calibration should not have been included on Exhibit S-90 (also Exhibit S-148).

SFC Alcott was then shown Exhibit S-131, an Excel Spreadsheet he created concerning the history of Alcotest Instrument ARWM-0086, located at Ocean Township Police Department, from March 3, 2009 to July 27, 2010. Again, that information was extracted from the Alcotest Information System database from a search, or query, the dates chosen to correspond with certain entries in Exhibit S-90 (also Exhibit S-148) that relate to the relevant time period. As with Exhibit S-130, S-131 contains a number of Rows (here, 28), and the same 126 Columns of information as to each Row. Rows 3 and 10 are

also highlighted in "Yellow," and when one scrolls over to Columns AO through AR, it is clear that Thomas Snyder, not Sergeant Marc Dennis, was the Operator who performed the Solution Change and Calibration of that Alcotest Instrument on January 29, 2010 and August 13, 2009 respectively. Accordingly, as with the example in Exhibit S-130, any subject entry included in Exhibit S-90 (also Exhibit S-134) as an individual who was asked to provide a breath sample on Alcotest Instrument ARWM-0086 based on those solution changes and calibrations should not have been included.

Similar examples relating to the manner in which SFC Alcott was able to complete his analysis of which subject entries contained in Exhibit S-90 (also Exhibit S-148) constitute requests to provide breath samples on Alcotest Instruments calibrated by Sergeant Marc Dennis, and which were not, as set forth in Exhibits S-128 and S-129, are set forth in Exhibits S-132 (Alcotest Instrument ARXA-0061, Shrewsbury Police Department), S-133 (Alcotest Instrument ARWM-0041, South Bound Brook Police Department), S-134 (Alcotest Instrument ARWF-0403, West Long Branch Police Department), and S-135 (Alcotest Instrument ARUL-0058, Westfield Police Department), all Excel Spreadsheets created by SFC Alcott by extracting information from the Alcotest Inquiry System database through a search or query of that system. Row entries color-coded in "Yellow" on those Spreadsheets reflect solution

changes and calibrations on those Alcotest Instruments that were not calibrated by Sergeant Marc Dennis. Accordingly, subject entries contained in S-90 (also Exhibit S-148) as individuals who were asked to provide breath samples on those Alcotest Instruments based on those solution changes and calibrations should not have been included. During this portion of SFC Alcott's testimony, all counsel so stipulated.

SFC Alcott also identified Exhibit S-127, a one-page document with the heading "Alcott Zingis Notes," a document he acknowledged creating. He represented that S-127 reflects the searches, or queries, he conducted of the Alcotest Inquiry System database resulting in his creation of the Excel Spreadsheet contained in Exhibits S-128 through S-135, when concluding that there are a total of 436 subject entries contained in Exhibit S-90 (also Exhibit S-148) should be eliminated.

SFC Alcott then identified Exhibit S-126, an Excel Spreadsheet, entitled "Zingis Project Spreadsheet 2-24-2023," which he created based on a larger Excel Spreadsheet he had requested of William Gronikowski in December 2022 (See Exhibit S-74) and subsequently obtained from him, see Exhibit S-116, containing all solution changes conducted on Alcotest Instruments in New Jersey from November 1, 2008 through January 9, 2016. SFC Alcott testified Exhibit S-126 contains a listing of all solution changes and calibrations

165

performed by Sergeant Marc Dennis, which he extracted from Exhibit S-92. S-126 contains 1329 Rows and 131 Columns of information. Each Row and Column (Field) is color-coded (reflected at the end of Row 1329), as follows: Orange: "Solution Change not sequential after linearity test;" Green: "Documents Found;" Red: "Documents Not Found;" and Blue: "Documents Found but Incomplete." He explained the entries in Column B, "Start Time" of the solution change, color-coded in Orange, are solution changes without corresponding calibrations. He stated the other Rows in Column B that are the start time of a solution change, color-coded in "Green," indicate he found a corresponding calibration. Those Columns color-coded in "Red" indicate the solution change and calibration documents were not found. Those entries color-coded in "Blue" reflects that part of the documents were found.

SFC Alcott then identified Exhibit S-116, an Excel Spreadsheet entitled "Records 11012005_01312008 [Compatibility Mode]," which consists of 2 sheets. Sheet 1 contains 64,999 Rows and Sheet 2 contains 41,413 Rows. Both Sheets contain the same 126 Columns of information. Column A lists Alcotest Instruments by serial number, Column H, the calibration date, Column Q, the solution change date, and Columns AO through AR, the identity of the Operator who performed the solution change and calibration. Exhibit S-116 is the Excel Spreadsheet created by William Gronikowski as a

166

result of the December 28, 2022 request of him by SFC Alcott, and contains an extraction from the Alcotest Inquiry System database, through a query, consisting of all solution changes conducted on all Alcotest Instruments in New Jersey from November 1, 2005 through January 31, 2018.

During his direct examination of SFC Alcott, DAG Clark scrolled to Column AO on Sheet 1 of S-116, the "Last Name" of the Operator, and filtered that Column for the name "Dennis." He performed that same operation on both Sheet 1 and Sheet 2 of S-116 to determine which solution changes were performed by Sergeant Marc Dennis, and then determined whether there was a corresponding calibration on the same date as the solution change. He used this information to develop the Excel Spreadsheet contained in Exhibits S-128, S-129, and S-126.

SFC Alcott was then shown hard copies of Exhibit S-121, which are 2 "Breath Testing Instrumentation Service Report" documents concerning Alcotest Instrument serial number ARUL-0055, located at the State Police Station in Cranbury. He noted the May 16, 2011 calibration reflected on the first page does not appear in S-116 because the Instrument failed to upload one solution change file from that date due to an error code, and the Instrument was returned to Draeger for repairs. Draeger replaced the microprocessor and the digital copy of that solution change file, which was then permanently lost.

167

The June 16, 2011 Calibration on the second page of Exhibit S-121 does appear on the Exhibit S-116 Excel Spreadsheet at line 25347. Filtering the Exhibit S-126 Spreadsheet by the Alcotest Instrument Serial Number ARUL-0055 that appears on Exhibit S-121 discloses that the prior-listed calibration of that Alcotest Instrument was performed on February 7, 2011, but the May 16, 2011 Calibration is not listed, which SFC Alcott explained was because of the repair of Alcotest Instrument ARUL-0055.

SFC Alcott was also shown Exhibit S-152, an Excel Spreadsheet entitled "Subjectsfrom11052008_06302016." That Spreadsheet contains 236,664 Rows of subjects and 21 Columns of information for each subject Row. Column A contains the "Arrest Date" of the subject, Column B is the Alcotest Instrument Serial Number on which the subject was asked to provide a breath sample, Column C is the calibration date, and Columns E through L the name and identity information for the subject. This Spreadsheet contains the names of all subjects who were arrested and charged with Driving While Intoxicated and asked to provide breath samples on the indicated Alcotest Instruments. Column B was then filtered by Alcotest Instrument ARUL-0055 (the Alcotest Instrument contained in Exhibit S-121). This exercise was to determine all subjects who were arrested between March 16, 2011 and June 16, 2011, the dates set forth in the Calibration records for Alcotest Instrument ARUL-0055

set forth in Exhibit S-121.  SFC Alcott acknowledged that Row 61,343 of S-152 reflects an arrest date of ██████████████ on May 10, 2011, and that Alcotest Instrument ARUL-0055, upon which he was requested to provide a breath sample, was calibrated on June 16, 2011.  Row 61,346 of S-152 reflects an arrest date of ███████████ on June 14, 2011, and Alcotest Instrument ARUL-0055, on which she was requested to provide a breath sample, was calibrated on June 16, 2011.

SFC Alcott was then shown Exhibit S-171B, which is an Excel Spreadsheet entitled "ARUL-055 Spreadsheet.2 instances(2) [Protected View]," which he acknowledged creating.  This Spreadsheet contains 55 Rows of the history of breath samples requested on Alcotest Instrument ARUL-0055 from April 27, 2011 through August 12, 2011.  It contains 310 Columns of information as to each Row, the calibration date contained on Column H, the solution change date on Column Q, and the identify information of the Operator performing the solution change and calibration on Columns AU through AX.  Rows 37 and 40 are highlighted in the color "Yellow."  SFC Alcott explained he created this Spreadsheet by going to the public database of the Alcotest Inquiry System and conducting a search for Alcotest Instrument ARUL-055 in a certain date range.  Since the search was made of the public database, the name of the subject, which would otherwise appear in Columns

169

AB through AD, was redacted and not available. However, Columns AF through AI on S-171B do provide the subject's age, gender, weight and height.

He then made a comparison of the data contained on Exhibit S-152 (all subjects arrested for Driving While Intoxicated between November 5, 2008 through June 30, 2016 and asked to provide breath samples on Alcotest Instruments), with the data extracted from the database for Alcotest Instrument ARUL-0055 reflected on Exhibit S-171B, using the calibration date, the Summons Number, Case Number, and Subject's age and gender Columns of information. From those comparisons he was able to determine that the information for ███████ on Row 61,343 in Exhibit S-152, except for the arrest date, matched with the information on Row 40 in Exhibit S-171B. SFC Alcott testified he concluded that the "Arrest Date" contained in Column "AR" in Exhibit S-171B was incorrectly entered into the database by the Operator, because the "Start Time" of the solution change in Column R cannot be changed by the Operator, since it is automatically entered by the Alcotest Instrument. SFC testified the same situation exists as to ███████. Comparison of the information in Row 61,346 for ███████ in Exhibit S-152 matched, except for the arrest date, the identifying information in Row 37 on Exhibit S-171B, and SFC concluded the arrest date appearing in Column "AR" in that Exhibit was also incorrectly entered by the Operator.

170

Alcotest Instrument ARUL-0055 used in the ███████ arrest and breath test was calibrated by Alcotest Operator Gregg Anacker, and Alcotest Instrument ARUL-005 used in the ███████ arrest and breath test was Calibrated by Alcotest Operator Oscar Diaz, as set forth in Columns AN through AQ on Rows 40 and 37, respectively, in Exhibit S-171B. Accordingly, they were properly eliminated as subjects who provided breath samples on an Alcotest Instrument calibrated by Sergeant Marc Dennis.

During the cross-examination of Lieutenant Snyder by Mr. Gold, he had been shown and provided testimony on the following documents: (1) Exhibit DB-6, a Calibration Record of Alcotest Instrument, serial number ARLD-0012, located in the Edison Township Police Department, in Union County, documenting the calibration of that Instrument by Sergeant Marc Dennis on June 10, 2009; (2) Exhibit DB-7, a Calibration Record of Alcotest Instrument, serial number ARUL-0055, located in the New Jersey State Police Barracks in Cranbury, documenting the calibration of that Instrument by Sergeant Marc Dennis on May 16, 2011; (3) Exhibit DB-8, a Calibration Record of Alcotest Instrument, serial number ARWC-0020, located at the Kean University Police Department, in Union County, documenting a calibration of that Instrument by Sergeant Marc Dennis on March 26, 2013; and Exhibit DB-9, a Calibration Record of Alcotest Instrument, serial number ARWC-0064, located at the New

171

Jersey State Police Barracks, Monmouth Station, documenting a calibration of that Instrument on July 15, 2013 by Sergeant Dennis.  See T2, page 43, line 19 to page 71, line 2.  These documents were extracted from, and are contained in: (1) as to Exhibit DB-6, Exhibit S-102, "Calibration Records of Sergeant Marc Dennis for each Municipality in Middlesex County;" (2) as to Exhibits DB-7 and DB-9, in Exhibit S-104, "Calibration Records of Sergeant Marc Dennis for each New Jersey State Police Barracks location;" and (3) as to Exhibit DB-8, in Exhibit S-107, "Calibration Records of Sergeant Marc Dennis for each Municipality in Union County."  Lieutenant Snyder then reviewed Exhibit S-92, the Excel Spreadsheet entitled "Spreadsheet_All Solution Changes_11-1-08 thru 1-9-16," and testified the Dennis calibrations reflected in Exhibits DB-6, DB-7, DB-8, and DB-9 were not contained on Exhibit S-92.

On direct examination of SFC Alcott, he was shown Exhibit DB-6, the Calibration Record for Alcotest Instrument, serial number ARLD-0012, located in the Edison Township Police Department, calibrated by Sergeant Marc Dennis on June 10, 2009.  Returning to Exhibit S-126, the "Zingis Project Spreadsheet 2-24-2023," the color-coded Excel Spreadsheet prepared by him, SFC Alcott testified the calibration of Alcotest Instrument ARLD-0012 by Sergeant Marc Dennis on June 10, 2009 does not appear on his Exhibit S-126 Spreadsheet.  SFC Alcott explained that omission was based on

172

his review of the four-page records for Alcotest Instrument ARLD-0012 contained in the Edison Township PDF file contained in Exhibit S-102, "Calibration Records of Sergeant Marc Dennis for each Municipality in Middlesex County," noting that this was not listed in Exhibit S-126 because the Control Test conducted by Sergeant Dennis failed and, therefore, it was not a valid calibration, and the Instrument could not be utilized to analyze breath samples with a failed solution change. SFC Alcott then reviewed Exhibit S-152, the Excel Spreadsheet entitled "Subjectsfrom 11052008_06302016." A sorting of Column B, "Serial Number" for Alcotest Instrument ARLD-0012 lists calibration records of that Instrument on Rows 3648 through 3830, and SFC Alcott verified there are no arrest dates of any subject relating to the calibration date of June 10, 2009 of Alcotest Instrument ARLD-0012 listed on Exhibit S-152.

With respect to Exhibit DB-8, the Calibration Record for Alcotest Instrument ARWC-0020, dated March 26, 2013, a sorting of Column F, "Serial Number" on Exhibit S-126, the color-coded Excel "Zingis Project Spreadsheet" created by SFC Alcott, for Alcotest Instrument ARWC-0020, discloses there is no calibration for that Instrument on March 26, 2013 appearing in Exhibit S-126. However, again, reviewing the three-page PDF file "ARWC-0020 Kean University" contained in Exhibit S-107, "Calibration

173

Records of Sergeant Marc Dennis for each Municipality in Union County," discloses the reason for its omission on S-126 is that the Control Test failed, and the Instrument could not be utilized to test breath samples. A further review of Exhibit S-126 discloses that the next successful calibration of Alcotest Instrument ARWC-0020 occurred on May 20, 2013. Reviewing Exhibit S-152, and sorting Column B by Alcotest Instrument ARWC-0020 discloses there are no arrest dates of any subject relating to the calibration date of March 26, 2013.

The same review was conducted by SFC Alcott as to the calibration records contained in Exhibits DB-7 and DB-9, with the same results, namely, a review of Exhibit S-104, "Calibration Records of Sergeant Marc Dennis for each New Jersey State Police barracks location" discloses that the Control Tests failed, they were not contained on Exhibit S-126, and a review of Exhibit S-152 discloses there were no arrests associated with the calibration dates set forth in Exhibits S-7 or S-9.

SFC Alcott was shown Exhibit S-89, another Excel Spreadsheet he created, entitled "Spreadsheet of towns and counties," which he explained contains the serial numbers and location of Alcotest Instruments on which Sergeant Marc Dennis calibrated or conducted solutions changes. He created that Spreadsheet from the data contained in Exhibit S-126. Exhibit S-89

174

contains 146 Rows and Three Columns of information, as follows:  Column A, "Serial Number;" Column B, "Agency;" and Column C, "County."  He testified Exhibit S-89 shows that Sergeant Dennis performed solution changes and calibrations in Burlington, Cape May, Mercer, Middlesex, Monmouth, Ocean, Somerset and Union Counties.  Referring to Exhibit S-89, SFC Alcott stated that, as to Burlington County, Sergeant Dennis performed solution changes on two Alcotest Instruments located at the Red Lion New Jersey State Police Station; as to Cape May County, he performed solution changes on one Alcotest Instrument located at the New Jersey State Police Station in North Wildwood; and as to Mercer County, he performed solution changes on two Alcotest Instruments located at the New Jersey State Police Station in Hamilton.

Sergeant Alcott then reviewed a sorting of Column F, "Serial Number," on Exhibit S-126 to search for the Serial Numbers of the Alcotest Instruments, listed in Exhibit S-89, for the Red Lion, North Wildwood and Hamilton State Police Stations.  As to Alcotest Instrument ARWE-0029 at the Red Lion Station, Exhibit S-126 disclosed, on Row 713, that Sergeant Dennis only performed one solution change on that Instrument, on December 21, 2014, and not a calibration.  As to Alcotest Instrument ARWE-0026 at the Red Lion Station, a sorting of Column F on Exhibit S-126 disclosed, on Row 712, that

175

Sergeant Dennis only performed one solution change on that Instrument, on December 17, 2010, and not a calibration. As to Alcotest Instrument ARWC-0058 at the North Wildwood Station, a sorting of Exhibit S-26 disclosed, on Row 615, that Sergeant Dennis performed both a solution change and a calibration on August 27, 2013. SFC Alcott then reviewed Exhibit S-152, the Excel Spreadsheet entitled "Subjectsfrom 11052008_06302016," and testified a sorting of Column B, "Serial Number," for Alcotest Instrument ARWC-0058 disclosed there were no breath tests conducted on that Instrument relating to the August 27, 2013 calibration by Sergeant Dennis. As to Alcotest Instrument ARWD-0107 at the Hamilton Station, he testified a sorting of that Instrument on Column F of Exhibit S-126 disclosed, on Rows 674 and 675, that Sergeant Dennis performed solution changes, not calibrations, on May 16, 2009 and July 13, 2012, respectively. As to Alcotest Instrument ARWE-0037, also at the Hamilton Station, he testified a sorting of Column F on Exhibit S-126 disclosed, on Rows 719 and 720, that Sergeant Dennis performed solution changes, not calibrations, on October 1, 2010 and July 8, 2011, respectively.

SFC Alcott also reviewed Exhibit S-90 (also Exhibit S-148). Scrolling over to Column T, "Final Error," SFC Alcott explained that Column of information reveals whether there was an error that prevented the Alcotest Instrument from producing an evidential BAC reading. On direct examination,

176

DAG Clark clicked on the "sort" button on that Excel Spreadsheet to display all the "error" messages on the corresponding Row. SFC Alcott explained that the error "Ambient Air Check Error" appears when the Instrument detects ambient air (atmospheric air), which causes the test to abort, without producing a BAC reading. He testified nothing a Coordinator does during the calibration process could cause that message, stating "[i]t's an automatic function from the instrument." T9, page 16, lines 7-8.

Concerning the error message, "Blowing Not Allowed," SFC Alcott explained if the subject blows into the mouthpiece when not prompted to do so by the Instrument, it will display that final error and abort the test. He testified that nothing the Coordinator does during the calibration of the Instrument can cause that message to appear, as the Instrument automatically displays that error if it detects breath being delivered before the subject is prompted to do so, and a BAC reading would not be produced.

As to the error message, "Control Test Failed," SFC explained that, with a breath test sequence, a control test is conducted before the actual breath sample is received from the subject, and another control test is conducted following receipt and analysis of a subject's breath test. He stated that if either one of those control tests is outside a 5% tolerance of .005, the

177

Instrument will record that the control test failed and would abort the test without producing a BAC reading.

Concerning the error message "Control Gas Supply," SFC Alcott testified if the Simulator Solution in the Instrument does not deliver gas when it is expected to during a control test, that message appears. He stated that nothing the Coordinator does during the calibration process can cause that error message. He noted this generally occurs during administration of the breath test if the Simulator gets disconnected, among other reasons.

SFC Alcott testified that the error message "Interference" occurs during a breath test if something other than ethanol is being blown into the Instrument. He explained that is automatically determined by the Instrument during a breath test, and there is nothing that a Coordinator can do during the calibration process that could cause that error message.

As to the error message, "Minimum Volume Not Achieved," SFC Alcott testified this message appears if the subject being tested does not meet the minimum requirements for the volume of the breath sample being provided, and there is nothing the Coordinator calibrating the Instrument can do to cause that error message. He explained that the Flow Sensor in the Instrument detects whether the minimum requirements of volume of the breath sample has

178

been achieved, and there is no involvement with the Flow Sensor in the calibration process.

SFC Alcott testified the error message "Mouth Alcohol" occurs if the Instrument detects a drop in the BAC concentration during receipt of the breath sample. He explained there is an internal algorithm in the firmware of the Instrument that makes that calculation and determines whether "Mouth Alcohol" is present, and nothing during the calibration process can cause that error to occur.

Concerning the error message, "Purging Error," SFC Alcott explained there is an internal pump inside the Alcotest Instrument that pumps room air through the system to clear out any alcohol before the next breath sample is received. If that process fails to clear out any alcohol, this error would appear. He testified there is nothing done by the Coordinator during the calibration process that could cause this error because it is automatically determined by the Instrument if the alcohol is not properly purged.

SFC Alcott testified that with respect to the error message, "Ready to Blow Expired," when the Instrument is ready to receive a breath sample, it prompts the subject to provide it and the subject has three minutes to deliver that breath sample. When the three minutes expires without a breath sample being provide, this error message appears. He explained this protocol is built

179

into the firmware of the Instrument and there is nothing that a Coordinator can do during the calibration process that could cause this message to appear.

With respect to the error message, "Simulator Temperature Error," SFC Alcott explained that if, during a control test, the simulator temperature is not 34 degrees centigrade, plus or minus .2 degrees, that message will appear. He stated this is an automatic measuring function controlled by the firmware, and nothing done during the calibration process can cause that error.

SFC Alcott then testified concerning the error messages, "Subject Refused," and "Test Terminated." He explained these are determinations made by the breath test Operator during the breath testing sequence. He explained the officer operating the Alcotest Instrument, or the arresting officer, has discretion to determine whether a subject should be cited for a violation of the Implied Consent Statute, requiring a subject arrested for driving while under the influence to submit to a breath test analysis on an Alcotest Instrument. He also stated that when an error message occurs that aborts a test, a solution change is required, which takes close to an hour and a half to restore the Instrument to working order. Accordingly, when an error message occurs, the arresting officer always has discretion to transport the subject to the location of another Alcotest Instrument, such as an adjoining municipality, to conduct another test.

180

On cross-examination by Mr. Noveck, SFC Alcott acknowledged he was not involved in the creation of Exhibit S-90 (also Exhibit S-148). He testified, although he was asked to analyze the Exhibit S-90 (also Exhibit S-148) list to determine whether every subject listed was asked to provide breath samples on an Alcotest Instrument that had been calibrated by Sergeant Dennis, he was not asked to check whether there were other individuals, not listed on those Exhibits, who had been requested to provide breath samples on Alcotest Instruments calibrated by Sergeant Dennis.

While questioning SFC Alcott, Mr. Noveck displayed Exhibit S-90, and SFC Alcott verified, through a sorting of Column E, "Subject Last Name," that a subject with the last name, ███████, was not contained in Exhibit S-90. Mr. Noveck then displayed Exhibit S-152, and sorted Column B, "Serial Number" on Exhibit S-152, for Alcotest Instrument ARTL-0023 which displayed, among other calibration dates, June 30, 2019. SFC Alcott acknowledged that Row 44209 on Exhibit S-152 shows that subject ████████████ (Columns E through G) was arrested on November 6, 2008 (Column A) in Bridgewater Township (Column D) and was asked to provide a breath sample on Alcotest Instrument ARTL-0023 (Column B), that Alcotest Instrument having been calibrated on June 30, 2009 (Column C). From his review of Exhibit S-90, it was clear to SFC Alcott that Sergeant Dennis calibrated that Instrument on

181

June 30, 2009.  However, SFC Alcott noted that the arrest date listed in Column A was more than six months before the calibration date.  Accordingly, he concluded that the arrest date was incorrectly entered, which would account for this subject being missed for inclusion on the Exhibit S-90 Spreadsheet.  That date-entry error by the arresting officer was verified by Exhibit DPD-2A, which is a one-page sheet of a "Municipal Case Search" conducted by Mr. Noveck, which documents that the actual arrest of ▮▮▮▮▮▮ in Bridgewater Township was November 6, 2009.  Accordingly, as acknowledged by SFC Alcott, ▮▮▮▮▮▮ should have been included in the Exhibit S-90 Spreadsheet as a person asked to provide a breath sample on an Alcotest Instrument calibrated by Sergeant Dennis.  Column U in Exhibit S-152 shows that a BAC reading of 0.132 was obtained, and Exhibit DPD-2A verifies she was convicted on Driving While Intoxicated on March 3, 2010.

Accordingly, the ▮▮▮▮ case is one that falls within the Court's decision in <u>Cassidy</u>, providing her the rright to notice and the right to file an application for post-conviction relief (PCR).  However it should be noted that a careful review of Exhibit DPD-2A reveals that ▮▮▮▮▮▮ was sentenced to a 90-day loss of her driving privileges, which was the sentence imposed, at that time, on what is commonly referred to as a Tier 1 DWI offense.  A BAC reading of 0.132 is <u>per se,</u> Tier 2 DWI Offense, which carried with it, at that time, a

license suspension of 6 months. In other words, the actual circumstances at the time of the conviction entered for a Tier 1 DWI offense would have to be examined during a hearing on the PCR application to determine the appropriate adjudication, since plea agreements in DWI cases are prohibited by Guideline 4 in the Appendix to Part VII of the Rules Governing the Courts of New Jersey. Nevertheless, ███████ should have been included on the Excel Spreadsheet in Exhibit S-91, and was entitled to notice of the Court's decision in <u>Cassidy</u>.

During his cross-examination, Mr. Noveck guided SFC Alcott through a similar analysis concerning ██████████. Exhibit DPD-2C, the one-page result of another Municipal Court Case Search conducted by Mr. Noveck, discloses that ███████ was arrested and charged with DWI on May 14, 2010, in Highlands Borough, but the summons was dismissed in Highlands Borough Municipal Court on July 27, 2010. Row 800 of Exhibit S-126 documents that Sergeant Dennis performed a calibration on Alcotest Instrument ARWF-0400 on April 20, 2010, located in the Highlands Borough Police Department. A sorting of Column B, "Serial Number" in Exhibit S-90 for that Instrument, and sorting of Column C, "Calibration Date" in Exhibit S-90 resulted in no matches for the last name of ██████. Filtering Column C, "Calibration Date," in Exhibit S-152, for the date of April 20, 2010, reveals, in

183

Row 167640, that ██████████████ was arrested on April 14, 2010 (Column A) in Highlands Borough (Column D), and was requested to provide a breath sample on Alcotest Instrument ARWF-0400, an Instrument calibrated by Sergeant Marc Dennis. However, it is noted that Column U, "End Result," of Row 167640 shows the BAC reading was "Zero," which is consistent with the result of dismissal of the DWI charge reflected in DPD-2C. Accordingly, notwithstanding that ██████████ provided a breath sample on an Alcotest Instrument calibrated by Sergeant Dennis, because of the entry of a dismissal, she would not be entitled to relief under the Court's decision in Cassidy.

Exhibit DPD-2B is a one-page Municipal Court Case Search result concerning defendant ██████████, who was issued a summons for DWI in Highlands Borough on October 31, 2012. A conviction for that offense was entered against her in Highlands Borough Municipal Court on August 20, 2013 and, in addition to fines and penalties, her driving privileges were revoked or a period of seven months. The Excel Spreadsheet constituting Exhibit S-126 discloses, on line 807, that Sergeant Marc Dennis performed a solution change and calibration on Alcotest Instrument ARWF-0400, located in Highlands Borough Police Department, on July 19, 2012. In displaying Exhibit S-90, Mr. Noveck filtered Column B (Serial Number) for all Rows containing Alcotest Instrument ARWF-0400, and then filtered Column C (Calibration Date) for

July 19, 2012. That resulted in the display of ten Rows in Exhibit S-90 (Rows 18833 through 18842) with the matching date of July 19, 2012. Filtering the name "████" on Column E (Subject Last Name) revealed no matches, namely, ███████ was not included Exhibit S-90.

Mr. Noveck then, again, displayed for SFC Alcott Exhibit S-152. Filtering Column E (Subject Last Name) for "████" disclosed Row 167508 containing the name of ████████, with the same arrest date in Column A and the same Summons Number in Column P as contained on Exhibit DPD-2B, and Column U in Exhibit S-152 shows her breath sample resulted in a BAC reading of 0.188, well over the per se, statutory limitation of a BAC reading of 0.10 for conviction of a Tier 2 DWI offense, which matches the conviction and sentence reflected on Exhibit DPD-2B. Accordingly, ████ ████, having provided a breath sample on an Alcotest Instrument calibrated by Sergeant Dennis, was entitled to be included with those defendants who were potentially affected by the Court's decision in State v. Cassidy, yet she was not included in the Exhibit S-90 list compiled by the NJSP, and was therefore not provided mailed notice of the misfeasance of Sergeant Dennis or the Court's decision in Cassidy, which included her right to file an application for post-conviction relief. Additionally, Exhibit DPD-2B also reflects that a warrant was issued for ████████ arrest on September 5, 2018, which, as of

185

the date of the Municipal Court Case Search on June 2, 2023, was still outstanding, with bail set and the issuance of a Proposed Suspension Notice, ostensibly for the failure to pay the full amount of the fines, costs and penalties imposed on the conviction.

Mr. Noveck then examined SFC Alcott concerning Exhibit DBP-2D, which is a "Municipal Court Search," conducted by Mr. Noveck in the matter of ███████████████████ On behalf of ██████████, his attorney filed an application for post-conviction relief based on State v. Cassidy, which is still under consideration, on the issue of whether ██████████ was requested to provide a breath sample on an Alcotest Instrument that had been calibrated by Sergeant Dennis. ██████████ was charged in the Township of Woodbridge with Driving While Intoxicated, in Summons Number SP4 314067 on December 27, 2008. The charge was filed by a New Jersey State Police Trooper. From my experience in handling Cassidy-based PCR applications, the State Police follow record-retention policies, and its records for that matter were destroyed prior to the Court's decision in Cassidy. In that PCR matter, SFC Alcott had been asked by DAG Mitchell to search the Alcotest Information System database for information concerning the ██████████ matter. See Exhibit S-149 (a series of emails in March 2023 between SFC Alcott, William Gronikowski, and DAG Mitchell concerning attempts to locate calibration

186

documents concerning that matter).  The result of the those documented attempts was that SFC Alcott needed to determine the Alcotest Instrument serial number before reaching any conclusions.  The Municipal Court Search conducted discloses he pled guilty to that offense in Woodbridge Municipal Court on April 22, 2009, and upon sentencing, in addition to fines, court costs and statutory penalties, the driving privileges of ████████ were suspended for a period of seven months.

Based on the arrest-date information in the ██████████████ matter, December 27, 2008, SFC Alcott testified he requested Mr. Gronikowski to conduct a statewide search (query) of the Alcotest Inquiry System database concerning DWI tickets issued from December 26, 2008 to December 28, 2008.  Exhibit S-150 is an Excel Spreadsheet entitled "Subjectsfrom 12282008_12282008," which contains 363 Rows of subjects charge with Driving While Intoxicated and 312 Columns (Fields) of information.  SFC Alcott testified the name of ████████████████ does not appear on this subject-based Excel Spreadsheet.  SFC Alcott was then shown Exhibit S-152, the Excel Spreadsheet entitled "Subjectsfrom 11052008_06302016," which contains 236,664 Rows of subject data, each Row containing 22 Columns (Fields) of information concerning each subject charged with DWI in New Jersey from November 5, 2008, through June 30, 2016. Mr. Noveck filtered

and sorted the name of "████ in Column (Field) E, "Subject Last Name,"

which SFC Alcott verified produced no results for the name "████████."

Mr. Noveck then filtered and sorted the Summons Number contained in

Exhibit DPD-2D in Column (Field) P of Exhibit S-152, which SFC verified did

not produce any results for that Summons Number.

SFC Alcott also reviewed Exhibit DPD-2D and verified that under

"Offense Information" there is a field of information entitled "Alcotest,"

which is blank (not filled-in). However, this court notes that ████████ was

convicted of DWI upon entry of a plea of guilty, and a seven-month license

suspension was imposed, which is the amount of license suspension applicable

to a Tier 2 violation upon a finding of a Blood-alcohol content reading of

0.10% or higher. Accordingly, his plea and conviction had to have been based

upon breath samples provided and analyzed by an Alcotest Instrument. SFC

Alcott testified that when a New Jersey State Trooper arrests someone for

DWI, the Trooper usually brings the defendant back to the State Police Station

to which he or she is assigned, in order to conduct the breath-samples test.

However, SFC Alcott further explained, there is nothing preventing the

Trooper from bringing the defendant to a municipal police station for the

breath test to be conducted. Accordingly, SFC Alcott concluded, given the

absence of State Police Records concerning the arrest of ████████, including

188

absence of the Alcohol Influence Report, the fact that ███████ was pulled over and charged with Driving While Intoxicated does not reveal the location where the Alcotest breath test was conducted.

When asked if he knew any reason why a record of the charging of ███ ████ with Driving While Intoxicated, and the testing of his breath on an Alcotest Instrument does not appear in the Alcotest Inquiry System database, SFC Alcott explained there was a time, prior to approximately 2011, that information was not downloaded from each Alcotest Instrument in the State, directly onto the Alcotest Inquiry System database, through a telephone modem, as it has been done from 2011 forward. He testified, as did Lieutenant Snyder, that prior to approximately 2011, breath-testing information from each Alcotest Instrument was downloaded onto a Compact Disc (CD) every six months, and the CD was transported to the Office of Forensic Sciences within the NJSP, which maintains the database, and then downloaded onto the database. He acknowledged that the absence of arrest and breath-testing records for ████████████. in the Alcotest Inquiry System database may have been because data concerning same was placed on a CD that was never downloaded onto that database. SFC Alcott testified another copy of the CD was retained by the agency in which the Alcotest Instrument was located, but he was unaware as to whether, either the Office of Forensic Sciences or the

189

local agency, retained the CDs.  He also testified that since approximately 2011, and currently, information from each Alcotest Instrument is downloaded through a telephone modem onto the database on a weekly basis.

Mr. Noveck also referred to another Excel Spreadsheet created by SFC Alcott, Exhibit S-171B, entitled "ARUL-0055.2 instances (003)," which contains the records of testing of subjects on that particular Alcotest Instrument.  It contains 55 Rows of subjects who were asked to provide breath samples on that Instrument, and 312 Columns of information as to each Subject Row.  Rows 37 ███████████████ and 40 ███████████████ on that Spreadsheet are highlighted in "yellow" because the dates of calibration of that Instrument appearing on Column H (Calibration Date) is June 16, 2011, which occurred after the listed date of arrest of the subject contained on Column AR (Arrest Date), June 14, 2011 as to Row 37, and May 10, 2011 as to Row 40, which is inconsistent.  SFC Alcott testified that the calibration date is automatically entered by the Alcotest Instrument, whereas the date of arrest is inputted by the officer conducting the breath test. Accordingly, he concluded, in those two instances, the date of arrest had to have been inaccurately manually entered by the officer conducting the breath test on that Alcotest Instrument.

Mr. Noveck then reviewed with SFC Alcott Exhibit S-90 (also Exhibit S-148). As has been previously noted, Column A on Exhibit S-90 is the "Arrest Date," Column B is the "Serial Number" of the Alcotest Instrument, Column C is the "Calibration Date," and Columns E through G lists the name of the subject tested. SFC Alcott reviewed Row 456 on Exhibit S-90, which lists the arrest date of subject ███████ as October 4, 2013, and the calibration date of the Alcotest Instrument on which he was tested as June 30, 2014. Similarly, Row 1054 on Exhibit S-90 lists the arrest date of subject ███████ as March 19, 2010, and the calibration date of the Alcotest Instrument on which he was tested as November 30, 2010. And, Row 1320 on Exhibit S-90 lists the arrest date of subject ███████ as February 15, 2009, and the calibration date of the Alcotest Instrument on which he was tested as December 28, 2009. These are further instances where the Alcotest Inquiry System database lists dates of arrest occurring before the dates of calibration of the Alcotest Instrument on which those subjects were requested to provide breath samples, SFC Alcott concluding the officer conducting the breath test incorrectly entered the date of arrest. SFC acknowledged if someone attempted to match the arrest date for a subject contained in the Alcotest Inquiry System database to the arrest date of that subject in the

191

Court's ATS database, in certain case, like those reviewed, they would not be able to obtain a match.

SFC Alcott was then questioned during cross-examination by Mr. Gold. SFC Alcott again verified that his review of Exhibit S-90 disclosed there were 436 subject entries contained thereon that had not provided breath samples on Alcotest Instrument calibrated by Sergeant Marc Dennis, and should not have been included in the Excel Spreadsheet of 27,833 subjects, contained Exhibit S-90. SFC Alcott again testified he created Exhibits S-128 and S-129. Again, Exhibit S-128 contains the same information as contained in Exhibit S-129, rearranged to place the first 436 subject Rows in Exhibit S-128 list, color-coded in "Red," as those subjects who were not asked to provide breath samples on Alcotest Instruments calibrated by Sergeant Marc Dennis.

SFC Alcott was then shown Exhibit DB-17, which was created by Mr. Gold. It is a table of the 27,833 subject records contained in Exhibit S-90, placed in Microsoft Access format. Exhibit DB-19 is that same information but is placed in Microsoft Excel Spreadsheet format. These Exhibits contain a sorted version of Exhibit S-90, sorted by "Driver's License Number (ascending)", then the "Subject's Last Name (ascending)," then the "Subject's First Name (ascending), then "Arrest Date (ascending), and "Arrest Time (ascending)." The "ID" Columns in Exhibit DB-17 and DB-19 have Row

192

numbers corresponding to the Row numbers contained in Exhibit S-90, less one number for the header line in the Excel Spreadsheet, Exhibit DB-19, but not in the Microsoft Access Spreadsheet, Exhibit DB-17.

In any event, the same 27,833 subject entries that appear in Exhibit S-90 (also Exhibit S-148) appear in Exhibits S-129, S-129, DB-17 and DB-19.  For ease and consistency of reference to the various Subject Row numbers, the court will refer to those contained in Exhibits S-90 and S-129 when discussing the cross-examination of SFC Alcott by counsel.

Mr. Gold was able to verify with SFC Alcott several instances on Exhibit S-90 where the arrest date listed was, in time, before the calibration date.  In one instance, as to subject ███████████, Row 5219 on Exhibit S-90 displays an arrest date for a DWI offense in the Borough of Dunellen in Middlesex County on February 6, 2015, where it shows breath samples were requested on Alcotest Instrument, Serial Number ARTL-0009, listed as being calibrated on February 10, 2010.  Then, Row 5220 on Exhibit S-90 displays the same ███████████ again, with an arrest date for a DWI offense ten days later, on February 16, 2015, again, in the Borough of Dunnellen, with breath samples requested on that same Alcotest Instrument, Serial Number ARTL-0009, again, calibrated on February 10, 2015.  The summons number listed in Column P of Exhibit S-90 is the same for both Rows, number E150004545, as

193

is the time of arrest listed, 22:40, in Column R of Exhibit S-90.  SFC Alcott testified these two listings are the same case and, for some unknown reason, it was run twice.

A similar error on Exhibit S-90 relates to the subject, ███████████, who appears on Rows 20546 and 20547 of that Exhibit.  Both Rows show a different arrest date for a DWI offense in the Borough of Deal on Column A, on the same Summons Number listed in Column P.  Row 20546 displays an arrest date of May 8, 2015, with breath tests requested on Alcotest Instrument Serial Number ARWM-0030, and Row 20547 displays an arrest date of May 5, 2015, with breath tests also requested on that same Alcotest Instrument, Column C listing its calibration date, on both Rows, as May 6, 2010.  Thus, again, at least as to Row 20547, the listed arrest date is before the listed calibration date.

Mr. Gold then displayed Exhibit S-83 for SFC Alcott, which is the Excel Spreadsheet entitled "Spreadsheet from AOC_All Addresses_Alcotest AS Defendants Matches – full matches and partial – to AG," and, as previously noted, is an Excel Spreadsheet, containing two Sheets, that contain addresses for those subjects the AOC was able to finding either a full match (18,249) or a partial match (947), through a search of the Court's ATS database, to the 20,667 subjects listed in Exhibit S-91.  Mr. Gold then performed a search in

both Sheets of Exhibit S-83 for the subject listed in Row 1783 of Exhibit S-90, ███████████████, and the subject listed in Row 1784 of Exhibit S-90, ██████ ████████, resulting in their names not appearing in either Sheet, meaning that an address match for those subjects was not obtained and, hence, those subjects were not provided the notification required by the Court's decision in Cassidy. This information was verified by SFC Alcott.

Mr. Gold then went through, with SFC Alcott, some of the "Final Error" messages contained in Column T of Exhibit S-90. Concerning the error message, "Subject Refused," which appears for multiple subjects in Exhibit S-90. When that error message appears, there is no BAC reading reported in Column U, "End Result," on Exhibit S-90. SFC Alcott explained that if a subject produces any breath samples, the maximum number that subject is permitted is eleven attempts at providing an acceptable sample for analysis. SFC Alcott acknowledged that Exhibit S-90 contains 21 Columns, of Fields, of information for each subject Row, and that from a Review of those 21 Columns it cannot be determined how many times a particular subject attempted to provide a breath sample. SFC Alcott acknowledged that if Exhibit S-90 contained all 310 Columns, or Fields, of information, it could be determined how many breath samples were attempted for any particular subject.

195

SFC Alcott was then asked about the error message, "Control Test Failed," which also appears for multiple subjects in Exhibit S-90. Again, when that error message appears, there is no BAC reading reported in Column U, "End Result," on Exhibit S-90. SFC Alcott acknowledged that it cannot be determined from the Columns contained in Exhibit S-90 whether it was the first or second control test that failed, nor can it be determined how many breath samples were provided by a particular subject. SFC Alcott acknowledged the same conclusion applies to any of the error messages reported in Column T of Exhibit S-90.

SFC Alcott was then questioned concerning Exhibit DB-32, which is a color photograph of a CU-34 Simulator that is utilized with the Alcotest Instrument to conduct the Control Test before and after each breath sample is provided. SFC acknowledged that the CU-34 Simulator is attached to the Alcotest Instrument by a clear tube located at the top of the CU-34, and there is a temperature probe, sometimes referred to as a flat key, that is attached to the back of the CU-34. He explained that the clear tube brings a vapor from the CU-34 Simulator into the Alcotest Instrument. A solution is contained in the jar of the CU-34 Simulator, which is heated to 34 degrees Celsius, plus or minus .2 degrees during each Control test to produce a vapor that is carried into the Alcotest for analysis, simulating human breath.

196

During his testimony, SFC Alcott explained the calibration process consistent with the Court's description in Cassidy, 235 N.J. at 488-89. SFC Alcott was then shown page 11 of Exhibit DB-4, the "Alcotest 7110 MKIII-C New Jersey State Police User Manual 1.1." That page was separately marked as Exhibit DB-36, and is entitled "Test Data." That page explains that a breath test can be performed when the Alcotest Instrument displays the word "Ready," after which the Operator of the Instrument presses the "orange" start button and begins entering the subject's information displayed in the bracketed portion on Exhibit DB-36, after which the operator can review the information entered and, if satisfied, enter the letter "N" to proceed, after which the Alcotest Instrument will automatically start the Control Test.

SFC Alcott agreed with the testimony given by DAG Mitchell on March 28, 2023, see Exhibit DB-33 (T4 pages 127-28), that if the temperature of the Solution is not properly calibrated, the vapor produced will not properly simulate human breath, the Control Test will fail, and an evidential BAC reading will not be produced, as the Instrument will not be ready to accept breath samples.

SFC Alcott also testified the best evidence to determine whether Sergeant Marc Dennis calibrated a particular Alcotest Instrument would be the actual calibration documents, with his signature and date thereon.

197

SFC Alcott was then shown Exhibit DB-17, the sorted Excel Spreadsheet of 27,833 subjects created by Mr. Gold; Exhibit S-129, the Excel Spreadsheet created by SFC Alcott of those 27,833 subjects, color-coded in "green" on Rows for those Alcotest Instruments calibrated by Sergeant Dennis, and in "Red" on Rows for those Alcotest Instruments that were not calibrated by Sergeant Dennis; and Exhibit S-90. The first line of questioning related to the subject ███████████. ███████████ appears on Rows 328, 329, and 330 in Exhibit DB-17; on Rows 16518, 16775 and 16776 in Exhibit S-129, and on Rows 16518, 16775, and 16776 in Exhibit S-90. Row 328 relates to a DWI arrest on July 21, 2014, in Scotch Plains, ████████ being asked to provide a breath sample on Alcotest Instrument ARWC-0062, calibrated by Sergeant Dennis on May 16, 2014, with an "End Result" stating "Subject Refused." Rows 329 and 330 both relate to an arrest date for a DWI offense on July 21, 2014 in Plainfield, and ████████ being asked to provide a breath sample on Alcotest Instrument ARWC-0069, calibrated by Sergeant Dennis on May 19, 2014. Column M of Row 329 states "Subject Refused," and Column M of Row 330 states "Control Test Failed." This same information appears in Column T on Rows 16519, 16775 and 16776, respectively, on Exhibit S-129, and on Rows 16519, 16775, and 16776, respectively on Exhibit S-90. No evidential BAC readings were obtain in the three instances.

198

A similar analysis relates to the subject ███████████████. Rows 17723 and 17724 on Exhibit S-129 reflects the same arrest date for DWI on May 5, 2009 by the Union County Police, with the subject being asked to provide breath samples on Alcotest Instrument ARWE-0083, calibrated by Sergeant Dennis on November 20, 2008, both with an error message listed on Column T as "Control Gas Supply," with no resulting evidential BAC reading. Row 7621 on Exhibit S-129 lists the subject with a last name of ██████ in Column E, but no first name. However, the birth date of April 16, 1969 in Column H for Row 7621 is the same birth date in Column H for Rows 17723 and 17724 and the same Driver's License Number appears in Column M for all three Rows, so this is the same subject. Both Rows 17723 and 17724 have the same error message, as well, in Column T, "Control Gas Supply," and there is no evidential BAC reading reported in Column U for any of the three subject entries. Additionally, the arrest date reflected in Columns A and Q and arrest time reflected in Column R for all three subject Rows are the same, May 5, 2009 at 23:59, and the Summons Number contained in Column P is the same for all three Rows. ██████████████ was asked to provide breath samples on Alcotest Instrument ARWE-0083, located at the Union County Police Station, and both attempted tests resulted in error messages of "Control Gas Supply." He was also asked to provide breath samples on Alcotest Instrument ARUL-

199

0058, in Westfield Police Station, which resulted in an error message of "Subject Refused," and, again, no BAC reading being reported. The same information is found on Exhibit S-90. SFC Alcott testified it is not uncommon for a subject to be transported to the location of another Alcotest Instrument when an attempt on one Alcotest Instrument is unsuccessful. The sequence of testing at those two locations is not clear.

SFC Alcott was then asked to review Rows 18439, 18440, 18441, and 23086 in Exhibit S-129, the color-coded Excel Spreadsheet prepared by SFC Alcott of all 27,833 subject records, pertaining to ███████████████████. All four Rows list the arrest date in Column A as May 15, 2010. Rows 18439, 18440 and 18441 reflect, in Column B, that ████████████ was asked to provide breath samples on Alcotest Instrument ARWF-0388, located in Little Silver Police Station, which was calibrated by Sergeant Dennis on March 26, 2010. Column T, "Final Error" on Rows 18439 and 18440 show an error code, Control Gas Supply," and Column T on Row 18441 show an error code of "Control Test Failed." Row 23086 reflects that ███████████ was also asked to provide breath samples on Alcotest Instrument ARXA-0061, located in the Borough of Shrewsbury Police Station, which was not calibrated by Sergeant Dennis. Column T on that Row reflects an error code, "Control Test Failed." Thus, all four attempts to obtain breath samples from ████████

200

██████ were unsuccessful and no BAC readings were obtained. The same information appears on Exhibit S-90. Again, the sequence of testing at those two locations is unknown.

SFC Alcott was also asked to review Rows 7651, 16229, 16230, and 17751 on Exhibit S-129, pertaining to ████████████. The Arrest Date in Column A for all four Rows is the same, September 20, 2009, as is the Summons Number in Column P, and the Arrest Location in Column S, which is 2020, the Municipal Code for the Town of Westfield. ███████████ was asked to provide breath samples on three separate Alcotest Instruments. Row 7650 shows he was asked to provide breath samples on Alcotest Instrument ARUL-0058, calibrated by Sergeant Dennis, located at the Westfield Police Station. The Error Code appearing in Column T for that Row states "Test Terminated." It would appear that since the arrest location was in the Town of Westfield, that would have been the first attempted test, sequentially. Row 17751 shows that ████████ was asked to provide breath samples on Alcotest Instrument ARWE-0083, an Instrument calibrated by Sergeant Dennis, located at the Union County Police Station, with Column T showing the error message "Test Terminated." Rows 16229 and 16230 reflect that ██ ████████ was also asked to provide breath samples on Alcotest Instrument ARWC-0057, also calibrated by Sergeant Dennis, located in Garwood Police

201

Department. Column T on Row 16229 shows an error message, "Ambient Air Check," and Column T on Row 16230 states "Subject Refused." Since that Column reflects the conclusion of the Operator of the Instrument, or the arresting officer, that ████████ refused to take the test, contrary to the Implied Consent Statute, it is likely that was, sequentially, the last attempt to obtain breath samples from him. No evidential BAC readings were reported on Column U. The same information is contained in Exhibit S-90.

SFC Alcott was then asked to review Exhibits S-90 and S-129 concerning the subject, ████████████. The same information for ███ ████████ appears in each Excel Spreadsheet in those Exhibits, on Rows 1145, 1146, 1147 and 1148. He was arrested, charged with DWI on August 25, 2015, and requested to provide breath samples on Alcotest Instrument ARNK-0037, an Instrument calibrated by Sergeant Dennis, located in the Middlesex Borough Police Station. Column T on each Row displays the error message, "Mouth Alcohol," and no BAC readings were reported on Column U. SFC Alcott testified this indicates ████████ provided at least one breath sample, on each of the four tests, that triggered the error message "Mouth Alcohol," and each test was automatically aborted. He explained the Alcotest Instrument has an automated algorithm in the firmware that can detect mouth alcohol.

202

Exhibits S-90 and S-129 were also reviewed concerning the subject, ███████████. The same information appears for ███████████ in both Excel Spreadsheets in those Exhibits on Rows 3675, 8371, 8372, and 8373. ██ ███████ was arrested on July 2, 2010, charged with DWI, and requested to provide breath samples on Alcotest Instrument ARUL-0081, calibrated by Sergeant Dennis, located in Perth Amboy Police Station. Three attempts were made, as reflected on Rows 8371, 8372, and 8373, with error messages reported in Column T of "Ambient Air Check Error" on Rows 8371 and 8272, and the error message "Control Test Failed," reported on Row 8373. The "Arrest Location" reported on Column S is "1216," which is the Municipal Code for the City of Perth Amboy. A fourth attempt to obtain breath samples from ███████████, reflected on Row 3675 of those Exhibits, was made on Alcotest Instrument ARSC-0059, located in the South Amboy City Police Station, which resulted in an error message, "Subject Refused." Again, no BAC readings were reported on Row U of those Exhibits.

SFC Alcott was also asked to review Exhibits S-90 and S-129 concerning the subject, ███████████. The same information appears for ██ ███████ in both Excel Spreadsheets, on Rows 21364, 21365, 26760, 26887 and 26888. ███████████ was arrested on February 13, 2011, and charged with DWI. He was requested to provide breath samples on three different Alcotest

203

Instruments, all calibrated by Sergeant Dennis. As reflected on Rows 21364 and 21365, he was asked to provide breath samples twice on Alcotest Instrument ARWM-0087, calibrated on January 19, 2011, located in the Hazlet Township Police Station. Both attempts resulted in the error message, "Control Test Failed." Row 26760 reveals ▮▮▮▮▮▮ was also asked to provide breath samples on Alcotest Instrument ARXD-0007, located at the Keyport Police Station, which also resulted in an error message, "Control Test Failed." Additionally, he was requested to provide breath samples twice on Alcotest Instrument ARXD-0011, located in the Keansburg Police Station, as reflected on Rows 26887 and 26888. Row 26887 displays, in Column T, an error message, Ambient Air Flow Error" and Row 26888 reports the error message, "Control Test Failed." Consequently, there are no evidential BAC readings reported for those five attempts.

Exhibits S-90 and S-129 were then reviewed by SFC Alcott concerning subject ▮▮▮▮▮▮ The same information for ▮▮▮▮ on Rows 16197, 16198, 17197, 17198 and 17199 is contained on both Excel Spreadsheets in those Exhibits. ▮▮▮▮ was arrested on August 16, 2014 and charged with DWI. The "Arrest Location" listed in Column S of each Row is "2007," which is the Municipal Code for Hillside Township. ▮▮▮▮ was asked to provide breath samples on three occasions on Alcotest Instrument ARWE-0023, an

204

Instrument located in the Hillside Police Station and calibrated by Sergeant Dennis on June 4, 2014.  All three attempts resulted in an error code, reported on Column T of each Row, as "Interference."  ██████████ was the asked to provide breath samples, on that same date, on Alcotest Instrument ARWC-0020, located at the Kean University Police Station, also calibrated by Sergeant Dennis, on May 19, 2014.  Those two attempts are reflected on Rows 16197 and 16198 of both Exhibits, and Column T on both Rows also reported an error message of "Interference." Again, no evidential BAC reading was reported.

The next subject reviewed with SFC Alcott on Exhibits S-90 and S-129 was ██████████████.  The same information for him appears on both Excel Spreadsheets contained in those Exhibits, on Rows 17315, 17316 and 17512.

██████████████ was arrested and charged with DWI on December 21, 2008, by a New Jersey State Trooper, the offense occurring, as reflected on Column S in each Row, in Edison Township.  ██████████ was requested twice to provide breath samples on Alcotest Instrument ARWE-0040, an Instrument located at the New Jersey State Police Station in Somerville, calibrated by Sergeant Dennis on November 29, 2008, as reflected on Rows 17315 and 17316.  The first attempt, listed on Row 17315, resulted in an error message reported on Column T as "Ambient Air Check Error," The second attempt, listed on Row

205

17316, resulted in an error message reported on Column T of "Control Test Failed." ████████ was also asked to provide breath samples, on that date, on Alcotest Instrument ARWE-0081, also located at that New Jersey State Police Station, and calibrated by Sergeant Dennis on November 28, 2008. That attempt resulted in an error message reported in Column T as "Control Gas Supply." Again, there were no evidential BAC readings reported for any of those attempts.

SFC Alcott was also shown, on Exhibits S-90 and S-129, listings on Rows 19590, 19591, 19592 and 19593 for the subject, ████████. The information displayed is the same on both Excel Spreadsheets. ████████ was arrested on March 21, 2014 and charged with DWI. She was requested to provide breath samples on Alcotest Instrument ARWJ-0014, located in Point Pleasant Police Station, and calibrated by Sergeant Dennis on December 23, 2013, on four attempts, all resulting in the error message, "Mouth Alcohol." No evidential BAC reading was reported in Column T on those Rows.

The next subject reviewed with SFC Alcott during his cross-examination pertaining to Exhibits S-90 and S-129 was ████████, on Rows 20537, 20538, 20539, 20540 and 21316. ████████ was arrested on April 20, 2015 and charged with DWI. Column S shows the Arrest Location as 1337, which is the Municipal Code for Ocean Township in Monmouth County. Row

206

21316 reflects that ▮▮▮▮▮▮▮▮▮ was asked to provide breath samples on Alcotest Instrument ARWN-0086, an Instrument located in Ocean Township Police Station and calibrated by Sergeant Dennis on March 23, 2015. Column T on that Row lists the error code, "Control Test Failed." ▮▮▮▮▮▮▮▮▮ was then asked to provide breath samples on that same date, with fours attempts, on Alcotest Instrument ARWM-0030, an Instrument located in the Borough of Deal Police Station and calibrated by Sergeant Dennis on November 13, 2014. The attempts reflected on Rows 20537, 20538 and 20539 all list an error code in Column T of "Mouth Alcohol." The final attempt, reflected on Row 20540 lists an error code in Column T as "Subject Refused." No evidential BAC readings were reported.

Mr. Gold also displayed, on Exhibits S-90 and S-129, subject ▮▮▮▮▮▮▮▮▮▮▮, who appears on Rows 27187, 21359 and 26754 on both Exhibits, with the same identification information. ▮▮▮▮▮▮▮ was arrested on December 14, 2010 and charged with DWI. Column S states the Arrest Location as 1322, which is the Municipal Code for the Borough of Interlaken. ▮▮▮▮▮▮ was requested to provide breath samples on three separate Alcotest Instruments in an unknown sequence. Row 27187 reflects he was asked to provide breath samples on Alcotest Instrument ARXE-0082, an Instrument calibrated by Sergeant Dennis on September 30, 2010, located at

207

the Union Beach Police Station.  Column T on that Row shows an error message, "Control Test Failed."  He was also asked to provide breath samples on Alcotest Instrument ARWM-0087, an Instrument calibrated by Sergeant Dennis on July 22, 2010, and Column T on Row 21359 also reflects the error message, "Control Test Failed."  ███████████ was further asked to provide breath samples on Alcotest Instrument on that date on Alcotest Instrument ARXD-0007, an Instrument located at the Keyport Police Station, also calibrated by Sergeant Dennis on July 22, 2010.  An error message appears on Column T on that Row as "Test Terminated" and no evidential BAC readings were reported.

Another subject reviewed with SFC Alcott was ███████████, who appears on Rows 23761, 12875 and 8993 of Exhibits S-90 and S-129.  ███ ████ was arrested on January 5, 2012 and charged with DWI.  Column S, "Arrest Location," states the arrest took place in "1318," which is the Municipal Code for Hazlet Township, and the Summons Number in Column P on all Rows is SP5000695, which means he was issued the Summons by a New Jersey State Police Trooper.  Row 23761 reflects he was asked to provide breath samples on Alcotest Instrument ARXB-0066, located at the Holmdel Police Station, calibrated by Sergeant Dennis on September 20, 2011.  Column T, "Final Error," provides an error message, "Subject Refused."  It is likely he

was first asked to provide breath samples on two separate Alcotest Instruments located at the New Jersey State Police Station in Holmdel, as follows: (1) Row 12875, on Alcotest Instrument ARWA-0171; and (2) Row 8993, on Alcotest Instrument ARUM-0057. Both of those Instruments were calibrated by Sergeant Dennis on November 16, 2011, and Column T on both Rows provides the error message, "Control Test Failed." There are no evidential BAC readings reported on those Rows.

SFC Alcott was also asked on cross-examination to review subject ███████████, whose name appears on Rows 23354, 24989 and 24990 on both Exhibit S-90 and S-129. ████████ was arrested on January 11, 2012 and charged with DWI. Column S on each line of both Excel Spreadsheets lists the "Arrest Location" as 1328, which is the Municipal Code for Manalapan Township. Row 23354 states he was asked to provide breath samples on Alcotest Instrument ARXA-0069, located at the Marlboro Township Police Station, calibrated by Sergeant Dennis on November 1, 2011, and Column T lists the error message, "Control Test Failed." ███████████ was also asked to provide breath samples twice on Alcotest Instrument ARXC-0067, located at the Freehold Borough Police Station, and also calibrated by Sergeant Dennis, on August 31, 2011. Column T on Row 24989 lists the error message, "Control Test Failed," and Column T on Row 24990 lists the error

209

message, "Control Gas Supply."  There are no reported evidential BAC readings on those Rows.

Another subject reviewed on cross-examination of SFC Alcott was ███ ███, whose name appears on Rows 9313 and 23880 on Exhibits S-90 and S-129.  ████████ was arrested on May 5, 2013 and charged with DWI.  Column S on those Excel Spreadsheets state the "Arrest Location" as 1331, which is the Municipal Code for the Borough of Matawan.  ████████ was asked to provide breath samples on two different Alcotest Instruments, both calibrated by Sergeant Dennis, as follows: (1) Row 9313, Alcotest Instrument ARUM-0057, located at the New Jersey State Police Holmdel Station, calibrated on April 11, 2013, resulting in the error message listed on Column T as "Control Test Failed;" and (2) Row 23880, Alcotest Instrument ARXB-0066, located at the Holmdel Township Police Station, calibrated on March 4, 2013, also resulting in the error message listed in Column T as "Control Test Failed."  Again, there are no reported evidential BAC readings on those Rows.

SFC Alcott was then asked on cross-examination to review the testing of subject ████████, whose name appears on Rows 6930, 6931, 2334 and 3699 on the Excel Spreadsheets in Exhibits S-90 and S-129.  ████████ was arrested on December 15, 2010, and charged with DWI.  Column S in all four Rows states the "Arrest Location" as 1201, which is the Municipal Code for

the Borough of Carteret.  Rows 6930 and 6931 reflects that ████████ was requested to provide breath samples twice on Alcotest Instrument ARTL-0026, located at the Borough of Carteret Police Station, calibrated by Sergeant Dennis on July 14, 2010.  Both attempts resulted in the error message on Column T, "Control Gas Supply."  Row 2334 states that ████████ was also asked to provide breath samples on Alcotest Instrument ARRL-0019, located at the Woodbridge Township Police Station, calibrated by Sergeant Dennis on July 21, 2010 and Column T lists the error message in Column T on that attempt as "Control Test Failed."  ████████ was also asked to provide breath samples on Alcotest Instrument ARSC-0059, located at the South Amboy City Police Station, also calibrated by Sergeant Dennis, on December 14, 2010, and the error message on Column T for that attempt states "Subject Refused."  No evidential BAC readings were reported.

Another subject reviewed with SFC Alcott was ████████████, whose name appears on Rows 2620, 2621, 2622, 2623 and 2624 on the Excel Spreadsheets contained in Exhibits S-90 and S-129.  ████████ was arrested on December 26, 2014 and charged with DWI.  Column S on all five Rows lists the Arrest Location as 1225, which is the Municipal Code for Woodbridge Township.  These Rows reflect that he was asked to provide breath samples on five separate occasions on the same Alcotest Instrument, Serial Number

211

ARRL-0019, located at the Woodbridge Township Police Station and calibrated by Sergeant Dennis on October 1, 2014.  The attempts on Rows 2620, 2622 and 2623 report the error message on Column T of "Mouth Alcohol."  The attempt on Row 2621 reports the error message on Column T as "Blowing Not Allowed," and the attempt on Row 2624 reports the error message on Column T, "Subject Refused."  No evidential BAC readings were obtained on those five attempts.  With respect to the "Mouth Alcohol" error message, SFC Alcott explained that when that message is reported by the Instrument, Alcotest Operators are trained to wait 20 minutes after receipt of the message before making another attempt to obtain breath samples.

SFC Alcott was also asked questions concerning the subject, ███████ ██████, who appears on Rows 1299 and 3350 of Exhibits S-90 and S-129.  ███ ███████ was arrested on January 23, 2010 and charged with DWI.  Column S on both Rows lists the Arrest Location as 1214, which is the Municipal Code for the Township of North Brunswick.  Row 1299 shows that ████████ was requested to provide breath samples on Alcotest Instrument ARNK-0042, located at the Rutgers Police Station, and calibrated by Sergeant Dennis on December 28, 2009.  Column T thereof lists the error code, "Control Test Failed."  On that date, he was also requested to provide breath samples on Alcotest Instrument ARSC-0007, located at the Highland Park Police Station,

212

and calibrated by Sergeant Dennis on October 13, 2009. Column T on that Row also reports the error code, "Control Test Failed." There were no evidential BAC readings reported by either Instrument.

Lastly, SFC Alcott reviewed Rows 23313 and 23314 on Exhibits S-90 and S-129 concerning the subject, ███████████. ██████████ was arrested on June 20, 2011 and charged with DWI. Column S on those Rows lists the Arrest Location as 1328, which is the Municipal Code for Manalapan Township. He was asked to provide breath samples on two occasions on Alcotest Instrument ARXA-0069, located at the Marlboro Township Police Station, and calibrated by Sergeant Dennis on May 11, 2011. Column T on both Rows lists the error code, "Interference." There were no evidential BAC readings reported on either attempt.

As to these examples, SFC Alcott testified that because all 310 Columns are not displayed on the Spreadsheet, it is possible that some BAC readings were obtained but were not acceptable to be reported because of the error messages. SFC Alcott explained that a person could search the Public portion of the Alcotest Inquiry System database, by each Alcotest Instrument, by a specific date range, and obtain copies of all the Alcohol Influence Reports (AIS's) for each Instrument in order to obtain more detailed information than as appears on the Excel Spreadsheets contained in the discussed Exhibits. SFC

213

Alcott testified that once a Control Test fails on an Alcotest Instrument, the Instrument automatically puts itself out of working order, and a new solution change must be performed to place it back into working order. He explained the Control Test is fundamental to ensuring the reliability of the readings, and if it fails, no breath samples on that Instrument are provided until a solution change occurs and the subsequent Control Test is successful.

Mr. Gold then referenced Exhibit DB-23, which is the Excel Spreadsheet containing the twenty-six (26) subject records identified by DAG Mitchell, during her cross-examination, as not being contained in the original Exhibit S-90 Excel Spreadsheet of 27,833 subjects, who had also been asked to provide breath samples on Alcotest Instruments that had been calibrated by Sergeant Dennis. In other words, they were somehow omitted from the original list in Exhibit S-90 that purportedly had contained all subjects who had been requested to provide breath samples on Alcotest Instruments calibrated by Sergeant Dennis. SFC Alcott acknowledged that during his cross-examination by Mr. Noveck, he confirmed there were an additional three (3) subjects that had not been contained in that Excel Spreadsheet contained in Exhibit S-90 (Subjects ███████████ (DPD-2A); ████████ (DPD-2B); and ██████ ████████ (DPD-2C)).

Subtracting the 436 subjects, contained in the original Exhibit S-90 Excel Spreadsheet, which SFC Alcott determined had not been requested to provide breath samples on Alcotest Instrument calibrated by Sergeant Dennis, from the 27,833 subject records contained in S-90, results in subjects 27,397. Adding-in the 26 subjects acknowledged by DAG Mitchell as not being contained in S-90, as well as the 3 subjects acknowledged by SFC Alcott as being omitted from S-90, results in a finding that there were 27,426 subjects who had been asked to provide breath samples on Alcotest Instruments calibrated by Sergeant Marc Dennis.

Mr. Gold then referred SFC Alcott to the Joint Exhibit DB/OPD-29, which is an Excel Spreadsheet entitled, "Zingis Index," containing 27,426 Subject Rows and 22 Columns, or Fields, of information, as follows:

| | | |
|---|---|---|
| A | - | Rows in State 27,833 |
| B | - | Arrest Date |
| C | - | Driver's License Number |
| D | - | Subject Last Name |
| E | - | Subject First Name |
| F | - | Summons Number |
| G | - | Location of Alcotest Instrument |
| H | - | Serial Number, Alcotest Instrument |
| I | - | Calibration Date |
| J | - | Subject Middle Initial |
| K | - | Subject Date of Birth |
| L | - | Subject Age |
| M | - | Subject Gender |
| N | - | Subject Weight |
| O | - | Subject Height |
| P | - | Issuing State of Driver's License |

215

```
Q    -    Case Number
R    -    Arrest Date
S    -    Arrest Time
T    -    Arrest Location
U    -    Final Error
V    -    End Result (BAC Reading, if any)
```

That Excel Spreadsheet, Joint Exhibit DB/OPD-29, is arranged chronologically, by Arrest Date, from November 15, 2008 through March 7, 2016, to capture all 27,426 subjects who were requested to provide breath samples on Alcotest Instruments calibrated by Sergeant Marc Dennis, including those not originally contained in Exhibit S-90. SFC Alcott acknowledged that DB/OPD-29 would correct the original list, contained in Exhibit S-90, that had been prepared by the New Jersey State Police and sent to the Office of the Attorney General.

SFC Alcott was then shown Joint Exhibit DP/OPD-28, which is a PDF file entitled "Dennis Calibration Repository," which consists of 1,047 files, on 1,050 pages, each file containing an "Alcotest 7110 Calibration Record" of a specific Alcotest Instrument, located at a specific location, each calibrated by Sergeant Marc Dennis from November 14, 2008 through October 9, 2015.

SFC Alcott then discussed Exhibit S-117, which is an Excel Spreadsheet entitled "Alcott.Copy of Zingis project Spreadsheet 2-2-2023 (002)," which is a color-coded Spreadsheet prepared by SFC Alcott to show all solution changes and calibrations performed by Sergeant Dennis, which he extracted

216

from the Excel Spreadsheet created by Mr. Gronikowski, based on actual Calibration documents reviewed by SFC Alcott. That Excel Spreadsheet contains 1,328 Rows, one for each Solution Change and Calibration performed on a specific Alcotest Instrument. He color-coded in "Green" those documents he found as to each Alcotest Instrument; color-coded in "Red," for those documents he was not able to find; color-coded in "Blue," for documents he found but were incomplete; and in "Orange," for those documents where the solution change was not sequential after the Linearity test. SFC Alcott acknowledged he was unable to find records for forty-one (41) solution changes and calibrations, because some agencies had destroyed their files or they were missing for other reasons. SFC Alcott agreed where there were partial documents available, it was at least clear that Sergeant Dennis had been at the Alcotest Instrument location on the date indicated, and likely performed the calibration of that Instrument. During questioning, he also agreed, with respect to the missing records, one could query the Alcotest Information System database and go through the 1,328 solution changes and match them up with calibration Dates to determine whether Sergeant Dennis was at that location on dates listed on Column D, "Calibration Date," in Exhibit S-117.

On re-direct by DAG Clark, SFC Alcott was referred to Exhibit DB-5, the four sample Alcohol Influence Reports (AIRs) produced during the March

20, 2023 hearing, and asked questions concerning some of the error messages shown on the two-page AIR, with redacted information, for the age 61 Male, page 2 thereof containing the final result as "Subject Refused." With respect to the error message, "Ready to Blow Expired" on page 1 thereof, SFC Alcott testified that the operator of the Alcotest Instrument has no input in causing that error message to appear, as it is automatically produced by the Instrument when the breath sample is not received within three (3) minutes of the subject being prompted to provide the breath sample. SFC Alcott also testified that the error message, "Minimum Volume Not Achieved," appearing on four (4) breath-sample attempts on pages 1 and 2 of that AIR, is also automatically determined by the Alcotest Instrument itself, based on insufficient volume contained in the breath sample given by the subject.

SFC Alcott was also shown Exhibit DB-34, which is the Excel Spreadsheet prepared by the New Jersey State Bar, entitled "Arrest dates bef calib and not in AOC mailings (003)," consisting of 111 Subject tests that are contained in Exhibit S-90, none of which are purportedly contained in Exhibit S-83, the Excel Spreadsheet created by the Administrative Office of the Courts, entitled "Spreadsheet from AOC_All Addresses_Alcotest ATS Defendants Matches-full matches and partial – to AG," containing two Sheets, Sheet 1 of 18,249 exact subject-to-address matches, and Sheet 2 of 947 partial

218

subject-to-address matches. Referring to Rows 107 and 108 on Exhibit DB-34, SFC Alcott verified they list the subject on both Rows as █████ ████████. Also shown Exhibit S-90, AFC Alcott verified that the same information for ██████████████ contained on Exhibit DB-34 is also contained on Rows 14575 and 14576 on Exhibit S-90. SFC Alcott was then shown Exhibit S-83, and verified that Rows 16256 and 16257 on Sheet 1 do, in fact, contain an exact address match for ██████████ as the "Summons Numbers" for her and "First Name" in both Exhibits DB-34, S-90, and S-83, all match, the difference being that her Last Name in Column D on Exhibit S-83 is hyphenated as "███████████████." The name of ███████████ ████████ also appears on Rows 2471 and 2472 on Sheet 1 of Exhibit S-88, the Excel Spreadsheet of exact and partial addresses, prepared by the AOC, entitled "Spreadsheet from AOC_Union County Only." Accordingly, Rows 107 and 108 in Exhibit DB-34 should be removed.

During additional cross-examination, SFC Alcott testified there are many reasons why a Control Test fails, including, but not limited to, an improper seal on the CU-34 Simulator, cold air causing condensation in the Head Space of the Simulator, and an aging fuel cell.

The testimony of SFC Alcott was credible and authoritative, based on his extensive experience with the operation and calibration of Alcotest

219

Instruments.  He clearly demonstrated that the 27,833 subjects contained in Exhibit S-90, identified as being requested to provide breath samples on Alcotest Instruments calibrated by Sergeant Dennis is not fully accurate, as his comprehensive analysis of each Row through referencing the actual calibration documents demonstrates that 436 of those Subject Rows contain attempted breath testing of individuals on Alcotest Instruments that had not been calibrated by Sergeant Dennis.

The testimony of SFC Alcott also demonstrates that Sergeant Dennis did perform Solution Changes in conjunction with Calibrations on Alcotest Instruments located in Burlington, Cape May, Mercer, Middlesex, Monmouth, Ocean, Somerset and Union Counties but did not perform any calibrations of the Alcotest Instrument located in the Borough of Collingswood in Camden County.

It is also noted that although SFC Alcott was asked to review Exhibit S-90 to determine whether Sergeant Dennis actually performed calibrations of the Alcotest Instruments on which the 27,833 listed subjects were asked to provide breath samples, he was not requested to determine whether there were individuals, not listed on Exhibit S-90, who were requested to provide breath samples on Alcotest Instruments that were calibrated by Sergeant Dennis.

However, the court finds it is clear from the candid and credible testimony of SFC Alcott there were many individuals who were requested to provide breath samples on Alcotest Instruments calibrated by Sergeant Dennis who were identified by the query that resulted in the compilation of Exhibit S-90.

Additionally, SFC Alcott's testimony established that a number of Subject Rows in Exhibit S-90 list the "Arrest Date" that, in time, occurred "before" the "Calibration Date" listed in Exhibit S-90, which, based on the testimony, was likely due to manual entry errors.

In addition to SFC Alcott's testimony establishing that 436 Subject Rows in Exhibit S-90 involve subjects who were requested to provide breath samples on Alcotest Instrument that were calibrated by Coordinators other than Sergeant Dennis, it is clear from the testimony of DAG Mitchell, through the questioning by *Amici* counsel, there were 29 individuals that were not included in Exhibit S-90, who were requested to provide breath samples on Alcotest Instruments that were, in fact, calibrated by Sergeant Dennis.

It is also clear to this court that failing to calibrate an Alcotest Instrument with an NIST-traceable thermometer can cause a Control test to fail. See Cassidy, 235 N.J. at 488-89. That is because, without using the NIST-traceable thermometer, it cannot be confirmed that the calibration unit

221

heated the solution to a temperature within 0.2 degrees of 34 degrees Celsius. However, the fact remains that when a Control Test fails, the Alcotest Instrument automatically aborts the contemplated breath test and, thereby, no evidential BAC reading can be reported, as no breath samples can be provided. However, the other error messages reported are the result of either the conduct of the individual being tested, which activates the Instruments firmware sensors, or some environmental condition. The credible testimony conforms none of that can be affected by the manner in which the Instrument is calibrated. Therefore, the error messages, "Subject Refused," or "Test Terminated" are the result of the exercise of discretion by the Operator or Arresting Officer based on the conduct of the individual being tested and, of course, no evidential BAC reading is reported.

### 8. Barbara Nolasco

Barbara Nolasco, Administrative Supervisor 3 with the New Jersey Judiciary, was also called to testify by the State. The testimony of Ms. Nolasco is contained in T3, the March 22, 2023 Transcript, at pages 104-126. The State provided an affidavit of Ms. Nolasco during discovery, dated January 23, 2023, which was marked as Exhibit S-57. She is employed by the New Jersey Judiciary as an Administrative Supervisor 3 and currently works in the Jury Programs Unit of the Administrative Office of the Courts (AOC).

Prior to that, Ms. Nolasco was assigned to supervise the Printing and Office Services Unit of the Administrative Office of the Courts, supervising a team of two to three people.  She and her staff would receive a file and instructions, would attend to the printing, bring it to the Bell and Howell Inserter instrument in their office, program the machine, load it, and the mailing was then folded and stuffed into an envelope and placed into mail trays, which were then taken to the AOC's Mail Room for the Capitol Post Office to pick-up and mail.

In July 2021, she was tasked by Steven Somogyi, the Assistant AOC Director for Municipal Court Services, with a special project to prepare and mail a certain notification letter, which she identified as Exhibit 55, consisting of a "Notice to All Defendants Impacted by State v. Cassidy," dated July 14, 2021, under the signature of Robert A. Fall, J.A.D., Retired Judge, which provided as follows:

> As you may be aware, on November 13, 2018 the New Jersey Supreme Court determined in State v. Cassidy, 235 N.J. 482 that certain breath samples obtained through the use of the Alcotest 7110 MKIII-C machine between 2008 and 2016 in connection with an arrest for Driving While Under the Influence (DWI) (contrary to N.J.S.A. 39:4-50) are inadmissible in a DWI prosecution. You may have already received a notice from the Office of the Attorney General or the Office of the County Prosecutor, or both, concerning the effect of the Cassidy decision in your case. You are receiving this letter now because you have been identified as a defendant whose case was implicated in the Supreme Court's Cassidy decision.

223

Due to the number of DWI cases involved, I was appointed by the Supreme Court to act as Special Master to coordinate the management of all affected cases on a statewide basis. Court records indicate that such an inadmissible Alcotest result was obtained in a DWI case in which you either entered a plea of guilty or were found guilty following a trial. You have a right to file a petition for Post-Conviction Relief with the court requesting to have your DWI conviction reviewed by the court.

The Administrative Office of the Courts has created a website specifically designed to assist you in filing your petition for Post-Conviction Relief. **Go to www.njcourts.gov and type "Cassidy DWI Review" in the search bar.** There you will find a form you will need to complete to file your petition, if you so choose, as well as a form to request the services of an attorney to represent you, if you cannot afford to hire your own attorney, and instructions for requesting an interpreter or accommodation for a disability, if needed. The website also contains detailed instructions on how and where to file your petition.

In considering whether to file your petition, you should be aware that a subsequent DWI conviction subjects you to enhanced penalties, including fines, license suspension, surcharges, and possible incarceration. If you have not already done so, you should strongly consider seeking legal representation. If you, or an attorney on your behalf, has already filed an application with the court requesting to vacate your DWI conviction, you do not need to complete and file another petition for Post-Conviction Relief, as a hearing will soon be scheduled to review that application.

Once you have filed your petition, you will receive a Notice of a Hearing that will be scheduled to

224

determine whether your petition for Post-Conviction Relief will be granted. If the court grants your petition for Post-Conviction Relief, depending on the position taken by the Attorney General's office, a trial may be conducted on a separate date to determine whether the observations of the arresting police officer and any other witnesses produced by the State, as well as any testimony and evidence produced by you, establishes your guilt beyond a reasonable doubt.

Due to the high number of Cassidy-affected cases, the need to continue following State and Federal health and safety measures brought about by COVID-19, and the need to promote the uniform processing, hearing and adjudication of these matters, all petitions for Post-Conviction Relief (with certain exceptions) will be scheduled for a virtual court hearing. These matters will be heard by a retired Superior Court Judge on recall duty, sitting as a Municipal Court Judge.

As mentioned previously, if you cannot afford an attorney and believe you qualify for the appointment of a Municipal Public Defender to represent you, you may complete the Financial Questionnaire to Establish Indigency found on the website and submit it along with your Petition for Post-Conviction Relief. The questionnaire will be reviewed by my staff and, if you qualify in accordance with the income eligibility guidelines for indigent defense services approved by the Administrative Office of the Courts, the Municipal Public Defender of the municipality where the matter was originally heard will be ordered to represent you in this matter.

[See Exhibit S-57.]

Ms. Nolasco testified these letters were prepared, stuffed into envelopes and mailed in accordance with their procedure. She noted that the envelopes,

as prepared, did not contain a marking requesting "Return to Sender." However, she stated that when the Post Office scans each envelope, if a forwarding address is indicated, Post Office staff automatically forward the letter to the new address. If the envelope cannot be delivered to the address it contains, the envelope will be returned to the sender's address contained on the envelope. Not placing "Return to Sender" allows the Post Office to automatically forward the mailing to a forwarding address if it is contained in their system but, if not, and undeliverable, it is returned to the sender's address.

Exhibit S-55 consists of copies of the aforesaid Notice and mailing addresses that were provided by Mr. Somogyi's Office, derived from the exact and partial subject-to-address Excel Spreadsheet contained in Exhibit S-83. Ms. Nolasco did not have knowledge as to how many letters were mailed.

Ms. Nolasco also had no knowledge as to whether any of the mailed Notice Letters were returned to the AOC as undeliverable, but noted that if some were returned, they would be sent to the Post Office Box listed on the envelopes, which is the Post Office address for the Municipal Court Services Division.

On cross-examination, Ms. Nolasco confirmed there are three possibilities concerning the disposition of the mailing. The first is that the

226

Post Office determines the listed address is good, the person lives there, and the mail is delivered. The second situation is where the Post Office has a forwarding address and then the letter is sent to that forwarding address. The third is when the address is good, but the person to whom it is addressed does not live there, but the mail is delivered to that address. If the person who lives there puts the envelope back into the mailbox, Post Office delivery personnel would return it back to the Post Office for return to the sender's address. The fourth possibility is where the address is inaccurate, there is no forwarding address, in which situation, the mailed letter is returned to the address of the sender. Ms. Nolasco was not aware whether any of the mailed letters were returned to their Mail Room and then sent to the Municipal Court Services Division.

This court requested the State to determine whether any of the mailed letters were returned to the Municipal Court Services Division as undeliverable and, if so, whether any further follow-up was undertaken to obtain better, updated addresses, and whether any letters returned as undeliverable were still in the possession of the Municipal Court Services Division.

Subsequent to Ms. Nolasco's testimony, on April 17, 2023, DAG Clark sent an email to Susanna Morris, Esq. and Thomas Russo, Esq., counsel for the AOC, requesting information concerning the number of the July 14, 2021

227

letters that were returned to the AOC.  On April 27, 2023, Mr. Russo sent an

email to this court, stating as follows:

> Your Honor is kindly urged to note that a review of the AOC's records has revealed the following:
>
> > (a) 13,618 notices were mailed by the AOC on July 4, 2021
> >
> > (b) 2,884 notices were returned to the AOC as being un-deliverable
> >
> > (c) 64 notices were re-mailed using a new address provided by the U.S. Postal Service; of those, two were returned to the AOC as being un-deliverable;
> >
> > (d) 34 notices were re-mailed based upon AOC support staff's belief that an incorrect zip code had been the problem; of those, twenty-five were returned to the AOC as being un-deliverable.
>
> The above data was retrieved from the attached spreadsheet.
>
> Your Honor is also urged to note that the AOC has located, in storage, several boxes of returned mailing; but the exact number of mailings contained in the boxes is unknown at this time.
>
> Kindly advise if Your Honor would like this office to also circulate the above information to all counsel of record in this matter.
>
> [See Exhibit S-163.]

This court replied to Mr. Russo on that date, copying Ms. Morris,

requesting that his email be sent to all counsel, which was accomplished.  The

Excel Spreadsheet attached to the April 27, 2023 email, also a part of Exhibit S-163, contains the names of the individuals whose July 14, 2021 letter was returned to the AOC as undeliverable, and the addresses to which the letter was mailed.

The testimony of Barbara Nolasco was credible and candid. Although she was not aware of the number of notification letters sent, or the reason for them being sent, subsequent information presented by Thomas Russo, Esq., counsel for the AOC, provided the mailing information and the fact that 2,857 letters were returned as being undeliverable to the addresses contained in Exhibit S-83.

### 9. Monica do Outeiro

Monica do Outeiro, an Assistant Prosecutor with the Monmouth County Prosecutor's Office, also testified. Her testimony is contained in T6, the April 26, 2023 Transcript, on pages 9-96. Ms. do Outeiro is currently the Director of the Office's Appellate Unit, and serves as its Municipal Prosecutor Liaison. She has been an Assistant Prosecutor since 2007. Prior to her testimony, her certification, dated January 17, 2023, with multiple Exhibits, was submitted by the State during discovery. See Exhibit S-44. As the Municipal Court Liaison, she supervised the County's municipal prosecutors, conveying relevant information to them, and assisting them in answering any questions they may

229

have concerning issues in their municipal courts, essentially acting in an advisory capacity.

Exhibit A to her certification is a copy of the September 19, 2016 letter sent by Elie Honig, Director of the Division of Criminal Justice of the Attorney General's Office to Judge Grant, Administrative Director of the Courts, concerning the criminal charges filed against Sergeant Dennis, and attaching Exhibit S-90, the Excel Spreadsheet containing the name of subjects identified as having been requested to provide breath samples on Alcotest Instrument calibrated by Sergeant Dennis. Ms. do Outeiro testified her Office was copied on that letter, which provided notice of the issues concerning Sergeant Dennis. Upon receipt of that letter, she forwarded copies of it to all municipal prosecutors in Monmouth County. See Exhibit B to her certification, an email from Ms. do Outeiro dated September 29, 2016 to all municipal prosecutors, which consists of three pages. Ms. do Outeiro testified she sent that email, explaining:

> It was to give them more information about what was happening, again with regard to [the] Sergeant Dennis matter, but also because Sergeant Dennis was the coordinator in Monmouth County at the time of his arrest and charging, we had numerous DWI prosecutions that were pending in municipal court, so it was to give them advice that had been conveyed through the Office of the Attorney General with how they should be handling those active cases, while the Sergeant Dennis matter was sorted out.

230

[T6, page 18, lines 11 through 20.]

Ms. do Outeiro stated she recalled receiving an Excel Spreadsheet, on a thumb drive, from the Attorney General's Office containing the names and addresses of individuals who had provided breath samples on Alcotest Instrument calibrated by Sergeant Dennis, containing two Sheets. See Exhibit G to Ms. do Oueiro's certification, which is also Exhibit S-85. Sheet 1 of that Spreadsheet contains exact subject-to-address matches of 7,479 individuals, and Sheet 2 contains partial subject-to-address matches of 432 individuals. The court notes there are multiple duplicate listings of subjects on Sheet 1, based on different ticket numbers, see e.g., Rows 13 &14; 16 & 17; 36 & 37; 81 & 82; 10 & 107; 118 & 119; 174 & 175; 209 & 210, et al., and on Sheet 2, Rows 35 & 36; 37 & 38; 39 & 40; 42 & 43; 45 & 46; 52 & 53, et al. When she received Exhibit S-85, Ms. do Outeiro provided the thumb drive to her secretary, who saved the information onto the hard drive of the Monmouth County Prosecutor's Office computer.

Referring to Exhibit C of her certification, Ms. do Outeiro testified she received, along with representatives of the Middlesex, Ocean, Somerset and Union County Prosecutors' Offices, an email from DAG Mitchell dated October 20, 2016, requesting her Office check the original list of subjects provided who had been requested to provide breath samples on Alcotest

231

Instruments calibrated by Sergeant Dennis, see Exhibit 81C, to determine whether any of those subjects were then currently incarcerated and, if so, requesting her Office send notifications to their attorney of the issues relating to the criminal charges filed against Sergeant Dennis. Exhibit C also contains an email sent by Ms. do Outeiro to Monmouth County First Assistant Prosecutor Lori and Deputy First Assistant Prosecutor Marc LeMieux, sending them DAG Mitchell's October 20, 2016 email.

As a result of DAG Mitchell's inquiry, Ms. do Outeiro identified 1,127 cases of potentially-impacted defendants. She, and her secretary then ran searches through both the Automated Ticket System (ATS) database and the Promis Gavel database to determine whether those subjects had DWI convictions, and as to whether they received a custodial sentence. As a result of those searches, Ms. do Outeiro testified they were able to identify two (2) defendants who were so incarcerated, and she sent notification letters to the attorneys for both, which are dated October 24, 2016, and are contained in Exhibit E to her certification. Those letters attached the September 16, 2016 letter from Director Honig to Judge Grant and requested any applications made by their clients be sent to her as well as DAG Mitchell and SDAG Czepiel.

Ms. do Outeiro identified Exhibit D to her certification as emails from her to all Municipal Prosecutors in Monmouth County, dated October 21,

232

2016, sending each a list of cases in their Municipal Court as being potentially affected by issues arising from the calibration of Alcotest Instruments by Sergeant Dennis, and requesting that copies of any applications filed on behalf of defendants in those cases be forwarded to her.

Ms. do Outeiro testified that she, as well as representatives of the Prosecutor's Offices in Middlesex, Ocean, Somerset, and Union Counties, received an email from DAG Mitchell, dated September 25, 2017, sending a form notification letter, requesting that letter be sent to all individuals identified as having provided evidential breath samples on Alcotest Instruments calibrated by Sergeant Dennis. That email states a list of addresses for those individuals would be sent to the Monmouth County Prosecutor's Office by the next day, and further stating, "please keep a running list of the names and contact information of any individuals who make inquiries to you as a result of these letters, and provide me with this information 90 days after your letters are mailed." See Exhibit F to Ms. do Outeiro's certification.

Ms. do Outeiro acknowledged that, thereafter, as noted above, her office received the Excel Spreadsheet from the Attorney General's Office contained in Exhibit S-85, and a copy therefore is also included as Exhibit G to her certification. Ms. do Outeiro and her staff sorted the list alphabetically,

233

eliminated duplicate entries, created a mail merge to generate labels, see Exhibit I to her certification, affixed them to envelopes, prepared a letter, under her signature, dated September 27, 2017, which was then mailed to the all subjects at their addresses contained in Exhibit S-85. Referring to her certification, Ms. do Outeiro stated that 7,480 letters were sent by regular mail.

Following those mailings, Ms. do Outeiro stated she received over 100 telephone calls from individuals and attorneys seeking additional information. She also received telephone calls from individuals who had not received a letter, as well as attorneys whose clients had not received a copy of the letter but believed they should have. She testified that when she received a telephone call from an individual or attorney, she would look them up on the list provided by the Attorney General and, if their address was wrong, she would change it and mail them another letter. If individuals stated they were moving, she would update the downloaded, working list with the new address. If their name was not on the list, she would direct them to contact their attorney. She also stated she received a number of calls from relatives advising the addressees had died.

Ms. do Outeiro stated her office also began receiving letters returned from the Post Office as being undeliverable. She so advised the Attorney General's Office but did not receive any instructions concerning them.

234

Following the Court's decision in State v. Cassidy, Ms. do Outeiro stated she, as well as representatives of the Prosecutor's Offices in Ocean, Middlesex, Somerset and Union Counties, received an email from DAG Mitchell, dated December 14, 2018, sending a form "Cassidy notice letter" and requesting it be mailed to those individuals in their Counties who have been identified as having provided evidential breath samples on Alcotest Instruments calibrated by Sergeant Dennis, and that the 2017 Excel Spreadsheets would be re-sent to them. See Exhibit J to Ms. do Outeiro's Exhibit S-44 certification.

As a result, Ms. do Outeiro placed that form letter on the stationary of her Office, dated it December 20, 2018, it was signed by the Monmouth County Prosecutor, see Exhibit K to her certification, and mailed it to the addresses contained on the updated list her Office had maintained, see Exhibit L to her certification. Exhibit M to that certification reflects that the December 20, 2018 letter was sent by regular mail to 6,218 individuals. Ms. do Outeiro noted her Office also established an automated message that was played when telephone calls were received, and a copy of the notification letter and other information concerning the Cassidy decision was placed on their Office's website, which also made reference to information being placed on the website of the Monmouth County Bar Association. Information

concerning the Cassidy decision was also placed on the social media account of the Monmouth Cunty Prosecutor's Office. See Exhibit O to her certification. Additionally, Ms. do Outeiro stated that when individuals or attorneys would call seeking further information, she would speak to them.

On cross-examination, Ms. do Outeiro stated the 2017 and 2018 letters that were returned by the Post Office as being undeliverable were initially retained in a box, but that box has since been disposed of. She stated her Office was not given direction by the Attorney General's Office as to what to do with the letters that were returned as being undeliverable. Ms. do Outeiro did not know how many letters on either mailing were returned as undeliverable or contained a forwarding address, but stated those that were undeliverable or contained a forwarding address, were deleted from the master list maintained by their Office, but were not deleted from the Exhibit 85 Excel Spreadsheet. She stated her recollection was that close to 1,000 letters were returned as being undeliverable.

On cross-examination, Mr. Noveck displayed Exhibit S-10, identified as an email from Ms. do Outeiro to DAG Mitchell and SDAG Czepiel, dated December 21, 2018, stating in pertinent part:

> I wanted to let you know that the Cassidy notification letter went out to all affected Monmouth County defendants yesterday. After sending out the initial letter last year, we had many defendants contact us to advise

236

of changes of address and, unfortunately, had family members of deceased defendants call us to have their relatives' names removed from the list to prevent further communications. We also had over a thousand letters returned as undeliverable for various reasons; we saved all returned letters. In light of this, the letters that we sent out yesterday reflect these various amendments to the initial list provided to us" addresses were changed when requested and deceased defendants and returned letters were removed from the mailing list. As we did before, we intend to save all letters returned during this second mailing. Additionally, MCPO will soon be posting notification on our website and social media (it will include links to your website as well).

Ms. Mitchell sent a return email to DAG Mitchell later that date, thanking her for sending out the Cassidy notification letter. Ms. do Outeiro again confirmed that her Office received no instructions from the Attorney General's Office as to what to do with the letters returned as being undeliverable. She also clarified that the list of those individuals who were sent the 2018 letter excluded those individuals whose letter had been returned as being undeliverable as a result of the 2017 mailing, with the exception of those individuals who had called, following the 2017 mailing, and provided her Office with updated addresses, in which case their list would be updated to reflect the new address. Ms. do Outeiro confirmed that any mailed letters that were returned as being undeliverable, and not sent to forwarding addresses, have not been retained by the Prosecutor's Office

237

On questioning by Mr. Troso, Ms. do Outeiro stated she had no understanding as to how the Exhibit S-85 Excel Spreadsheet of potentially-affected individuals was created.

The court finds the testimony of Ms. do Outeiro to be credible and forthright. Clearly, the Monmouth County Prosecutor's Office, as well as the other County Prosecutors' Offices only utilized the lists they were provided by the Attorney General's Office to diligently mail the form letters, also provided by the Attorney General's Office, were given limited instructions concerning how to handle the notification letters returned as being undeliverable. It is noted, those undeliverable letters have been discarded by this Prosecutor's Office.

### 10. Suzanne Musto

Suzanne Musto, a trial secretary at the Somerset County Prosecutor's Office, also testified. Ms. Musto's "Amended Certification," dated February 13, 2023, was provided by the State during discovery, contains several Exhibits, and has been marked as Exhibit S-138. She has been employed at that Office since January 2017. The testimony of Ms. Musto is contained in T6, the April 26, 2023 Transcript, on pages 98-128.

Referring to her certification, Ms. Musto testified that, on September 26, 2017, Assistant Somerset County Prosecutor Anthony Parenti was sent an

email from DAG Mitchell, <u>see</u> Exhibit B to Mr. Musto's certification,

requesting their Office mail a form notice letter provided to all defendants

contained on Exhibit S-87, an Excel Spreadsheet sent to their Office of

individuals potentially affected by the actions of Sergeant Dennis. That form

letter, dated September 6, 2017, is attached to Ms. Musto's certification as

Exhibit A. Exhibit S-87, the Spreadsheet Spreadsheet, prepared by the AOC,

contains two Sheets. Sheet 1 contains the names and addresses of 877 exact

subject-to-address matches, and Sheet 2 contains 52 partial subject-to-address

matches. There are a number of duplicate subject entries on Sheet 1, based on

different ticket numbers. <u>See</u>, <u>e.g.</u>, Rows 51 & 52; 57 & 58; 151 & 152; 205 &

206; 223 & 224; 227 & 228, <u>et. al.</u>, and Sheet 2 contains duplicate subject

entries on Rows 5 & 6; 22 & 23; 26 & 27; 31 & 32; and 35 & 36.

Ms. Musto explained, based on the form letter provided, a letter dated

October 6, 2017, was created on the letterhead of the Somerset County

Prosecutor's Office, signed by First Assistant Prosecutor Thomas J.

Chirichella. <u>See</u> Exhibit C to her certification. Ms. Musto was tasked with

stuffing the addressed envelopes and mailing them by regular mail. She

testified that 948 letters were mailed, on or about October 6, 2017, and

approximately 175 of those mailed letters were returned as being

undeliverable, of which 16 had forwarding addresses. She then re-addressed

239

and mailed back out those 16 letters. Updated addresses for the remaining returned letters were not sought.

Following the Court's decision in State v. Cassidy in November 2018, Ms. Musto testified their Office was requested by the Attorney General's Office to prepare and mail a second letter, based on another form letter provided to them by the Attorney General's Office. See Exhibit D to Ms. Musto's certification. Accordingly, a second letter was prepared and signed by First Assistant Prosecutor Chirichella, dated December 21, 2018. See Exhibit E to Ms. Musto's certification. She testified that letter was prepared and sent by her to the same subjects and addresses, as listed on Exhibit S-87. Referring to her certification, Ms. Musto stated 206 of those mailed letters were returned as being undeliverable, and 24 contained forwarding addresses, which were re-mailed to those subjects at the forwarding addresses provided. She was not aware that any of those 2017 or 2018 letters, that were re-mailed based on forwarding addresses provided by the Post Office, were again returned as being undeliverable. Ms. Musto also stated that all envelopes returned as being undeliverable on both the 2017 and 2018 mailings have been retained by the their Office in a box inside a filing cabinet.

Although she did not know its specific content, Ms. Musto testified information concerning the letter and the Cassidy decision was placed on the Office's website.

On cross-examination, Ms. Musto did not know what the policy of their Office was concerning notice to incarcerated defendants who may have been affected by the actions of Sergeant Dennis and the Cassidy decision, and she was unaware of any efforts made to provide notice to the attorneys of the subjects whose letters were returned as being undeliverable.

The testimony of Ms. Musto was credible. As with the mailing of all notification letters, there was no attempt to obtain updated addresses for letters that were returned as undeliverable and were unable to be forwarded.

## 11. Tracey Mannix

Tracey Mannix, Chief Clerk of the Investigation Unit of the Union County Prosecutor's Office also testified. She has worked in that Office for twenty-five (25) years. The testimony of Ms. Mannix is contained in T6, the April 26, 2023 Transcript, on pages 130-164. During that time, she worked with Assistant Union County Prosecutor Michele C. Buckley on the notification letters sent as result of the conduct of Sergeant Dennis, and the Court's decision in State v. Cassidy. Although she has not submitted her own certification, Ms. Mannix has reviewed and was shown the January 23, 2023

241

Certification of Assistant Prosecutor Buckley, <u>see</u> Exhibit S-73, and the March 8, 2023 certification of Assistant Prosecutor Buckley, <u>see</u> Exhibit S-140.

Referring to those certifications, Ms. Mannix testified their Office received an Excel Spreadsheet from the Attorney General's Office in 2017, containing the names and addresses of defendants who were potentially affected by the conduct of Sergeant Dennis and, ultimately, by the Court's decision in <u>State v. Cassidy</u>.  <u>See</u> Exhibit S-88.  That Spreadsheet contains two Sheets.  Sheet 1 contains the names and addresses of 4,464 exact subject-to-address matches, and Sheet 2 contains 216 partial subject-to-address matches. Sheet 1 contains several duplicate subject listings, based on different ticket numbers.  <u>See</u>, <u>e.g.</u>, Rows 245 & 246; 265 & 266; 295 & 296; 371 & 372, <u>et al.</u> Sheet 2 also contains several duplicate subject listings.  <u>See</u> Rows 31 & 32; 37 & 38; 110 & 111; 119 & 120; 126 & 127; 129 & 130: 133 & 134, <u>et al</u>.

Ms. Mannix testified their Office was requested to mail a form notification letter, prepared and sent to them by the Office of the Attorney General, notifying the subjects contained on Exhibit S-88.  She also noted their Office was contacted following the Court's decision in <u>State v. Cassidy</u> in late 2018, and again requested their Office mail out a second notification letter in the form sent to them by the Attorney General's Office.  Copies of those letters are attached to Exhibit S-73. The 2017 letter, which is undated, is under the

signature of Thomas K. Isenhour, Acting Union County Prosecutor.  The second letter, which is dated, incorrectly, as January 2, 2018, whereas it should be dated January 2, 2019, since it followed the Court's November 13, 2018 decision in <u>Cassidy</u>.

With respect to the 2017 letter, Ms. Mannix stated multiple clerical persons within their Office completed the job of attending to the addressing of the envelopes and stuffing then with the 2017 notification letter.  Referring to Assistant Prosecutor Buckley's Exhibit S-140, March 8, 2023, certification, Ms. Mannix confirmed that she had actually counted 846 of those mailed letters returned by the Post Office as being undeliverable.  Those that had forwarding addresses were re-mailed to those subjects, but there was no attempt to find better addresses for the remaining undeliverable envelopes, noting their Office has retained them.

As to the second notification letter, sent on or about January 2, 2019, Ms. Mannix stated their Office followed the same procedures as the first letter, using the same addresses on the Excel Spreadsheet provided.  Referring to Assistant Prosecutor Buckley's March 8, 2023 certification, Ms. Mannix confirmed that 860 of those second notification letters were returned by the Post Office as being undeliverable.  Again, where forwarding addresses were provided, those envelopes were re-addressed and the letters mailed out to the

243

forwarding addresses.  Again, there were no attempts made to find better addresses for the remainder of the 860 subject letters.  Ms. Mannix stated that the second notification letter was placed on the website of the Union County Prosecutor's Office.[25]

On cross-examination by Mr. Hernandez, Ms. Mannix testified she did not know how many of the first or second undeliverable letters that had forwarding addresses and were re-mailed, were returned, if any.  Mr. Noveck then displayed page four of Exhibit S-17, which is a copy of an email from Ms. Mannix to Doreen Yanik, identified by Ms. Mannix as First Assistant Union County Prosecutor, dated April 19, 2019, stating their Office sent out 4,465 of the second notification letters, guessing that about 60 letters that were returned as being undeliverable, had forwarding addresses, and were re-mailed to those addresses. She noted that the 4,465 number was probably a typographical error, as 4,464 second-notification letters were actually mailed.

With respect to telephone calls received by their Office as a result of the mailings, she testified that Assistant Prosecutor Buckley spoke with most of the callers.

---

[25]  Although Ms. Mannix repeatedly referred to the certifications of Assistant Prosecutor Buckley, this court is satisfied Ms. Mannix had sufficient personal knowledge and involvement concerning both the 2017 and 2019, and the circumstances surrounding them.

The testimony of Tracey Mannix was credible and, as noted, contained sufficient personal knowledge of the facts she provided.

## 12. Brian Gillet

Brian Gillet was called as a witness by the State. Mr. Gillet worked as an Assistant Prosecutor at the Middlesex County Prosecutor's Office from January 2005 until November 30, 2021. His testimony is contained in T7, the April 27, 2023 Transcript, on pages 7-89. Currently, he works part-time for that office, assigned to the Megan's Law Unit. In 2016, he was one of two Deputy First Assistant Prosecutors, and his duties included overseeing a number of trial teams, appellate cases, and various special investigations. He was also the Office's Municipal Prosecutor Liaison and, in that capacity, fielded questions from municipal prosecutors, conducted training programs, and held yearly meetings with them on various issues. Frances Mondi of the Middlesex County Prosecutor's Office was his Administrative Assistant, and Robert Scalitti of that Office worked in the Appellate Section performing clerical duties. Ms. Mondi left the Office in January 2020.

With respect to issues concerning Sergeant Dennis, Mr. Gillet recalled receiving information from the Attorney General's Office in September 2016, informing his Office that there were a number of calibrations of Alcotest Instruments that had been performed by Sergeant Dennis in Middlesex County

245

being called into question due to the filing of criminal complaints filed against Dennis. He recalls being asked by the Attorney General's Office as to whether any defendants were incarcerated from convictions for DWI where Sergeant Dennis had calibrated an Alcotest Instrument utilized in their cases.

Mr. Gillet testified his Office was unable to determine whether defendants identified as having a DWI conviction, and who were incarcerated, also had other, non-DWI convictions, so his Office decided to send direct notification letters to all counsel where their clients were currently incarcerated, had a DWI conviction, and were breath-tested on an Alcotest Instrument calibrated by Sergeant Dennis. Contained within Exhibit S-2 is a copy of an email, dated September 30, 2016, from Mr. Gillet to Assistant Prosecutors in Monmouth, Ocean, Somerset and Union Counties, stating:

> We recently learned that out of the 307 individuals who were issued tickets on Alcotest machines allegedly calibrated by Dennis after 7/1/15, five are incarcerated in our workhouse, some perhaps on other charges not related to DWI. We have determined to make direct notifications to their attorneys so they can make the motions they deem necessary in light of the criminal charges now, rather than later. I enclose a copy of the letter that will be forwarded today. Please feel free to use the letter as you see fit.

Mr. Gillet testified the form notification letter attached to that email was sent to counsel for all defendants incarcerated, who had been charged with a DWI

246

offense based, in part, on the results from an Alcotest Instrument calibrated by Sergeant Dennis.

Exhibit S-2 contains an email, dated October 7, 2016, from Stephanie Kurowsky, Administrative Assistant to Andrew C. Carey, the Middlesex County Prosecutor, to the Sayreville Municipal Court, copying Mr. Gillet, advising of the criminal complaints filed against Sergeant Dennis, and attaching a list of all DWI arrests between June 1, 2015 and the date of that email, resulting in convictions and the current incarceration of the listed defendants. The email states that all defendants, through counsel, have been notified of the charges filed against Sergeant Dennis, and that any further information would be sent to that court, when available.

DAG Rachuba, who was conducting the direct examination of Mr. Gillet, showed him Exhibit S-139, an undated certification executed by Francine Mondi, provided in discovery. Mr. Gillet stated he had reviewed S-139, was familiar with its contents, and confirmed the procedures and actions taken that are contained in Ms. Mondi's certification. As noted, he identified Ms. Mondi as his former Administrative Assistant, with whom he worked on issues relating to the conduct of Sergeant Dennis and the Cassidy case.

In that certification, Ms. Mondi states the Attorney General's Office sent their Office an Excel Spreadsheet containing the names of 5,013 potentially-

247

impacted DWI cases, and that, on October 2, 2016, she assisted Mr. Gillet in sending an email to all municipal prosecutors in Middlesex County, asking whether they were aware of any defendants who were incarcerated as the result of an Alcotest Instrument calibrated by Sergeant Dennis, requesting form notification letters be sent to them. Her certification states no one advised of any defendants so incarcerated. Ms. Mondi's certification goes on to states that in reviewing the Spreadsheet containing 5,013 names, she discovered numerous duplicate entries and she assisted in the mailing of notification letters to just over 4,815 potentially-impacted defendants. Mr. Gillet was also shown Exhibit S-47, which he identified as the first letter sent in 2017, but noted that the date contained thereon, January 25, 2023 is wrong and in error, and it should contain a date in 2017. Ms. Mondi's certification states 818 of those letters were returned as being undeliverable and, due to a lack of forwarding addresses for most of them, and the illegibility of forwarding addresses for some, the Middlesex County Prosecutor's Office did not attempt to find more updated addresses for those returned letters and, instead, removed those names and addresses from its list of letter recipients.

Mr. Gillet stated after the Court issued its decision in State v. Cassidy, his Office was contacted by the Attorney General's Office. Exhibit S-8 contains an email, dated December 14, 2018, from DAG Mitchell to, among

248

others, Mr. Gillet and Middlesex County Prosecutor Andrew Carey, attaching a form notification letter, under the signature of SDAG Robert Czepiel, requesting that letter be sent to the individuals identified on the previous Excel Spreadsheet sent to them as having provided breath samples on Alcotest Instruments calibrated by Sergeant Dennis.  Exhibit S-80 contains a copy of the second form notification letter, under Mr. Czepiel's signature, which is dated January 24, 2019.  That letter contains, inter alia, the following information concerning the Court's decision in Cassidy:

> The Court found that the sergeant's failure to follow the established protocol adversely affected the scientific reliability of breath tests taken on Alcotest Instruments calibrated by him, and ruled that the results from those instruments are inadmissible in court.  **Therefore, if you gave a breath sample on an Alcotest instrument calibrated by this sergeant, the results of those breath tests cannot be used as evidence in your DWI case, and you might be entitled to post-conviction relief.**  The Administrative Office of the Courts will be setting up procedures for those potentially affected individuals to seek post-conviction relief.  Until such time that these procedures are established, you may contact the municipal court where your case was handled if you believe that you might be entitled to relief.  You may consult with a private attorney or municipal public defender, if available, to determine whether you are entitled to relief and/or what action if any you should take.

Upon reviewing Exhibit S-17, Mr. Gillet testified his Office mailed SGAG Czepiel's January 24, 2019 form letter to the 4,815 individuals noted in

249

Ms. Mondi's certification, which was attended to by Daniele Guerrero of their Office. Referring to Exhibit S-110, Mr. Gillet testified that 1,106 of the those 4,815 mailed notification letters were returned as being undeliverable. Although he was not personally aware of what was done with those 1,106 returned letters, Mr. Gillet stated his Office would have followed the same procedures as it did with the 2017 mailed notification letters, but he was aware that those returned letters that were not mailed back out to any forwarding addresses were placed in the same box as those that were undeliverable from the 2017 mailing. On questioning by the court, Mr. Gillet confirmed that the box containing those undeliverable notification letters is still in the possession of the Middlesex County Prosecutor's Office

Mr. Gillet testified further that the Office of the Attorney General did not advise his Office that any additional steps should be taken concerning obtaining updated addresses for those 2017 or 2019 letters returned as undeliverable, but were told to keep them and put them in a box, which was done by his Office.

In her certification, Ms. Mondi states, following the mailing of the notification letters, she personally answered dozens of telephone calls and emails from potentially-impact defendants and their attorneys, and would check the Excel Spreadsheet containing the 5,013 names and provide them

250

with the information contained in the form notification letter. He testified he also answered numerous telephone calls concerning Sergeant Dennis and the Cassidy matter. Mr. Gillet stated his Office also developed a "script" to be used during these telephone calls or email inquiries, contained in Exhibit S-111, which is, as follows:

> Please be advised that aside from the letter you received, you can check out website http:www. middlesexcountynj.gov/Government/Departments/PHS/ Prosecutor/Pages/main.espx for further information. The Middlesex County Prosecutor's Office cannot provide any legal advice concerning either State v. Cassidy or Sgt. Marc Dennis. You must contact your own attorney. Thank you.

Ms. Mondi also certified the Middlesex County Prosecutor's Office established a page on its website containing a copy of the notification letters, and links to the Cassidy decision, applicable Court Rules, the websites of the Attorney General, the Court, and the Middlesex County Bar Association for additional information. Mr. Gillet confirmed that information, as well.

Mr. Gillet also identified Exhibit S-84 as the Excel Spreadsheet, entitled "Spreadsheet from AOC_Middlesex County Only" as the one that had been prepared by the AOC, derived from Exhibit S-91, and sent from the DCJ to the AOC to find Addresses for Subjects listed therein, which consists of 2 Sheets, as follows: (1) Full Subjects-to-Address Matches, 5,012; and (2) Partial

251

Subjects-to-Address Matches, 215, which was sent to his Office for the mailing of the notification letters.

On cross-examination by Mr. Hernandez, Mr. Gillet stated his Office made no effort search the Automated Traffic System (ATS) for the name of the individuals identified in Exhibit S-84 in order to identify the names of attorneys that may have represented those individuals so that counsel could be notified. He noted his Office was not asked by the Attorney General's Office to search ATS. As to defendants who were incarcerated, Mr. Gillet stated that in September 2016, his Office identified individuals who were incarcerated and sent notice to their attorneys.

Th testimony of Mr. Gillet was credible and consistent with the testimony of the representatives of the other Prosecutors' Office.

## 13. Donna Prestia

Donna Prestia, Chief Clerk of the Ocean County Prosecutor's Office was called as a witness by the State. Ms. Prestia's certification, dated January 5, 2023, was identified as Exhibit S-41. Ms. Prestia has retired from that position as of April 1, 2023, having worked in the Ocean County Prosecutor's Office for almost thirty-two (32) years. The testimony of Ms. Prestia is contained in T7, the April 27, 2023 Transcript, at pages 93-129.

252

Ms. Prestia confirmed that in the fall of 2016, their Office was notified of the criminal charges that were filed against Sergeant Dennis. In an email dated September 26, 2017 (see Exhibit B to Ms. Prestia's certification), DAG Mitchell of the Attorney General's Office sent an Excel Spreadsheet to former Assistant Prosecutor Kim Pascarella of their Office, containing the names and addresses of individuals potentially affected by the alleged misfeasance of Sergeant Dennis. See Exhibit S-86.[26] DAG Mitchell's email referred to a form "Sgt. Dennis notice letter" sent to Mr. Pascarella the day before, and Mr. Pascarella was requested to mail that form letter, which is Exhibit A to Ms. Prestia's certification, to the names and addresses contained on the Excel Spreadsheet by not later than December 15, 2017. Ms. Prestia was given the Spreadsheet by Mr. Pascarella and he requested her to prepare and mail that form letter, which is dated September 25, 2017, to the names and addresses contained on that Spreadsheet. DAG Mitchell's email noted Exhibit S-86 contained 298 exact subject-to-address matches on Sheet one, and 26 partial subject-to-address matches.[27]

---

[26] Exhibit B to Ms. Prestia's certification is also Exhibit S-24A.

[27] Sheet 1 of Exhibit S-86 actually contains 299 exact subject-to-address matches, although there are some duplicate subjects listed, based on different ticket numbers. See, e.g., Rows 2 & 3; 5 & 6; 22 & 23; 90 & 91; 100 & 101; 109 & 110; 265 & 266. Sheet 2 actually contains 27 partial subject-to-address matches.

253

Referring to her certification, Ms. Prestia stated she prepared, and caused to be mailed, by regular mail, 310 form notification letters to the names and addresses on the Excel Spreadsheet. She accounted for the difference in the numbers contained on both sheets of Exhibit S-86, and the 310 mailings, based on the existence of duplicate Subject Rows. Exhibit C to Ms. Prestia's certification contains a copy of one of letters she caused to be mailed, which is dated October 2, 2017, under the signature of Ocean County Prosecutor Joseph D. Coronato. Mr. Prestia stated following that mailing, there were a number of calls concerning same received by the Office, and she left a copy of the form letter with the Office's receptionist so she could guide the callers accordingly.

Referring again to her certification, Ms. Prestia testified approximately 73 letters were returned as undeliverable, of which 17 contained forwarding addresses. She then re-mailed those 17 letters to the forwarding address provided. She testified that, to her knowledge, their Office did not received any instructions from the Attorney General's Office concerning how to handle letter returned as being undeliverable and, other than re-mailing the 17 letters with forwarding addresses, their Office did nothing further to ascertain any additional address information.

Ms. Prestia testified further that in late 2018, following the Court's decision in State v. Cassidy, the Ocean County Prosecutor's Office was again

254

contacted by the Office of the Attorney General, requesting a second notification letter be mailed to the subjects, and their addresses, as contained on the same Excel Spreadsheet in Exhibit S-86. Exhibit D to Ms. Prestia's certification is a copy of that form notification letter, which is dated December 19, 2018. As requested, Ms. Prestia then prepared the letter, and sent it to the subjects and addresses in Exhibit S-86 by regular mail. Exhibit E to her certification is a copy of one of the form notification letter mailed. Referring to her certification, Ms. Prestia testified she mailed 326 letters, and accounted for the mathematical difference between that number and the 310 first, 2017 mailing, stating "[t]he only discrepancy I can think of is I did not catch the duplicate names on the list this time." T7, page 109, lines 6-7.

Ms. Prestia testified that 82 of those December 19, 2018 letters were returned by the Post Office as being undeliverable, of which 13 contained forwarding addresses, which were then mailed back to the forwarding addresses of those subjects. Notably, Ms. Prestia stated the Ocean County Prosecutor's Office has retained both the 2017 and 2018 envelopes and letters that were returned by the Post Office as being undeliverable.

On cross-examination, Ms. Prestia testified her Office made no attempt to determine whether any of the subjects listed on two Sheets of the Exhibit S-

86 Excel Spreadsheet were represented by attorneys or whether any of them were incarcerated.

With regard to telephone calls received following the mailings, Ms. Prestia stated no legal advice was given and, essentially, the callers were told the same information contained in the form notification letters. If someone called whose name was not on the list, she stated they were referred to the Attorney General's Office. On cross-examination by Mr. Noveck, Ms. Prestia was referred to pages 8 and 9 in Exhibit S-24, which is an email from Mr. Pascarella to DAG Mitchell dated October 6, 2017, to which she was copied, stating "Ocean [C]ounty letters have been mailed (a lot coming back undeliverable). Do you need any type of affidav[it] of mailing from our staff? We are keeping a file[.]" However, Ms. Prestia did not know whether there was ever a response to that email.

The testimony provided by Ms. Prestia was credible. As with the other witness concerning the notification mailings. Her Office received no instructions concerning the handling of both notification letters returnable as being undeliverable. However, with all but the Monmouth Cunty Prosecutor's Office, notification letters returned as being undeliverable have been retained.

B. <u>Witness on Behalf of *Amicus*, New Jersey State Bar Association</u>

1. <u>John Joseph Dell'Aquila</u>

John Joseph Dell'Aquilo was called as a witness by the New Jersey State Bar Association. His testimony in contained in T5, the April 25, 2023 Transcript, at pages 179-250, and in T8, the June 12, 2023 Transcript, on pages 7-111. Mr. Dell'Aquila was employed by the Cherry Hill Police Department as a patrol officer in March of 1976. He was also attending Stockton University, graduating with Bachelor's Degree in Criminal Justice in 1978. He was trained and certified as an operator on the Breathalyzer 900 and 900-A, and participated in numerous DWI cases, either as the arresting officer, a back-up officer, or as Breathalyzer Operator. When he retired from the Cherry Hill Police Department in 2004, he had attained the rank of Lieutenant. At the time of his retirement, he was the Department's Director of Internal Affairs.

In 1986, while still employed by the Cherry Hill Police Department, Mr. Dell'Aquila began attending Rutgers Law School in its evening program, graduating with a Juris Doctor degree in 1990. Immediately following his retirement from the Cherry Hill Police Department in 2004, he was employed by the Division of Criminal Justice within the New Jersey Attorney General's Office, as a Deputy Attorney General (DAG), where he worked until 2011.

As a DAG, Mr. Dell'Aquila was assigned to the Prosecutor's Supervision and Coordination Bureau.  He explained that Bureau works with, supervises and coordinates with prosecutors.  He worked largely with issues concerning municipal prosecutors, and on some traffic safety issues.  Mr. Dell'Aquila is a member of the New Jersey Aggressive Driving Task Force, working with a number of State agencies, including the New Jersey Division of Highway Traffic Safety. He also worked with the Traffic Safety Bureau, the Information Technology Bureau and the Alcohol and Drug Testing Unit of the New Jersey State Police.  While a DAG, Mr. Dell'Aquila also served as the Attorney General's representative on the New Jersey Supreme Court Municipal Court Rules Committee.

Mr. Dell'Aquila explained that when he began his employment as a DAG, State v. Foley, 370 N.J. Super. 341 (Law Div. 2003) had been recently decided concerning the scientific reliability of the Alcotest 7110 MKIII-C, and he, thereafter, participated in State v. Chun, 194 N.J. 54 (2008), as one of the Deputy Attorney Generals representing the State, resulting in the Court finding that the Alcotest MKIII-C with New Jersey firmware version 3.11 was sufficiently scientifically reliable.  In connection with that representation, he was responsible for coordinating all discovery, working with expert witnesses and preparing witnesses for the hearings that were conducted.

In terms of special training, while a DAG, Mr. Dell'Aquila completed a two-day Draeger Safety Diagnostics, Inc. Operator Training and Preventive Maintenance course on the Alcotest 7110 MKIII-C. Exhibit DB-20 is a Certificate issued by Draeger Safety Diagnostics, Inc., dated October 28, 2004, concerning his successful completion of that Course, which states:

> Completion of this course qualifies this individual to train and certify Operators in the proper use and operation as well as perform Preventive Maintenance on the New Jersey specific Alcotest 7110 MKIII-C.

Mr. Dell'Aquila also testified he attended and successfully completed the five-day course at the Borkenstein School on Alcohol and Traffic Safety at Indiana University.

Mr. Dell'Aquila explained to become certified as a Breath Test Coordinator, both the Draeger two-day course and the Borkenstein five-day course must be attended and successfully completed. He testified that for a police officer to become certified as an Alcotest Operator, the officer had to complete a four-day course and, if previously certified as a Breathalyzer Operator, there was a shorter, one-day conversion course, converting a certified Breathalyzer Operator into a certified Alcotest Operator. However, Mr. Dell'Aquila explained he was not certified as an Alcotest Operator because only a sworn police officer can become certified as such.

259

During most of his time as a DAG, Mr. Dell'Aquila stated part of his duties involved working with the ADTU in assuring that a candidate for becoming a certified Breath Test Coordinator had all the necessary training and paperwork requirements to submit to the Attorney General for approval.

Mr. Dell'Aquila recalled that he left the Attorney General's Office at the end of June in 2011, and about six month later began working for law firms on the defense side of Driving While Intoxicated issues, initially for a short time with Levow DWI Law, P.C., and then become employed, in April 2012, with Helmer, Conley & Kasselman, P.A., a law firm with several locations throughout the State, that handles, inter alia, the defense of Drunk Driving cases. He became a practicing defense attorney, appearing in Municipal Courts throughout the State, representing clients in various matters, including those charged with DWI. During such representations, he would frequently access the Alcotest Inquiry System database for information concerning his clients' cases.

Mr. Dell'Aquila testified he has participated in various continuing legal education programs as an instructor on DWI issues for the New Jersey Institute for Continuing Legal Education (ICLE), the Garden State Continuing Legal Education, and the New Jersey Association for Justice. He was also an Adjunct Professor at Camden County Community College and Rowan University.

260

In discussing the workings of the Alcotest 7110 MKIII-C Instrument, Mr. Dell'Aquila explained the components of an Alcotest Instrument consist of the Instrument itself, a CU-34 Simulator, the Simulator Solution, the Temperature Probe, a Printer and a Keyboard. He described the CU-34 Simulator as a component that consists of a jar, containing the Simulator Solution in its lower portion, and a Lid, which has a Heater, an Agitator and a Portal. He explained that the heater is designed to heat the Simulator Solution to a temperature of 34 degrees Celsius, plus or minus two degrees. He stated the Agitator is intended to keep the water-ethanol Solution homogenous, and the Portal is a hole in the Lid through which the Temperature Probe is inserted that reads the temperature of the Solution. Mr. Dell'Aquila testified the Temperature Probe is plugged into the back of the Alcotest Unit to allow the Instrument to determine the temperature of the Simulator Solution. When heated, the Solution creates a "head space vapor" that must contain a 0.10% Blood-Alcohol Content (BAC) to be operable.

Mr. Dell'Aquila testified part of the Calibration of an Alcotest Instrument is the conducting of a Control Test, and a recalibration of every Alcotest Instrument must be completed every six (6) months. In a Control Test, a sample of the Standard Solution is heated and the vapor created is measured to determine whether the 0.10% BAC reading has been obtained. He

noted the Alcotest Instrument uses two separate technologies in taking the measurement, consisting of Infrared (IR) technology, and Electrochemical (EC) technology. During the calibration process, the Instrument performs a Linearity test, which is a function similar to that of the Control Test, but instead of one Simulator Solution, three different Simulator Solutions are utilized to generate a head space vapor at a strength of 0.40%, 0.80%, and 0.160% BAC, measured by both the IR and EC technologies. He stated all of the results of those tests are stored in the Instrument and then printed out in the form of a report, and that stored data is periodically uploaded from each Alcotest Instrument onto the Alcotest Inquiry System database.

Mr. Dell'Aquila testified the uploaded data can be extracted from the database into an Excel Spreadsheet in the form of 310 Columns of information, including the IR and EC measurement results, the time each breath sample is taken, the duration of the blowing of that sample, the start of the time of the blowing, the end time of the blowing, the identifying information of the subject being tested, any error message, the end result, and other information regarding the specific breath test conducted.

Mr. Dell'Aquila was shown the last two pages of Exhibit DB-5, which is an actual Alcohol Influence Report (AIR), with the name and Driver's License number of the subject tested, and the name of the Police Department, redacted.

262

He confirmed the "Subject" portion of the AIR, containing identifying information of the subject's name, date of birth, gender, height, weight and driver's license number, are fields that are manually entered by the Operator conducting the test, except the "age" is calculated by the Instrument based on the date of birth that is entered. Additionally, all the fields in the "Arresting Officer" section of the AIR are entered manually by the Operator. With respect to the "Instrument" portion of the AIR, although unsure whether the "Serial No." field is entered manually by the Operator, Mr. Dell'Aquila stated the "Location" field would also be entered manually. He noted the middle columns in the Instrument portion of the AIR include the calibration date and solution change date of the Instrument, and the columns to the right of the middle column record how many times the corresponding procedure was done.

Referring to the "Breath Test Information" section in the AIR, Mr. Dell'Aquila explained the operations performed by the Alcotest Instrument are an "Ambient Air Blank," a "Control Test," another "Ambient Air Blank," and then "Breath Test" results, including the EC and IR results, and then another "Ambient Air Blank" prior to the next "Breath Test." He stated that for a breath test result to be admissible, there must be at least two valid breath samples accepted and analyzed by the Instrument. He noted that up to eleven (11) attempts are permitted to provide those two acceptable breath samples.

263

He explained the breath sample must have a minimum volume of 1.5 liters, produced at a flow rate of 2.5 liters per minute, and must be provided for at least 4.5 seconds, and has to reach the plateau, to be acceptable.  He stated that in chemical breath testing, the goal is to obtain the deepest, long air because it most closely approximates the amount of alcohol in the blood, explaining it further, as follows:

> So as a breath presentation is given, it will generally start off low and they call it the breath test curve.  It will generally start off low because if you think about blowing into any kind of device, the first thing you do is take a deep breath.  You blow in that initial air [which has] less alcohol in it because you sort of purged your mouth and your upper-respiratory system.
>
> As you blow, the level goes up and over time, it continues to climb a gradual curve.  At some point in time, you've reached that bottom level that you could achieve and that's called the plateau.  And I believe the Alcotest is looking for a plateau when the . . . alcohol content doesn't go up by more than 1 percent in one quarter-second, then it assumes that it has leveled off.
>
> Truly, my understanding is from what [I learned] is that it never truly levels off but it gets to a plateau where it's pretty much level and that's that 1 percent in a quarter-second.
>
> [T5, page 221, line 17 to page 222, line 11.]

Mr. Dell'Aquila explained there are "blowing errors" and errors produced by the Instrument that abort the test and become reported as a final

264

error. One of the blowing errors he discussed was "Minimum Volume Not Achieved," which is recorded by the Instrument when the subject fails to blow a minimum volume of 1.5 liters of air. He noted that, as per the Court's decision in Chun, women over the age of 60 are only required to blow a volume of 1.2 liters of air, although Alcotest Instruments were never re-programmed to adjust for that difference.

With respect to the blowing error, "Ready to Blow Expired," he explained once the Instrument is ready to accept a breath sample, that sample must be collected within three (3) minutes. If it is not provided within that time period, the Instrument will automatically display that error message. Referring to the sample AIR on page 16 of Exhibit DB-4, the User Manual of the Alcotest MKIII-C, as to the error message "Blowing Time Too Short," Mr. Dell'Aquila stated the subject is required to blow a breath sample into the mouthpiece for a duration of at least 4.5 seconds. Anything shorter, will result in the Instrument generating that error message.

Again referring to that sample AIR on page 16, Mr. Dell'Aquila stated the error message, "Blowing Not Allowed" is generated by when the subject attempts to blow into the mouthpiece before the Instrument is ready to accept the breath sample. He noted that error message can also occur when the subject keeps blowing into the mouthpiece, takes a second breath and starts

265

blowing again. Referring to page 17 (the second page of that sample AIR on Exhibit DB-4), Mr. Dell'Aquila stated the error message "Blowing Time Too Long" is rare and, although he was unable to state the maximum time that is permitted, he testified that error appears when the subject blows for too long a period of time. He noted he has never seen that error message occur during an attempted breath test.

In discussing these blowing errors, Mr. Dell'Aquila explained when these errors occur, the Operator of the Instrument can continue to require the subject to attempt to provide additional breath samples up to a total of eleven (11) attempts. He also stated where a subject provides one valid breath sample that produces a BAC reading, but there are no further breath samples obtained, the Alcotest Operator has the option of either pressing the "Refusal" or the "Test Terminated" entry button on the Instrument, and the AIR would report the "Test Result" as either "Subject Refused" or "Test Terminated." He testified:

> Test Terminated is supposed to be used when some breath sample attempt has been made. You know, these would be examples of that where somebody blew but they didn't blow enough, they didn't blow long enough, some other issue but they actually presented a breath sample at some level.
>
> [T5, page 231, lines 1-6.]

266

Mr. Dell'Aquila testified that when he was a DAG, and while in the private practice of law, he has seen instances where Alcotest Operators use the option "Subject Refused" and "Test Terminated" interchangeably.

In discussing errors generated by the Instrument that prohibit any further attempts to provide a breath sample, Mr. Dell'Aquila identified "Control Test Failed." He explained that prior to and at the end of a testing sequence, during a Control Test, the Instrument will draw in the heated vapor and if its measurement of that vapor is not between 0.095 and 0.105 BAC, the "Control Test Failed" message will appear, and the breath test will be aborted.

Mr. Dell'Aquila also testified the message "Control Gas Supply Error" is generated normally where there is a leak in, or a disconnection of, the neoprene hose connecting the CU-34 Simulator to the back of the Instrument. He also stated that the message "Ambient Air Check Error" is produced by the Instrument when it detects that the room air contains some alcohol or other substance. He stated the error message of "Interference" is generated by the Instrument when some other substance, other than ethanol, is detected, such as cleaning fluid. Mr. Dell'Aquila testified the error message "Purging Error" results where the Instrument does not completely purge or blow out the air it has sucked in, stating it could be the result of a mechanical error or where some residual of ethanol remains. With respect to the error message, "Out of

267

Measuring Range," he stated he has never seen that message, but explained that the Instrument only measures BAC to a certain level. Although unsure what that level is, he stated if the subject's breath sample was analyzed beyond that level, that message would be generated.

On direct examination, Mr. Dell'Aquila was also asked to explain the error message "Test Outside +/- Tolerance." He stated the difference, or tolerance, between the BAC reading generated by the EC and the IR results must be close together and if they are not, the Instrument will generate that error message and the test is aborted. He also testified the error message "Simulator Temperature Error" occurs if the Instrument detects that the Simulator temperature is not 34 degrees Celsius, plus or minus 2 degrees, and therefore would not create the proper vapor.

The court notes those, and other, error messages generated, automatically cause the breath test to be aborted and are listed on page 18 of Exhibit DB-4.

Mr. Del'Aquila then was asked to address the deletion by DAG Mitchell of those Subject Rows in Exhibit S-90 (also Exhibit S-148), where Column T (Final Error) reported that the "Subject Refused" and no BAC reading was thereby reported in Column U (End Result). He testified in such circumstances, without being able to obtain and review all 310 Columns of

268

information available, it cannot be determined from the 21 Columns contained in those Excel Spreadsheets whether those deleted subjects provided any breath sample or, if so, how many tests were attempted, what the results were, or whether there was a verbal refusal to take the test. Additionally, it cannot be determined whether any women over age 60 provided a breath sample with a volume of less than 1.5 liters. In other words, he explained the actual basis for the conclusion that the subject refused cannot be determined from the 21 Columns contained on Exhibit S-90 (also S-148).

On questioning by Mr. Gold, Mr. Dell'Aquila testified he is presently "Of Counsel" with the Helmer, Conley & Kasselman law firm, with which Mr. Gold and Mr. Troso are affiliated. He explained he is currently on a "Sabbatical" from the firm due to various medical issues.

Mr. Gold displayed Exhibit DB-32 for Mr. Dell'Aquila, which is a color photograph of a CU-34 Simulator.[28] Mr. Dell'Aquila described the CU-34 Simulator as follows:

> Well, this simulator has several parts to it. The bottom part is essentially the glass jar, that holds liquid. The top part . . . has a heating element in it as well as an agitator in it to keep the solution mixed. The heater has a heating element that goes down into it. It also has . . . in this particular one, it has a temperature probe

---

[28] The Transcript, T8, page 12, line 5, refers to that Exhibit as DB-4, which is incorrect.

269

inserted into it.  That's a coil wire that goes up and then it comes back down.

Then the tube on the top is just the tube that would normally hook into the back of the Alcotest where a pump inside the Alcotest blows air into the mechanism. . .

* * * *

[T]hat tube . . . basically takes air pumps from the Alcotest into the simulator.  Then there's a shorter tube that hooks in, that actually hooks in and takes the gas out of the simulator into the Alcotest.

[T8, page 12, line 24 to page 13, line 21.]

He explained the CU-34 Simulator heats the ethanol alcohol solution in the bottom part of the jar to 34 degrees Centigrade so it produces a vapor that stays in the upper, head space of the jar so that it simulates human breath at a BAC reading of 0.10%.  Then, that vapor is pumped into the Alcotest Instrument at the beginning and at the end of the process.  He stated in order to achieve that simulated BAC reading, there must be a proper concentration of ethanol alcohol in the simulator solution, and that concentration has to be heated to a temperature of 34 degrees Centigrade, plus or minus .2 degrees.  If those two conditions do not exist, an inaccurate sample will be pumped into the Alcotest.

Referring to page 11 of Exhibit DB-4, the Alcotest 7110 MKIII-C User Manual, entitled "Test Data," Mr. Dell'Aquilla testified when the Instrument

270

displays "Ready," the Operator presses the "orange" start button, and manually enters the data set forth in prompts listed in the large, boxed-in, fields listed on that page. After entering the data in those fields and, if desired, reviewing the entered date, the Operator then presses the "N" button to proceed, whereupon the Instrument will run a "Control Check," with the Instrument displaying and completing, the following sequences:

> Purging
> Ambient Air Check
> Air Blank Check
> Control Check
> Purging
> Ambient Air Check
> Air Blank Check

Mr. Dell'Aquila explained the purpose of those tests is to check to make sure the Instrument is reading properly. If no error occurs, the Instrument is ready to receive a breath sample and conduct the breath test.

Mr. Gold, then showed Mr. Dell'Aquila an excerpt from the testimony of DAG Mitchell on March 28, 2023, in T4, at page 127, line 17 to page 128, line 1, which reads as follows:

> Q. Well, in other words, if we start with the proposition that the control test is basically the machine simulating a human breath, taking you know a whiff of the simulator to see if its running properly, temperature is very important to the control test as well as the [later] human test, correct?

271

A.      Yes because if it's - - well, if it's not hitting the right temperature, then it's not going to give the correct vapor to get the correct alcohol reading.

Mr. Dell'Aquila testified he basically agreed with the response provided by DAG Mitchell, stating further if the calibration of an Alcotest Instrument was not properly done, by not using an NIST-traceable thermometer, then all the functions thereafter would be potentially incorrect.  Upon further questioning, he stated none of the Control Tests conducted on an Instrument calibrated by Sergeant Dennis could be relied upon.

Regarding use of an Alcohol Influence Report (AIR) produced by an Alcotest Instrument, Mr. Dell'Aquila testified it routinely is admitted into evidence in the prosecution of a DWI case as evidence of a per se violation of N.J.S.A. 39:4-50(a), and can also be used as evidence in refusal prosecution under N.J.S.A. 39:4-50.4a(a).

Mr. Gold also displayed for Mr. Dell'Aquilo, Exhibit DB-15, which is the excerpt of a quote from State v. Chun, 194, N.J. 54, 104-05 (2008), which reads:

> Our conclusion is that the firmware must be revised to accept a minimum breath volume sample of 1.2 liters from women over the age of sixty requires us to consider the impact of this directive for pending prosecutions. In light of the scientific evidence that we have found to be persuasive, in the absence of some other evidence that supports the conclusion that any such individual was capable of providing an

272

appropriate sample, by volume, we must assume that she was unable to do so. For these individuals, then, an AIR demonstrating insufficient breath volume may not be used as proof of a charge of refusal. On the other hand, if the AIR demonstrates that a woman over the age of sixty was able to provide at least one sample that was deemed to be sufficient for purposes of the 1.5 liter volume requirement, but she failed to do so on a subsequent attempt, the AIR demonstrating those facts <u>may be utilized</u> as evidence, albeit not conclusive proof, in support of a refusal charge.

[Emphasis added.]

Mr. Dell'Aquilo testified in this quote from <u>Chun</u>, the Court recognized that except for these qualifications, the AIR can be admitted into evidence in a refusal prosecution.

Mr. Gold also displayed Exhibit DB-16 for Mr. Dell'Aquila, which is the following excerpt from <u>State v. Tischio</u>, 107 N.J. 504, 522 (1987):

Accordingly, we hold that the statute prescribes an offense that is demonstrated solely by a reliable breathalyzer test administered <u>within a reasonable period of time after the defendant is stopped for drunk driving</u>, which test results in the prescribed blood-alcohol level.

[Emphasis contained in Exhibit DB-16.]

Mr. Dell'Aquila agreed where there is an issue whether the breath test was administered within a reasonable time after the defendant is stopped, the AIR would be admissible to demonstrate the time of the arrest and the times the breath tests were administered. He stated in a "reasonable time" issue, this

273

would be particularly important if an attempt to test the defendant in one location was unsuccessful and the defendant was then transported to another location for additional breath testing. However, he stated if one or more of those Alcotest Instruments had been calibrated by Sergeant Dennis, the resulting AIR, containing those times, would not be reliable.

On cross-examination concerning his employment status, Mr. Dell'Aquila stated he is not formally retired, and the agreement with the Helmer, Conley and Kasselman law firm is he would be placed on a sabbatical leave due his medical issues. He currently performs no work for the firm while on the sabbatical and receives no payment except some money is paid to him for cases he brought to the firm. He testified he is unsure whether he will return to work in the future, or formally tender his resignation.

In terms of his familiarity with the Alcotest MKIII-C, Mr. Dell'Aquila stated he was never certified as an Alcotest Operator but did learn how to operate it from the courses he took and from his participation as one of several counsel for the State in the State v. Chun litigation. On further questioning, Mr. Dell'Aquila acknowledged nothing a Coordinator does when performing the calibration of an Alcotest Instrument is intended to change any of the Instrument's sensors that measure the breath volume or breath time. He also stated he has not performed calibrations on Alcotest Instruments and did not

274

take the four-day training course for Alcotest Operators offered by Draeger, nor has he ever engaged in the repair of Alcotest Instruments. When asked what facts support a claim that the calibration of an Alcotest Instrument by Sergeant Dennis without use of an NIST-traceable thermometer produces errors that result in the absence of a BAC reading, Mr. Dell'Aquila stated:

> We spoke about that, we were looking at what data needed to be provided and what notice needed to be given. Some of the alcohol reports that were not given, that list of however many, may have data regarding breath samples that were provided which could be exculpatory in a refusal offense, or could provide other evidence related to an instrument - - a test performed by another instrument.

> [T8, page 98, lines 7-14.]

On further questioning by Mr. Gold, Mr. Dell'Aquila stated he was receiving no compensation for his testimony in this matter.

The testimony provided by Mr. Dell'Aquila was credible to the extent of his experience and familiarity with the operation and working of the Alcotest MKIII-C Instrument. However, he was not presented or qualified as a witness who could provide expert testimony to address the issue of whether the failure of a Coordinator to utilize an NIST-traceable thermometer in the calibration procedure would result in the Instrument malfunctioning, and generating error messages that could result in the Operator reaching the conclusion that the individual being tested had refused to comply with the Implied Consent

275

Statute. No competent evidence has been provided that would sustain the position asserted by *Amici* and Defendant-Respondent that Alcotest Instruments calibrated by Sergeant Dennis, presumably without the use of an NIST-traceable thermometer, would cause the firmware sensors of the Instrument to be unable to accurately detect the sufficiency of breath samples provided, or cause other Error Messages to occur. If a Control Test fails, the testing process is aborted, which has nothing to do with the behavior of the subject about to be tested, nor it is it relevant to the issue of a Refusal.

## V. ARGUMENTS AND ISSUES PRESENTED.

Following conclusion of the plenary hearing, on July 17, 2023, counsel for the parties and *amici* submitted the following proposed findings, conclusions and recommendations.

### A. PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AND RECOMMENDATIONS BY THE STATE OF NEW JERSEY:

POINT I: ONLY THOSE PERSONS WHOSE BREATH TESTS PRODUCED BLOOD ALCOHOL CONCENTRATION END RESULTS WERE ENTITLED TO GET NOTICE OF THE CASSIDY DECISION.

A. Cassidy Granted the Right to Seek Post-Conviction Relief Only to Those Individuals With Per Se DWI Convictions on Alcotest Instruments Calibrated by Dennis.

276

B.  Defendants Convicted of Refusal Always Had the Right, and Ability, to Challenge the Evidence of Their Alleged Violation.

C.  The Use of Evidence For One Purpose, Even If It Lacks Sufficient Reliability For Admission For a Different Purpose, Is Not Unique to This Circumstance.

D.  To the Extent His Testimony Was Relevant, NJSBA's Witness Confirmed This Analysis of This Issue.

POINT II: ALL RELEVANT FACTS REGARDING THE REASONABLENESS OF A DETENTION WERE KNOWN WHEN THOSE CASES WERE RESOLVED.

POINT III: THE FIVE PRIMARILY AFFECTED COUNTIES PROVIDED SUFFICIENT NOTICE TO POTENTIALLY IMPACTED DEFENDANTS.

RECOMMENDATIONS:

1.  Identified Individuals to Whom Notice Was Ever Attempted to Be Delivered.

2.  All Persons Who Have Not Yet Filed Petitions For Post-Conviction Relief.

3.  State Objections to Recommendations of NJSBA and OPD:

A.  General Objections.

B.  Objections to Zingis Index.

C.  Objections to the Dennis Repository.

277

## B. PROPOSED FINDINGS REQUESTED BY DEFENDANT RESPONDENT, THOMAS ZINGIS:

1. The State Had a Duty to Prove Beyond a Reasonable Doubt That a Previous DUI That It Seeks to Use to Obtain a Sentence to a Second or Subsequent DUI was Not Affected by Trooper Dennis's Misdeeds.

2. The State Failed to Move Into Evidence Any Admissible Proof Of Defendant's Alleged Prior Conviction for DUI and the Appellate Division Decision's Decision to Resentence Defendant As a First Offender Should Be Upheld.

3. The List Compiled by the State Is Not Competent Evidence Because the State Arbitrarily Redacted the List of Those Affected By Marc Dennis's Malfeasance and Because It Is Hearsay Without An Exception.

4. The State's Arbitrary Redaction of its List Precludes the Use of the List As Evidence at Trial Against Defendants and Zingis's Presence or Lack Thereof Should Not Be Reported to the Court.

5. The State Failed In Its Duty Under Cassidy to Provide Notice to Defendants of Their Cassidy Status.

6. Going Forward, the State Should Be Required to Make Notice To Defendants During Discovery in any DUI Prosecution Seeking To Use Prior DUI Convictions from 2008 to 2016.

278

C. PROPOSED FINDINGS OF FACT FROM *AMICUS CURIAE* NEW JERSEY STATE BAR ASSOCIATION:

I.  MARC DENNIS IS A WITNESS COMPROMISED AS TO EVERY SUBJECT TEST THAT WAS BASED UPON HIS CALIBRATION.

II.  CREATION OF THE 27,833 SUBJECT TESTS SPREADSHEET REMAINS UNKNOWN.

    A) The role of the NJSP-ADTU in its creation was never explained.

    B) The NJSP-ITU could not authenticate the 27,833 subject test records spreadsheet.

        1.  Donahue did not recall creating the spreadsheet.

        2.  The State's non-public database was used to find subject test records and the other parties were not permitted to verify the State's data or methods independently.

        3.  The SQL query statement attached to the 27,833 spreadsheet did not match the accompanying spreadsheet tab, and that glaring inconsistency remain unexplained.

III.  ASSUMING THE STATE'S DATA, THERE ARE 27,426 AIRs AFFECTED BY A DENNIS CALIBRATION.

    A) DAG  Mitchell deleted 7,166 subject test records from the 27,833 records given to her by the ADTU.

    B) Every witness who was asked on the subject agreed that it followed from the findings in Cassidy that every control test, which simulates human breath and relies on the same on proper temperature being set at calibration, would also be unreliable.

C) Since all of the 27,833 subject test records had unreliable control tests begun, all Dennis calibrated machines were not in "good working order," and every one of those subject tests were affected by a Dennis calibration, including the 7,166 the State deleted.

D) Every subject test record in the 27,833 spreadsheet has a corresponding printed AIR that would have been admissible, but for the knowledge that it was calibrated by Dennis, on a number of issues other than a breath test result including, but not limited to, its routine admission on Refusal charges.

E) Even assuming the State's initial data, the actual number of subject tests on machines calibrated by Dennis is 27,426, after additions and deletions.


## IV. THE VARIOUS MAILINGS WERE FLAWED IN EXECUTION, AND, IN ANY EVENT, THEIR CONTENT DID NOT FORECLOSE DEFENDANTS' RIGHTS IN PENDING OR FUTURE CASES.

A) The first mailing, in 2017, voluntarily sent by the State, was contradictory and had a high rate of undeliverables.

1. The DCJ's first letter, in 2017, stated it was about "all the calibrations" as well as Dennis's "false swearing," not just breath tests, but nevertheless was only sent to a list of subjects who had a final breath test on a Dennis machine.

2. The Administrative Office of the Courts (AOC) eliminated 1,468 additional records from what the State handed over, further reducing the subject records to 18,250, with another 948 "questionable."

3. The County Prosecutor's Offices further reduced the subject test records actually mailed to about 17,489 with 2,882 letters returned as undeliverable.

B) The 2018 post *Cassidy* court ordered mailing was tailored to the holding of the particular case and even had a higher rate of undeliverables.

1. The State, well before *Cassidy*, had already limited its list to reported breath tests, then the State chose a case for direct certification (*Cassidy*) that pertained only to reported breath tests, and the second DCJ letter was specific to that case's holding on final breath test readings.

2. In their second mailing, this one court ordered, the State used the same mailing lists created over a year earlier by the AOC, and, unsurprisingly, the undeliverable rate increased from about 17% in the first mailing to about 21% in this *Cassidy* ordered mailing.

C) The 2021 AOC "*Cassidy* PCR Court" notices were a courtesy extended by the Court, in the interests of justice, were narrowly sent only to the most obviously aggrieved defendants under the *Cassidy* holding, and also had a high rate of undeliverables.

V. THE WAY THAT THE FLAWED *CASSIDY* LISTS WERE USED IN PRACTICE BY PROSECUTORS FOR ENHANCED SENTENCINGS BECKONS THE IMPLEMENTATION OF THE "*ZINGIS* INDEX" AND "DENNIS REPOSITORY" SOLUTION JOINTLY OFFERED AS AN EXHIBIT BY THE NJSBA AND OPD.

281

A) The flawed *Cassidy* lists were often used to represent to courts and defendants whether Marc Dennis did a calibration, although the best evidence would be the calibration documents.

B) The "*Zingis* Index" and "Dennis Repository" proposed by the NJSBA and the OPD as an Exhibit, placed online, would be a quick and easy way for prosecutors, defense, and courts to know, in minutes, whether a prior was calibrated by Marc Dennis or not, and, if Dennis did the calibration, to have the best available evidence of same printed for record, also in minutes.

PROPOSED CONCLUSIONS OF LAW SUBMITTED BY *AMICUS CURIAE*, THE NEW JERSEY STATE BAR ASSOCIATION:

I.  SINCE DENNIS'S CALIBRATION CERTIFICATES WERE HELD PRESUMPTIVELY FALSE IN *CASSIDY*, THEY CANNOT BE ADMITTED AT TRIAL UNDER *CHUN* AS RELIABLE ROUTINE BUSINESS RECORDS, AND SINCE "AIR" ADMISSION REQUIRES ADMISSION OF ITS CALIBRATION CERTIFICATES UNDER *CHUN*, NO DENNIS ASSOCISATED "AIR" IS ADMISSIBLE AS A HEARSAY EXCEPTION, WHETHER FOR PURPOSE OF A BREATH TEST RESULT OR OTHER REASON.

II.  SINCE EVERY ALCOTEST "SUBJECT TEST RECORD," AND ITS PRINTED "AIR," HAS AT LEAST ONE CONTROL TEST (A SIMULATED HUMAN BREATH TEST) WHICH REQUIRES A NIST TRACEABLE THERMOMETER IN CALIBRATION PER *CASSIDY*, AND SINCE *CASSIDY* PRESUMES THAT SUCH CALIBRATIONS WERE NOT DONE BY DENNIS, EVERY DENNIS ASSOCIATED AIR IS SCIENTIFICALLY UNRELIABLE AND, THEREFORE, INADMISSIBLE UNDER *CASSIDY*.

282

## III.  THE STATE IS REQUIRED TO DISCLOSE DENNIS MISCONDUCT IN ANY PENDING CASE WHERE THE STATE SEEKS TO ENHANCE A SENTENCE WITH A PRIOR CONVICTION.

A) Prosecutors And Courts Have a Special Obligation To Avoid The Possibility That Evidence Tainted By Police  Misconduct is Admitted.

B) *Cassidy* Did Not Concern, Nor Address, The State's Burden When Seeking To Enhance A DWI Sentence With A Prior Conviction Which Might Be Tainted By Dennis's Misconduct.

C) Pursuant to *R.* 7:7-7, The State Has The Obligation In A Pending DWI To Disclose Discovery To Defendants, Which Includes Whether Dennis Calibrated Any Subject Test On Defendant In A Prior Case The State Intends To Rely Upon To Seek An Enhanced Sentence, As Well As Dennis's Criminal Record And Other Materials Affecting His Credibility.

D) Through These *Zingis* Special Master Hearings, We Now Know that (1) The State's Mailing List Did Not Include "Every DWI Conviction Possibly Tainted By Dennis's Misconduct," (2) That Notice Was Not Received By Everyone On That List, And (3) That The State Did Not Create A Record Of Service Sufficient To Prove Actual Receipt Of Any Notice Beyond A Reasonable Doubt.

1.  The State's Mailing List Far From Included "Every DWI Conviction Possibly Tainted By Dennis's Misconduct."

2.  Notice was also certainly not received by everyone on the State's list, let alone from the AOC's list.

283

3. The State Did Not Create A Record Of Service Sufficient To Prove Actual Receipt Of Any Notice Beyond A Reasonable Doubt.

IV. THE CONDITIONAL PARAMETERS THAT TRIGGER THE STATE'S OBLIGATION TO PROVIDE ADDITIONAL DISCOVERY AND DETERMINE THE BURDEN OF PROOF.

A) Condition Precedent: The Relevant Date Set Is All 27,426 Subject Test Records, Complete And Unredacted, Subject To Protective Order, If Deemed Necessary.

B) Time Frame: November 1, 2008, To April 1, 2016, Inclusive Of Both Dates.

C) Arrest Locations: Monmouth, Middlesex, Union, Ocean, and Somerset Counties.

D) The Parameters Used To Define The State's Burdens.

1. Outside of Either Time Frame Or Location Parameter, Preponderance Of Evidence Standard.

2. Inside Both Of The Parameters, The Beyond A Reasonable Doubt Standard Must Govern.

V. THE MOST EFFICIENT WAY FOR THE STATE TO ROUTINELY SATISFY ITS DISCOVERY OBLIGATION AND BURDEN OF PROOF IS TO PLACE ONLINE THE FULL AND UNREDACTED 27,426 SUBJECT RECORDS (WITH PROTECTIVE ORDER) ALONG WITH A COMPANION REPOSITORY OF "PDF" COPIES OF SIGNED CALIBRATION RECORDS OR, IF THEY DO NOT EXIST, THE ALCOTEST DATABASE RECORDS FOR MISSING RECORDS.

284

A) Full Discovery As To The Prior Conviction Would Be The Definitive Solution, But The NJSBA And OPD Have Jointly Suggested An Alternate As An Exhibit That Might Solve The Problem Simply And Effectively.

B) The "*Zingis* Index"

1. Purpose Of The Index, And Possible Expansion.

2. Subject Record Frows Included.

3. Identifying Individual Subjects, Cross Reference.

4. Repository As Companion To Index.

5. Post-Conviction Relief (PCR).

6. The Process Expected.

C) The "Dennis Repository."

## C. PROPOSED FINDINGS OF FACT AND PROPOSED SOLUTIONS PRESENTED BY *AMICUS CURIAE,* THE NEW JERSEY OFFICE OF THE PUBLIC DEFENDER:

I. Proposed Findings of Fact Related to the Remand Question, #1: "Which counties had convictions affected by the    conduct of Marc W. Dennis, a coordinator in the New Jersey State Police's Alcohol Drug Testing Unit, as described in State v. Cassidy, 235 N.J. 482 (2018)?"

A.  Proposed Solutions Related to Remand Question #1.

II. Proposed Findings of Fact Related to the Remand Question #2: "What notification was provided to defendants affected by Dennis's conduct?"

B.  Proposed Solutions Related to Remand Question #2.

## VI. FINDINGS OF FACT AND CONCLUSIONS OF LAW

As noted, the Order appointing this court as Special Master directed a plenary hearing be conducted, and then this court should consider and decide which counties had convictions affected by the conduct of Sergeant Dennis, as described in State v. Cassidy, 235 N.J. 482 (2018), and what notification was provided to defendants affected by Dennis's conduct. Using its discretion, this court was also permitted to consider and decide any other questions deemed relevant to that undertaking. State v. Zingis, 251 N.J. 502, 503 (2022).

After considering the testimony provided and the voluminous exhibits presented, as well as the submissions by counsel, this undertaking is transmuted into a discussion of essentially the following five (5) issues:

I. DOES THE COURT'S DECISION IN STATE V. CASSIDY, FINDING THAT "BREATH TEST RESULTS PRODUCED BY ALCOTEST MACHINES NOT CALIBRATED USING A NIST-TRACEABLE THERMOMETER ARE INADMISSIBLE," 235 N.J. AT 498, AFFECT ALL DEFENDANTS WHO WERE REQUESTED TO PROVIDE BREATH SAMPLES ON ALCOTEST INSTRUMENTS CALIBRATED BY STATE POLICE SERGEANT MARC W. DENNIS, REGARDLSS OF WHETHER A BLOOD-ALCOHOL CONTENT (BAC) READING WAS OBTAINED, OR DOES IT ONLY APPLY TO THOSE DEFENDANTS WHO PROVIDED BREATH SAMPLES ON A DENNIS-CALIBRATED INSTRUMENT RESULTING IN THE REPORTING OF A BAC READING?

II.   HAS THE STATE PROPERLY IDENTIFIED ALL INDIVIDUALS WHO HAVE BEEN AFFECTED BY THE COURT'S DECISION IN <u>CASSIDY</u>?

III.  DID THE STATE PROVIDE SUFFICIENT NOTIFICATION, AS DIRECTED BY THE COURT, TO ALL INDIVIDUALS AFFECTED BY THE COURT'S DECISION IN <u>CASSIDY</u>?

IV.   WHAT IS THE OBLIGATION OF THE STATE, ON SENTENCING A DEFENDANT CONVICTED OF DWI, WHERE A PRIOR DWI CONVICTION OCCURRED BETWEEN NOVEMBER 2008 AND APRIL 2016, WHICH PRIOR CONVICTION IS POTENTIALLY AFFECTED BY THE COURTS' DECISION IN <u>CASSIDY</u>?

V.    WHAT ARE THE AVAILABLE REMEDIES IN THE EVENT THE   COURT DETERMINES THAT THE STATE HAS NOT SUFFICIENTLY COMPLIED WITH THE REQUIREMENTS OF ITS DECISION IN <u>CASSIDY</u> CONCERNING THE IDENTIFICATION ALL DEFENDANTS WHO WERE POTENTIALLY AFFECTED BY ITS DECISION IN <u>CASSIDY</u> OR NOTIFYING THOSE DEFENDANTS AFFECTED ITS BY DECISION, OR BOTH?

## I.

The first issue was raised by counsel for *amici curiae*, the New Jersey State Bar Association and the Office of the New Jersey Public Defender, joined by counsel for Defendant-Respondent.  They essentially contend all individuals, who were asked to provide breath samples on an Alcotest Instrument calibrated by Sergeant Marc W. Dennis, are individuals potentially affected by the Court's decision in <u>Cassidy</u>, regardless of whether an evidential

287

BAC reading was produced by that Instrument. Most specifically, they focus on situations where a police officer has reasonable grounds to believe an individual has been operating a motor vehicle in violation of N.J.S.A. 39:4-50, requests that individual to provide breath samples on an Alcotest Instrument to determine the content of alcohol in that individual's blood, and the ultimate conclusion, by either the arresting officer or the operator of the Alcotest Instrument, is that the individual has refused to submit to such testing and is thereby charged with a violation of the Implied Consent Law, N.J.S.A. 39:4-50.2(a), which provides, as follows:

> Any person who operates a motor vehicle on any public road, street or highway or quasi-public area in this State shall be deemed to have given his consent to the taking of samples of his breath for the purpose of making chemical tests to determine the content of alcohol in his blood; provided, however, that the taking of samples is made in accordance with the provisions of this act and at the request of a police officer who has reasonable grounds to believe that such person has been operating a motor vehicle in violation of the provisions of N.J.S.A. 39:4-50 or N.J.S.A. 39:4-50.14.

The provisions of the Implied Consent Law require that, (1) a record of the taking of such breath samples, disclosing the date and time thereof, as well as the result of any chemical breath test, be made and a copy thereof, upon request, shall be furnished or made available to the person tested, N.J.S.A. 39:4-50.2(b); (2) the person tested shall be permitted to have such breath

samples taken and chemical tests of that person's breath, urine or blood made

by a person or physician of that person's own selection, N.J.S.A. 39:4-50.2(c);

(3) the police officer shall inform the person tested of that person's rights

under subsections (b) and (c) of N.J.S.A. 39:4-50.2, and (4) pursuant to

N.J.S.A. 39:4-50.2(e), no person may be made to, or forced to, provide breath

samples against resistance by that person, but that person shall be advised of

the consequences of refusing to submit to a breath-sample testing on an

Alcotest Instrument, set forth in N.J.S.A. 39:4-50.4a.

The testimony and evidence in this matter make clear there are several

situations that may result in an individual being charged with a violation of

N.J.S.A. 39:4-50.2(a). Page 15 of Exhibit DB-4, the Alcotest 7110 MKIII-C

New Jersey State Police User Manual, outlines instructions to the Operator of

an Alcotest Instrument concerning, (1) the Termination of a test that was

started, (2) Refusals, and (3) Invalid Samples, as follows:

> **Terminations**:
> Termination of a test can be performed in one of two
> ways:
>
> - To terminate a test prior to a subject providing a
>   sample, press 'R' at the PLEASE BLOW/R> prompt
>   and then select #1.
>
> - To terminate a test following an invalid sample
>   (see table below), select #1 after the option is
>   displayed.

The instrument will perform a 'Control Check' and record "Test Terminated" on the display. The printout will record "Test Terminated" in the Test Result Row and the "Invalid Sample" result (if applicable) in the Error Message column.

*Please see printout of Invalid Samples in the following section.

## Refusals

A refusal can be performed in one of two ways:

- If the subject refuses to take a test prior to providing a sample, press 'R' at the PLEASE BLOW/R> prompt and then select #2.

- If the subject refuses after providing an invalid sample (see table below), select #2 after the option is displayed.

The instrument will perform a 'Control Check' and record "Subject Refused" on the display. The printout will record "Subject Refused" in the Test Result Row and the "Invalid Sample" result (if applicable) in the Error Message column.

## Invalid Samples

Any breath interruption or failure to satisfy the minimum requirements of a valid breath sample will result in an 'invalid sample.' The issue will be displayed for a few seconds along with the measurement result (i.e., BLOWING TIME TOO SHORT 2.6s). If an invalid sample was provided, the breath test can be terminated, refused, or continued.

NOTE: If option #3 (continue) is selected, the system will purge and return to the PLEASE BLOW/R prompt.

The subject is allowed 11 attempts to collect a maximum of 3 valid breath samples.[29]

Most obviously, upon being informed of the provisions of subsections (b), (c), and (d), the person may refuse to provide breath samples for testing. As noted in the Manual, the Operator will then press the button "R" at the "Please Blow" prompt, then select #2, and the Instrument will perform a "Control Check" and record "Subject Refused" on the display panel, and the printout of the Alcohol Influence Report (AIR) will record the "Test Result" as "Subject Refused."

In some circumstances, the breath test is commenced, and the Instrument records that an invalid breath sample has been produced. Page 15 of Exhibit DB-4 provides the following table of Invalid Samples and the Action that can be taken by the Operator:

| Invalid Samples | Action |
|---|---|
| MINIMUM VOLUME NOT ACHIEVED | Instruct the subject to take a deeper breath and exhale longer. |
| BLOWING TIME TOO SHORT | Instruct the subject to exhale for a longer time and/or at a lower flow rate. |
| BLOWING TIME TOO LONG | Instruct the subject to exhale for a shorter time. |
| BLOWING NOT ALLOWED | Ensure that the subject waits for the PLEASE BLOW/R> prompt before blowing. |

---

[29] This same information, as well as the following chart, is contained on page 29 of Exhibit DZ-1, the "Alcotest 7110 MKIII-C New Jersey State Police User Manual-Technical."

| PLATEAU NOT ACHIEVED | Instruct the subject to take a calm, deep breath and repeat the test. |
|---|---|
| READY TO BLOW EXPIRED | Instruct the subject to provide sample within 3 minutes of when PLEASE BLOW/R prompt first appears. |

As noted in the Manual, as well as in the outlined testimony provided on the subject of "Refusals," a subject is permitted eleven (11) attempts to collect a maximum of three (3) valid breath samples. Two (2) valid samples are required for the Instrument to produce a BAC reading as the "End Result" of the testing. When the eleventh attempt has still not produced two (2) valid breath samples for analysis,[30] or the Operator concludes, during the testing, that the subject has refused to provide valid breath samples, the Operator, using training and experience, has the discretion to either terminate the test or follow the procedures for recording that the subject has refused to provide breath samples for analysis. In those circumstances, Column T of Exhibit S-90, the Excel Spreadsheet containing the 27,833 Subject Rows, purportedly containing the names of those individuals who were asked to provide breath samples on an Alcotest Instrument calibrated by Sergeant Dennis, will record the "Error Message," of either "Test Terminated" or "Subject Refused," and

---

[30] See page 50 of Exhibit DZ-1, noting that when two (2) valid breath samples are collected, and found to be within acceptable tolerances, the firmware of the Instrument begins the chemical analysis of the sample, producing an IR (Infrared measurement) and EC (Electrochemical measurement) result for each valid breath sample.

Column U will record the "End Result" with no evidential BAC reading being

displayed.

Page 18 of the Exhibit DB-4 Manual, entitled "Aborted Tests," states the

following:

> A test will automatically be aborted whenever the
> following errors are encountered:
>
> - CTRL GAS SUPPLY
> - AMBIENT AIR CHECK ERR
> - MOUTH ALCOHOL
> - INTERFERENCE
> - OUT OF MEASURING RANGE
> - TESTS OUTSIDE +/- TOL
> - CONTROL TEST FAILED
> - QUICK RESET
> - PURGING ERROR
> - MEMORY FULL
> - SIMULATOR TEMP. ERROR
>
> The instrument will purge the system, run a control
> check and print the results. The printout will read
> "TEST RESULT: TEST ABORTED" followed by the
> error name in the Result Row. The error name will also
> be printed in the Error Message column on the printout.
> *Please see the 'Aborted Test Printout' in the following
> section.[31]

Each of these message errors have been discussed during the credible

testimony of SFC Alcott. Additionally, pages 24 and 26 of Exhibit DB-4,

entitled "Remedies," contains a chart that lists the "Possible Cause" of twenty-

---

[31] This same information is contained on page 32 of Exhibit DZ-1, the
"Alcotest 7110 MKIII-C New Jersey State Police User Manual-Technical."

293

five (25) possible "Fault Messages" that may be generated by an Alcotest Instrument, including errors relating to the sufficiency of the breath sample, and aborted tests, the "Possible Cause" of that "Fault Message," and a suggested "Remedy" for each message.[32]

Amici, the New Jersey State Bar Association and the Public Defender, as well as Defendant-Respondent, contend an Alcotest Instrument calibrated by Sergeant Marc W. Dennis without the use of an NIST-traceable thermometer is defective and any "Error Messages" generated by that Instrument recording an invalid breath sample, or any of the "Aborted Test" error messages, cannot be relied upon. Thus, they submit, any circumstance where the Instrument records the end result of "Subject Refused," or where no BAC reading has been produced due to an Aborted Test or Error Message, should be deemed a case that falls within the category of an individual potentially affected by the Court's decision in State v. Cassidy, both as to the identification and notification requirements.

This court finds that there has been no competent evidence, expert or otherwise, from which it can be concluded that an Alcotest Instrument calibrated without the use of an NIST-traceable thermometer will not operate

---

[32] This same information is contained on pages 48-49 of Exhibit DZ-1, the "Alcotest 7110 MKIII-C New Jersey State Police User Manual-Technical."

properly in determining whether the minimum requirements for a valid breath sample have been satisfied, or automatically determining that a test should be aborted. SFC Alcott credibly testified the fact an Alcotest Instrument was calibrated without the use of an NIST-traceable thermometer would have no effect on the ability of the Instrument to detect that the sufficiency of the breath sample provided, or properly record an error message that results in an aborted test. In essence, it is the actual chemical analysis of a breath sample conducted by a Dennis-calibrated Alcotest Instrument, resulting in an evidential BAC reading that could have been used in the prosecution of a subject for a violation of N.J.S.A. 39:4-50 that is tainted and inadmissible, entitling a convicted subject the right to seek post-conviction relief.

As properly noted in the final submission by the State in this matter, in the Report of the Special Master to the Court in <u>Cassidy</u>, Judge Lisa focused on "the scientific reliability of breath test readings used for evidential purposes in DWI cases." 235 N.J. at 501. Moreover, this court finds the testimony of SFC Alcott on this issue to be persuasive. As noted, SFC Alcott is a certified Breath Test Coordinator/Instructor, who has had extensive training, and has conducted hundreds of solution changes and calibrations, and has credibly explained how a subject's breath moves through an Alcotest Instrument during a breath test, identifying the sensors that take the pulmonary measurements

295

concerning sufficiency of the breath sample, before the breath sample enters the IR cuvette for analysis, noting that no pulmonary readings take place inside the IR cuvette, or after the breath sample leaves the IR cuvette, and the pulmonary sufficiency readings are recorded before any BAC readings. Additionally, SFC Alcott credibly testified the sensors that register the pulmonary sufficiency measurements have nothing to do with the method of calibrating the Instrument, nor are they affected by it. As noted by SFC Alcott, every breath test begins with a Control Test, which can fail for any number of reasons. When a Control Test fails, the Instrument prevents the subject being tested from providing breath samples. That has nothing to do with the pulmonary sufficiency of breath samples that are provided an Instrument, as detected by its sensors.

As noted, *Amicus Curiae*, the New Jersey State Bar, presented testimony from John Dell'Aquila, a retired police officer and former Deputy Attorney General. Upon leaving the Attorney General's Office, Mr. Dell'Aquila worked for the law firm of Helmer, Conley and Kasselman, P.A., primary as a defense counsel in municipal court matters, including the handling of DWI cases. He completed the two-day Draeger Safety Diagnostics, Inc. Operator Training and Preventative Maintenance Course on the Alcotest 7110 MKIII-C and was issued a Certificate, Exhibit DB-20, stating he is qualified to train and certify

296

Operators in the proper use and operation as well as perform Preventative Maintenance on that Instrument. However, he has never performed calibrations and, because he was not a sworn police officer, was never qualified by the Attorney General to perform calibrations or solution changes, nor has he ever repaired any Alcotest Instrument. He certainly testified to his familiarity with the Alcotest 7110 MKIII-C Instrument and was conversant in its use and operation. However, he was never qualified as an expert, such as the chemistry and physics experts who testified in State v. Chun before Special Master, Judge Michael Patrick King, who might have been able to testify as to whether the calibration of an Alcotest Instrument without using an NIST-traceable thermometer would affect the ability of the instrument's pulmonary sensors to detect the sufficiency of breath samples provided or how it might affect the reliability of "Aborted Test" messages. In fact, Mr. Dell'Aquila acknowledged that all breath calculations are detected automatically by the Instrument. Moreover, as with SFC Alcott, Mr. Dell'Aquila stated the decision, during an attempted breath test, whether to conclude the subject had refused, or to terminate the test, is based on the circumstances that occurred and through the exercise of the opinion and discretion of the police officer administering the test, based on an evaluation of the conduct of the person being requested to provide breath samples. Accordingly, the opinion expressed

297

by Mr. Dell'Aquila that the calibration of Alcotest Instruments by Sergeant Dennis without use of an NIST-traceable thermometer could affect the conclusion that the subject had refused to comply with the Implied Consent Statute, is without a sufficient factual or expert basis.

Additionally, Exhibit S-128 is the Excel Spreadsheet entitled, "Alcott Sorted Spreadsheet Received from NJSP_27833 subject records," which contains all 27,833 Subject Rows contained in Exhibit S-90, the Rows sorted to reflect, first, those Subject Rows for breath tests that were attempted on Alcotest Instruments that had not been calibrated by Sergeant Dennis, 436 in number and color-coded in "Red," and the remaining 27,397 Subject Rows for breath tests that were attempted on Alcotest Instruments that were calibrated by Sergeant Dennis. A review of those two categories reveals that the percentage of those "Error Messages" listed in Column T for those 436 Subject Rows, which contain subjects who were requested to provide samples on Alcotest Instruments not calibrated by Sergeant Dennis, is comparable, actually slightly less, than the percentage of "Error Messages" listed in Column T for Alcotest Instruments that were, in fact, calibrated by Sergeant Dennis. This further supports this court's conclusion that the fact Sergeant Dennis performed a calibration on an Alcotest Instrument does not affect the pulmonary results regarding the sufficiency of breath samples or aborted test

298

messages, that produce Error Messages and the consequent absence of an evidential BAC reading.

Accordingly, this court concludes the actions taken by DAG Mitchell, on behalf of the Division of Criminal Justice, of deleting those Subject Rows in Exhibit S-90 where Column U, "End Result," failed to record an evidential BAC reading, was fully appropriate, since no "reading" was produced by a chemical analysis of a breath sample that could be considered admissible in the prosecution of that subject for a violation of N.J.S.A. 39:4-50(a). Although not dispositive, an AIR producing a "Test Result" that the "Subject Refused" can be admissible in evidence during a Refusal prosecution. However, the varying circumstances under which the "Refusal" conclusion of the police officer was based, when that particular Alcotest Instrument had been calibrated by Sergeant Dennis, could have been made evidential and fully contested during trial on a refusal prosecution. This court concludes that an Alcotest Instrument reporting an "Error Message" and, consequently, no BAC reading, has nothing to do with the fact that Sergeant Dennis calibrated a particular Alcotest Instrument, which is only relevant when an evidential BAC reading was produced.

The second question posed addresses one of the specific issues remanded to this court to conduct a plenary hearing and to make findings and conclusions as to "[w]hich counties had convictions affected by the conduct of Marc W. Dennis, a coordinator in the New Jersey State Police's Alcohol Drug Testing Unit, as described in State v. Cassidy, 235 N.J. 482 (2018)." State v. Zingis, 251 N.J. 251, 252 (2022). Clearly, that issue was framed based on the issue directly presented in Zingis, which involved an adjudication in both the Berkely Township Municipal Court and the Law Division based on a conclusion that Sergeant Dennis had not calibrated Alcotest Instruments in Camden County and, thereby, his prior DWI conviction could not have been potentially affected by the Court's decision in Cassidy.

However, the broader issue addressed herein, which encompasses and addresses the issue as posed by the Court, is how the State compiled its list of those defendants who were requested to provide breath samples on an Alcotest Instrument calibrated by Sergeant Dennis, and whether that compiled list correctly identified all such defendants. As has been noted, in Cassidy, the Court directed "the State to notify all affected defendants of our decision that breath test results produced by Alcotest machines not calibrated using a NIST-traceable thermometer are inadmissible, so that they may take appropriate

action[."  235 N.J. at 498 (Emphasis added).  It goes without saying, that in order to provide "notification," it is first necessary to "identify" those entitled to notification.  Accordingly, this section of the Report deals with the issue of "identification."

It should be noted that any ultimate decision in an application for post-conviction relief by a defendant to vacate a DWI conviction is not at issue here.  That application would be judicially determined on a case-by-case basis, considering all the facts and circumstances, starting with the conclusion that any BAC reading resulting from an analysis of breath samples provided on an Alcotest Instrument calibrated by Sergeant Dennis, was inadmissible.  The issue in such a proceeding is whether the evidential BAC reading affected the outcome of the judicial proceeding.  Specifically, did the inadmissible BAC reading affect the decision of the defendant to plead guilty to any offense, or was it the basis for an adjudication of guilt, and any resulting conviction.  For example, the Court should be aware during this court's handling of over a thousand applications for post-conviction relief pursuant to Cassidy, there were many instances where a defendant was convicted of a lesser-included offense, such as Reckless Driving, contrary to N.J.S.A. 39:4-96, pursuant to a guilty plea to that offense, where a BAC reading had been obtained on a Dennis-calibrated Instrument, and the defendant pled guilty to that lesser-

included offense because of a possible conviction for DWI based on that BAC reading.  Depending on the facts and circumstances, in some instances, the conviction to that lesser-included offense was vacated, and in others, post-conviction relief was denied.[33]

Exhibit S-90 (also Exhibit S-148) is the Excel Spreadsheet, prepared by the Information Technology Bureau of the New Jersey State Police based on a query, or search, of the Alcotest Information System database, as requested by the Attorney General's Office, purportedly representing a listing of all individuals who had been requested to provide breath samples, pursuant to the Implied Consent Statute, N.J.S.A. 39:4-50.2(a), on Alcotest Instruments that had been calibrated by Sergeant Marc Dennis.  This Spreadsheet contains 27,833 Subject Rows, one for each attempt to obtain breath samples from an

---

[33] Guideline 4 Guideline 4 of the APPENDIX TO PART VII Rules, incorporated by Rule 7:6-2(d), paragraph A, specifically states that "No plea agreements whatsoever will be allowed in drunken driving or certain drug offense[,]" citing to N.J.S.A. 39:4-50.  Judge Carchman, the Acting Administrative Director of the Courts, issued a Memorandum, dated December 4, 2004, to all municipal court judges directing them to engage in a painstaking and detailed inquiry of the Municipal Prosecutor whenever the State seeks to downgrade, amend or dismiss a drunk driving prosecution.  That Memorandum is consistent with the Supreme Court's ban on the plea bargaining of drunk driving cases.  See State v. Hessen, 145 N.J. 441 (1996).  However, there are circumstances where a pea to a lesser-included offense is appropriate, such as the presence of a defense expert report raising serious questions of admissibility of a BAC reading, and the observational evidence is weak, or the officer is unavailable.

individual.  It contains twenty-one (21) Columns of information as to each attempted test, including Column U, which reflected whether the attempted breath testing resulted in an evidential Blood-Alcohol Content (BAC) reading that could be utilized in the prosecution of an individual for a DWI offense.

The persuasive evidence and testimony in this matter conclusively establishes that Exhibit S-90 (also Exhibit S-148) does not identify all individuals who had bene requested to provide breath samples on an Alcotest Instrument calibrated by Sergeant Dennis.  First, the credible testimony of the State's witness, SFC Kevin Alcott, identified 436 individuals listed in Exhibit S-90 (also Exhibit S-148) who has been requested to provide breath samples on Alcotest Instruments that had not been calibrated by Sergeant Dennis, see Exhibits S-128 and S-129, placing significant doubt about the accuracy of the query conducted of the Alcotest Information System database.  In any event, the accuracy of Exhibit S-129 is not contested, and it resulted in the reduction of the 27,833 attempted tests to 27,397.

This court has already found that it was appropriate for DAG Mitchell to reduce that 27,833 number to 20,667, in creating the Excel Spreadsheet, Exhibit S-91, resulting from her deleting those attempted breath tests in Exhibit S-90 (also Exhibit S-148) where there was no resulting evidential BAC reading.  As has been noted, Rows 2 through 437 on Exhibit S-128 represent

those 436 attempts to provide breath samples on Alcotest Instrument that had not been calibrated by Sergeant Dennis.  A review of those 436 Rows demonstrates that the "End Result" in Column U of S-128 reported no BAC reading in 122 of those 436 Rows, which means that DAG Mitchell would have eliminated those 122 Rows from Exhibit S-90 (also Exhibit S-148) when she created Exhibit S-91.  It also means that Exhibit S-91 contains 314 Rows (436 minus 122) of attempted breath tests, represented as being conducted on Alcotest Instruments calibrated by Sergeant Dennis, that were, in fact, attempted on Instruments that were not calibrated by Sergeant Dennis.  It is also interesting to note that in 65 of the 314 Rows where a BAC reading was obtained, the BAC reading was either "zero" or below the per se BAC level set forth in N.J.S.A. 39:4-50(a).  The import of that finding is not every BAC reading reported in Column U is the basis for a per se DWI conviction.

Additionally, the candid and credible testimony of DAG Mitchell and SFC Alcott further clearly established that Exhibit S-90 (also Exhibit S-148) failed to include 29 individuals who had been requested to provide breath samples on Alcotest Instruments calibrated by Sergeant Dennis.[34]  Assuming

---

[34]  Exhibit DB-23 contains a list of twenty-six (26) attempt to provide breath samples, acknowledged by DAG Mitchell as not being contained on the State's list of 27,833 attempts as contained on Exhibit S-90 (also Exhibit S-148). There were an additional three (3) individuals identified by the Office of the Public Defender, contained in Exhibits DPD-2(A), DPD-2(B), and DPD-2(D),

304

the otherwise accuracy of the list of individuals requested to provide breath samples on Alcotest Instruments calibrated by Sergeant Dennis contained in Exhibit S-90 (also Exhibit S-148), this results in a finding there were at least 27,426 instances where an individual was requested not provide breath samples on an Alcotest Instrument that had been calibrated by Sergeant Dennis. The word "instances" is utilized because the evidence also disclosed there are numerous duplicate entries contained in that 27,426 number, where the same individual, with the same arrest date and summons number was requested to provide breath samples on two, or more, Alcotest Instruments because the first attempt resulted in one of the many error messages in Column T of Exhibit S-90 (also Exhibit S-148). In such circumstances, the individual was either transported to a second, or third, location in an attempt to provide breath samples on one or more different Alcotest Instruments, or retested on the same Instrument.

---

resulting in DWI convictions, and having provided breath samples on Alcotest Instruments calibrated by Sergeant Dennis who were not contained on Exhibit S-90 (also Exhibit S-148). This court does note ███████████████ identified on Exhibit DPD-2(D), provided breath samples on Alcotest Instrument that resulted in a Tier 2, per se DWI conviction. His conviction is included in this number because the State has been unable to identify the specific Alcotest Instrument on which he was tested, and his conviction should be vacated, since all State Police arrest reports concerning that matter have been destroyed due to record retention rules.

305

However, it is also clear from the evidence and testimony that the Excel Spreadsheets contained in Exhibit S-90 (also Exhibit S-148) does, at least, properly identify 27,397 breath test attempts on Alcotest Instruments that were calibrated by Sergeant Dennis, see Exhibits S-128 and S-129, and the evidence and testimony has identified another twenty-nine (29) breath test attempts conducted on Alcotest Instruments calibrated by Sergeant Dennis, that were not contained on Exhibit S-90 (also Exhibit S-148). With respect to those twenty-nine (29) individuals, not only were they not "identified" as persons potentially affected by the Court's decision in Cassidy, there was, therefore, no attempt to obtain addresses from them, or to send them notification letters.

Moreover, a review of Exhibit DB-23, the list of those twenty-six (26) individuals who were identified during the hearing as being requested to provide breath samples on Alcotest Instruments calibrated by Sergeant Dennis demonstrates there was no evidential BAC reading obtained on six (6) of those twenty-six (26) entries. Additionally, there are two entries concerning ▉▉▉▉▉ ▉▉▉▉▉, reflecting 2 breath-sample attempts by ▉▉▉▉▉▉ on Alcotest Instrument ARWF-0356, located in the Warren Township Police Station, in Somerset County, on the arrest date of May 14, 2009, with the same summons number. The first attempt resulted in the Error Message, "Ambient Air Check Error," but the second attempt resulted in a BAC reading of 0.117. DB-23 also

306

shows two breath-test attempts by ███████████ on Alcotest Instrument ARWF—0400, located at the Highlands Borough Police Station, on the arrest date of April 6, 2012, same summons number. Each attempt resulted in evidential BAC readings (0.124 and 0.125).

Beyond these findings that Exhibit S-90 (also Exhibit S-148) contains 426 breath-sample attempts on Alcotest Instruments that were not calibrated by Sergeant Dennis, and fails to contain at least 29 breath-sample attempts on Alcotest Instruments calibrated by Sergeant Dennis, the evidence and testimony has also raised a significant issue as to whether the Alcotest Inquiry System database was properly queried (searched) in creating Exhibit S-90 (also Exhibit S-148).

The first Sheet, or Tab, on Exhibit S-90 (also S-148), entitled "SQL Results," contains the Excel Spreadsheet, consisting of 27,833 breath-sample attempts. The second Sheet, or Tab, on that Exhibit, entitled "SQL Statement," is the query (search) purportedly utilized to create that Excel Spreadsheet. During the testimony of Mr. Donahue, Mr. Noveck created a "Word" version of that SQL Statement, see Exhibit DPD-1, and then questioned Mr. Donahue concerning its contents. See T1, page 119, line 17 to page 124, line 24. During that questioning, Mr. Donahue stated he believes the Excel Spreadsheet on Sheet (Tab) 1 was created from a query of the

307

subject table of the Alcotst Inquiry System database, but he acknowledged that "SQL Statement" does not match the results contained in the Excel Spreadsheet, since were nineteen (19) serial numbers of Alcotest Instruments contained in the query, yet there were many more Alcotest Serial numbers contained on the Excel Spreadsheet, and the query called for 310 Columns, or Fields, of information to be extracted, whereas there are twenty-one (21) Columns contained on the Excel Spreadsheet.  Mr. Donahue was unable to recall who asked him to run the query, and a subsequent search of any email or other communications specifically detailing or outlining what was being requested was not produced.  See T1, page 124, line 25 to page 130, line 16. Mr. Donahue was unable to recall or explain why the query contained in the SQL Statement on Sheet (Tab) 2 did not match the SQL Results on Sheet 1 (Tab) of Exhibit S-90 (Also Exhibit S-148).

Although Exhibit S-90 (also Exhibit S-148) clearly did identify a significant number of breath-sample attempts on Alcotest Instruments calibrated by Sergeant Dennis, it is clear that it does not fulfill the intent of its creation to identify all breath sample-attempts on Alcotest Instruments calibrated by Sergeant Dennis.   Accordingly, the listing contained on those

308

Exhibit, as well as on Exhibit S-91,[35] cannot not be considered accurate as containing <u>all</u> individuals who provided breath samples on Alcotest Instruments calibrated by Sergeant Dennis where an evidential BAC reading resulted.

## III.

The third issue concerns whether the State provided sufficient notification, as ordered, to "<u>all</u> affected defendants" of its decision in <u>Cassidy</u> "that breath test results produced by Alcotest machines not calibrated using a NIST-traceable thermometer are inadmissible, so that they may take appropriate action." 235 N.J. at 498 (emphasis added). Given the fact that not all affected defendants were identified, that would not be possible. In any event, the Court did not establish a procedure that would constitute notification that would be sufficient to satisfy that requirement.

As has been noted, even before the Court's decision in <u>Cassidy</u>, once the Attorney General's Office became aware that Sergeant Dennis had not been utilizing a NIST-traceable thermometer when calibrating certain Alcotest

---

[35] Clearly, Exhibit S-91 contained 314 (436 minus 122) subjects who provided breath samples on Alcotest Instruments <u>not</u> calibrated by Sergeant Dennis, <u>see</u> Exhibits S-128 and S-128, and failed to include 23 breath- sample attempts on Alcotest Instruments that were calibrated by Sergeant Dennis that resulted in the reporting of an evidential BAC reading. <u>See</u> Exhibit DB-23 (26 attempts minus 6 where no BAC reading resulted), and <u>see</u> Exhibits DPB-2(A), DPD-2(B), and DPD-2(D).

Instruments, it began the process of attempting to identify those defendants who had been requested to provide breath samples on all Alcotest Instruments that had been calibrated by Sergeant Dennis, knowing there could be future applications seeking to vacate DWI convictions based on Dennis's misfeasance.

As also noted, that effort consisted of requesting the Information Technology Unit of New Jersey State Police to search the Alcotest Information System database, which it maintained, to identify those individuals who had been requested to provide breath samples on Alcotest Instruments calibrated by Sergeant Dennis. Although there is some uncertainty as to how that request was accomplished, ultimately the Information Technology Unit of the NJSP delivered to the Division of Criminal Justice a listing that was represented as containing all breath sample attempts on Alcotest Instruments calibrated by Sergeant Dennis in the form of an Excel Spreadsheet, marked as Exhibit S-90 (also Exhibit S-148), containing 27,833 breath-sample attempts.

The Attorney General's Office determined that list should be modified to eliminate those breath-sample attempts where no BAC reading resulted, creating Exhibit S-91, resulting in 20,667 breath-sample attempts where a BAC reading was reported. Since Exhibit S-91 did not contain addresses for those individuals who had been identified as providing breath samples on

310

Alcotest Instruments calibrated by Dennis where a BAC reading resulted,[36] the DCJ reached out to the AOC, seeking a search for addresses of the databases it maintained, by matching the 20,667 subjects to addresses contained in the court's databases.

That task was undertaken by Charles Prather, an independent data analyst working for the AOC. After eliminating those entries on Exhibit S-91 that were duplicates, and those that contained no driver's license number or an invalid driver's license number, Mr. Prather creating a list of 19,367 subject entries extracted from Exhibit S-91 that could be searched in the court's databases for a subject-to-address match. That search resulted in the creation of Exhibit S-83, consisting of two Sheets, or Tabs. Sheet 1 contains 18,249 exact subject-to-address matches, and Sheet 2 contains 947 partial subject-to-address matches, for a total of 19,196 subject-to-address matches provided by the AOC to the DCJ. As noted, that left 1,471 breath-sample attempts, where an evidential BAC reading was reported, where no subject-to-address match was provided in Exhibit S-83. Again, that occurred in 2017, prior to the Court's decision in <u>Cassidy</u>.

---

[36] The Alcotest Information System database does not contain addresses for individuals who were requested to provide breath samples on Alcotest Instruments.

311

Thereafter, the DCJ broke down both Sheets in Exhibit S-83 into separate Excel Spreadsheets for the five (5) principal Counties, containing separate Sheets for exact subject-to-address matches and partial subject-to-address matches, see Exhibits S-84 (Middlesex County), S-85 (Monmouth County), S-86 (Ocean County), S-87 (Somerset County), and S-88 (Union County), and a separate Excel Spreadsheet for municipal court cases in other Counties, see Exhibit S-82B.

In 2017, the Prosecutor's Offices in each of those Counties was tasked by the DCJ with mailing a form notification letter it provided, to the individuals with exact and partial addresses contained on Exhibits S-84 through S-88, and the DCJ attended to the mailing of the same notification letter to those individuals with exact and partial matches on Exhibit S-82B. The testimony of representatives from each Prosecutor's Office outlines the number of notification letters mailed in 2017.

Although each County Prosecutor's Office handled the mailings somewhat differently, as noted in this court's discussion of each representative's testimony, several things are clear. First, the addresses provided by the AOC, and thereby utilized by each Prosecutor's Office, were addresses for those individuals that existed as of the date of their arrests, which were between dates ranging from 2008 to 2016. As a result,

312

approximately 2,912 mailed 2017 notification letters were returned as being undeliverable, as follows: 818 in Middlesex County; approximately 1,000 in Monmouth County; 73 in Ocean County; approximately 175 in Somerset County; and 846 in Union County.

Second, there were a small number of the 2017 notification letters that were returned as undeliverable that contained forwarding addresses, and they were re-mailed to those forwarding addresses.

Third, in some instances, were not sent to subjects where a partial subject-to-address was contained on the Spreadsheets forwarded by DCJ to the County Prosecutors.

Fourth, there were no instructions provided to the County Prosecutor's Offices, regarding those 2017 notification letters, concerning attempts to find updated addresses, other than a request they be retained and, in at least one instance, the undeliverable letters returned have been discarded. There were, in fact, no attempts by either the County Prosecutor's Offices or the DCJ to seek updated addresses for those notification letters returned as being undeliverable.

Following issuance of the Court's November 13, 2018 opinion in Cassidy, the DCJ again tasked each County Prosecutor's Office in the five principal Counties with sending a second form notification letter, provided by

313

the DCJ, to the same individuals, at the same addresses contained in Exhibits S-84 through S-88.  Again, each County Prosecutor's Office handled those post-Cassidy mailings differently, as described by this court's discussion of the testimony provided by each County Prosecutor's representative.

As noted, no updated addresses were provided for those individuals mailed the 2017 notification letters that were returned as being undeliverable. At least as to the Monmouth County Prosecutor's Office, those individuals whose letters were returned as being undeliverable were deleted from Exhibit S-85 prior to the post-Cassidy mailed notification letters.  Again, certain facts are evident.

First, there were over 3,000 of the post-Cassidy mailed notification letters returned as being undeliverable, as follows: 1,106 in Middlesex County; less than the 2017 letter but close to a thousand, in Monmouth County; 82 in Ocean County; 206 in Somerset County; and 806 in Union County.

Second, a small number of the post-Cassidy notification letters had forwarding addresses and the letters were re-mailed to those addresses, and although there are no specific numbers concerning the return of any of those as being undeliverable, the number would be small, in any event.

Third, there was no attempt to secure updated addresses for any of the post-Cassidy notification letters that were returned as being undeliverable.

Except for the Monmouth County Prosecutor's Office, which ultimately discarded those letters returned as being undeliverable, the other Prosecutor's Offices did retain them.

There was a third mailing of notification letters that occurred on or about July 14, 2021, following the Court authorizing the creation of a centralized system for receipt , hearing and adjudication of applications for post-conviction relief based on its decision in <u>Cassidy</u>.  That mailing is detailed in this court's discussion of the testimony provided by Barbara Nolasco, an Administrative Supervisor with the New Jersey Judiciary.  As provided in Exhibit S-63, that July 14, 2019 notification letter was mailed to 13,618 individuals identified as having been convicted of DWI and potentially affected by the Court's decision in <u>Cassidy</u>.  Of those mailings, 2,884 were returned as being undeliverable, 64 of those were re-mailed to new addresses provided by the Post Office, of which 2 were returned as undeliverable, and 34 of those originally returned as being undeliverable, where no new address was provided, were re-mailed using a different zip code, of which 25 were returned as being undeliverable.

Again, certain facts are evident.  First, the addresses utilized for the 2019 mailing were the same addresses contained in Exhibit S-83, created back in 2017.  Second, prior to the 2019 mailing, attempts were made to seek

315

updated addresses from the Motor Vehicle Commission for those individuals, contained in Exhibit S-83, who had driver's license numbers, but that was not able to be accomplished.

With respect to notification letters directly mailed by the DCJ to those individuals in Counties other than the five principal Counties, identified as being potentially affected by the misconduct of Sergeant Dennis and, ultimately, by the Court's decision in Cassidy, Exhibit S-153, the April 4, 2023 certification of Holly Lees, an Administrative Analyst with the Prosecutors Supervision and Training Bureau of the DCJ, provides certain information. Ms. Lees certified that on December 4, 2017, she mailed notification letters, signed by SDAG Robert Czepiel, to 110 potentially affected individuals to their addresses listed in Exhibit S-83, and that on January 30, 2019, she mailed a post-Cassidy notification letter, also signed by SDAG Czepiel, to those same individuals at the same addresses. There is no mention as to whether any were returned as being undeliverable.

Additionally, in an attempt to provide notice to individuals who were potentially affected by the Court's decision in Cassidy, the testimony and evidence discloses that the AOC placed detailed information concerning that decision on the Court's website. That information was also placed on the website of the Attorney General, and there were several Notice to the Bar

316

issued by the Court.  Additionally, information concerning the Cassidy

decision was placed on the websites and social media sites of the County

Prosecutors in some of the principal Counties.  See Exhibit S-146 (Judiciary's

Cassidy website; T2, page 147, lines 12 to page 148, line 2 (Mr. Somogyi's

testimony); Exhibit S-27 (DAG Mitchell's certification); Exhibit S-139 (Ms.

Mondi's certification); Exhibit S-44 (Ms. do Outeiro's certification).

As noted, the Court did not specify the type of notification to be given to

those defendants affected by its decision.  However, in general, when an

individual is entitled to notice of an event that affects his or her right to make

an application for relief, and the address of that individual to which such

notice is to be sent is reasonably ascertainable, "constructive notice" alone of

that right, such as placement of such notice on a website or in a Notice to the

Bar, does not appear to satisfy the requirements of due process.  See, e.g.,

Mennonite Bd. of Missions v. Adams, 462 U.S. 791, 798, 103 S.Ct. 2706,

2711, 77 L.Ed.2d 180, 187 (1983); Mullane v. Central Hanover Bank & Trust

Co., 339 U.S. 306, 515, 70 S.Ct. 652, 658, 94 L.Ed. 865, 874 (1950); New

Brunswick Sav. Bank v. Markouski, 123 N.J. 402, 419 (1991).  That seems

particularly true where a prior conviction, affected by the Court's decision in

Cassidy, may constitute the basis for enhanced sentencing if a defendant is

317

convicted of a subsequent DWI offense and, potentially, faces a term of incarceration.

The right to due process demands a party be given adequate notice and a reasonable opportunity to be heard. Ewing Oil, Inc. v. John T. Burnett, Inc., 441 N.J. Super. 251, 260 (App. Div. 2015). However, due process is not a rigid concept, but flexible and calls for such "procedural protections as the particular situation demands, recognizing that not all situations calling for procedural safeguards require the same kind of procedure." Avant v. Clifford, 67 N.J. 496, 531 (1975).

In Matthews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976), the Court set forth the following balancing test to determine the precise procedural protections mandated by due process:

> [F]irst, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Considering this balancing test, the question that arises is whether updated addresses were, and are, "reasonably ascertainable" upon the exercise of due diligence, for those individuals who were entitled to notice, required under Cassidy, considering that the notification letters were mailed to an

318

address that existed as of the date of the DWI conviction, which would be between 2008 and 2016, and thousands of those notification letters have been returned by the Postal Service as being undeliverable. In the New Brunswick Sav. Bank v. Markouski decision, the Court identified several factors to be considered when conducting that inquiry. 123 N.J. at 419-20. Although that case involved whether the requirements of due process were satisfied when a sheriff's judgment execution sale of real property, conducted without actual notice to other judgment creditors, vacates the statutory liens of such judgment creditors on the property, its reasoning is somewhat analogous to this situation, considering that the Cassidy decision concerned itself with notification of the due process rights of those defendants who were potentially-affected by the misfeasance of a public police officer that may have resulted in an improper basis being utilized in their conviction. Actual or potential incarceration as a result is a harsh result as it constitutes the deprivation of liberty, particularly in situations where a DWI conviction, based on a BAC reading obtained from breath sample provided on an Alcotest Instrument calibrated by Sergeant Dennis, is sought to be the basis for enhanced sentencing on a subsequent, valid DWI conviction.

Accordingly, the focus in determining whether updated addresses for those individuals who had been identified as being potentially affected by the

319

Court's decision in <u>Cassidy</u>, where the mailed notification letters returned as being undeliverable, is whether updated addresses were, or are, "reasonably ascertainable" upon the exercise of due diligence. This requires an evaluation of our public repository of addresses. For a New Jersey driver who continues to maintain a license to operate a motor vehicle, following a period of suspension required for a DWI conviction and upon restoration, the New Jersey Motor Vehicle Commission maintains a listing of the addresses of its licensees and a system for updating addresses upon license renewal. <u>See</u>, <u>e.g.</u>, N.J.A.C. 13:21-8.2(a), -8.2(b); 13:21-9. It would appear that compiling a list of those individuals whose notification letters were returned as being undeliverable and sending that information to the Motor Vehicle Commission, with a request for a search of current addresses, could potentially, when compared with the undeliverable address, obtain at least some updated addresses for a remailing of the notification letters. Moreover, it would constitute reasonable diligence and not be overburdensome, although the cooperation of the Motor Vehicle Commission, not a party to these proceedings, would have to be obtained. Here, that effort was attempted by Mr. Somogyi concerning the third letter mailed, but was not an available option.

Of course, even then, that method would not be effective concerning convictions of out-of-state licensees. More significantly, the evidence and testimony in this matter discloses that due, in all likelihood to human entry error, the Alcotest Inquiry System database contained numerous entries where either no driver's license, or an invalid driver's license, was listed for an individual, which would make an effective search of the database of the Motor Vehicle Commission's database questionable.

Here, clearly not all individuals potentially affected by the Court's decision in Cassidy were identified by the State and, of those that were identified, addresses for many of them were not secured and notification letters were not sent to them. Moreover, many of the addresses that were obtained were obviously outdated, resulting in thousands of notification letters being returned as being undeliverable. Additionally, there were no efforts to obtain updated addresses for those mailed notification letters that were returned as being undeliverable, and no evidence or suggestions have been presented that updated addresses for those individuals whose notification letters were returned as being undeliverable were, or are, reasonably ascertainable. Even those letters that were not so returned, there is no certainty that the intended addressee actually resided at that address, and received same.

321

Applying the balancing test set forth in the <u>Matthews</u> decision, first, clearly there is a significant private interest affected by the notification efforts undertaken by the State for those individuals potentially affected by the Court's decision in <u>Cassidy</u> and who were not notified, either because they were not identified among those as being so-affected, or because there were no effective efforts to secure updated addresses for them. Second, there is a significant, identifiable risk to those individuals affected by the Court's decision in <u>Cassidy</u> who were not provided direct notification thereof. That risk implicates not only the potential they may have lost the ability to vacate a conviction that may have been improperly entered against them, but there is a continuing risk to a person that a wrongful conviction could be, or may have been, utilized to enhance the sentence of a subsequent DWI conviction. There is also a stigma inherent in a DWI conviction that might prevent or impede certain employment or appointment opportunities. That risk has to be considered in the light of the probably value, or possibility, if any, of substitute notification.

Finally, our State has an interest in providing justice, particularly where there has been misfeasance by a public official that has potentially led to a conviction, balanced against any fiscal and administrative burdens that any additional procedural requirements would entail.

Should the Court conclude that the notification requirement in its decision in Cassidy has not been sufficiently fulfilled, this court will provide some suggested solutions, designed to provide additional notification, in Section V of this Report.

## IV.

When a defendant, convicted of DWI, faces imposition of an enhanced sentence based on a prior DWI conviction that occurred during the period of time that Sergeant Dennis had been calibrating Alcotest Instruments, what party has the obligation to establish whether, in the proceedings leading to that prior DWI conviction, the defendant had been requested to provide breath samples for analysis on an Alcotest Instrument that had been calibrated by Sergeant Dennis?[37]

That, of course, was the focal issue before the Berkeley Township Municipal Court in Zingis, as well as the Law Division in the de novo hearing, on appeal from the determination of the Municipal Court Judge that the State had satisfactorily established that Mr. Zingis had not been tested on an Alcotest Instrument calibrated by Sergeant Dennis and, therefore, the Court's

---

[37] It has been established that Sergeant Dennis was authorized to calibrate Alcotest Instruments from November 5, 2008, up until October 8, 2015. Since Alcotest Instruments must be recalibrated every six months, it is possible an individual could have been requested to provide breath samples up until approximately April 6, 2016.

decision in <u>Cassidy</u> was not applicable.  That determination was based on the Municipal Court Judge accepting the State's representations that the portion of Attorney General's website providing information concerning the <u>Cassidy</u> decision, as well as accepting oral representations of the Municipal Prosecutor that he had spoken with the Attorney General's municipal liaison to municipal courts in Ocean County, who stated information from the Attorney General's Office was that Sergeant Dennis had not calibrated any Alcotest Instruments in Camden County, because Dennis-affected convictions occurred in Middlesex, Monmouth, Ocean, Somerset, and Union Counties and, in addition, Mr. Zingis was not on the list to receive notification that his case was potentially affected by the <u>Cassidy</u> decision.

The Municipal Court Judge concluded the defendant's prior DWI conviction in 2012, in a Municipal Court located in Camden County, could not have been affected by the <u>Cassidy</u> decision. After convicting Mr. Zingis if DWI, the Judge imposed an enhanced sentence based on the 2012 DWI conviction.  <u>Zingis</u>, 471 N.J. Super. at 598-99.

Mr. Zingis had argued Municipal Court judge should follow the November 28, 2017 Order entered by Judge Lisa, when he was the Special Master in <u>Cassidy</u>, issued prior to the Court's ultimate decision on November 13, 2018, directing that, in pending DWI prosecutions resulting in a

conviction, whenever the State sought to utilize a prior DWI to enhance the sentence imposed, the State had an affirmative obligation to establish whether or not defendant had provided breath samples on an Alcotest Instrument calibrated by Sergeant Dennis in that prior DWI case, and must produce documentary evidence of that determination to the defendant and the court. 471 N.J. Super. at 597; see also Exhibit S-100. Mr. Zingis had also argued that Judge Lisa's Order was followed by a June 19, 2018 letter, sent by the Attorney General's Office to all county prosecutors, implementing that November 28, 2017 Order. Ibid.

The Law Division affirmed the conviction and enhanced sentence imposed, finding that the misfeasance of Sergeant Dennis was limited to those five Counties, and Mr. Zingis had not received notification that his case fell within the boundaries of the Cassidy decision, concluding the Zingis matter was outside what was contemplated by Judge Lisa's Order. Id. at 599-600.

As has been noted, on appeal, the Appellate Division affirmed the DWI conviction, but vacated the enhanced sentence, concluding the State had not produced proof, beyond a reasonable doubt, that the 2012 DWI conviction was not tainted by the misconduct of Sergeant Dennis. Id. at 603. Although the Appellate Division concluded that the November 28, 2017 Order and the Attorney General's June 19, 2018 letter were no longer applicable, 471 N.J.

Super. at 604, the court recognized the approach set forth in Judge Lisa's November 28, 2017 Order did provide definitive proof whether a prior DWI conviction was, or was not, potentially affected by the misfeasance of Sergeant Dennis, further stating:

> While this approach may be less convenient and efficient for the State than reliance on a list of defendants provided Cassidy notice, the definite nature of which has not been proven, the burden of Dennis's malfeasance as a law enforcement officer falls on the State. Where the State seeks to impose an enhanced sentence, it cannot escape on the grounds of convenience and expediency its obligation to prove that the prior conviction on which that enhanced sentence is predicated was not tainted by the previously established misconduct of a police officer.
>
> [Id. at 607.]

Although the court did not foreclose the possibility the State might establish, beyond a reasonable doubt, it has identified every DWI conviction tainted by the misconduct of Sergeant Dennis, and provided them notification of that fact, id. at 607, the evidence and testimony presented to this court has clearly established that the State has not "identified" all defendants potentially affected by that misconduct, nor has it provided effective "notification" to all defendants that it did identify and, certainly, not to those it has not identified. It is also clear that the State did engage in a good faith effort to identify and

326

notify those defendants who were potentially affected by the Court's decision in <u>Cassidy</u>.

Given the severity of the consequences of being sentenced as a second or subsequent offender, based on a prior DWI conviction that may have been improperly entered due t the misfeasance of a public law enforcement officer, this court concludes the State has the obligation to provide a defendant, subjected to a possible enhanced sentence, information and documentation, prior to imposing any sentence, whether the prior DWI conviction did, or did not, involve an evidential BAC reading obtained from breath samples provided on an Alcotest Instrument calibrated by Sergeant Dennis. In the next section of the Report, this court will provide suggestions designed to satisfy that obligation.

Other than exposure to enhanced sentencing, this court has recognized there are other legal, economic and social consequences to a DWI conviction on the record of an individual that may motivate a post-conviction application to vacate that conviction. However, much of the focus of this hearing revolved around that potential exposure to enhanced sentencing. Accordingly, it should be noted that N.J.S.A. 39:4-50(a)(3) provides, in pertinent part:

> A person who has been convicted of this section need not be charged as a second or subsequent offender in the complaint made against him in order to render him liable to the punishment imposed by this section on

a second or subsequent offense, <u>but if the second or subsequent offense occurs more than 10 years after the first offense, the court shall treat the second conviction as a first offense for sentencing purposes and if a third offense occurs after more than 10 years after the second offense, the court shall treat the third conviction as a second offense for sentencing purposes</u>.

[Emphasis added.]

This version of the step-down sentencing provision has been in effect since 1981. <u>See</u> <u>L.</u>1981, <u>c.</u> 47, §1. For a discussion of this statutory provision, see <u>State v. Revie</u>, 220 N.J. 126, 128-29 (2014). Additionally, pursuant to <u>State v. Laurick</u>, 120 N.J. 1, 16, <u>cert. denied</u>, 498 U.S. 111, S.Ct. 429, 112 L.Ed.2d 413 (1990), where a prior conviction involves a guilty plea in which the defendant was not represented by counsel, that conviction does not constitute a prior offense for purposes of increasing defendant's custodial sentence, but is counted as a prior offense for purposes of imposing administrative penalties on the defendant. <u>Revie</u>, 220 N.J. at 138.

It should also be noted that, upon vacating a conviction, the State and defendant are returned to their respective positions *status quo ante*. <u>State v. Roddy</u>, 210 N.J. Super. 62, 68 (App. Div. 1986), namely, with a pending DWI charge to be addressed. These factors are mentioned because there has been some discussion during these hearings relating to the relatively small number of <u>Cassidy</u>-based PCR applications that were filed (1,000-1200) during the

centralized <u>Cassidy</u>, post-conviction relief program, in relation to the thousands of individuals identified as potentially being affected by the Court's decision and notified. They are only mentioned because they may weigh in the determination by a <u>Cassidy</u>-identified and notified individual as to whether to file a PCR.

## V.

Beyond specifically addressing the charges given to this court in its July 28, 2022 Order, <u>see</u> <u>State v. Zingis</u>, 251 N.J. 502, 503 (2022), it is appropriate to suggest potential remedies should the Court accept the findings that: (1) not all defendants potentially affected by its decision in <u>Cassidy</u> have been identified; (2) not all defendants entitled to notification under the <u>Cassidy</u> decision have been notified; and (3) there are potentially severe consequences to the use of a DWI conviction, affected by the misfeasance of Sergeant Dennis, in the form of an enhanced sentence upon a second or subsequent DWI conviction.

All counsel in this matter have been fully attuned to the "solution dilemma" presented to the Court, and all have been extremely diligent in posing potential remedies that will fully serve the interests of justice, whether they fully or partially agree or disagree with the approach, findings and determinations of this court. This court is aware it must balance its findings

with the practical effectiveness, and any administrative burdens incurred, of any suggested solution, the polestar being the obligation to fully serve the interests of justice.

*Amici*, the New Jersey State Bar Association and the New Jersey Office of the Public Defender, have provided the court with Joint Exhibits as constituting potential solutions to address the issue of properly identifying all individuals who have been requested to provide breath samples on Alcotest Instruments calibrated by Sergeant Dennis.

DB/DPD-28,a s discussed infra., is a PDF file that has been titled "Dennis Calibration Repository." It contains the calibration documents of all Alcotest Instruments that were calibrated by Sergeant Dennis from November 14, 2008 through October 9, 2015. It is in printable, pdf. format, and consists of the documents of 1,047 calibrations on 1,069 pages. *Amici* counsel represent this document was compiled directly from the Exhibits submitted by the State during discovery and then placed in PDF format in chronological order, and represents the best evidence to establish whether Sergeant Dennis calibrated a particular Alcotest Instrument, at a particular location, on a particular date and time. They have submitted Exhibit DB/DPD-31, titled "Notes on the 'Dennis Calibration Repository,'" which outlines the content, purpose and potential use of Exhibit DB/DPD-28.

They have also submitted Exhibit DB/DPD-29, an Excel Spreadsheet, titled "Zingis Index." It contains 27,426 Rows of subject defendants and twenty-two Columns (or Fields) of information for each Subject Row. It was created using Exhibit S-90 (also Exhibit S-148), the original Excel Spreadsheet created by the IT Bureau of the NJSP and sent to the DCJ, containing 27,833 Rows of breath-test attempts purportedly conducted on Alcotest Instrument calibrated by Sergeant Dennis, less the 436 breath-test attempts testified to by SFC Alcott as being conducted on Alcotest Instrument that were not calibrated by Sergeant Dennis, see Exhibits S-128 and S-129, plus the 26 attempted breath tests contained in Exhibit DB-23, admittedly conducted on Alcotest Instruments calibrated by Sergeant Dennis, plus the 3 attempted breath tests contained in Exhibits DPD-2(A) ███████████████, DPD-2(B) █████ ███████, and DPD-2(C) ███████████████.[38] The additional 26 Rows that were not contained in Exhibit S-90 (also Exhibit S-148) are highlighted in "yellow," and the 3 additional Rows are highlighted in "green" on Exhibit DB/DPD-29.

---

[38] It should be noted that Exhibit DPD-2(C) demonstrates that the DWI charge filed against ███████████ on May 14, 2010 in Highlands Borough in Summons Number H 20050, was dismissed by the Highlands Borough Municipal Court Judge on July 27, 2010.

The twenty-two Columns, or Fields of information contained on the Exhibit DB/DPD-29 Excel Spreadsheet are:

A - Row in Exhibit S-90
B - Arrest Date
C - Driver License No.
D - Subject Last name
E - Subject First Name
F - Summons No.
G - Location
H - Serial Number of Instrument
I - Calibration Date
J - Subject Middle Initial
K - Subject Date of Birth
L - Subject Age
M - Subject Gender
N - Subject Weight
O - Subject Height
P - Issuing State
Q - Case Number
R - Arrest Date
S - Arrest Time
T - Arrest Location
U - Final Error
V - End Result

The Subject Test Rows contained on the Exhibit DB/DPD-29 Excel Spreadsheet are listed chronologically, in Row B, by arrest date, starting with an arrest date of November 15, 2008, on Row 2, ending with arrest date of March 7, 2016, on Row 27427.

Exhibit DB/DPD-29 does contain those Subject Rows where the attempted breath testing resulted in the reporting on Column U of various "Final Errors" and no evidential BAC reading resulted in Column V. This

332

court has concluded Rows where no BAC reading was obtained were properly deleted by DAG Mitchell in creating Exhibit S-91. If the Court accepts that finding, then Row 1383 ███████████, Row 12580 (███████████, and Row 14659 ██████████, as well as all other Rows where there is no BAC reading reported in Column V, should be deleted. This court's review of Exhibit DB/DPD-29 discloses that would result in a total of 7,051 Subject Test Rows being deleted. Another 2,075 breath-test attempts contained in Joint Exhibit DB/DPD-29 resulted in an evidential BAC reading of 0.000. Subtracting those 7,051 Subject Test Rows, and the 2,075 Subject Test Rows, results in 18,300 breath-test Rows remaining, constituting attempted breath tests on Alcotest Instruments calibrated by Sergeant Dennis where an evidential BAC reading was reported.

Additionally, a further review of those remaining 18,300 Subject Test Rows discloses numerous evidential BAC readings that were below the per se BAC level of 0.080. Of course, they were still evidential. Joint Exhibit DB/DPD-29 also contains numerous duplicate, and some triplicate, entries, where there were multiple breath-test attempts on the same Subject, with the same arrest date and summons number. Of those duplicate entries, some resulted in evidential BAC readings and some did not. Moreover, many of the Subject Test Rows reflect individuals who have made PCR applications based

on the Cassidy decision, that have been heard and adjudicated. In any event, should the Court conclude Subject Test Rows where no evidential BAC reading was listed be retained, then the entirety of 27,426 Subject Test Rows would remain.

*Amici*, the New Jersey State Bar Association and the Office of Public Defender, have also submitted Exhibit DB/DPD-30, titled "Notes on 'Zingis Index' to the Repository," which contains the content, purpose and potential use of the "Zingis Index" contained in Exhibit DB/DPD-29.

As noted, Exhibit DB/DPD-28 is presented as containing the calibration documents on all Alcotest Instruments calibrated by Sergeant Dennis, extracted from the discovery provided by the State in this matter, and Exhibit DB/DPD-29 is presented as containing all Subject Test Rows, consisting of all individuals who were requested to provide breath samples on Alcotest Instruments, contained in Exhibit DB/DPD-28, and calibrated by Sergeant Dennis. The following explanation of those Exhibits is contained in Exhibit DB/DPD-31:

> The Zingis index [Exhibit DB/DPD-29] and the Dennis Calibration Repository [Exhibit DB/DPD-28] is intended as a method for parties and the court to be satisfied as to whether a prior conviction that is being used as a sentencing enhancement in a subsequent case is or is not a Dennis case. It is a device for presumptive notice by the State that Dennis was involved in the prior case. It does not alleviate the State's burden to provide

334

these documents as discovery to the defense. That question is separate and apart from the notices ordered in Cassidy due to the court finding that readings obtained were not admissible. The question is Zingis (not decided in Cassidy) is what evidence the State needs to prove beyond a reasonable doubt, in a case involving enhanced sentencing, that Marc Dennis was not involved in the prior case? Although the question is framed by the burden of proof, the burden is to notice to defense whether the prior involved Marc Dennis, not the ultimate question of what would become of a PCR if filed.

## II.  THE USE OF THE INDEX AND REPOSITORY

A. ABSTRACT: The MVC abstract contains the dates of all arrests that become convictions.  ("V" is the violation date, "O" is the court date if DWI)

B. NJ COURTS PORTAL: That violation date and other information can now be used to go to the public court portal for exact motor vehicle dispositions, including all summon numbers etc. (https://portal.njcourts.gov/webe41/MPAWeb/)

C. ZINGIS INDEX: With the information from that one goes to the repository index and can search any field by name, driver's license, arrest date, summons, and more. (Even an index without any personal information but leaving the summons number would still account for almost all cases being found by just are summons numbers which are public info.) This will yield the broadest notice of whether Dennis was involved in the case.

D. REPOSITORY:    The    Dennis    Calibration repository contains proof that Dennis did the calibration, by means of the best evidence available*.  Each PDF is printable and can be

searched in any file system by name, serial number, location, or date.

(*All the information comes directly from the Zingis discovery. There are 1,005 signed PDFs the State provided. There is 1 signed linearity test on the day of calibration (where the signed calibration record is missing) as the next best evidence Dennis. And, in the case of 41 calibration signatures missing, we have imported the actual data from the State's 68K solution change spreadsheet (the third best evidence) directly into a form made into a printable PDF, noting that the signed certification is missing but that the State's AIS indicates that Dennis did the calibration. Those last files 41 are also noted in the file name "AIS only".)

E. <u>THE PROCESS</u>: We would expect the process to take form something like this:

1. that the defense would utilize this index at the beginning of a case to ascertain whether a PCR was required,

2. that the State would use it when providing discovery to satisfy its discovery obligation to provide possibly exculpatory information (i.e., that a possible witness in the case committed malfeasance) and

3. it would assure the court judicial integrity by allowing even on the day of sentencing the court to query the parties as to whether the prior was a Dennis case, and, in the event that it was necessary, the parties could locate the answer to that question within literally minutes by reference to the online repository and index, allowing no uncertainty if sentencing proceeds.

336

F.  <u>TIPS ON SEARCHING THE REPOSITORY</u>:

1.    In most windows systems, repository will be a file folder that you can search as any other by a box at the very top right corner

2.    In searching for dates, use the format "YYYY-MM-DD".

3.    In searching for serial numbers, do not include the dash or hyphen. So ARTL-0008 will be found by searching "ARTL0008"

4.    When searching locations, type the most limited version first. For example, start with "Highland" and then narrow when you find out how the file is named. State barracks should all contain "NJSP". HOWEVER, there are instances where "State of New Jersey" is used, so we advise always trying multiple methods if in doubt.

In DB-27, a June 9, 2023 letter to this court, copies to all counsel, Mr.

Gold, counsel for the NJSBA, notes the following, concerning the

confidentiality of personal identification information:

As the "Zingis Index" [Exhibit DB/DPD-29] contains personal identifiers previously under protective order in the underlying data, those protections presumptively govern any non-publicly available data therein as well, without further order, unless the court directs otherwise, and the parties are herein advised, therefore, that no subject test, non-public, personal information should be distributed or shared beyond the court

337

proceedings, lawyers, and witnesses, unless otherwise ordered or directed by the Court.

The Court and parties have been (or will be shortly) provided with an invitation by Dr. Robert Spangler (rspangler@njsba.com )of the NJSBA to download these materials via a secure site at the State Bar. Once the invitation is received, the parties will have to confirm their email as required, and then receive a code to enter to get into the secure site. Once the code is confirmed, there will be one folder (Repository) containing 1047 files and three other files ( Notes on Repository, Zingis Index, and Notes on Zingis Index) . All four should be downloaded as the secure location will only remain available for a limited time.

In its post-hearing submission, the State had recognized and identified various errors in Exhibit S-90 (also Exhibit S-148). As noted, the Excel Spreadsheet contained in Exhibit S-152, created by the IT Unit of the NJSP at the request of this court, contains a record of all 236,664 breath tests conducted on all Alcotest Instruments in New Jersey from November 5, 2008 and June 30, 2016. In addition to the erroneous inclusion in Exhibit S-90 (also Exhibit S-148) of 436 breath tests that were performed on Alcotest Instruments that were not calibrated by Sergeant Dennis, the State noted that an analysis of Exhibit S-152 during the plenary hearing disclosed there were 26 breath tests conducted on 3 Alcotest Instruments calibrated by Sergeant Dennis that were not included in Exhibit S-90 (also Exhibit S-148).

Those not included are 17 requests to provide breath samples on Dennis-calibrated Alcotest Instrument ARWF-0400, located at the Borough of Highlands Police Station, appearing on Exhibit S-152, and listed on Exhibit DB-23, as follows:

| Row on S-152 | Date | Name | Error? | BAC Reading |
|---|---|---|---|---|
| 167776 | 5-26-12 | ██████████ | None | 0.193 |
| 167777 | 5-26-12 | ██████████ | None | 0.203 |
| 167767 | 4-06-12 | ██████████ | None | 0.125 |
| 167768 | 4-06-12 | ██████████ | None | 0.124 |
| 167769 | 4-15-12 | ██████████ | None | 0.150 |
| 167773 | 5-19-12 | ██████ | None | 0.174 |
| 167771 | 4-29-12 | ██████████ | None | 0.204 |
| 167772 | 5-06-12 | ██████████ | None | 0.061 |
| 167774 | 5-20-12 | ███████ | None | 0.000 |
| 167770 | 4-21-12 | █████████ | Test Term | ----- |
| 167766 | 3-21-12 | ██████████ | Refusal | ----- |
| 167778 | 5-28-12 | ██████████ | Refusal | ----- |
| 167779 | 6-10-12 | ██████████ | Test Term | ----- |
| 167764 | 3-11-12 | ██████████ | None | 0.058 |
| 167775 | 5-26-12 | ██████████ | None | 0.000 |
| 167765 | 3-11-12 | ██████████ | None | 0.000 |
| 167640 | 4-14-10 | ██████████ | None | 0.000[39] |

The State contends those individuals listed where no evidential BAC reading was obtained do not fall under the Court's decision in Cassidy, and were not entitled to be notified. Although the State concedes the remaining individuals on this list, identified as being requested to provide breath samples

---

[39] ██████████████, who was tested under the name of █████████ (same person) appears in Exhibit DPD-2(C).

on Alcotest Instrument calibrated by Sergeant Dennis, and not included on Exhibit S-90 (also Exhibit S-148) were entitled to notice, because Exhibit DPD-2(C) reflects that the DWI charge field against ████████████████ was dismissed, she would not be entitled to notification.

The State also acknowledged there were 10 requests to provide breath samples on Alcotest Instrument ARWF-0356, calibrated by Sergeant Dennis, that are not contained on Exhibit S-90 (Also Exhibit S-148), as follows:

| Row on S-152 | Date | Name | Error? | BAC Reading |
|---|---|---|---|---|
| 154922 | 3-28-09 | ██████ | None | 0.139 |
| 154928 | 5-14-09 | ████████ | Ambient Air Chk | ----- |
| 154929 | 5-14-09 | ████████ | None | 0.117 |
| 154924 | 4-12-09 | ███████ | Refusal | ----- |
| 154923 | 4-01-09 | █████████ | None | 0.120 |
| 154926 | 5-10-09 | ███████ | None | 0.163 |
| 154927 | 5-10-09 | ████████ | None | 0.034 |
| 154921 | 3-01-09 | ███████ | None | 0.187 |
| 154925 | 4-25-09 | ████████ | None | 0.194 |
| 154920 | 2-08-09 | ██████ | None | 0.209 |

Again, the State contends those individuals listed where the requested breath-sample tests did not result in an evidential BAC reading did not fall within the Court's decision in Cassidy, and were not entitled to notification. The State also noted that two of those individuals, ██████████ and ███ ████████, were sent the Cassidy notification letters based on different DWI

340

arrests.[40]  The State also notes, although there were no driver's license numbers listed for ███████ and ████████, the AOC, at the request of the State during the pendency of this matter, was able to find an address for ██ ████, but was unable to locate an address for ████████.  See Exhibit S-170F.[41]

Additionally, the State acknowledged that ██████████████, also was not included on Exhibit S-90 (also Exhibit S-148), although she was requested, on June 30, 2009, to provide breath samples on Alcotest Instrument ARTL-0023, located at the Bridgewater Police Station, calibrated by Sergeant Dennis, see Row 44209 on Exhibit S-152, and Exhibit DPD-2A.  There was no error on that testing and a BAC reading of 0.132 resulted.

The State also agrees that the evidence and testimony disclosed that there were multiple instances where, due to human data-entry errors, there were many instances where the date of the arrest entered was, in time, before

---

[40]  There is no indication whether the notification letters sent to ███████ and ██████████ were among those returnable as being undeliverable.

[41]  As noted, based on testimony and information received during the plenary hearings, DAG Clark did reach out to the AOC, requesting a search for addresses of those individuals who had been identified as being requested to provide breath samples on Alcotest Instruments calibrated by Sergeant Dennis, see Exhibit S-170B, and Exhibit S-170F,  a two-page list sent back to DAG Mitchell containing the results of that requested search.  Addresses for some individuals, but not all,  were located and it is not known whether notification letters were subsequently mailed and, if so, whether they were received.

the date of the calibration of the Alcotest Instrument.  That error impeded the ability of the AOC to located addresses for those individuals when creating Exhibit S-83, because the "date of arrest" was utilized in its search to locate the correct individual in the court's database.

The State also properly noted that because of these multiple errors of inclusion and exclusion, which were discovered during the plenary hearing, it is unknown whether any of those excluded individuals had a later conviction in a different County.

On the issue of "notification," the State agrees there were never attempts to send notification letters to those individuals, identified during the hearing as having provided breath samples on Alcotest Instruments calibrated by Sergeant Dennis that resulted in BAC readings, but were not included on Exhibit S-90 (also Exhibit S-148).  The State notes that includes the 26 individuals noted above, as well as some 76 individuals whose arrest dates were incorrectly entered by arresting officers or Alcotest Instrument officers at the time of testing.  Additionally, the testimony of Tracey Mannix (Union County) and Brian Gillet (Middlesex County) was unable to confirm that notification letters were sent to those individuals appearing on Sheet (Tab) 2 of Exhibits S-84 (215 in Middlesex County) and S-88 (216 in Union County).  The State

submits that the second, post-Cassidy form notification letter should be mailed to those individuals.

The State correctly points out, despite the obvious deficiencies in being able to fully notify all individuals who were requested to provide breath samples on Alcotest Instruments, calibrated by Sergeant Dennis, and resulting in a BAC reading, there were significant attempts at notification. Those efforts consisted of three mailings, one during the pendency of the Cassidy litigation, another following the Court's decision in Cassidy, and a third during the centralized post-conviction relief application phase. Additionally, the Division of Criminal Justice, the New Jersey State Police, and the Administrative Office of the Courts all placed information concerning the Cassidy decision and the misfeasance of Sergeant Dennis on their websites, as did some of the principal Counties. There were also Notices to the Bar prepared, published and distributed concerning the Cassidy decision and the misfeasance of Sergeant Dennis. Notwithstanding, those notification efforts were not fully effective in terms of notifying "all affected defendants," Cassidy, 235 N.J. at 498.

In its submission, the State highlights the difficulties encountered in providing notice, including the inability of the AOC to locate addresses where either no driver's license, or an invalid driver's license, was contained on

343

Exhibit S-91.  Additionally, attempts by the AOC to updated address information from the Motor Vehicle Commission were unsuccessful and may, or may not, have been effective, and certainly would not have included out-of-state licensees or those who no longer retained driver's licenses.

The solution posed by the State is two-fold.  First, those individuals now identified as having provided breath samples on Alcotest Instruments calibrated by Sergeant Dennis, resulting in BAC readings, for which the AOC has secured addresses, should be sent the second, post-Cassidy form notification letter.

Second, the State should make all calibration documents pertaining to calibrations now known to have been conducted by Sergeant Dennis on Alcotest Instruments available to the public on the public Cassidy websites of the Attorney General, the New Jersey State Police, and the Administrative Office of the Courts.  The State also suggests that Exhibit S-89, the Excel Spreadsheet, entitled "Spreadsheet of towns and counties," created by SFC Alcott, containing a listing of the serial numbers and locations of Alcotest Instruments that Sergeant Dennis calibrated should also be placed on those public websites.

SFC Alcott testified he created Exhibit S-89 by extracting information from Exhibit S-126, the Excel Spreadsheet created by SFC Alcott, entitled "Zingis Project Spreadsheet 2-24-2023." Exhibit S-89 contains 146 Rows and three Columns of information: Column A, the Alcotest Serial Number; Column B, the Agency where the Instrument is located; and Column C, the County in which Instrument is located. Exhibit S-89 lists Alcotest Instrument, calibrated by Sergeant Dennis in Burlington, Cape May, Mercer, Middlesex, Monmouth, Ocean, Somerset, and Union Counties. SFC Alcott noted, in his testimony, that the Alcotest Instruments listed in Burlington, Cape May, and Mercer Counties are all located in State Police Barracks. Referring to Exhibit S-126, SFC Alcott testified that Sergeant Dennis only performed Solution Changes, not Calibrations, on the two Alcotest Instruments located in Burlington County, and on the two Alcotest Instruments located in Mercer County. Accordingly, the State recommended that Exhibit S-89 be modified by SFC Alcott to remove Rows 2 and 3 ("NJSP – Red Lion – Burlington") and the Rows 5 and 6 ("NJSP – Hamilton – Mercer") because only Solution Changes, not calibrations, were performed on those Instruments by Sergeant Dennis. The State also recommends that SFC Alcott further modify Exhibit S-89 to place the "Calibration Dates" performed by Sergeant Dennis in Column D and to place next to each Calibration date the letter "Y," for "Yes" that the

345

calibration documents are available in the Alcotest Inquiry System database, the letter "M" to signify the calibration documents are "missing" from the database, and the letter "P" to signify that "some documents are missing" from the database. Those designations could be extracted by SFC Alcott from Exhibit S-126.

The State submits that by using the individual calibration records of Sergeant Dennis on the public websites, and Exhibit S-89, as modified by those suggestions, that would allow any individual, knowing the approximate date and location of arrest, to determine whether his or her breath test was conducted on an Alcotest Instrument calibrated by Sergeant Dennis, and that individual, or counsel, and could search the public portion of the database to obtain the serial number of the Alcotest Instrument on which he or she was tested.

The State also suggests that the public be notified of the availability of that information by the Attorney General and every County Prosecutor's Office issuing a press release and placing same on their websites.

The State maintains that the Excel Spreadsheet contained in Exhibit S-152, which contains 236,664 Subject Rows of all individuals who were requested to provide breath samples on all Alcotest Instruments in New Jersey from November 1, 2004 through June 30, 2016, should not be publicly posted

346

because it contains personal identification information that should remain confidential. The State does suggest Exhibit S-152 could be distributed to each County Prosecutor's Municipal Court Liaison to verify, for inquiries by individuals, whether the Alcotest Instrument on which they were tested was calibrated by Sergeant Dennis and, if so, where and when.

The State also objects to the joint recommendations by *Amici*, the NJSBA and the Office of Public Defender concerning joint Exhibit DB/DPD-28, the PDF file, "Dennis Calibration Repository," and joint Exhibit DB/DPD-29, the Excel Spreadsheet, "Zingis Index." In addition to its general objections, outlined on pages 98-100 in Exhibit AF, altering or modifying the fee charged for public searches of the database, is beyond the scope of this court's ordered authority, and *Amici* have improperly suggested that a conviction predicated on an Alcohol Influence Report (AIR), generated based on breath tests conducted on an Alcotest Instrument calibrated by Sergeant Dennis, should be automatically vacated. The State contends the "Zingis Index" is objectionable because it contains personal and confidential identification information and, even if removed, was created by counsel, rather than by the State, which is responsible for the content of the public database.

The State also objects to the "Dennis Calibration Repository" because it was created by counsel, usurping a responsibility of the State, and the State

347

also does not see the usefulness of arranging records by the date of calibration, maintaining that an individuals who obtains a record from the public database will know the serial number of the Alcotest Instrument on which they were tested and then can search the posted Excel Spreadsheet in Exhibit S-152, as modified, to determine whether Sergeant Dennis calibrated that Instrument.

*Amicus*, the Office of the Public Defender, has also submitted some recommendations, correctly observing that the evidence and testimony presented during the hearings established that the list of individuals contained in Exhibit S-90 (also Exhibit S-148) is underinclusive, as it fails to identify all individuals who were requested to provide breath samples on Alcotest Instruments calibrated by Sergeant Dennis, and there are multiple deficiencies in the notification procedures employed by the State in that not all individuals potentially affected by the Court's decision in Cassidy were properly notified that BAC readings produced on Alcotest Instruments that were not calibrated by using an NIST-traceable thermometer were inadmissible, so they could take appropriate action in the form of an application for post-conviction relief.

The recommendations submitted by the Public Defender's Office are focused more on the effect that DWI convictions, based on Alcotest Instruments calibrated by Sergeant Dennis, might have on indictable offenses. Specifically, the post-hearing submission by the Public Defender's Office

expresses concern that the testimony by Mr. Somogyi reveals that a DWI

charge, filed in Municipal Court that is related to an indictable offense filed in

Superior Court is noted in the court's Automated Traffic System (ATS)

database as being transferred to the court's Automated Criminal System (ACS)

in the Superior Court  Sometimes, the DWI charge is sent back by the Superior

Court for disposition in the Municipal Court, which is then recognized and

captured in the ATS database.  However, if the DWI charge is disposed of in

the Superior Court in the form of a conviction, there is no tracking of that

conviction in the ATS database, other than the notation it had been transferred

to the Superior Court.

The Public Defender's Office recommends the Court create a rebuttable

presumption that an individual requested to provide breath samples on an

Alcotest Instrument that was calibrated between November 5, 2008 and April

9, 2016, was tested on an Instrument that was calibrated by Sergeant Dennis,

submitting that:

> In many cases, it will be straightforward for the State
> or the defense to confirm or rebut the presumption. The
> primary, and best, evidence regarding the calibrator of
> the machine will come from the original discovery
> documents in the underlying municipal court case. If
> those documents are no longer retained—as apparently
> took place in the ███████████ matter—then the State
> must seek other evidence confirming whether or not
> Dennis calibrated the machine involved in the case. Of
> course, if the relevant test is contained in the index of

subject tests involving Dennis-calibrated machines provided by the OPD and the NJSBA, see DB/OPD-29, then it is clear that the matter involved a Dennis-calibrated machine. But even if the relevant test is not contained in that index, the State must provide evidence overcoming the presumption. That evidence could be from the broader AIS data, see S-152, showing that the relevant subject test was provided on a machine not calibrated by Dennis. But if, for whatever reason, the State cannot identify the appropriate subject test—as appears to have happened with ▮▮▮▮▮▮—then the presumption applies, and the test is presumed to have been conducted on a Dennis-calibrated machine. In this sense, the State is held to account for both the misconduct of its law enforcement employee who failed to appropriately calibrate the machine and its failure to retain sufficient information, either through discovery materials or the AIS, to identify whether the person was tested on a Dennis-calibrated machine.

[See Exhibit AI, page 9.]

The Office of the Public Defender maintains this presumption should at least apply to those cases where an individual was requested to provide breath samples on an Alcotest Instrument located in the five principal Counties of Middlesex, Monmouth, Ocean, Somerset and Union, where Sergeant Dennis performed almost all his calibrations.

Turning to the issue of indictable offenses, the Office of Public Defender also requests this court recommend to the Supreme Court that the AOC be directed to provide the Public Defender with a list of, (1) all individuals convicted of Reckless Vehicular Homicide, contrary to N.J.S.A. 2C:11-5(a),

from November 5, 2008 through October 9, 2017, two years after the last calibration performed by Sergeant Dennis; (2) all individuals convicted of Assault by Auto, contrary to N.J.S.A 2C:12-1(c), from November 5, 2008 through October 9, 2017; (3) all individuals convicted of fourth-degree Driving while license is suspended for a DWI conviction, contrary to N.J.S.A. 2C:40-26, from November 5, 2008, to the present. The Public Defender notes the testimony of Mr. Somogyi confirmed these results can be extracted from the ACS database, and contends

> this information will allow it to identify persons who it may have represented in connection with a Superior Court criminal conviction that may have been tainted by Dennis's misconduct, so that the OPD can advise its clients on how to obtain appropriate relief.
>
> [See Exhibit AI, page 10.]

The Public Defender also asserts the mailing of notices to those addresses identified as existing at the time of the arrests, between 2008 and 2016, and the website posting of information concerning the misfeasance of Sergeant Dennis and the Court's Cassidy decision, were insufficient. The Public Defender does support the State's agreement to mail notices to those individuals identified, during the plenary hearing, as having been requested to provide breaths samples on a Dennis-calibrated Alcotest Instrument, but were

351

omitted from Exhibit S-90 (also Exhibit S-148), and for which the AOC has now been able to secure addresses for some of them.

In terms of solutions for the "notification" issue, the Public Defender recognizes

> that the task of identifying new addresses for these individuals would be arduous, if it is even possible. Instead, the OPD proposes that the State and Judiciary attempt to identify individuals at the time that they suffer additional collateral consequences from the Dennis-affected conviction.

[See Exhibit AI, pages 14-15.]

The Public Defender maintains if a person is convicted of DWI, and there is a prior DWI conviction that occurred during the period of time Sergeant Dennis was calibrating Alcotest Instruments, thereby subjecting that person to enhanced penalties in a Municipal Court case, the State should be required to make a *prima facie* showing that the prior conviction was not one based on a BAC reading produced by an Alcotest Instrument calibrated by Sergeant Dennis. It contends that same procedure should be followed for criminal matters in Superior Court, where DWI convictions may have collateral consequences.

Essentially, the Public Defender's Office maintains unless the State can establish a *prima facie* case that the DWI conviction at issue was not affected by the Cassidy decision, then it should not be able to proceed with imposing an

352

enhanced sentence or consider collateral consequences until the defendant has an opportunity to file an application for post-conviction relief and be heard.

Counsel for Defendant-Respondent, Thomas Zingis, contends there has not been advanced a credible method of producing a comprehensive list of all defendants potentially entitled to relief under the Court's decision in <u>Cassidy</u>, nor an effective method of providing them, if identified, with notification of their right to seek relief. Therefore, Defendant-Respondent contends the State should be required to provide notice to any defendant against whom the State intends to utilize a prior DWI conviction entered during the time period Sergeant Dennis was calibrating Alcotest Instruments to enhance the sentence of a defendant convicted of a subsequent DWI offense, and provide full discovery, including the AIR relating to that prior conviction. Additionally, counsel contends the State should not be permitted to move forward with sentencing until the defendant has the opportunity to file for post-conviction relief concerning that prior conviction, and that application has been fully adjudicated.

Based on the evidence and testimony presented during the plenary hearing and the positions and recommendations provided by counsel, this court makes the following findings, conclusions and recommendations:

1.    The State Did Not Identify All Individuals Who Were Requested To Provide Breath Samples on Alcotest Instruments Calibrated By Sergeant Marc Dennis.  In order to comply with the Order of the Supreme Court State v. Cassidy that the State "notify all affected defendants" of its decision that "breath test results produced by Alcotest machines not calibrated using a NIST-traceable thermometer are inadmissible, so that they may take appropriate action[,]" 235 N.J. at 498 (emphasis added), it first necessary to "identify" those individuals so affected.  That task took the form of identifying all defendants who had provided breath samples on Alcotest Instrument calibrated by Sergeant Dennis through a search, or "query," of the Alcotest Information system database.

As has been thoroughly discussed in this Report, although the State attempted, in good faith, to comply with the Court's Order, the search conducted by the Information Technology Bureau of the New Jersey State Police, in the form of the Excel Spreadsheet contained in Exhibit S-90 (also Exhibit S-148), was both overinclusive and underinclusive.  Part of the reason for that result was that the "query," listed on the second Sheet, or Tab, of the Spreadsheet as the "SQL Statement," did not match the results contained on the first Sheet, or Tab, the "SQL Results."  However, there were a substantial number, almost "all," of those defendants who were identified as having been

354

requested to provide breath samples on Alcotest Instruments calibrated by Sergeant Dennis.

The thoroughness of the discovery provided by the State, and the diligent efforts of *Amici* counsel have assisted this court in being satisfied that almost all of those individuals who have been requested to provide breath samples on a Dennis-calibrated Alcotest Instrument have been identified, with the elimination of 436 breath-sample attempts, and the inclusion an additional 29 breath-sample requests. There are certain exceptions to the inclusiveness of that conclusion, due to human error. Arresting Officers and Alcotest Operators are required to manually enter informational data into certain fields when both conducting an arrest and in attempting to administer a breath test. Information reflected in police reports and in Alcohol Information Reports (AIRs) and other breath-test informational reports is only accurate to the extent it is accurate when manually entered. The evidence and testimony clearly reveals some instances where that information has been inaccurately entered, such as the date of the arrest, the driver's license number of the individual, the identifying information of the Operator of the Alcotest Instrument, the spelling of the individual's name, and other identification information, and thereby, the resulting data information contained in the Alcotest Information System database will also be inaccurate. There were, for example, numerous instances

355

where the date of arrest in a Subject Row was listed as occurring prior to the date of the listed calibration date of the Instrument on which the test was performed. See Exhibits S-171A and S-171B.

An additional reason for the potential omission of an individual requested to provide breath samples on an Alcotest Instrument calibrated by Sergeant Dennis in the database is the prior method of downloading all solution change, calibration, breath-testing and identification information onto the Alcotest Information System database. Presently, and since in or about 2011, informational data of breath-test attempts, and results, including subject identification information, has been downloaded periodically into the database directly, and automatically, through a dedicated telephonic modem connecting every Alcotest Instrument in New Jersey to the database located in West Trenton, New Jersey, maintained by the State Police. Prior to that, Operators and Coordinators were required to periodically download that information onto two compact discs, one being retained by the agency location of the Alcotest Instrument, and the other being transported to the New Jersey State Police and manually downloaded onto the database. The testimony and evidence disclosed one instance, that of ███████████████ where a Municipal Court Case Search conducted by the Office of the Public Defender, see Exhibit DPD-2(D), disclosed ████████ was arrested on December 27, 2008, and charged by

356

a State Trooper with DWI on the New Jersey Turnpike in Woodbridge Township. ████████ was convicted of DWI on April 22, 2009, based on his plea of guilty. However, a search of Exhibit S-152, the Excel Spreadsheet containing 236,664 subject records of all individuals who were requested to provide breath samples on all Alcotest Instruments in New Jersey between November 5, 2008 and June 30, 2016, discloses there is no record of ████████ having been requested to provide breath samples. Additionally, ████████ does not appear on Exhibit S-90 (also Exhibit S-148), or on Exhibit S-150 (Also Exhibit DB-19), the Excel Spreadsheet prepared by Mr. Gronikowski, at the request of SFC Alcott, containing 362 Subject Rows of those individuals who were requested to provide breath samples on all Alcotest Instruments in New Jersey from December 26, 2008 through December 28, 2008, in an effort to located a breath-testing on ████████. SFC Alcott, in his testimony, posed the possibility the omission of ████████ testing from the database was the result of human error due to the prior, compact-disc method of downloading information onto the database, where the information on a particular compact may not have been downloaded onto the database. See T9, page 70, line 17 to page 71, line 5.

    2.    <u>The Classification Of Those Defendants Entitled To Notification Of The Court's Decision In Cassidy Is Limited To Those Who Were</u>

<u>Requested To Provide Breath Samples On An Alcotest Instrument Calibrated</u>

<u>By Sergeant Dennis That Resulted In The Reporting Of An Evidential Blood-</u>

<u>Alcohol Content (BAC) Reading</u>.  As has been fully considered and discussed

in this Report, this court concludes there has been no expert or scientific

evidence presented, establishing that an Alcotest Instrument calibrated without

the use of a NIST-traceable thermometer would be unable to properly report an

Error Message, preventing the Instrument from analyzing breath samples and

providing an evidential BAC reading that could have been utilized in the

prosecution of the DWI offense, or which could have been utilized to affect a

defendant's decision to enter a guilty plea to that offense or another lesser-

included,  This court recognizes that an AIR reporting a conclusion that the

"Subject Refused" to comply with the Implied Consent Statute may be

admissible.  That conclusion can be based on an actual refusal of an individual,

when requested, to submit breath samples, which is recorded by the Operator

or Arresting Officer conducting test and, ultimately, that fact is downloaded

onto the Alcotest Inquiry System database as, in those situations, the

Instrument is prepared and ready to receive breath samples and the subject

directly refuses to provide breath samples.  A "refusal" conclusion can also be

determined when the Operator or Arresting Officer concludes the Subject is

refusing to provide the required, sufficient breath samples.  Again, in those

358

circumstances, there has been no expert or scientific evidence or testimony presented establishing that the sensors in the firmware of an Alcotest Instrument are rendered ineffective or inoperable in being able to automatically report whether insufficient breath samples have been provided on an Instrument calibrated without the use of a NIST-traceable thermometer.

3.     The State Did Not Fully Provide the Ordered Notification To All Defendants Affected Defendants Of The Court's Decision In Cassidy.  The evidence and testimony is clear, as discussed fully in this Report, there were some affected defendants who were not provided direct notification because they were not "identified" as having been requested to provide breath samples on Alcotest Instrument calibrated by Sergeant Dennis and, thereby, were not mailed notification letters concerning the malfeasance of Sergeant Dennis or the Court's decision in Cassidy.  The evidence and testimony is also clear there were many individuals, identified in Exhibit S-91 as having provided breath samples on Alcotest Instrument calibrated by Sergeant Dennis resulting in an evidential BAC reading, where the AOC was unable to search for, or locate, a mailing address for those individuals, resulting in that subject not being mailed any of the three notification letters undertaken by the State.  Lastly, the evidence and testimony is clear that thousands of those mailed notification letters were returned by the Postal Authorities as being undeliverable and,

359

other than remailing some of those notification letters to forwarding addresses provided by the Postal Authorities, there were no additional efforts undertaken by the State to secure updated addresses for those undeliverable letters. Moreover, some the addresses that were secured by the AOC were the addresses of individuals on file as of the date of their arrests, between 2008 and 2016, no doubt accounting for the large number of undeliverable notification letter, as this court takes judicial notice that some people do periodically move from one address location to another for many reasons. See Exhibit S-31, page 14.

The evidence and testimony also disclosed, beyond the mailing of three notification letters, there have been attempts to notify Cassidy-affected defendants in the form of notifications of the misfeasance of Sergeant Dennis, and that the Cassidy decision, were placed by the State on the websites of various County Prosecutors, and on the website of the Attorney General. The Judiciary has also placed that information on its website, creating a specific Cassidy website that still exists, and there have been Notices to the Bar and Public concerning the misfeasance of Sergeant Dennis and the Cassidy decision issued and published by the Judiciary. These efforts are in the nature of "constructive notification."

360

Despite these recognized notification deficiencies discussed herein, there has been no evidence or testimony offered or presented that would provide this court with an acceptable manner of determining reliable, updated addresses for: (1) all those individuals who were not identified as being affected by the Cassidy decision;[42] (2) for all those who have been previously identified as being Cassidy-affected, but the AOC was unable to search for, or find, addresses; and (3) for those individuals whose address was identified, were mailed notification letters, and those letters were returned as being undeliverable.

There has been no additional "public repository" of address information identified that, if accessed, would provide assurance that addresses, or updated addresses, for all individuals identified as being affected by the Court's decision in Cassidy can be secured in order to mail additional notification letters. Although this court has previously identified the repository maintained by the New Jersey Motor Vehicle Commission as a potential source for more updated address information, the Motor Vehicle Commission is not a party to

---

[42] As has been noted, the names and identifying information of those individuals identified as being Cassidy-affected during the plenary hearing, but having not been included in Exhibits, S-90, S-148 or S-91, were sent by the State to the AOC, which did secure a subject-to-address for some of them, and the State has agreed to mail the post-Cassidy decision form letter to them. That should be accomplished, even though the addresses secured were as of the date of arrest, as any attempted notice is better than none.

this litigation and, even if impleaded for address-search purposes, there is no assurance that addresses for <u>all</u> <u>Cassidy</u>-affected individuals could be obtained, given the lack of driver's license numbers for many individuals in the various Spreadsheets placed into evidence, as well as some affected individuals being out-of-state, or no longer holding a driver's license.  Notwithstanding, those limitations, the Court may consider and determine that approach should be undertaken.

This court also takes judicial notice there are multiple private, "people-find" and "background" websites, such as "Spokeo," www.spokeo.com, "truthfinder, www.truthfinder.com, "Been Verified," www.beenverified.com, "Intelius," www.intelius.com, "PeopleLooker," www.peoplelooker.com, "peopleWhiz," www.peoplewiz.com,  "peoplefinders," and many others. However, they are private, fee-generating websites, or companies, and there is no assurance, and certainly no evidence, they would be able to secure current addresses for those not previously sent notification letters or those whose mailed notification letters were returned as being undeliverable, and the fiscal and administrative burdens clearly outweigh and potential benefit from their access and use.

4.     <u>There Are Solutions Available That Should Be Implemented To Better Assure The Proper Identification Of Those Individuals Who Have</u>

362

Provided Breath Samples on Alcotest Instrument Calibrated by Sergeant Dennis And To Provide Those Individuals With Additional Notification.

This court has carefully considered the various suggestions and remedies to both the identification and notification issues presented by counsel. What is particularly concerning, as in the Zingis matter, is the circumstance where a prior DWI conviction, that occurred as a result of breath testing between November 2008 and April 2016, is sought to be utilized in sentencing a defendant, convicted of a subsequent DWI offense, to an enhanced sentence under either N.J.S.A. 39:4-50(a)(2) or 39:4-50(b)(3), which includes, inter alia, a period of imprisonment. The issue, of course, is whether that prior conviction is potentially affected by the Court's decision in Cassidy, i.e., was there an evidential BAC reading in that case, obtained on an Alcotest Instrument that was calibrated by Sergeant Dennis. Of significant importance is whether any such DWI conviction, involved an evidential BAC reading obtained on a Dennis-calibrated Alcotest Instrument, even when it is not being utilized by the State in seeking enhanced-penalty sentencing on a subsequent DWI conviction. Even a first DWI conviction has consequences, regardless of whether a subsequent DWI conviction is entered.

Even though it appears all, or almost all, Cassidy-affected individuals have been now identified, but many have not received direct mailing

363

notification of the misfeasance of Sergeant Dennis and the Court's decision in

Cassidy, this court finds there are certain measures that can be taken, designed

to serve the interests of justice, as follows:

A.      The use of the proposed "Dennis Calibration Repository,"

contained in Exhibit DB/DPD-28, when used in conjunction with Exhibit S-

152, is the best available method of determining whether an individual was

requested to provide breath samples on an Alcotest Instrument calibrated by

Sergeant Dennis and an evidential BAC reading was obtained.  Joint Exhibit

DB/DPD-28 contains a listing, in chronological order, the calibration

documents of all Alcotest Instruments calibrated by Sergeant Dennis, which

was compiled from the discovery documents produced by the State.  To the

extent the State objects because it was compiled by the efforts of *amici*

counsel, that can be remedied by a full review of that exhibit to assure such is

the case and, if so, the State can develop its own "mirrored" file containing all

calibration documents performed by Sergeant Dennis.  That compiled PDF file

can be maintained by the Attorney General's Office, placed on its website or,

perhaps additionally, be provided to each Municipal Court, County

Prosecutor's Office, and each Superior Court.  It contains no personal

identification information, and can provide virtually instantaneous information

as to whether a particular Alcotest Instrument, at a particular location, was calibrated by Sergeant Dennis, on a particular date.

Exhibit S-152 contains all subject records contained in the Alcotest Information System database, listing 236,664 instances where an individual was requested to provide breath samples on an Alcotest Instrument in the State of New Jersey from November 1, 2008, through June 30, 2016, which fully includes the period of time, and more than six months after, when Sergeant Dennis was calibrating Alcotest Instruments. That document does contain personal identification of those subjects, and its availability should be the subject of a protective order as determined by the Court, which can also determine the scope of its availability. It is a record that should be maintained by the Office of the Attorney General, with access thereto by all Municipal Courts and the Superior Court, with information therefrom provided to defendants and counsel during discovery.

The instant case of State v. Thomas Zingis is a good example of how those documents can be utilized in conclusively determining whether a prior DWI conviction involved an evidential BAC reading from an Alcotest Instrument calibrated by Sergeant Dennis. First, conducting a search of the Excel Spreadsheet in Exhibit S-152 discloses, on Row 75536, that Thomas Zingis was arrested on January 13, 2012 (Column A), in the Borough of

Collingswood (Column S), in Camden County, and charged with DWI. The information on that Row further reveals that, on that date, Mr. Zingis provided breath samples on Alcotest Instrument ARUM-0042 (Column B), located at the Collingswood Police Station (Column D), calibrated on October 13, 2011 (Column C), which resulted in an evidential BAC reading of 0.178 (Column U). Turning to Joint Exhibit DB/DPD, a review of same discloses that Alcotest Instrument ARUM-0042 is not an Instrument that was calibrated by Sergeant Dennis. Accordingly, the inescapable conclusion is Mr. Zingis not an individual affected by the Court's decision in Cassidy. Had this information been provided to the defendant and counsel in discovery, and made available to the Municipal Court Judge, the issue of whether the prior, 2012 DWI conviction could be utilized in sentencing on January 8, 2020 would have been properly resolved.

B. In order to assure that a defendant, convicted of DWI anywhere in this State, either in a Municipal Court or in the Superior Court, linked to an indictable charge, faces circumstances where a prior DWI conviction is sought by the State as the basis for imposition of an enhanced sentence, prior to sentencing, the State should be required to provide discovery to the defendant and counsel, and information to the court, the results of a search of Exhibit S-152 (access to which should be provided to defendant and counsel under a

366

protective order), and the correlating information contained in Exhibit DB/DPD-28, as reviewed, modified and adopted by the State, which should be provided to defendant and counsel in discovery.  There should be no sentencing of a defendant where the State seeks imposition of an enhanced sentence until that process has been completed.

This court is aware that in some very limited circumstances, such as revealed in the ██████████████ matter, where there is no record in the database of an attempt to obtain breath samples from a defendant, there may, or may not be, discovery available to assist the court in determining whether or not an enhanced sentence should be imposed, but the burden remains on the State to establish, beyond a reasonable doubt, that the enhanced sentence is warranted.

C.  In circumstances where a defendant files an application seeking post-conviction relief based on the Court's ruling in Cassidy, contending he or she was tested on an Alcotest Instrument calibrated by Sergeant Dennis that produced an evidential BAC reading, the defendant should be provided discovery access to Exhibit S-152 under a protective order, and access to Exhibit DB/DPD-28 (as reviewed, modified and adopted by the State), as well as other available discovery relating to the DWI charge and conviction.  That

information will provide the court considering the application for post-conviction relief with information on which to base its decision.

D.    With respect to additional notification to those individuals identified as providing breath samples on Alcotest Instruments calibrated by Sergeant Dennis that resulted in an evidential BAC reading, this court finds the suggestions by State as being most persuasive.

First, there has been no evidence of testimony presented identifying a database or repository, governmental, public or otherwise, that cold be accessed and searched that would provide a guarantees or assurances that updated addresses could be obtained to facilitate yet another mailing of notification letters. This court is satisfied the State has exercised reasonable diligence, given the available resources, in attempting to secure addresses for those individuals identified as having been requested to provide breath samples on an Alcotest Instrument calibrated by Sergeant Dennis, where an evidential BAC reading was obtained.

The only other notable possibility would be to implead the Motor Vehicle Commission and consider directing it to conduct a search for current addresses in its database for all identified Cassidy-affected defendants. As has been discussed, there has been no testimony or evidence that this approach is viable, or even possible.

Certainly, the State has expressed a willingness to mail the second, post-Cassidy notification letter to the addresses secured by the AOC for some of those potentially-affected defendants who had been omitted from Exhibit S-90 (also Exhibit S-148), and consequently omitted from both Exhibits S-91 and S-83. See Exhibit S-170(F). That should be accomplished.

As noted, it is recommended that the State conduct a review of Joint Exhibit BD/DPD-28 to assure it contains all calibration documents on Alcotest Instruments calibrated by Sergeant Dennis and create a mirror PDF list, modified of not, depending on the results of that review. It is recommended that State-created PDF file be made publicly available on the websites of the Attorney General, the NJSP, and the AOC, following issuance and publication of an explanatory press release and Notice to the Bar and Public.

It is recommended that the Court require the State to make the Excel Spreadsheet contained in Exhibit S-152 available, through a Protective Order that ensures confidentiality of private, identification information, for access by Municipal Courts, Superior Courts, Prosecutors, Public Defenders, Defense Counsel and unrepresented Cassidy-affected defendants when either post-conviction relief or enhanced sentencing is sought. Upon a defendant being identified as an individual potentially affected by the Court's decision in Cassidy this will allow access to the calibration information contained in Joint

369

Exhibit DB/DPD-28, as modified and adopted by the State, that will determine whether the identified Alcotest Instrument was calibrated by Sergeant Dennis.

As noted, this court additionally recommends that the press release suggested by the State be issued by the Attorney General's Office, with similar press releases issued by each County Prosecutor's Office, and Notice to the Bar and Public be issued by the Court, all of which should be placed on their respective websites.

This court finds these recommendations, given the limitations discussed and available resources, will be the best methods of further identifying individuals potentially affected by the Cassidy decision.

Finally, this court is thankful to all counsel for their assistance, dedication, and suggestions throughout these proceedings.

## APPENDIX II – EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| S-1 | Emails dated 10-09-15 between SFC Snyder and Sergeant Dennis concerning calibrations; and Email dated 12-01-15, from Lieutenant Roberto Tormo to Captain Brendan McIntyre, Bureau Chief, and Matteo Russo, Re: Marc Dennis, attaching an Interoffice Communication dated 12-1-15 from Lieutenant Tormo to Major D. Acevedo, Commanding Officer, Special Investigations Section, copy to Captain McIntyre, advising that SGT Dennis did not properly conduct re-calibrations on certain Alcotest Instruments. |

370

| | |
|---|---|
| S-2 | Email, dated 9-22-16, from DAG Robyn Mitchell to representatives of County Prosecutors' Offices concerning conference call that day confirming Director of Criminal Justice Honig's request a Special master be assigned to handle all cases arising from the allegations against Sgt Dennis with recommendations, and follow-up emails relating to notification concerning defendants incarcerated relating to convictions based on BAC readings from Alcotest Instruments calibrated by Sergeant Dennis. |
| S-3 | 8-10-17 Email from Steven Somogyi to Assistant AG Robert Czepiel, copy to Steven Bonville, Jennifer Perez, Tina LaLena, DAG Robyn Mitchell, attaching Excel spreadsheet containing the defendant address information sought pursuant to 7-13-17 Case Management Order of Special Master, Judge Joseph Lisa. |
| S-4 | 11-30-18 Email concerning draft of notification letter |
| S-6 | Email Chain dated 1-13-23 concerning notification letters. |
| S-7 | 11-5-08 letter from AG Anne Milgram to Col. Joseph R. Fuentes, Superintendent of the NJ State Police, approving Trooper II Marc W. Dennis #5925 as a duly certified Breath Test Coordinator/Instructor, effective immediately, attaching a copy of his certification card dated 11-5-2008 |
| S-8 | Emails in December 2018 concerning second form notification letters to be mailed by County Prosecutors' Offices, DAG Mitchel asked, "Please keep any of the letters that might be returned to you so that we can show we did attempt to notify these individuals, should the issue arise." |
| S-10 | Email, dated 12-21-18, from Monmouth Country Assistant Prosecutor Monica Do Outeiro to DAG Robyn Mitchell advising her that the Cassidy notification letter went out to all affected Monmouth County defendants yesterday, noting over a thousand letters were returned as undeliverable for various reasons, and were saved, and her Office will be posting notification on its website and social media accounts. |
| S-11 | Emails in December 2018 and January 2019, between DAG Mitchell and Steven Somogyi, concerning Excel Spreadsheets of addresses of potentially-affected defendants |

371

| S-13 | Emails dated 1-7-19, between Annmarie Taggart, Assistant Attorney General, Counsel to the Director of DCJ, and Robyn Mitchell, concerning the <u>Cassidy</u> website. |
|------|------|
| S-14 | Emails in January 2019, between DAG Robyn Mitchell and Holly Lees, AG Senior Management Assistant, concerning notification letters following the Court's decision in <u>Cassidy</u>. |
| S-15 | Emails in February 2019, between DAG Mitchell and SFC Thomas Snyder concerning Excel Spreadsheet of all Solution Changes. |
| S-17 | Emails concerning mailing of second notification letter. |
| S-18 | Emails between DAG Mitchell, SDAG Czepiel, and Steven Somogyi in July and August 2017 concerning obtaining addresses for the defendants identified as having been requested to provide breath samples on Alcotest Instruments calibrated by Sergeant Dennis, as contained in the Exhibit S-91 Excel Spreadsheet. |
| S-20 | This is a copy of the State's Motion in <u>State v. Cassidy</u>, dated July 27, 2017, requesting the Supreme Court to issue a Directive requiring the State to provide notice to the 20,667 individuals referenced in the State's Motion to appoint a Special Master in <u>State v. Cassidy</u>. |
| S-21 | This is a copy of the Amicus New Jersey State Bar Association's response to the State's motion for appointment of a Special Master, dated August 4, 2017. |
| S-24 | 9-26-17 and 9-27-17, emails from DAG Robyn Mitchell to the Ocean County Prosecutor's Office, the Somerset County Prosecutor's Office, and the Monmouth County Prosecutor's Office, attaching Excel Spreadsheets containing the names and addresses of individuals, in those counties, who provided breath samples on Alcotest instruments calibrated by Sergeant Marc Dennis between 2008 and 2016, asking each Office to send the "Sgt. Dennis notice letter" sent to them on 9-26-17, mailing same by not later than 12-15-17 and to keep any of the letters that might be returned as undeliverable. |
| S-25 | Letter from Mr. Czepiel to Sharon A. Balsamo, Esq, General Counsel for the State Bar dated 9-6-17 (advising that the County Prosecutors Offices will provide individual notice to the more than 18,000 individuals whose last-known addresses, as found by the ATS system, provided by the |

| | AOC before 12-15-17 and with regard to those individuals whose addresses were not identified by the AOC through ATS, the State will continue to work with the AOC to find their last known address, and enclosing a copy of the notices to be sent) and dated 9-25-17 (stating he was aware of the State bar's objection to the letter but would be sending the version of the letter sent in the 9-6-17 correspondence). |
|---|---|
| S-26 | This contains several pages of a chart submitted by the State of the municipalities and counties in which Sergeant Marc Dennis performed solution changes on Alcotest instruments. |
| S-27 | This is a certification of DAG Robyn B. Mitchell dated 9-16-22 setting forth the procedure utilized to determine the identity of defendants potentially-affected by the Court's decision in State v. Cassidy; discussing the Alcotest Inquiry System; setting forth the notices sent to identified potentially-affected defendants; and development of the Excel spreadsheet of Solution Changes between 11-1-08 and 1-9-16 from every evidential Alcotest in New Jersey; and contains exhibits setting forth the calibration records of Sergeant Marc Dennis in Middlesex, Monmouth, Ocean, Somerset, Union, Burlington, Cape May, and Mercer Counties. |
| S-28 | Contains handwritten notes of Robyn Mitchell of her telephone conversation with Thomas Snyder and Salvatore DeGirolamo of the State Police, dated 2-8-19, concerning Solution Changes between November 2008 and December 2015 and seven pages of Solution Change records "Updated on 10-31-18" |
| S-30 | This exhibit is noted by the State to contain a DAG Mitchell Mark-up of Mr. Gronikowski's list and of towns and counties |
| S-31 | Initial Report of Special Master Robert A. Fall, J.A.D. in State v. Cassidy dated June 21, 2019. |
| S-32 | (1) Letter from Elie Honig, Director of the AG Division of Criminal Justice to Judge Grant, Administrative Director of the Courts, dated September 19, 2016, requesting the appointment of a Special Master as a result of criminal charges being filed against Sergeant Marc Dennis; (2) Letter from Robyn Mitchell to Robert A. Fall, J.A.D. Special Master appointed following the Court's decision in State v. |

| | |
|---|---|
| | Cassidy, dated September 16, 2022, addressing the August 31, 2022 Case Management Order issued, sending the court and counsel of record (a) a copy of the 9-19-16 letter; (b) the county-by-county listing of the 20,677 individuals referenced in the State's letter to Judge Grant dated 9-19-16;(c) a spreadsheet of the 20,677 potentially-affected defendants; and Robyn Mitchell's 9-16-22 certification. |
| S-33 | Copy of the Order entered by Judge Fall on January 19, 2023, analyzing the records required to be supplied by the State for in camera inspection in the court's December 27, 2022 Order relating to personnel records of Sergeant Marc Dennis. |
| S-34 | This is designated by the State as a New Jersey State Police Alcotest Calibrating unit new standard solution report dated 10-6-15 from Asbury Park signed by Sergeant Dennis. |
| S-36 | This contains a receipt dated 2-14-19 by Robyn Mitchell, received from The New Jersey State Police, of a CD-R containing Excel Spreadsheet with Data Downloads and Solution Change Reports from the Alcotest Inquiry System entitled, "20190124 containing certified test records 11-1-08 through 1-9-16," and one thumb drive containing Excel Spreadsheets with Data Downloads and Solution Change Reports from that same Alcotest Inquiry System. This exhibit also contains a copy of an email from Thomas Snyder of the State Police to Robyn Mitchel dated 1-18-19 concerning fulfillment of the request for those documents – this exhibit also includes another copy of a portion of the handwritten notes set forth in Exhibit 28. |
| S-40 | Several letters of inquiry in October and November 2017 to Monmouth County Prosecutor's Office from attorneys representing defendants receiving first notification letters or otherwise aware of the Alcotest/Sergeant Dennis matter, and replies by that Office. |
| S-41 | Certification of Donna Prestia, Chief Clerk of Ocean County Prosecutor's Office, dated 1-5-23, with exhibits, stating the first notification letter was mailed to 310 potentially-affected defendants on 10-2-17 to those addresses on an Excel Spreadsheet provided by the AG's Office, with approximately 73 letters being returned, of which 17 had forwarding addresses, which were then re-mailed. The |

374

| | |
|---|---|
| | certification states that on 12-19-18 326 second-notification letters were mailed to potentially-affected defendants, using the same Excel Spreadsheet, noting that the discrepancy between 310 and 326 is that "there may have been duplicate letters that were mailed as several defendants had more than one DWI during the Cassidy timeframe." Of those mailed, 82 were returned as undeliverable, 13 of which had forwarding addresses, and new letters were sent to them between 1-4-19 and 1-9-19. |
| S-42 | List of municipalities and counties where Sergeant Marc Dennis calibrated Alcotest instruments. |
| S-43 | Email dated 12-28-22, between William Gronikowski of the IT Bureau of NJ State Police and SFC Kevin Alcott concerning Solution Change Records for all Alcotest Instruments from 12/1/2005 to 12/31/2017, Mr. Gronikowsi stating his expanded the search by a month on each side of the requested date range, resulting in creation of an Excel Spreadsheet with two sheets, the first containing 65,000 Solution Changes, the other about 44,000 Solution Changes, which became Exhibit S-116. |
| S-44 | Certification of Monica do Outeiro, Assistant Prosecutor Monmouth County, dated 1-17-23, with 6 exhibits thereto, outlining the procedure taken by that office in mailing the notification letters. |
| S-45 | Set forth as "Discovery Burning Summary" provided as "Computer Code for Search Spreadsheet of all Alcotest test 2008 through 2015. |
| S-47 | These are copies of letters, dated January 23, 2023, from the Middlesex County Prosecutor's Office to addressees. The "Discovery Burning Summary" states these are "Middlesex County First Notice Letter" and a review of the content clearly indicates they would have been letter sent in 2017, HOWEVER, the "DATE" listed on each letter is clearly in ERROR. |
| S-49 | Email and letter from DAG Thomas Clark to Judge Fall concerning extension of discovery time period. |
| S-50 | January 17, 2023 Order of Judge Fall on application for reconsideration of discovery ordered and scheduling. |
| S-51 | January 17, 2023 Letter Opinion of Judge Fall. |

375

| | |
|---|---|
| S-52 | (1) Email 10-21-22 from DAG Clark to Judge Fall, enclosing letters concerning discovery requests of Thomas Zingis and on applications of NJ State Bar and Public Defender for Amicus admission; (2) Email 12-6-22 from Judge Fall to all counsel of record sending 10-21-22 email from DAG Clark to all counsel; (3) Email 12-6-22 from Jeffrey Evan Gold, Esq. to Judge Fall, advising of his representation on behalf of the NJ State Bar; and (4) Email 11-6-22 from Judge Fall to Jeffrey Gold, Esq., and all counsel and court staff regarding Mr. Gold's appearance via Zoom. |
| S-53 | Email 12-27-22, from Judge Fall to all counsel and Mr. Somogyi attaching December 27, 2022 Order for Discovery and Case Management Conference and Plenary Hearing Scheduling; (2) 1-17-23 email from Susanna J. Morris, Esq., AOC Counsel, concerning provision of information from Mr. Somogyi set forth in the 12-27-22 Order, with copy of that Order attached. |
| S-54 | Alcotest Records with Matching Tickets in ATS for all municipalities and counties, prepared by AOC. |
| S-55 | Matching addresses provided by the AOC with a copy of July 14, 2021 notification letter from Judge Fall outlining State v. Cassidy decision, creating of and access to Cassidy/Alcotest website with form to be completed and filed seeking post-conviction relief, and right and procedure to seek counsel representation through Public Defender. |
| S-57 | Certification of Barbara Nolasco, Administrative Supervisor 3 with the State of New Jersey Judiciary, dated 1-23-23, proof of mailing of July 14, 2021 notification letter. |
| S-58 | Email 1-17-23 Judge Fall to all counsel of record sending, January 17, 2023 Opinion. |
| S-59 | August 31, 2022 Case Management Order issued by Judge Fall. |
| S-61 | December 5, 2022 Order granting applications to appear as Amicus Curiae to NJ State bar and Office of the Public Defender, Scheduling a Case Management Conference, and Argument on Discovery Applications. |
| S-63 | 1-19-23 Email from Judge Fall to all counsel sending January 19, 2023 Letter Opinion and Order on Documents Submitted by the State for In-Camera Inspection. |

376

| | |
|---|---|
| S-64 | Letter from DAG Thomas Clark, Esq., to Judge Fall dated January 9, 2023 concerning the State's position on the additional discovery request. |
| S-66 | January 17, 2023 transmittal letter from DAG Clark to Judge Fall, copies to counsel of record, sending "Personnel Records" of Sergeant Marc Dennis. |
| S-67 | Emails and letter from DAG Thomas Clark, Esq., dated 1-12-23, to Judge Fall and counsel of record concerning request of submission of "Personnel Records" of Sergeant Marc Dennis for in camera review and Judge Fall's response concerning same. |
| S-68 | Email and State's Motion for In-Camera Review of "Personnel Records" of Sergeant Marc Dennis dated 1-12-23. |
| S-69 | Email and letter from Jeffrey Evan Gold, Esq. dated 1-16-23 in opposition to State's Motion for In Camera review. |
| S-71 | Email and January 3, 2023 Letter Brief from DAG Thomas Clark, Esq. to Judge Fall, copies of all counsel concerning motion for reconsideration of December 27, 2022 Oder for Discovery. |
| S-73 | January 25, 2023 Certification of Michele C. Buckley, Assistant Union County Prosecutor, setting forth procedure for mailing of first and second Notification Letters to potentially-affected defendants (See Exhibit 134 Amending this Certification) |
| S-74 | Email 1-19-23 from William Gronikowski, IT Bureau of NJ State Police to DAG Thomas Clark, Esq., stating "Attached is an email chain from SFC Alcott [dated 12-28-22], this email contained a spread sheet that was previously supplied to him. I used that information to find the query that produced it. That query was stored on out network drive that Bill Donahue kept other AlcoTest documentation. I then updated the query with the new date range that was requested." – The referenced spreadsheet is attached to that email. |
| S-76A | Excel Spreadsheet entitled "Defendants who received notice letter from DCJ," from other counties: Total Matches 112, Partial Matches 5: Burlington County – 1 full match; Essex County – 70 full matches, 3 partial matches; Hudson County |

377

| | |
|---|---|
| | – 1 full match; Hunterdon County – 1 full match; Mercer County – 39 full matches, 2 partial matches |
| S-78 | 1-18-19 Email from Thomas Snyder of the NJ State Police to DAG Robyn Mitchell, copy to Salvatore Degirolamo and Joseph Dellanoce concerning "Solution Changes From Centralized Database", and an Excel Spreadsheet of all the solution changes in the database for the dates requested. |
| S-80 | Email Chain: (1) 12-14-18 Robyn Mitchell to all county prosecutors sending Excel spreadsheet of names and addresses of all potentially-affected defendants; (2) 12-14-18 email from Robyn Mitchell to Holly Lees sending the email she sent to the county prosecutors and additionally stating "there were a couple of hundred 'Sgt. Dennis notice letters' that we mailed because they were defendants who weren't arrested in one of the affected counties but who gave breath samples on a Dennis-affected instrument. I will talk to you on Monday about getting the letters signed by Rob [Czepiel] and getting them out." (3) 1-15-19 from Holly Lees to Robyn Mitchell, "I just realized that I forgot to send this to you. I'm sorry. Here is the Excel spreadsheet that we used last time to mail our notice letters." Contains copies of notice letters sent on 12-4-18 and on 1-24-19. Also contains spreadsheets for all municipalities in counties identified as having potentially-affected defendants. |
| S-81A | This contains (A): a copy of the 9-19-16 letter sent to Judge Grant, Administrative Director of the Courts from Elie Honig, Director of the Division of Criminal Justice following the filing of criminal charges against Sergeant Marc Dennis and stating the State "has identified 20,677 individuals who provided evidential breath samples on those instruments. The attached thumb drive contains a county-by-county listing of these cases." The letter also requests the Supreme Court issue a Notice to the Bar and appoint a Special Master. This exhibit also contains Excel Spreadsheets for each municipality and testing station in Middlesex, Monmouth, Ocean and Union Counties |
| S-81B | Excel Spreadsheet entitled "Middlesex_IndivDefts wo refusals and error messages", containing 4,963 Subject Rows of defendants and 21 Columns. |

| | |
|---|---|
| S-81C | Excel Spreadsheet entitled "Monmouth_IndivDefts wo refusals and error messages" containing 9,402 Subject Rows of Defendants and 21 Columns. |
| S-81D | Excel Spreadsheet entitled "Ocean_IndivDefs wo refusals and error messages" containing 289 Subject Rows of Defendants and 21 Columns. |
| S-81E | Excel Spreadsheet entitled "Somerset_InvidualDefts wo refusals and error messages" containing 1,207 Subject Rows of Defendants and 21 Columns. |
| S-81F | Excel Spreadsheet entitled "Union_IndividualDefts wo refusals and error messages containing 4,806 Subject Rows of Defendants and 21 Columns. |
| S-82A | This exhibit is another copy of the 12-14-18 email from Robyn Mitchell to Holly Lees, with attachments, and also contains a copy of the 12-4-17 and 1-24-19 Notification Letters sent by the Office of Attorney General to potentially-affected defendants from Cassidy decision. |
| S-82B | Excel Spreadsheet entitled "Defendants who received notice letter from DCJ" in Counties other than the five primary Counties, containing Six (6) Sheets: Sheet One - Total Full Address Matches, 113 Subject defendants; Partial Address Matches, 5 Subject defendants; Sheet 2 – Burlington County – 1 Full Address Match; Sheet 3 – Essex County – 69 Full Address Matches; 3 Partial Address Matches; Sheet 4 – Hudson County – 1 Full Address Match; Sheet 5 – Hunterdon County – 1 Full Address Match; Sheet 6 – Mercer County – 38 Full Address Matches; 1 Partial Address Match |
| S-83 | Excel Spreadsheet, entitled "Spreadsheet from AOC All Addresses ATS Defendant Matches-full matches and partial matches to AG" prepared by the AOC of all addresses for potentially-affected defendants in the following Counties: Middlesex, 5,012 exact subject address matches and 215 partial subject address matches, total of 336 Excel pages; Monmouth, 7,479 exact subject address matches and 432 partial subject address matches, total of 510 Excel pages; Ocean, 299 exact subject address matches and 27 partial subject address matches, total of 24 Excel pages; Somerset, 877 exact subject address matches and 52 partial subject address matches, total of 63 Excel pages; and Union, 4,464 |

379

| | |
|---|---|
| | exact subject address matches and 216 partial subject address matches, total of 300 Excel pages. |
| S-84 | Excel Spreadsheet entitled "Spreadsheet from AOC_Middlesex County Only" from the AOC containing identified addresses for potentially-affected defendants in Middlesex County municipalities, Sheet 1 containing 5,012 exact address matches (321 Pages), and Sheet 2 containing 215 partial address matches (15 Pages) for a total of 5,227 address matches |
| S-85 | Excel spreadsheet entitled "Spreadsheet from AOC_Monmouth County Only" from the AOC containing identified addresses for potentially-affected defendants in Monmouth County municipalities, Sheet 1 containing 7,479 exact address matches (480 Pages), and Sheet 2 containing 432 partial address matches (30 pages) for a total of 7,911 address matches |
| S-86 | Excel spreadsheet entitled "Spreadsheet from AOC_Ocean County Only" from the AOC containing addresses for potentially-affected defendants in Ocean County municipalities, Sheet 1 containing 299 exact address matches (21 pages) and Sheet 2 containing 28 partial address matches (3 pages) for a total of 327 address matches |
| S-87 | Excel spreadsheet entitled "Spreadsheet from AOC_Somerset County Only" from the AOC containing addresses for potentially-affected defendants in Somerset County municipalities, Sheet 1 containing 877 exact address matches (57 Pages) and sheet 2 containing 52 partial address matches (6 Pages) for a total of 929 address matches |
| S-88 | Excel spreadsheet entitled "Spreadsheet from AOC_Union County Only" from the AOC containing addresses for potentially-affected defendants in Union County municipalities, Sheet 1 containing 4,464 exact address matches (285 Pages) and Sheet 2 containing 216 partial address matches (15 Pages) for a total of 4,680 address matches |
| S-89 | Excel spreadsheet of municipalities in Burlington, Cape May, Mercer, Middlesex, Monmouth, Ocean, Somerset and Union Counties where Sergeant Marc Dennis calibrated Alcotest instruments. |

| | |
|---|---|
| S-90 | Excel spreadsheet entitled "Spreadsheet Received from NJSP_27,833 subject records," received from the New Jersey State Police by the Division of Criminal Justice in the Attorney General's Office, containing 27,833 names of potentially-affected defendants. |
| S-91 | Excel spreadsheet entitled Spreadsheet all Counties_wo refusals and error msgs_20,667" of all defendants without breath-sample refusals consisting of 20,666 defendants. |
| S-92 | Excel spreadsheet entitled, "Spreadsheet_All SolutionChanges_11-1-08 thru 01-9-16" of all Solution Changes and calibrations statewide on Alcotest instruments made from 11-1-08 to 1-9-16, containing 68,449 rows for each solution change occurring in all Alcotest Instruments in New Jersey during that period, with 130 Columns (Fields of Information, Columns "AS through AV" indicating the identity of the Operator performing each solution change. |
| S-94 | Email from Carmen Acevedo of the Division of Criminal Justice to representatives of all County Prosecutors' Offices in New Jersey attaching a Memorandum from Supervising DAG Robert Czepiel dated 12-1-17 updating the status of the State v. Cassidy litigation. |
| S-95 | 12-1-17 memorandum from DAG Analisa Sama Holmes to all County Prosecutors, the Director of DCJ, and Colonel Callahan, Acting Superintendent of NJ State Police attaching a copy of the Memorandum updating the status of the State v. Cassidy litigation (portion redacted) |
| S-96 | 12-1-17 memorandum from Supervising DAG Robert Czepiel to all County Prosecutors and all County Municipal Prosecutor Liaisons attaching a 11-3-17 letter he sent concerning allegations against Sergeant Marc Dennis, and attaching an Order dated 11-2-17 granting a stay an Order dated 11-28-17 supplementing that Order and outlining steps taken by the AG's Office |
| S-97 | 11-3-17 memorandum to all County Prosecutors setting forth allegations against Sergeant Marc Dennis and outlining procedures taken by Special Master Judge Joseph Lisa |
| S-98 | Copy of Order issued by Special Master Judge Lisa dated 11-2-17 staying certain proceedings |

| | |
|---|---|
| S-99 | Certification of Special DAG Robert Czepiel dated 10-17-17 in support of the State's motion for a stay |
| S-100 | Copy of Order dated 11-28-17 by Special Master Judge Lisa, supplementing the 11-2-17 Order |
| S-101 | Copy of letters dated 12-6-17 from Supervising DAG Robert Czepiel to County Prosecutors' Offices in Essex, Atlantic, Cape May, , Cumberland, Ocean, Sussex, Union, and Warren Counties enclosing thumb drives containing a master list of every individual identified as having provided a breath sample on a Dennis-calibrated Alcotest instrument; an Excel spreadsheet containing a list of individuals for whom the AOC was able to find a last known address of those individuals; and a list of municipal codes throughout the State.  The letter asks County Prosecutors to work with on identifying any affected cases in their County.   Also attached is the list of municipal codes. |
| S-102 | Calibration records of Sergeant Marc Dennis for municipalities in Middlesex County |
| S-103 | Calibration records of Sergeant Marc Dennis for municipalities in Monmouth County |
| S-104 | Calibration records of Sergeant Marc Dennis for NJ State Police Barracks Hamilton, Fort Monmouth, Cranbury, Holmdel, Carteret Marine, North Wildwood, Monmouth Station, Point Pleasant, Red Lion, Somerville |
| S-105 | Calibration records of Sergeant Marc Dennis for municipalities in Ocean County |
| S-106 | Calibration records of Sergeant Marc Dennis for municipalities in Somerset County |
| S-107 | Calibration records of Sergeant Marc Dennis for municipalities in Union County |
| S-110 | email dated 2-7-23 from Robert Scaliti of the Middlesex County Prosecutor's Office to DAG Thomas Clark, attaching a sheet, stating "This document has the number of the counted returned Cassidy notification letters I counted."  The attachment lists 818 returned letters from the 2017 mailing and 1,106 returned letters from the 2019 mailing. |
| S-111 | Email from Francine Mondi of the Middlesex County Prosecutor's Office dated 2-7-23, sending an email dated 1-22-19 from Diane Johnson of the Middlesex County |

| | |
|---|---|
| | Prosecutor's Office to Andrea Kolody of that office with a copy to Francine Mondi and Daniel Guerrero of that office stating "Below is a script to use in case you receive any calls regarding the DWI letters that were sent.  Last year Francine was inundated with calls so Brian developed this script to use again this year.  The script states: "Please be advised that aside from the letter you received, you can check our website . . . for further information.  The Middlesex County Prosecutor's Office cannot provide any legal advice concerning either State v. Cassidy or Sgt. Marc Dennis.  You must contact your own attorney.  Thank you." |
| S-112 | This exhibit is a copy of the transcript of a Case Management Conference conducted by Special Master Judge Joseph F. Lisa on July 13, 2017 in State v. Cassidy |
| S-113 | This exhibit is a copy of Case Management Order I issued by Special Master Judge Lisa dated July 13, 2017 |
| S-114 | This exhibit is a copy of the transcript of a Case Management Conference conducted by Special Master Judge Lisa on August 17, 2017 in State v. Cassidy |
| S-115 | This exhibit is a copy of Case Management Order II issued by Special Master Judge Lisa dated August 17, 2017. |
| S-116 | Excel Spreadsheet created by William Gronikowski of New Jersey State Police. entitled "Records11012005_01312018," containing all solution changes on Alcotest Instruments between 11-1-05 and 1-31-18, containing 64,999 lines on Sheet 1, one for each Alcotest Instrument (17,501 Pages), and 41,413 lines on Sheet 2 (11,159 Pages) for a total of (28,652 Pages) |
| S-117 | Spreadsheet entitled "Alcott.Copy of Zingis Project Spreadsheet 2-2-23" created by SFC Kevin Alcott of the New Jersey State Police, color-coded as follows:  Yellow: Solution Change not sequential after linearity test; Green: Documents Found; Red: Documents Not Found; and Blue: Documents Found But Not Complete – contains 1,328 Solution-Change lines all solution changes and calibrations performed by Sergeant Marc Dennis, containing 1,329 lines and 131 Columns (Fields) of information as to each Solution Change, columns AT through AW setting forth the name of the Operator who performed the Solution Change, based on the actual calibration documents provided on Thumb Drive |

| | |
|---|---|
| | #4 under cover letter 2-7-23 – This is a color-coded spreadsheet – as per the State's 2-23-23 Letter, line 458 is not correctly colored – while Column B should be in orange, the rest of that line should be in green, not orange. |
| S-118 | "ALCHO TEST RECORDS WITH MATCHING TICKETS IN ATS" .pdf file, obtained from the Administrative Office of the Courts. |
| S-119 | Additional Calibration Records, concerning Alcotest Instrument ARWA-0178, located in Linden Township – inadvertently omitted from Dennis Calibration Records contained on Thumb Drive #4, see Exhibit 107 |
| S-120 | These are additional records concerning solution changes and calibrations of Alcotest Instrument ARWA-0178, located in Linden City, accompanied by a single page inventory of those records – should be considered part of the Dennis Calibration records delivered on Thumb Drive #4 delivered by transmittal letter dated 2-7-23. |
| S-121 | Two (2) "Breath Testing Instrumentation Service Report" documents concerning Alcotest Instrument ARUL-0055, located at New Jersey State Police Station in Cranbury, New Jersey – the calibration of 5-16-11 does not appear on the "Spreadsheet of All Solution Changes from 11-01-08 through 1-09-16 because that Instrument failed to upload one solution change file from 5-31-2011 due to an error code, and returned to Draeger for repairs. Draeger replaced the microprocessor and the digital copy of this solution change file was then permanently lost. The 6-16-11 calibration does appear on that spreadsheet at line 25347. Filtering the spreadsheet by the instrument serial number discloses that the prior listed calibration was performed on 2-7-2011 (see Row 22134) |
| S-122 | Calibration records of Sergeant Marc Dennis, concerning Alcotest Instrument ARWE-0019 located at Winfield Township |
| S-123 | Calibration records of Sergeant Marc Dennis, concerning Alcotest Instrument ARXA-0056, located at Long Branch City |

384

| | |
|---|---|
| S-124 | Calibration records of Sergeant Marc Dennis, concerning Alcotest Instrument ARXB-0072, located in Tinton Falls Township |
| S-125 | Supplemental Certification of Deputy Attorney General Robyn Mitchell, with Exhibits, dated March 1, 2023 |
| S-126 | Revised, color-coded spreadsheet, entitled "Zingis Project Spreadsheet 2-24-2023," prepared by SFC Kevin Alcott of the New Jersey State Police showing all calibrations and solution changes by Sergeant Marc Dennis – replaces the color-coded spreadsheet provided in Exhibit 107 |
| S-128 | Excel Spreadsheet Excel Spreadsheet Notes, entitled "Alcott Sorted Spreadsheet Received From NJSP_27833 subject records" prepared by New Jersey State Police SFC Kevin Alcott, SQL Sheet containing 27833 lines sorted by Alcotest Instruments with 21 Columns of information, with columns for serial number of each instrument; calibration date; location of instrument; last name, first name and middle initial, date of birth, age, gender, weight, height and driving license number, and issuing state of each person tested; the case number; summons number; arrest date, time, and location; final error, if any; and End Result. Column C, "Calibration Date" has those columns colored-coded in RED indicating Alcotest Instruments Not Calibrated by Sergeant Dennis (436) and color-codes in GREEN for those Alcotest Instruments calibrated by Sergeant Dennis SQL Statement Sheet is the Query Code used to extract that information, |
| S-129 | Excel Spreadsheet entitled Álcott Spreadsheet Received from NJSP_27,833 subject records, with 21 Columns (Fields) of Information with Column C, "Calibration Date" color-coded in Green for Calibrations performed by Sergeant Dennis and color-coded in Red for Calibrations not performed by Sergeant Dennis, |
| S-130 | Excel Spreadsheet of calibration information from Alcotest Instrument Serial Number ARWJ-0019 located in North Plainfield Police Department |
| S-131 | Excel Spreadsheet of calibration information from Alcotest Instrument Serial Number ARWM-0086 located in Ocean Township Police Department |

385

| | |
|---|---|
| S-132 | Excel Spreadsheet of calibration information from Alcotest Instrument Serial Number ARXA-0061 located in Shrewsbury Police Department |
| S-133 | Excel Spreadsheet of calibration information from Alcotest Instrument Serial Number ARWM-0041 located in South Bound Brook Police Department |
| S-134 | Excel Spreadsheet of calibration information from Alcotest Instrument Serial Number ARWF-0403 located in West Long Branch Police Department |
| S-135 | Excel Spreadsheet of calibration information from Alcotest Instrument Serial Number ARUL-0058 located in Westfield Police Department |
| S-136 | March 2023 Affidavit of William Gronikowski, Supervisor, Information Technology, New Jersey State Police, with attached Exhibits. |
| S-137 | 3-6-23 Affidavit of William Donahue, retired civilian employee of New Jersey State Police, last job title, Supervising Management Improvement Specialist (Programming Unit Head), Information Technology with attached Exhibits. |
| S-138 | Amended Certification of Suzanne Musto, dated 2-13-23, Secretary at Somerset County Prosecutor's Office, concerning Cassidy notification letters, with attached Exhibit of sample notification letter dated 9-6-17, and 9-26-17 email from DAG Robyn Mitchell to Somerset County Assistant Prosecutor Anthony Parenti with attached Excel Spreadsheet of names and addresses of defendants in Somerset County who provided breath samples on Alcotest Instruments calibrated by Sergeant Marc Dennis |
| S-139 | Certification of Francine Mondi, undated, Administrative Assistant in Appellate Unit of Middlesex County Prosecutor's Office, concerning notification to Cassidy-affected defendants. |
| S-140 | Amended Certification of Michele Buckley, dated 3-8-23, Assistant Union County Prosecutor, amended certification contained in Exhibit 73. |
| S-141 | Letter from DAG Thomas Clark to the Court and all Counsel of Record concerning affected defendants in Hudson County, with attached Exhibit, two pages entitled "Alcho Test |

| | |
|---|---|
| | Records with Matching Tickets in ATS," and copy of 2-page email from Steven Somogyi to Thomas Clark dated 3-6-23 |
| S-142 | 1-24-23 Email from Steven Somogyi to the Court and to all Counsel of Record attached a copy of the "Alcho Test Records With Matching Tickets in ATS" for defendants in all municipalities, prepared by the Administrative Office of the Courts based on the list sent to Director Grant by the Office of Attorney General. |
| S-144 | Email to the Court and all Counsel of Record from DAG Rachuba attaching two form Cassidy notification letters from the Union County Prosecutor's Office as additional attachments to Assistant Union County Prosecutor's Amended Certification dated 3-8-23 |
| S-145 | Email to the Court and all counsel of Record containing Certification of Charles Prather, dated 3-13-23, an independent contractor working for the AOC concerning preparation of the spreadsheet of matching Alcotest Addresses from ATS records of AOC on Subject Defendants contained on Excel Spreadsheet received by AOC from the DCJ |
| S-146 | Judiciary Cassidy website. |
| S-147 | Handwritten Notes by DAG Robyn Mitchel concerning CD-rom containing spreadsheet received by DAG Robyn Mitchell from New Jersey State Police (NJSP) containing 27,833 subject lines and 21 columns identified by NJSP as names of defendants who provided breath samples on Alcotest Instruments calibrated by Sergeant Marc Dennis. |
| S-148 | Excel Spreadsheet entitled "5925_Spreadsheet_ Final.xslx," sent to DAG Mitchell at DCJ from NJSP, containing 27,833 lines (including title of column) and 21 Columns identified, as names of defendants who provided breath samples on Alcotest Instruments calibrated by Sergeant Marc Dennis, including some subjects who refused to provide breath samples and some control test failures. This is the same as Exhibit S-90. |
| S-149 | Copies of emails between William Gronikowski and SFC Kevin Alcott of NJSP concerning the search for records relating to ▮▮▮▮▮▮▮. |

| | |
|---|---|
| S-150 | Excel Spreadsheet entitled, "Subjectsfrom12262009 _12282009" that William Gronikowski of NJSP delivered to Kevin Alcott of NJSP containing a search of records between December 26, 2008 and December 28, 2008 of defendants providing breath samples on Alcotest Instruments in New Jersey, containing 363 lines (including title of column) and Columns of information, A through KZ, |
| S-151 | Excel Spreadsheet entitled, "Records11012004_ 12312022" containing 147,482 subject records, by Alcotest Instrument, and 128 Columns (Fields) of information, placed by William Gronikowski of the NJSP on the New Jersey State Police computer network at the request Sergeant Alcott of the NJSP in February 2023 consisting of calibration and solution changes of all Alcotest Instruments, from November 1, 2004 through December 31, 2022, Column "H" stating the Calibration Date, Column "Q" the Solution Change Date, and Columns "AO through AR" the identity of the Operator performing those functions. |
| S-152 | Excel Spreadsheet entitled, "Subjectsfrom11052008 _06302016" containing 236,664 subject records from November 5, 2008 through June 30, 2016, of all subject defendants tested, with the same 20 columns as appearing in the original spreadsheet that the NJSP delivered to the Division of Criminal Justice with the Office of the Attorney General in 2016, as required by the March 29, 2023 Order entered by the Special Master. |
| S-153 | Certification of Holy Lees, employee of the Division of Criminal Justice concerning mailings sent to defendants. |
| S-154 | Contains 760 email items, consisting of message, or chains of messages, concerning the daily or weekly itinerary of Sergeant Marc Dennis covering the period November 20, 2009 through October 7, 2015, which were retrieved from archived records of the NJSP. |
| S-155 | An email chain from the NJSP dated 4-12-23 concerning the search concerning the spreadsheets testified by William Donahue he created entitled "5925_Spreadsheet_Final.xlsx" and "20190124CerttestsRecs11-01-08thru1-09-16." |
| S-156 | Certificate dated March 14, 2023, from Drager, certifying Kevin Alcott as successfully completing two-day Draeger Safety Diagnostic, Inc. Alcohol Coordinator Training Course |

| | |
|---|---|
| | on the New Jersey specific Alcotest 7110 MKIII-C, qualifying him as an Operator Trainer and Maintenance Technician qualified to train and certify Operators in the proper use and operation as well as perform Preventative Maintenance on the Alcotest 7110 MKIII-C. |
| S-157 | Certificate of Completion, dated 6-8-21 from Drager, certifying that Kevin Alcott successfully completed the two-day Drager, Inc. Operator Training and Technician Course on the New Jersey-specific Draeger Alcotest 9510, certifying him as a qualified Operator Trainer and Maintenance Technician to train and certify Operators in the proper use and operation of the Drager Alcotest 9510 and to perform maintenance on same. |
| S-158 | November 15, 2022 Drager Record of Attendance of Kevin Alcott regarding attendance at the two-day Licensed New Jersey Attorney and Expert Course on the New Jersey-specific Drager Alcotest 9510. |
| S-159 | Copy of email dated 4-17-23 from Thomas Russo, Esq of the AOC to DAG Clark stating "A review of the AOC's records indicates that 35 mailings were returned as being undeliverable. We should have a response re: the code issue by the end of this week." |
| S-160 | Copy of State v. Tischio, 107 N.J. 504 (1987) |
| S-163 | Copy of 10-21-08 Memorandum from SDAG Hester Agudosi, Chief of Prosecutors Supervision and Coordination Bureau to Attorney General Anne Milgram submitting a request by State Police Superintendent Fuentes for certification of Marc Dennis as a "Breath Test Coordinator/Instructor. |
| S-164 | Copy of 11/17/08 Memorandum from DAG John Dell'Aquilo to Boris Moczula, Acting Director of DCJ attaching a copy of the final version of the letter signed by Attorney General Anne Milgram approving March Dennis as a Breath Test Coordinator/Instructor. |
| S-165 | Copy of Memorandum, dated December 24, 2008, from DAG John Dell'Aquilo to All Municipal Prosecutors Supervisors and All Municipal Prosecutors concerning available training by Drager Safety Diagnostics, Inc. to New Jersey licensed attorneys and experts. |

| | |
|---|---|
| S-166 | Copy of a print-out record from NJSP relating to DAG John Dell'Aquilo concerning his certification as a Breathalyzer Instructor on dates ranging from 9/21/1979 to 4/15/2002. |
| S-167 | Certification of DAG Robyn B. Mitchell dated 5-9-23 clarifying that the name of the Excel Spreadsheet on the CD-rom received from the NJSP labeled "5925_Spreadheet_Final.xlsx" (Exhibit S-148) and Excel Spreadsheet provided by the State in discovery, named "Spreadsheet Received from NJSP_28,833 subject records.xlsx (Exhibit S-90), are identical in content. |
| S-168 | 4/27/23 Email from Thomas Russo, Esq., counsel for the AOC, authored by Susanna J. Morris, Esq., counsel for the AOC, stating that a review of the AOC's records revealed that 13,618 notices were mailed to Cassidy-affected defendants on July 14, 2021; that of those, 2,844 notices were returned from the U.S. Postal Service to the AOC as being undeliverable; that 64 of those returned notices were re-mailed using a new address provided by the U.S. Postal Service, and. of those 64, 2 were returned to the AOC as being undeliverable; and 34 of those 64 notices were re-mailed based upon the AOC support staff's belief that an incorrect zip code had been utilized and, of those 64, 25 were retuned to the AOC as being undeliverable. An Excel Spreadsheet is attached. The AOC has also located several boxes of returned mailings in storage, but the exact number was unknown at the time of this email. |
| S-169 | Transcripts of testimony of NJSP Sergeant Kevin M. Flanagan in State v. Chun hearing before Special Master Michael P. King, P.J.A.D., Retired, On Recall, on November 27, 2006, November 28, 2006, December 4, 2006, and December 5, 2006, the State being represented by DAG John J. Dell'Aquilo. |
| S-170B | Copy of an email from DAG Clark to Susanna Morris, Esq, and Thomas Russo, Esq., counsel for the Administrative Office of the Courts, dated 5-10-23, stating that 23 defendants were identified during the Zingis hearings who provided breath samples on Alcotest Instruments calibrated by Sergeant Marc Dennis but were not included on the original Excel Spreadsheet provided by the New Jersey State Police to the Division of Criminal Justice (S-90 in evidence). |

| | |
|---|---|
| | DAG Clark further stated "3 of the persons in that group received Notice based on other arrests, 2 did not produce a driver's license, 8 people did not have any reading for various reasons, or a reading of zero. I attach an exhibit listing those instances. DAG Clark then asked whether addresses could be extracted from the Automatic Traffic System (ATS) database for eleven of those defendants. |
| S-170C | Copy of a reply email to DAG Clark dated 5-10-23 from Susanna Morris, Esq. stating she and Mr. Russo would review his email and get back to him |
| S-170D | Copy of an email from DAG Clark to Susanna Morris, Esq. and Thomas Russo, Esq., dated 5-24-23, asking for an answer to his 5-10-23 email, and adding the names and driver's license numbers for three additional defendants. DAG Clark also stated: "I separately sent Tom [Russo] noting that while he wrote an email to Judge Fall that [the] AOC originally (July 2021) mailed out 13,618 notices, [the] AOC only delivered 13,615 individual Notice letters that were sent out. Is there an explanation for the discrepancy?" |
| S-170E | Copy of an email from Susanna Morris, Esq. to DAG Clark dated 6-1-23, stating in relevant part: "Attached please find the address information that the AOC was able to locate for the individuals you provided to us in your May 24, and May 10, 2023 emails. As to your request for information regarding the discrepancy on the mailing, please note that the AOC has closely reviewed the matter, however, it cannot explain the reason with any degree of certainty the reason for the discrepancy in numbers concerning the mailed notices. It can only speculate as to possible reasons, which, needless to say, would not serve any meaningful purpose in this matter." |
| S-170F | A two-page list from the AOC, attached to the referenced 6-1-23 email, concerning the results of the requested search of addresses for the defendants requested by DAG Clark. The list contains information for twenty-three (23) defendants with the following columns of information: Defendant's name; Date of Arrest; Municipality of the Violation; Last Known Address; Case Adjudicated? (Y/N); Finding; Date Adjudicated. |
| S-171A | Letter from DAG Clark to the Court, copies to all counsel, supplementing the State's May 1, 2023 Letter concerning the |

| | |
|---|---|
| | testimony of Sergeant Kevin Alcott, stating that "In connection with DB-7, a calibration record pertaining to Alcotest Instrument ARUL-0055, Sergeant Alcott has discovered that S-152, the Subject Record spreadsheet created by William Gronikowski, included inaccurate information on the arrest date for two rows, line 61343 ███████████████ and line 61346 ███████████████. |
| S-171B | Spreadsheet prepared by Sergeant Alcott on June 8, 2023 highlighting in Yellow Row 40 ███████████ and Row 37 ██████████ |
| S-172 | Copy of Website of Helmer, Conley & Kasselman Law Firm |
| DB-1A | Printout showing the 310 columns (fields) of data in the Alcotest Subject records database |
| DB-1B | Printed (and attached end-to-end, 45 pages) to show 310 columns of data in the Alcotest Subject Records Table with "Yellow" highlight on the 290 columns not included in the Excel Spreadsheet submitted by the State in discovery. |
| DB-1C | Printing of first 25 rows (and attached end-to-end, 3 pages) of the Excel Spreadsheet submitted by the State in discovery showing the 20 fields, or columns. |
| DB-2 | Copy of Easel drawing showing two separate tables in the State's Alcotest Inquiry System: (1) Alcotest Subject Records; and (2) Alcotest Instrument Records. |
| DB-3 | Printout showing the 310 columns (fields) called for by William Donahue in his "SQL" query of Alcotest Subject records. |
| DB-4 | Alcotest 7110 MKIII-C New Jersey State Police "User Manual Operator" |
| DB-5 | Four Sample "Alcohol Influence Reports. |
| DB-6 | Copy of the "Alcotest 7110 Calibration Record, signed by Marc Dennis on 6-10-09 as to Edison Township Alcotest Instrument ARLD-0012, which record nis not contained within the 68,450 spreadsheet utilized by the State to constitute the "Cassidy List" – identified by Thomas Snyder during his testimony. |
| DB-7 | Copy of the "Alcotest 7110 Calibration Record, signed by Marc Dennis on 5-16-11 as to Cranbury Township Alcotest Instrument ARUL-0055, which record is not contained within the 68,450 spreadsheet utilized by the State to |

| | |
|---|---|
| | constitute the "Cassidy List" – identified by Thomas Snyder during his testimony. ( |
| DB-8 | Copy of the "Alcotest 7110 Calibration Record, signed by Marc Dennis on 3-26-13 as to Kean University Police Alcotest Instrument ARWC-0020, which record is not contained within the 68,450 spreadsheet utilized by the State to constitute the "Cassidy List" – identified by Thomas Snyder during his testimony. |
| DB-9 | Copy of the "Alcotest 7110 Calibration Record, signed by Marc Dennis on 7-15-13 as to Monmouth Station Alcotest Instrument ARWC-0064, which record is not contained within the 68,450 spreadsheet utilized by the State to constitute the "Cassidy List" – identified by Thomas Snyder during his testimony. |
| DB-10 | Copy of S-90, State's "Cassidy List," utilized during cross-examination of Thomas Snyder concerning D-6 through D-9. |
| DB-11 | Copy of Case Management Order II issued by Cassidy Special Master Judge Lisa dated 8-17-17. |
| DB-12 | Copy of State's Excel "5925_Spreadsheet_Final" (from State's Thumb Drive #8) containing 27,833 lines of data, 21 columns (fields) |
| DB-13 | Printed version of SQL query statement from DB-12 (Excel "5925-Spreadsheet Final" with 19 serial numbers. |
| DB-14 | Copy of State's Excel spreadsheet "Subjectsfrom12262008_12282008" (from State's Thumb Drive #8 with 363 lines on 576 pages) |
| DB-15 | Quote from State v. Chun, 194 N.J. 54, at 104-105 (2008) |
| DB-16 | Quote from State v. Tischio, 107 N.J. 504, at 522 (1987). |
| DB-17 | Table of the State's 27,833 subject records in MS Access Format, sorted by Driver's Licenses (ascending), then Last Name (ascending) the First Name (ascending), then Arrest Date (ascending), then Arrest Time (ascending). |
| DB-18 | Screenshot of the sorting being utilized in DB-17. |
| DB-19 | Import of DB-17 into MS Excel Format (sorting of 27,833 records by "DL_Last_First_ArrestDate_ArrestTime,") |
| DB-20 | Drager Certificate certifying that DAG John J. Dell'Aquilo successfully completed the 2-day Draeger Safety Diagnostic, Inc. Operator Training and Preventative Maintenance course on the New Jersey Specific Alcotest 7110 MKIII-C and is |

| | |
|---|---|
| | certified as a Qualified Trainer and Maintenance Technician qualifying him to train and certify Operators in the proper use and operation as well as perform Preventative Maintenance on the Alcotest 7110 MKIII-C. |
| DB-21 | Calibration Record of Alcotest 7110 MKIII-C machine, serial number ARWF-0400, in Highlands Borough, dated 3-8-12, signed by NJSP Trooper Marc Dennis, which is not included in the 27,833 records sent by the ATDU Unit of the NJSP to the DCJ. |
| DB-22 | Calibration Record of Alcotest 7100 MKIII-C machine, serial number ARWF-0356, in Warren Township, dated 1-22-09, signed by NJSP Trooper Marc Dennis, which is not included in the 27,833 records sent by the ATDU Unit of NJSP to the DCJ. |
| DB-23 | Spreadsheet identified by DAG Robyn Mitchell as subject test records as not included in 27,833 subject test records sent to her by the ADTU Unit of the NJSP, initialed by DAG Mitchell. |
| DB-24A | Email dated 9-26-17 from DAG Mitchell to Assistant Ocean County Prosecutor Kim Pascarella attaching Excel Spreadsheet of names and addresses of individuals who provided breath samples on Alcotest instruments calibrated by Sergeant Marc Dennis for mailing of Notice on template letter provided by DCJ. |
| DB-24B | Email dated 9-26-17 from DAG Mitchell to Assistant Somerset County prosecutor Anthony Parenti attaching Excel Spreadsheet of names and addresses of individuals who provided breath samples on Alcotest instruments calibrated by Sergeant Marc Dennis for mailing of Notice on template letter provided by DCJ. |
| DB-24C | Email dated 9-26-17 from DAG Mitchell to Assistant Monmouth County Prosecutor Monica do Outeiro attaching Excel Spreadsheet of names and addresses of individuals who provided breath samples on Alcotest instruments calibrated by Sergeant Marc Dennis for mailing of Notice on template letter provided by DCJ. |
| DB-27 | 6/9/23 Letter to Court from Mr. Gold, copies to all Counsel, attaching proposed Exhibits, "Dennis Calibration Repository," "Notes on Dennis Calibration Repository," |

394

| | |
|---|---|
| | "Zingis Index," and "Notes on Zingis Index," explaining they are joint Exhibits with amicus, Office of the Public Defender, and enclosing Thumb Drive containing same to the Court. |
| DB-32 | Color Photo of CU-34 Simulator. |
| DB-33 | Copy of extract from testimony of DAG Robyn Mitchell during Zingis Plenary Hearing conducted on March 28, 2023, pages 127-128. |
| DB-34 | Excel Spreadsheet of 111 Subject Defendants not contained on S-90 Excel Spreadsheet of 27,833 Subject Defendants represented to having provided breath samples on Alcotest Instruments calibrated by Sergeant Marc Dennis, containing 111 Subject Rows and 23 Columns (Fields) of information. |
| DB-35 | Excerpt from State v. Cassidy decision, pages 78-79. |
| DB-36 | Page 11 of Drager Operator's Manual, which is DB-4 in Evidence. |
| DB-37 | Excel Spreadsheet entitled 08-17 (27K Reduction Table)" containing screen shots of 111 Subject Defendants not on S-90. |
| DB-38 | Example of Alcotest 7110 Calibration Record (Serial Number ARWA-0188, Hillsborough Township Police, with calibration date of 11-14-08) extracted from DB/DPD-31, shown to SFC Kevin Alcott during his testimony. |
| DB-39 | Example of "Missing Signed Calibration Certificate" confirming, from the Alcotest Inquiry System database that calibration of Alcotest Instrument Serial Number ARWA-0180 in Summit Police Department on 10-27-14 was likely performed by Sergeant Marc Dennis, extracted from DB/DPD-31, shown to SFC Kevin Alcott during his testimony. |
| DB/DPD-28 Joint Exhibit | 6/9/23 Thumb Drive- Joint Exhibit – pdf. File entitled "Dennis Calibration Repository" consisting of 1,047 files, each evidencing a calibration record of an Alcotest Instrument by Sergeant Marc Dennis from November 14, 2008 through October 9, 2015, with a total of (1,069 PAGES).  BY YEAR: 2008: 29; 2009: 137; 2010: 143: 2011: 152; 2012: 133; 2013: 123; 2014: 212; 2015: 140. Consists of 1,069 pages |

| | |
|---|---|
| DB/DPD-29 Joint Exhibit | 6/9/23 Thumb Drive – Joint Exhibit – Excel Spreadsheet entitled "Zingis Index" – this contains 27,426 subject defendant Rows and 22 Columns (Fields) of information for each row – those Columns (Fields) are as follows: A: ROW IN STATE 27,833 EXCEL SPREADSHEET; B: ARREST DATE; C: DRIVER'S LICENSE NUMBER; D: SUBJECT'S LAST NAME; E: SUBJECT'S FIRST NAME; F: SUMMONS NUMBER; G: LOCATION OF ALCOTEST; H: SERIAL NUMBER OF ALCOTEST INSTRUMENT; I: CALIBRATION DATE; J: SUBJECT'S MIDDLE INITIAL; K: SUBJECT'S DATE OF BIRTH; L: SUBJECT'S AGE; M: SUBJECT'S GENDER; N: SUBJECT'S WEIGHT; O: SUBJECT'S HEIGHT; P: ISSUING STATE OF DRIVER'S LICENSE; Q: CASE NUMBER; R: ARREST DATE; S: ARREST TIME; T: ARREST LOCATION; U: FINAL ERROR; V: END RESULT OF TEST.  Consists of 5,148 pages |
| DB/DPB-30 Joint Exhibit | Joint Exhibit Entitled: "Notes on 'Zingis Index'" to the Repository. |
| DB/DPD-31 | Joint Exhibit Entitled: "Notes on the 'Dennis Calibration Repository.'" |
| DPD-1 | Text of the cell located in the second spreadsheet (labeled "SQL Statement) of States Exhibit S-90 (the 27,833 Alcotest records), copies and pasted into a Microsoft Word document for reference. |
| DPD-2 | (A) Municipal Court Case Search (MCCS) Ticket Detail: ▮▮▮▮▮▮▮▮▮ (B) Municipal Court Case Search (MCCS) Ticket Detail: ▮▮▮▮▮▮ (C) Municipal Court Case Search (MCCS) Ticket Detail: ▮▮▮▮▮▮▮▮ (D) Municipal Court Case Search (MCCS) Ticket Detail: ▮▮▮▮▮▮▮▮ |
| DZ-1 | Copy of Draeger "User Manual – Technical" of New Jersey State Police for Alcotest 7110 MKIII-C. |
| DZ-2 | Memorandum dated June 29, 2018, signed by DAG Robert Czepiel, sent to all County Prosecutors. |
| A Also, S-59 | August 31, 2022 Case Management Order entered by Judge Fall |

| | |
|---|---|
| B | September 30, 2022 Public Defender's Motion to participate as *Amicus Curiae* |
| C | September 30, 2022 First Discovery Demands by Defendant-Respondent, Thomas Zingis |
| D | October 6, 2022, State's request for an extension of time to reply to discovery demands |
| E | October 12, 2022, Motion by New Jersey State Bar Association For Leave to Participate as *Amicus Curiae* |
| F | October 21, 2022, Submission of State concerning request for discovery and applications to participate as *Amici Curiae* |
| G | October 21, 2022, Reply by NJSBA to submissions by the State |
| H | October 27, 2022, response by Office of Public Defender to State's brief concerning its *Amicus Curiae* application |
| I<br>Also, S-61 | December 5, 2022 Order of Judge Fall, granting the *Amicus Curiae* applications, scheduling argument on discovery issues, and setting a second case management conference |
| J | December 20, 2022 email from NJSBA outlining its position on discovery issues |
| K<br>Also, S-53 | December 27, 2023 Order entered by Judge Fall, adjudicating discovery issues and scheduling plenary hearing |
| L | January 3, 2023, requests by Office of Public Defender for additional discovery |
| M | January 4, 2023, requests by NJSBA for additional discovery |
| N<br>Also, S-71 | January 3, 2023, request by the State to reconsider a portion of discovery determination in December 27, 2022 Order |
| O<br>Also, S-64 | January 9, 2023, opposition letter brief by State to additional discovery requests |
| P | January 9, 2023, email from Office of Public Defender responding to the State's opposition to additional discovery |
| Q | January 10, 2023, letter brief from NJSBA, responding to State's opposition to additional discovery, and to State's reconsideration application |
| R<br>Also, S-67<br>and S-68 | January 12, 2023, letter brief and certification from State, requesting this court to review work records of Sergeant Dennis, <u>in</u> <u>camera</u> |
| S<br>Also, S-69 | January 16, 2023, letter brief from NJSBA concerning additional discovery and work records of Sergeant Dennis |

| | |
|---|---|
| T<br>Also, S-50<br>and S-51 | January 17, 2023, Letter Opinion and Order entered by Judge Fall determining discovery issues and rescheduling the plenary hearing |
| U<br>Also, S-33<br>and S-66 | January 19, 2023, Letter Opinion and Order entered by Judge Fall concerning work records of Sergeant Dennis |
| V | February 6, 2023, Defendant-Respondent's request for additional discovery and this court's denial of same |
| W | February 6, 2023, submission by the State of list of witnesses and summaries of proposed testimony |
| X | February 9, 2023, letter from NJSBA requesting adjournment of plenary hearing date |
| Y | February 9, 2023, letter from State concerning adjournment request |
| Z | February 13 2023, request of NJSBA and Office of Public Defender for Protective Order for access private portion of Alcotest Inquiry System database |
| AA | February 13, 2023 and February 22, 2023 objections by the State to proposed Protective Order |
| AB | February 22, 2023, response by NJSBA to State's objection to proposed Protective Order |
| AC | February 22, 2023, request by Office of Public Defender that State provide sworn statements from its proposed witnesses in advance of plenary hearing |
| AD | February 22, 2023, position of NJSBA concerning sworn statements in advance of plenary hearing |
| AE | February 21, 2023, request by AOC for Protective Order concerning personal identification information to be disclose in discovery and at the plenary hearing |
| AF | February 22, 2023, Protective Order entered by Judge Fall concerning personal identification information disclosed in discovery and during plenary hearing |
| AG | February 27, 2023, letter from the State containing notice, pursuant to N.J.R.E. 807, concerning admission of "Public Records, Reports and Findings" in accordance with N.J.R.E. 803(c)(8) |

| | |
|---|---|
| AH | February 28, 2023, Letter Brief of State concerning testimony from witnesses Donahue, Gronikowski, and Prather |
| AI | February 28, 2023, Office of Public Defender's position concerning access to private portion of the Alcotest Inquiry System database |
| AJ | February 28, 2023, Reply by NJSBA concerning access to private portion of database |
| AK | March 1, 2023, Letter Brief from State concerning its opposition to access to private portion of database |
| AL | March 1, 2023, additional Reply by NJSBA concerning access to private portion of database |
| AM | March 2, 2023, Letter Opinion and Order entered by Judge Fall, requiring State to provide sworn statements of witnesses Donahue, Gronikowski, and Prather in advance of plenary hearing, and reserving on issue of access to private portion of database |
| AN | March 3, 2023, submission by State of summary of testimony to be provided at the plenary hearing by DAG Mitchell and SFC Alcott |
| AO | July 17, 2023, Proposed Findings of Fact and Conclusions of Law submitted by the State |
| AP | July 17, 2023, Proposed Findings of Fact and Conclusions of Law submitted on behalf of Defendant-Respondent, Thomas Zingis |
| AQ | July 17, 2023, Proposed Findings of Fact and Conclusions of Law submitted by *Amicus Curiae*, the New Jersey State Bar Association |
| AR | July 17, 2023, Proposed Findings of Fact and Conclusions of Law submitted by the New Jersey Office of Public Defender |
| AS | March 29, 2023 Letter Opinion and Order of Judge Fall re: Access to Private Portion of Alcotest Inquiry System database |

## EXHIBIT III – <u>TRANSCRIPTS</u>

| NUMBER | DATE |
|--------|------|
| T1 | March 20, 2023 |
| T2 | March 21, 2023 |
| T3 | March 22, 2023 |
| T4 | March 28, 2023 |
| T5 | April 25, 2023 |
| T6 | April 26, 2023 |
| T7 | April 27, 2023 |
| T8 | June 12, 2023 |
| T9 | June 13, 2023 |
| T10 | June 14, 2023 |